**23-2267**

# United States Court of Appeals for the Federal Circuit

FRAUNHOFER-GESELLSCHAFT ZUR FORDERUNG DER ANGEWANDTEN FORSCHUNG E.V.,

*Plaintiff-Appellant,*

– v. –

SIRIUS XM RADIO INC.,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the District of Delaware in No. 1:17-cv-00184-JFB-SRF Honorable Joseph F. Bataillon, Senior Judge*

## BRIEF FOR PLAINTIFF-APPELLANT

BEN J. YORKS
DAVID C. MCPHIE
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, California 92660
(949) 760-0991
byorks@irell.com
dmcphie@irell.com

*Counsel for Plaintiff-Appellant*

NOVEMBER 9, 2023

COUNSEL PRESS (800) 4-APPEAL • (713087)

## CERTIFICATE OF INTEREST

Counsel for Appellant Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V. certifies the following:

1. The full name of every party or amicus represented by me is:

   Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V.

2. The name of the real party in interest represented by me is:

   Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   IRELL & MANELLA LLP
   Morgan Chu
   Kamran Vakili
   Nima Hefazi
   Heather Benzmiller Sultanian
   Alexis Federico
   Josh Woods

   FARNAN LLP
   Brian E. Farnan
   Michael J. Farnan

   SHULMAN HODGES & BASTIAN LLP
   LOBEL WEILAND GOLDEN FRIEDMAN LLP
   Alan J. Friedman

5. Other than the originating case, any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

None.

6. Organizational Victims and Bankruptcy Cases:

Not applicable.

Respectfully submitted,

Dated: November 9, 2023 */s/ Ben J. Yorks*

Ben J. Yorks
David C. McPhie
IRELL AND MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6324
Telephone: 949-760-0991

*Attorneys for Appellant*
*Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V.*

# TABLE OF CONTENTS

**Page**


STATEMENT OF RELATED CASES ........ 1

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUES ........ 2

INTRODUCTION AND STATEMENT OF THE CASE ........ 3

A. Fraunhofer Is Awarded Patents For Its Innovations In Satellite Radio Technologies ........ 4

B. Fraunhofer Licenses Its Satellite Radio Patents To WorldSpace ........ 5

C. XM Enters Into Sublicense With WorldSpace To Gain Access To Fraunhofer's Patents For Use In XM's Satellite Radio Service ........ 6

D. XM And Sirius Merge But Continue To Operate Their Distinct Satellite Radio Systems ........ 7

E. WorldSpace Files For Bankruptcy, Settles Payment Disputes With XM, And Enters Into Agreement With Fraunhofer To Terminate The Master License ........ 9

F. Fraunhofer Is Prompted To Investigate Status Of The Sublicense And Files An Infringement Lawsuit After SXM Refuses Meeting To Discuss Licensing ........ 11

G. The Federal Circuit Rejects SXM's Motion to Dismiss Based On The Sublicense And The Parties Proceed With Discovery On Remand ........ 13

H. On Summary Judgment, The District Court Again Concludes SXM Has A License As A Matter Of Law, And Denies As "Moot" Fraunhofer's Motions On Its Other Liability Theories ........ 15

SUMMARY OF ARGUMENT ........ 16

**Page**

STANDARD OF REVIEW ........................................ 20

ARGUMENT ........................................ 21

I. SUMMARY JUDGMENT WAS IMPROPERLY GRANTED AS SXM FAILED TO PRESENT UNDISPUTED FACTS PROVING AN IMPLIED LICENSE AS A MATTER OF LAW ........................................ 21

A. SXM Failed To Establish Any Conduct By Fraunhofer Necessarily Giving Rise To A Misleading Inference ............ 22

1. SXM Did Not Present Evidence Sufficient To Satisfy Its Burden To Prove Misleading Conduct ........................................ 23

2. SXM Did Not Establish That The Only Possible Inference Was That Fraunhofer Misled SXM ............ 28

3. Other Factual Disputes Render Summary Judgment For SXM Improper, Including Whether Fraunhofer Had A "Clear Duty To Speak" ........................................ 31

B. SXM Failed To Establish Reliance On Any Allegedly Misleading Conduct By Fraunhofer ........................................ 33

1. SXM Did Not Present Evidence Of Reliance ............ 33

2. The Evidentiary Record Affirmatively Demonstrates SXM Did Not Rely On Any Allegedly Misleading Conduct By Fraunhofer ........... 37

3. Other Factual Disputes Render Summary Judgment For SXM Improper, Including Whether The Low-Band System Presented A Viable Alternative To Infringement ............................ 39

C. SXM Failed To Establish Any Prejudice To SXM Caused By Fraunhofer's Allegedly Misleading Conduct ........................................ 41

**Page**

D. The Existence Of An Express License On The Same Subject Precludes Any Finding Of An Implied License Here ........ 45

E. The Other Rationales Presented In The Order Fail To Support The Finding Of Summary Judgment ........ 48

II. FRAUNHOFER'S CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED IN VIEW OF SXM'S FAILURE OF PROOF ........ 52

III. THE SUMMARY JUDGMENT ORDER FAILED TO PROPERLY ADDRESS FRAUNHOFER'S OTHER THEORIES OF LIABILITY, WHICH SHOULD BE RESOLVED ON REMAND ........ 54

A. Remand Is Needed To Consider Fraunhofer's Alternative Theory That The MLA And Sublicense Terminated In 2015 ........ 55

B. Remand Is Needed To Consider Fraunhofer's Independent Theory That SXM Never Received Any Rights Under The Sublicense Because It Was Not Properly Assigned To SXM ........ 57

IV. THE DISTRICT COURT ERRED IN DENYING FRAUNHOFER'S PRIVILEGE CLAIMS ON THE LEGALLY INCORRECT THEORY THAT A PATENTEE AND POTENTIAL LICENSEE CANNOT HAVE A COMMON INTEREST UNTIL A LICENSE IS EXECUTED ........ 59

CONCLUSION ........ 62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) ....................*passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................20

*Atlas Corp. v. United States*,
895 F.2d 745 (Fed. Cir. 1990) ....................45, 46, 47

*B. Braun Med., Inc. v. Abbott Lab'ys*,
124 F.3d 1419 (Fed. Cir. 1997) ....................27, 32, 51

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*,
750 F. 2d 903 (Fed. Cir. 1984) ....................21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................52, 53

*Crane Sec. Techs., Inc. v. Rolling Optics*,
230 F. Supp. 3d 10 (D. Mass. 2017)....................61

*Endo Pharms. Inc. v. Actavis, Inc.*,
746 F.3d 1371 (Fed. Cir. 2014) ....................45, 46, 47

*Ferring B.V. v. Allergan, Inc.*,
980 F.3d 841 (Fed. Cir. 2020) ....................58

*Fin Control Sys. Pty, Ltd. v. OAM, Inc.*,
265 F.3d 1311 (Fed. Cir. 2001) ....................56, 57, 59, 60

*Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V. v. Sirius XM Radio Inc.*,
940 F.3d 1372 (Fed. Cir. 2019) ....................*passim*

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,
60 F.3d 770 (Fed. Cir. 1995) ....................20, 35, 41

**Page**

*Hall v. Aqua Queen Mfg., Inc.*,
93 F.3d 1548 (Fed. Cir. 1996) ....................................................*passim*

*Heat and Control, Inc. v. Hester Indus., Inc.*,
785 F.2d 1017 (Fed. Cir. 1986) ....................................................21

*Hemstreet v. Comput. Entry Sys. Corp.*,
972 F.2d 1290 (Fed. Cir. 1992) ....................................32, 38, 41, 42

*High Point Sarl v. Sprint Nextel Corp.*,
67 F. Supp. 3d 1294 (D. Kan. 2014)...............................................47

*High Point Sarl v. Sprint Nextel Corp.*,
817 F.3d 1325 (Fed. Cir. 2016) ....................................23, 39, 46, 47

*Hilsinger Co. v. Eyeego, LLC*,
2015 WL 11120842 (D. Mass. Aug. 13, 2015)...................................61

*Hon Hai Precision Indus. Co. v. Asia Vital Components Co.*,
2004 WL 5806997 (C.D. Cal. Feb. 12, 2004) ...............................39, 40

*John Bean Techs. Corp. v. Morris & Assocs., Inc.*,
887 F.3d 1322 (Fed. Cir. 2018) ....................................................20

*Meyers v. Asics Corp.*,
974 F.2d 1304 (Fed. Cir. 1992) ....................................................*passim*

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014)....................................................................48, 49

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
597 F.2d 1090 (6th Cir. 1979) ....................................................57

*Radio Sys. Corp. v. Lalor*,
709 F.3d 1124 (Fed. Cir. 2013) ...............................................25, 55

*In re Regents of Univ. of Cal.*,
101 F.3d 1386 (Fed. Cir. 1996) ...............................................60, 61

*Relume Corp. Tr. v. GE Lighting Sols., LLC*,
2013 WL 6979467 (D. Del. Dec. 30, 2013) .....................................57

**Page**

*Ricoh Co. v. Nashua Corp.*,
185 F.3d 884 (Fed. Cir. 1999) ....................................................................56

*SCA Hygiene Prods. v. First Quality Baby Prods.*,
580 U.S. 328 (2017)....................................................................22, 48, 49

*SCA Hygiene Prods. v. First Quality Baby Prods.*
807 F.3d 1311 (Fed. Cir. 2015) ....................................................................22

*SCA Hygiene Prods. v. First Quality Baby Prods.*,
767 F.3d 1339 (Fed. Cir. 2014) ....................................................................*passim*

*Sprint Commc'ns Co. v. Time Warner Cable, Inc.*,
2017 WL 978107 (D. Kan. Mar. 14, 2017) ..........................................32, 38, 40

*Stickle v. Heublein, Inc.*,
716 F.2d 1550 (Fed. Cir. 1983) ..........................................................32, 47, 52

*TC Tech. LLC v. Sprint Corp.*,
2018 WL 6584122 (D. Del. Dec. 13, 2018) ..................................................61

*Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*,
103 F.3d 1571 (Fed. Cir. 1997) ..........................................................20, 25, 45

**Statutes**

28 U.S.C. § 1292(c)(2)........................................................................1, 5, 6

28 U.S.C. § 1338(a) ..............................................................................................1

35 U.S.C. § 286..........................................................................................48, 49, 50

**Rules**

Fed. R. Civ. P. 36 ...............................................................................................1

## STATEMENT OF RELATED CASES

This case and related matters have previously been before this or another appellate court in the following: (1) a precedential decision in an earlier appeal of this case (No. 18-2400 with Judges Dyk, Linn, and Taranto) entered on Oct. 17, 2019, and published at 940 F.3d 1372; (2) a Rule 36 summary affirmance of a final written decision in a related IPR proceeding (No. 20-2319 with Judges Lourie, Linn, and Dyk) entered on September 7, 2021; (3) a non-precedential decision denying a petition for writ of mandamus on a discovery order (No. 2022-125 with Judges Dyk, Linn, and Taranto) entered on March 22, 2022; and (4) a precedential opinion in an appeal of a related discovery dispute before the D.C. Circuit (No. 22-7001 with Judges Srinivasan, Henderson, and Edwards) entered on February 17, 2023, and published at 59 F.4th 1319.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over Fraunhofer's patent infringement action under 28 U.S.C. § 1338(a). The District Court entered final judgment on July 10, 2023, and all prior interlocutory decisions were merged into that final judgment, including the discovery-related orders dated June 28, 2022, and September 6, 2022. Fraunhofer timely filed its notice of appeal on August 4, 2023. The Federal Circuit has jurisdiction over this appeal under 28 U.S.C. § 1292(c)(2).

## STATEMENT OF THE ISSUES

1. Did the District Court err in granting summary judgment of implied license based on an equitable estoppel theory, where SXM failed to present undisputed evidence sufficient to meet its burden on any of the three elements of misleading behavior, reliance, and prejudice?

2. Was it legal error to find an implied license where there was an express contract with Fraunhofer dealing with the same subject matter that specifically disclaimed any grant of rights to the patents-in-suit?

3. Should summary judgment have been granted in Fraunhofer's favor on SXM's alleged defenses of equitable estoppel and implied license based on equitable estoppel, where SXM failed to present evidence from which a factfinder could conclude SXM satisfied its burden on either of those defenses?

4. Where the District Court's finding of implied license was expressly premised on only one of Fraunhofer's three distinct theories of liability, was it error to further dismiss Fraunhofer's other two theories as "moot"?

5. Did the District Court err in ordering production of privileged documents on the theory that a patentee and potential licensee cannot enjoy the protection of the common interest doctrine until a license is formally executed?

## INTRODUCTION AND STATEMENT OF THE CASE

This is the second time this case comes before this Court on review of an order concluding that defendant Sirius XM ("SXM") had a license to Fraunhofer's asserted patents as a matter of law. In the first appeal, this Court rejected the District Court's finding that SXM had an express license on the face of the contracts themselves and remanded to provide SXM an opportunity to seek extrinsic evidence via discovery to see if it could properly support its license claim.

On remand and after the close of discovery, SXM filed a motion for summary judgment conceding that discovery had changed "nothing" but nevertheless advancing various arguments for why SXM had a license "[a]s [the District] Court originally found." Fraunhofer filed its own motions seeking summary judgment that SXM had failed to meet its burden on the license defense (for multiple independent reasons), among other alleged SXM defenses.

Despite voluminous briefing from the parties on the license dispute that was the subject of this Court's remand decision, the District Court concluded that no analysis of that issue was needed. Instead, the District Court "assumed" a particular outcome to that dispute (disregarding the alternative theories raised by Fraunhofer) and elected to terminate the case by adopting a fallback argument that SXM presented in a one-and-a-half-page section at the end of its summary judgment brief: that SXM had an ***implied*** license under an equitable estoppel theory.

This second attempt to short-circuit Fraunhofer's case based on a legally defective license theory fares no better than the first. Because SXM has again failed to meet its burden of proving that it has a license to the asserted patents as a matter of law, this Court should reverse the Order and remand for further proceedings consistent with its earlier opinion so all of Fraunhofer's distinct theories of infringement liability may be properly resolved.

### A. Fraunhofer Is Awarded Patents For Its Innovations In Satellite Radio Technologies

Fraunhofer is a partially state-funded non-profit research organization headquartered in Germany, with facilities worldwide, and is one of the largest and most successful applied research organizations in Europe and the world. Appx6178. Since its founding over 70 years ago, Fraunhofer has grown to employ thousands of scientists and engineers who develop real-world solutions and innovations in a wide variety of technologies. *Id.*; Appx3284.

In the late 1990s, Fraunhofer began developing the enabling technology for a Digital Audio Radio Service ("DARS"), commonly referred to as satellite radio. Appx6178; Appx3289-90. Fraunhofer patented a number of its inventions related to DARS, including the four patents-in-suit: U.S. Patent Nos. 6,314,289, 6,931,084, 6,993,084, and 7,061,997. Appx29-103.

### B. Fraunhofer Licenses Its Satellite Radio Patents To WorldSpace

Fraunhofer was working at this time with a company named WorldSpace that had ambitions to launch satellite radio in various regions of the world. Appx3289-90. In March 1998, Fraunhofer entered into a Master License Agreement with WorldSpace (Appx1627-36, "MLA") that granted an exclusive, worldwide license to certain Fraunhofer intellectual property relating to DARS, encompassing the inventions of the four patents-in-suit and their foreign equivalents (referred to as the "MCM Intellectual Property Rights"). Appx1629 § 3.1. The MLA also provided that WorldSpace could sublicense these rights to others. *Id.*

The MLA further articulated WorldSpace's ongoing duties and the conditions under which WorldSpace could lose its rights under the MLA. In particular, Article 4 set forth a schedule of payments and imposed a continuing obligation on WorldSpace to reimburse Fraunhofer for certain "fees and costs" associated with the licensed Fraunhofer patents. Appx1630-31 § 4. Emphasizing the importance of the payment provision, Article 7 expressly provided that WorldSpace would risk forfeiture of its license rights altogether if it failed to pay Fraunhofer "all of the amounts specified in Article 4." Appx1632 § 7.4; *see also id.* §§ 7.1, 7.2, 7.3 (termination provisions); Appx1633 § 7.5 (in case of termination or expiration, authorized use of licensed technology by sublicensee's customers would be limited to products or services previously sold).

### C. XM Enters Into Sublicense With WorldSpace To Gain Access To Fraunhofer's Patents For Use In XM's Satellite Radio Service

Around this same time, the company American Mobile Radio Corporation (later renamed XM Satellite Radio Inc. or "XM") was engaged in efforts to create the first ever commercial satellite radio service in the United States. XM sought the engineering assistance of Fraunhofer for this project and the two parties ultimately entered into a Firm Fixed Price Contract (Appx1660-1708, "FFPC") detailing the parameters of the technological design work Fraunhofer would perform for XM. *Id.*; Appx4312 at 140:2-11.

As part of this project, Fraunhofer repeatedly emphasized (and XM's representatives confirmed) that XM would need to go to WorldSpace to obtain a sublicense to Fraunhofer's DARS patents, given that those patents had already been exclusively licensed to WorldSpace. Appx4366 at 194:3-195:2; Appx4154-55 at 85:5-87:6; Appx4257 at 75:18-76:25; Appx4308 at 124:12-20. This obligation was reiterated in Exhibit D of the FFPC, which identified the four asserted patents and stated: "***All of the above listed patents related to MCM technology are exclusively licensed to WorldSpace. XM Radio will be in charge to obtain a license for these patents from WorldSpace.***" Appx1707; Appx4383-84 at 265:18-267:14.[1]

[1] All emphasis to quoted material in this brief has been added and all internal quotes and citations removed, except where otherwise noted.

Consistent with this understanding, XM entered into an express sublicense agreement with WorldSpace (Appx1638-58, "Sublicense") to gain access to Fraunhofer's "MCM Technology" patents. Appx1639 § 1(iii). The Sublicense included substantial payment obligations from XM to WorldSpace of over $14 million depending on satisfaction of certain benchmarks. Appx1642-43 § 4(c). The Sublicense did not grant XM any assignment rights and was thus not assignable.

XM successfully incorporated Fraunhofer's patented technology into its satellite radio system, which launched in September 2001. Appx3292-93; Appx4675; Appx4310 at 131:10-15. Although Fraunhofer continued to provide some development work under the FFPC over the next several years to continue to improve the system, these efforts were substantively "wrapped up" by 2010 with no "new work" thereafter. Appx4380 at 252:12-25. The fundamental patented features of the XM satellite radio system continue to be used to this day, as later versions of the system have maintained backwards compatibility to ensure continued radio service for both old and new receivers. Appx4375 at 232:1-233:7.

### D. XM And Sirius Merge But Continue To Operate Their Distinct Satellite Radio Systems

Sirius Satellite Radio, Inc. was a competitor to XM that launched its own satellite radio service in 2002. Appx3291-92, Appx3296. Because the Sirius system was designed to use a lower portion of spectrum than the XM system, the Sirius and

XM systems are sometimes referred to as the "low band" and "high band" systems, respectively. *Id.*

After years of competition, Sirius and XM announced in 2007 that they would join forces. Appx3298. Following FCC approval, a reverse triangular merger was executed in July 2008, resulting in XM becoming a wholly-owned subsidiary of Sirius. Appx4767. In August 2008, Sirius changed its name to Sirius XM Radio Inc. ("SXM"). *Id.*

One challenge faced by SXM post-merger was the question of what to do with the two distinct systems of XM and Sirius going forward. Due to technical differences between these systems, a high-band radio receiver is not physically capable of receiving radio service from the low-band satellite radio system, nor can a low-band receiver be used to obtain service via the high-band system. Appx4362-63 at 181:19-182:9; Appx4387 at 280:12-18; Appx4183 at 198:8-17. Thus, it was not commercially practical for SXM to simply shut off either of the two existing systems, as that would terminate radio service for the millions of existing customers of the shuttered system (absent an expensive and arduous effort to recall and replace those customers' existing car receivers). Appx4355 at 151:6-152:24.

It was therefore apparent that SXM would need to operate both the high-band and low-band systems for an extended period after the merger while SXM gradually worked to convince car manufacturers to shift to just one of the two systems for

installations in new cars going forward. Appx4355-56 at 153:20-154:5; Appx4406. At the time of the merger, XM (which used the high-band system covered by the patents-in-suit) had nearly twice the market penetration of Sirius (which used the low-band system), with about 65 percent of car manufacturers committed to XM versus just 35 percent for Sirius. Appx4099 at 37:1-24; Appx4362 at 179:10-19; Appx4386 at 274:22-275:7; Appx4397 at 319:15-320:2. For that reason, SXM concluded it would make the most sense economically and logistically to encourage manufacturers to consolidate over time to the high-band system for installations in new vehicles—a goal that was not achieved until 2020. *Id.*; Appx4359 at 169:1-9.

### E. WorldSpace Files For Bankruptcy, Settles Payment Disputes With XM, And Enters Into Agreement With Fraunhofer To Terminate The Master License

Meanwhile, WorldSpace had encountered serious obstacles in its efforts to offer satellite radio in Africa, Asia, and Europe, including difficulties in meeting financial obligations to its contractual partners. In October 2008, WorldSpace filed a Chapter 11 petition in the District of Delaware Bankruptcy Court. Appx2569-74.

In June 2009, XM and WorldSpace entered into a settlement agreement (Appx1711-12, "XM Settlement") to resolve outstanding payment disputes under the Sublicense. The XM Settlement characterized itself as an amendment to the Sublicense, confirming that it could not be "assigned or transferred (by sale, merger, operation of law or otherwise) … without the prior written consent of all Parties."

Appx1712 § 4. In satisfaction of all amounts owed under the Sublicense, XM agreed to pay WorldSpace about $300,000. *Id.* § 2. Notably, Fraunhofer and SXM were not named as parties to the XM Settlement. Nor did the settlement grant any rights to SXM, which was XM's parent company at the time of execution.

About a year later, Fraunhofer and WorldSpace entered into their own negotiations in connection with the bankruptcy, culminating in a written agreement rejecting certain contracts and providing that the MLA would also be rejected unless Fraunhofer and a third party ("Yazmi") were able to reach a suitable "going forward" arrangement within 90 days. Appx1769-70. The agreement also confirmed what this "rejection" would entail: "[a]s a result of said rejection, everything, including all rights arising under or relating to the Agreements shall be and is hereby retained by Fraunhofer" and "WorldSpace does not and shall not retain anything or any rights arising under or related to the Agreements." *Id.* On June 1, 2010, this agreement was read and approved by the Bankruptcy Court at a public hearing attended by interested parties (including an affiliate of Liberty Media, then a major investor in SXM). Appx1763-67; Appx6247-60. When the Yazmi contingency failed to materialize within the allotted time (Appx1812), the MLA terminated pursuant to the Court-approved agreement, with all patent rights reverting to Fraunhofer. Appx1769-70. Fraunhofer thereafter focused its attention on other projects, including exploring

alternative opportunities regarding satellite radio in Europe (e.g., "ESDR"). *See, e.g.*, Appx6104.

In January 2011, the final step of the Sirius-XM merger occurred with XM formally merging with and into SXM. Appx5186. However, XM never obtained the necessary written approval from WorldSpace to transfer any rights to SXM under the Sublicense and XM Settlement. *Cf.* Appx1712 § 4. Thus, any arguably surviving rights under the Sublicense were extinguished when XM ceased to exist as a result of the merger.

### F. Fraunhofer Is Prompted To Investigate Status Of The Sublicense And Files An Infringement Lawsuit After SXM Refuses Meeting To Discuss Licensing

After 2010, communication between SXM and Fraunhofer tapered off significantly given that Fraunhofer had substantially completed its work under the FFPC on the XM satellite radio system. Appx1827-28 at 89:6-90:17. From that point on, the "vast majority" of SXM's interactions were with a "separate group[] of people" at a "different organization" within Fraunhofer, and related to "potential other engagements relating to audio technology." *Id.*; Appx4380 at 252:12-253:11. There were occasional friendly contacts with old colleagues sharing industry chatter such as updates regarding ESDR efforts in Europe. Appx6025; Appx6053. Fraunhofer also reached out a few times to follow up on overdue payments for work

previously performed under the FFPC, which were finally resolved in 2013. Appx6012-17; Appx6033-49.

In 2013, a patent licensing company named IPXI approached Fraunhofer about an opportunity to participate in a patent pool directed to wireless technologies. Appx953-58 at 114:6-117:8, 119:13-19, 123:16-126:4, 136:21-137:12; Appx3707. At least one of the Fraunhofer patents-in-suit (the '289 patent) was under consideration as part of this discussion. *Id.* IPXI's interest prompted Fraunhofer to investigate any possible encumbrances relating to the '289 patent and the other patents-in-suit, including the status of the MLA and Sublicense. *Id.* In an abundance of caution, Fraunhofer sent a letter to WorldSpace in November 2015 expressly confirming that the MLA was terminated. Appx1812-13.

In July 2015, Fraunhofer representative Michael Schlicht made a phone call to Paul Marko of SXM and sent a letter advising that, as a result of an "internal analysis" regarding its IP portfolio, Fraunhofer had "detected an issue regarding specific patent families, which we deem of relevance for SiriusXM":

> The situation arose from the Worldspace bankruptcy cases. During the course of the bankruptcies, substantial rights in conjunction with the design of communication systems and associated waveforms reverted to Fraunhofer.

Appx1800. Fraunhofer proposed a "face to face meeting in order to share the results of our analysis and discuss a mutually beneficial arrangement." *Id.* Despite this letter and Fraunhofer's subsequent attempts to initiate further discussion, SXM repeatedly

declined to meet and would not even discuss the possibility of entering into a license. *See, e.g.*, Appx1802-03. The head lawyer at SXM went so far as to bluntly tell a Fraunhofer representative, "You can sue us." Appx4074 at 162:21-164:6.

Accordingly, Fraunhofer brought suit for patent infringement against SXM in February 2017. Appx167. Due to a judicial vacancy in the District of Delaware, the case was assigned to Senior Judge Joseph F. Bataillon of the District of Nebraska. Appx110.

### G. The Federal Circuit Rejects SXM's Motion to Dismiss Based On The Sublicense And The Parties Proceed With Discovery On Remand

SXM sought early on to have the District Court dismiss Fraunhofer's lawsuit, arguing on the pleadings that the Sublicense provided a right to use Fraunhofer's patents. Appx285. The District Court initially agreed, finding that SXM had valid license rights under the Sublicense regardless of any possible termination of the MLA, noting that these licenses had been characterized as "irrevocable." Appx333, Appx403.

On appeal, this Court rejected SXM's arguments and vacated the District Court's dismissal. *Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372 (Fed. Cir. 2019). In its opinion, the Court explained that the law "does not provide for automatic survival of a sublicense" when a principal license is terminated. *Id.* at 1380. Rather, "the

survival of the sublicensee's rights" should "depend[] on the interpretation of the Master Agreement." *Id.* at 1381. The Court further found that the use of the term "irrevocable" in the MLA was "equivocal" and not dispositive, including in light of other provisions of the MLA (e.g., Articles 7.4 & 7.5). *Id.* Accordingly, the case was remanded to allow for further discovery and consideration of other evidence that might bear upon this issue. *Id.* at 1381-82.

As discovery proceeded on remand, Fraunhofer asked SXM to articulate the purported legal and evidentiary bases for its affirmative defenses. *See* Appx2937-38. For example, Fraunhofer noted that "SXM is … not a signatory to the Sublicense" and sought to have SXM explain the basis for its alleged license to the patents-in-suit if the Sublicense were found to have survived termination of the MLA. Appx2931. In response, SXM merely pointed to the merger proceedings in 2008 and 2011 and claimed that SXM was "successor-in-interest to XM's rights under the Sublicense." Appx2979. SXM did not identify or produce any written agreement or consent from WorldSpace authorizing the assignment or transfer of rights under the Sublicense. SXM similarly failed to provide any meaningful disclosure supporting its alleged defenses based on implied license and/or equitable estoppel. Appx2980-81.

### H. On Summary Judgment, The District Court Again Concludes SXM Has A License As A Matter Of Law, And Denies As "Moot" Fraunhofer's Motions On Its Other Liability Theories

At the conclusion of discovery, both parties filed several summary judgment motions. Appx2363, Appx5544. SXM presented multiple motions pertaining to its license theories, including one that renewed its original request for a finding that SXM had an express license under the Sublicense as a matter of U.S. law (even while conceding that discovery had changed "nothing"). Appx1451. At the end of this motion, SXM added a short (one-and-a-half-page) argument contending in the alternative that SXM might have an "implied license" under an equitable estoppel theory. Appx1468-70.

Fraunhofer sought summary judgment that SXM had no rights under the Sublicense based on at least three independent theories: (1) the Sublicense was extinguished when the MLA was terminated by mutual agreement in 2010 (Appx1506-09); (2) alternatively, the Sublicense was extinguished upon Fraunhofer's unilateral termination of the MLA in 2015 (Appx1510-13); and/or (3) the Sublicense was never properly transferred or assigned from XM to SXM during the merger proceedings (Appx1485-92). Another Fraunhofer motion sought summary judgment on several other issues, including: (4) that the FFPC did not give SXM any rights to the patents-in-suit (Appx1532-39); (5) that SXM did not have an

implied license (Appx1539-43); and (6) that SXM had failed to meet its burden on several equitable defenses including equitable estoppel (Appx1544-45).

Despite extensive briefing on the express license issue, the District Court's order never reached the merits of that dispute. Appx1-8 ("Order"). Instead, the Order focused solely on the parties' competing arguments regarding SXM's implied license defense under an equitable estoppel theory. *Id.* In addressing this narrow issue, the Order did not make any findings of fact as to the three elements of equitable estoppel, but rather asserted there was "undisputed evidence" sufficient to satisfy SXM's burden on each of those elements. Appx4, Appx7-8. The Order further considered and rejected Fraunhofer's other arguments that SXM had failed to demonstrate it was entitled to an implied license as a matter of law. Appx3-4, Appx7-8. The District Court therefore granted summary judgment for SXM and denied all other motions filed by the parties as "moot." Appx8. This appeal followed.

## SUMMARY OF ARGUMENT

The Order dismissing Fraunhofer's infringement case on summary judgment was error and should be reversed. SXM's motion for summary judgment of implied license rests on a paltry evidentiary showing that did not come close to satisfying SXM's burden of proving its claimed defense. Specifically, SXM claims to have established an implied license as a matter of law under an equitable estoppel theory premised on allegations that (1) Fraunhofer committed misleading conduct, (2) SXM

relied upon that conduct, and (3) SXM was prejudiced thereby. Yet, the Order and SXM fail to present undisputed facts adequate to prove ***any*** of these elements.

On the first element of “misleading” behavior, SXM points to Fraunhofer’s purported silence regarding infringement between 2010 and 2015. But it is well-established that silence alone is not enough to give rise to estoppel, and SXM does not identify any other action or inaction by Fraunhofer from which one must ***necessarily*** infer that Fraunhofer had abandoned any possible infringement claim against SXM. Any number of inferences could be drawn from the period of relative quiet from 2010 to 2015—including that this was the natural result of Fraunhofer’s substantial completion of its development and design work for the XM satellite radio system by 2010. Summary judgment is impermissible where (as here) there are multiple alternative inferences and other factual disputes capable of being resolved in the non-movant’s favor.

SXM fares no better on the “reliance” and “prejudice” elements. For “reliance,” SXM’s motion presents only attorney argument that is not supported by any evidence at all, much less undisputed evidence showing SXM relied on any supposedly misleading Fraunhofer conduct in deciding to shift manufacturers to its infringing system. In fact, SXM’s corporate designee admitted the ***only*** criterion SXM considered in making that decision was the fact that a larger number of car manufacturers were already using the infringing system. And SXM likewise fails to

present evidence of "prejudice," pointing only to conjecture rather than actual, undisputed proof of harm traceable to the allegedly misleading conduct.

SXM's claim that the alleged equitable estoppel in this case resulted in an implied license also fails as a matter of law. Judicially implied licenses are rare under any doctrine, and contract rights cannot be deemed to arise by mere implication in situations where there is an express contract dealing with the same subject. In this case, witnesses from both sides were consistent in testifying that the Firm Fixed Price Contract between Fraunhofer and XM specifically ***excluded*** any license to the patents-in-suit, thus precluding any claim to an implied license here.

Given the numerous independent defects in SXM's implied license defense based on equitable estoppel, this Court should not only reverse the finding of summary judgment for SXM but also find that summary judgment should affirmatively be granted for Fraunhofer. As Fraunhofer demonstrated in its own motion on these issues, SXM cannot meet its burden on either its equitable estoppel defense or its implied license defense based on an equitable estoppel theory, and thus those defenses necessarily fail as a matter of law.

Moreover, the Order's fundamental errors extend beyond these issues, as the Order improperly proceeds on a series of assumptions without engaging the threshold questions presented by Fraunhofer's three alternative theories of liability. For example, despite this Court's prior remand decision, the Order does not make

any factual findings on whether the MLA and Sublicense were actually terminated (and if so, when), but instead merely "assumes" that ***if*** these contracts were terminated in 2010, ***then*** it was "misleading" for Fraunhofer to not raise any infringement concerns until 2015. But Fraunhofer also argued in the alternative that these contracts were not terminated until 2015, in which case there would have been no reason nor opportunity to raise any infringement issue earlier. And Fraunhofer's third independent theory of liability—that XM never properly transferred any rights under the Sublicense upon its merger into SXM—was something that Fraunhofer was not even aware of until fact discovery in this case, and thus there could be no improper "delay" in raising it. In short, the Order erred in dismissing as "moot" Fraunhofer's motions on these alternative second and third theories, and the Court should order that both theories be fully considered on remand regardless of whether summary judgment based on the 2010 termination theory is affirmed or reversed.

Finally, the Court should also take the opportunity to correct a legally erroneous discovery ruling by the District Court requiring production of certain privileged Fraunhofer documents from the critical period of 2010 to 2015. The District Court ordered production of these documents on the theory that communications between a patentee and a licensee fall categorically outside the common interest privilege unless a license has been formally executed. That unduly

rigid approach is contrary to the law of this Court (and others) holding that a common interest may exist even between a patentee and a ***potential*** licensee.

## STANDARD OF REVIEW

"A district court's grant of summary judgment is reviewed de novo." *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995). A decision granting summary judgment will not be affirmed if "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The "implied license defense" is an "issue[] of law" that is reviewed "de novo," including when the defense is based on an equitable estoppel theory. *Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1581 (Fed. Cir. 1997). Following plenary review of a summary judgment decision to evaluate whether there are genuine disputes of material fact, the application of a stand-alone equitable estoppel defense is reviewed for "abuse of discretion." *John Bean Techs. Corp. v. Morris & Assocs., Inc.*, 887 F.3d 1322, 1327 (Fed. Cir. 2018); *A.C. Aukerman Co. v. R.L. Chaides Co.*, 960 F.2d 1020, 1041, 1043 (Fed. Cir. 1992) (no discretion to grant equitable estoppel on summary judgment if there are genuine factual disputes).

Decisions related to discovery are reviewed under an "abuse of discretion" standard and must be overturned when based on "an erroneous conclusion of law." *Heat and Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1022 (Fed. Cir. 1986).

# ARGUMENT

## I. SUMMARY JUDGMENT WAS IMPROPERLY GRANTED AS SXM FAILED TO PRESENT UNDISPUTED FACTS PROVING AN IMPLIED LICENSE AS A MATTER OF LAW

The Order granting summary judgment should be reversed as SXM did not come close to meeting the legal and evidentiary prerequisites to prove an implied license defense at the summary judgment stage. "[T]he burden of proving the establishment of an implied license falls upon the defendant," *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F. 2d 903, 924 (Fed. Cir. 1984), and SXM failed to satisfy that burden here.

The finding of implied license in this case rested on an equitable estoppel theory, invoking a three-part test that this Court has previously articulated: "(1) a patentee, acting on the basis of accurate facts, communicated something in a ***misleading*** way, by words, conduct, or omission, to an alleged infringer, (2) on which the accused infringer ***relied***, (3) such that he would be materially ***prejudiced*** if the patentee is allowed to assert a claim that is inconsistent with his earlier communication." *SCA Hygiene Prods. v. First Quality Baby Prods.*, 767 F.3d 1339, 1343 (Fed. Cir. 2014) (citing *Aukerman*, 960 F.2d at 1041, 1046).[2]

---

[2] Further review in *SCA Hygiene* left the panel's original ruling regarding equitable estoppel undisturbed. *See* 807 F.3d 1311, 1333 (Fed. Cir. 2015) (*en banc*); 580 U.S. 328, 333 n.2 (2017).

The proponent of equitable estoppel bears the burden of proof by a "preponderance of evidence," supported by facts that are "clear, positive, and unequivocal in their implication." *Aukerman*, 960 F.2d at 1046. "Where … the movant has the burden of proof on defenses raised in a summary judgment motion, the movant must show that there is no genuine issue of material fact as to every element of the defenses." *Meyers v. Asics Corp.*, 974 F.2d 1304, 1307 (Fed. Cir. 1992).

SXM did not present evidence sufficient to satisfy its burden with respect to any of the three equitable estoppel factors in this case—much less all of them. Nor did SXM prove the additional requirements of an implied license defense. Thus, as detailed below, each of these deficiencies provides a separate and independent basis for reversal of the Order.

### A. SXM Failed To Establish Any Conduct By Fraunhofer Necessarily Giving Rise To A Misleading Inference

The first element of the equitable estoppel defense requires proof of "misleading" conduct by the patentee "support[ing] an inference that the patentee did not intend to press an infringement claim against the alleged infringer." *Aukerman*, 960 F.2d at 1042. This element poses a formidable hurdle at the summary judgment stage, as the inference of misleading action or inaction "must be the *only* possible inference from the evidence." *Id.* at 1044 (emphasis in original).

SXM failed to meet its burden on this first element. Both SXM's motion and the Order focus primarily on the allegation that Fraunhofer did not directly accuse SXM of infringement between 2010 and 2015, arguing that this inaction was "misleading." Appx1469; Appx2-3. However, this Court has made clear that mere silence or inaction is ***not*** enough on its own to establish equitable estoppel. Rather, a plaintiff's alleged "inaction must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant[s] is abandoned." *Aukerman*, 960 F.2d at 1042; *see also High Point Sarl v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016) ("[M]ere silence must be accompanied by some other factor which indicates that the silence was sufficiently misleading as to amount to bad faith."); *Meyers*, 974 F.2d at 1308 ("Silence alone is not sufficient affirmative conduct to give rise to estoppel.").

### 1. SXM Did Not Present Evidence Sufficient To Satisfy Its Burden To Prove Misleading Conduct

The evidence cited in SXM's motion fails to reveal any "other facts" in addition to silence that could plausibly suggest Fraunhofer's behavior was misleading—much less establish that this was the ***only*** possible inference from the record.

***First***, SXM's motion points to the FFPC (the 1999 contract where XM sought engineering work from Fraunhofer) and Fraunhofer's subsequent efforts to "buil[d] the [allegedly] infringing aspects of the XM DARS System at the request of XM …

using the technologies covered by the [Asserted] Patents." Appx1469 (citing Appx1659-1708; Appx441 ¶ 29). Yet SXM ignores that the FFPC expressly indicated that Fraunhofer was ***not*** providing any license to the asserted patents, stating that "XM Radio will be in charge to obtain a license for these patents from WorldSpace." Appx1707. SXM's witnesses confirmed the parties' mutual understanding that the FFPC did not and could not grant XM any license to the asserted patents. *See, e.g.*, Appx4366 at 194:3-195:2 (Fraunhofer had already entered into "exclusive license" with WorldSpace; "very clear that … we needed to go to WorldSpace and gain those rights"); Appx4154-55 at 85:5-86:9 (noting "caveat" in "firm fixed price contract [FFPC]"; "we had to go through an extra step" for patents subject to "exclusive license [with] WorldSpace"); Appx4257 at 75:18-76:25 ("the [FFPC] had a carve-out of certain patents" that "Fraunhofer did not have the right to license"); Appx3919 at 159:24-160:7; *see also* Appx4308 at 124:12-20. And in fact, XM initially followed this instruction and entered into the Sublicense with WorldSpace. Appx1638-39; Appx4154-55 at 85:8-86:9.

The most plausible inference to be drawn from these facts is that all parties understood XM would need to secure a patent sublicense from WorldSpace to operate the satellite radio system that Fraunhofer was designing for XM. Under these circumstances, it would not have been expected for Fraunhofer to make any allegation of infringement during this period of design work when the MLA and

Sublicense were in full force and WorldSpace owned exclusive rights to the patents-in-suit. There is nothing misleading about these facts, nor do they suggest Fraunhofer was indifferent or intended to waive its patent rights. *See Wang Lab'ys*, 103 F.3d at 1581 ("no implied license existed … given that the course of infringing action only began later and distinct from the cited conduct"); *cf. Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1131 (Fed. Cir. 2013) (communications cannot mislead when they predate patent grant).

***Second***, SXM's motion cites a two-page addendum to the FFPC ("Addendum No. 2") that clarified the payment status for certain engineering work that XM had requested in a 2004 amendment to the FFPC ("Amendment No. 7"). Appx1469; Appx1796-97. Fraunhofer had completed this work years earlier and advised SXM in March 2011 that payment was "long overdue." *See* Appx6017. In executing Addendum No. 2, the parties confirmed that payment had been finally made in June 2011 and the "agreed payments for Amendment No. 7" were therefore "considered complete." Appx1797. SXM also cites a few emails regarding Addendum No. 2 and other invoices Fraunhofer had submitted to XM through 2010 when the MLA and Sublicense were still in force. Appx6012-17; Appx6033-49.

The most plausible inference from this evidence is simply that Fraunhofer sought to ensure it had been paid in full for work that Fraunhofer had already performed years ago for XM. These few documents are narrow in scope; they

contain no mention of patents or license rights, and do not refer to any ongoing collaboration between the parties on substantive engineering work after 2010. All of this is entirely routine and not misleading in the slightest.

***Third***, SXM's motion cites a page of deposition testimony from its own witness, Paul Krayeski, in which he recollected that work with Fraunhofer on satellite radio system development was "tapering off" around 2010 (though he was "[n]ot clear" on the timing). Appx1469; Appx1827 at 89:6-24. He further testified that, after 2010, "I don't believe we talked much about … broadcast systems-type work" (i.e., satellite radio). Appx1827 at 89:6-24. Rather, the "vast majority" of his interactions and dealings from that point on were with a "separate group[] of people" with a "different organization" at Fraunhofer, and related to "potential ***other*** engagements relating to audio technology." Appx1827-28 at 89:6-90:17.

The most plausible inference to be drawn from this evidence is that the parties had substantially completed their collaboration on the satellite radio project by 2010, and thus it was only expected that communications on that subject would be significantly reduced thereafter. Indeed, on this point, Mr. Krayeski's testimony is consistent with other record evidence. *See, e.g.*, Appx4380 at 251:6-25, 252:12-253:11 (collaboration on DARS was essentially "wrapped up" by 2010 with "no new work"). Accordingly, there was no reason to view the relative lack of communication regarding the satellite radio system after 2010 as suggesting Fraunhofer

affirmatively believed that XM continued to enjoy rights to Fraunhofer's patents, much less that SXM enjoyed such rights. *See SCA Hygiene*, 767 F.3d at 1350 (no misleading silence where communications were "meager"); *B. Braun Med., Inc. v. Abbott Lab'ys*, 124 F.3d 1419, 1425 (Fed. Cir. 1997) (no misleading silence where communications were directed to a different product).

***Finally***, the Order cites a few additional pieces of evidence not mentioned in SXM's motion, specifically three email exchanges (dated August 2012, October 2012, and April/May 2013) regarding a possible meeting between the companies to explore new projects. Appx6023-31 (discussing meeting regarding potential interest in "Safetrip" initiative); Appx6051 (discussing possible meeting to discuss "potential new things"). Again, these sporadic emails on different topics have no relevance here. They do not mention anything about patents or the status of licenses. Rather, they are wholly consistent with the other evidence discussed above showing little or no communication between the parties regarding the satellite radio system between 2010 and 2015.

In summary, even when considered in the aggregate, the evidence presented by SXM does not come close to meeting its burden on summary judgment with respect to the "misleading" element of equitable estoppel, as SXM fails to present any "other facts" that could even plausibly support an inference that Fraunhofer's

alleged inaction suggested abandonment of any possible claim of infringement over SXM's satellite radio system. *Aukerman*, 960 F.2d at 1042.

#### 2. SXM Did Not Establish That The Only Possible Inference Was That Fraunhofer Misled SXM

Moreover, even assuming such an inference were ***possible*** based on the evidence presented by SXM, that would ***still*** not be enough to affirm the judgment below, because SXM was required to prove at the summary judgment stage that this was the ***only*** possible inference. *Aukerman*, 960 F.2d at 1044. As shown above, the evidentiary record permits multiple alternative inferences that do not suggest any misleading conduct by Fraunhofer. For example, SXM could have reasonably concluded Fraunhofer did not raise any express claim of infringement between 2010 and 2015 because:

- The development project between Fraunhofer and XM for the satellite radio system was substantially completed and thus it was expected that active communication regarding that system would draw to a close. *See, e.g.*, Appx4380 at 252:12-253:11.
- After 2010, SXM's interactions were primarily with a different team at Fraunhofer involving different people without knowledge of the relevant patents and licenses and thus would not have been expected to raise such issues. *See, e.g.*, Appx1827-28 at 89:6-90:17.

- The parties had a pattern of sometimes taking a long time—even on the order of multiple years—to resolve payment issues and other matters relating to contractual obligations without necessarily waiving their rights. *See, e.g.*, Appx1795-77; Appx6016-17; Appx6033-35; Appx6042-49; Appx4310 at 131:20-132:4; Appx2165-66.
- As a foreign non-profit organization dedicated to engineering research, Fraunhofer's attention was not focused on efforts to identify possible infringement lawsuits it might file in the United States (and there was no evidence of Fraunhofer ever having done so in the past). *See, e.g.*, Appx6178; Appx3284; Appx2164-65.
- Given SXM's limited profitability in the several years following the merger, it may not have been worth the expense for Fraunhofer to explore and potentially bring an infringement claim against SXM at that time. *See, e.g.*, Appx3359.
- Fraunhofer may not have had the full set of facts necessary to properly evaluate any possible claims against SXM, including because it was unaware until the discovery phase of this case that XM had failed to secure the permission of WorldSpace in attempting to transfer any remaining Sublicense rights to SXM. *See, e.g.*, Appx1483; Appx2979; Appx2931.

This Court's *en banc* decision in *Aukerman* provides an instructive example of how a single alternative inference is enough to overcome summary judgment based on equitable estoppel, even in the face of circumstances where (unlike here) there was significant evidence that the patentee's silence may have been considered misleading. In *Aukerman*, the patentee had identified an infringing product and reached out to demand a license from the alleged infringer. *Aukerman*, 960 F.2d at 1026. The target company responded that it understood any responsibility for infringement rested with the third party from whom it had purchased the accused product, and in any event, it believed any alleged infringement to be so modest that any potential recovery would not be worth pursuing. *Id.* at 1026-27. The patentee did not immediately respond and there was no further interaction between the parties for over eight years. However, upon receiving word that the accused business may have recently become more "substantial," the patentee renewed its claim of infringement and brought suit shortly thereafter. *Id.* at 1027. The defendant filed a motion for summary judgment of equitable estoppel based on the patentee's period of prolonged silence, and the district court granted that motion. *Id.*

On appeal, this Court reversed the summary judgment order. The Court acknowledged the defendant's express claim of non-infringement followed by prolonged silence had indeed put the defendant "in a position to infer" that the plaintiff may have "abandoned its claim." *Id.* at 1044. Nevertheless, the Court further

observed that this was not the ***only*** possible inference on the facts presented. For example, given the initially modest size of a potential recovery, the defendant may have reasonably inferred that the plaintiff "did not sue because the amount in issue was *de minimis*, not that [the plaintiff] was abandoning its claim … for all time." *Id.* In view of these competing possible inferences based on the undisputed facts, this Court found that summary judgment was "impermissible." *Id.*

As in *Aukerman*, the possibility of even ***one*** non-misleading inference from Fraunhofer's behavior is sufficient to defeat summary judgment. Given the multitude of alternative inferences set forth above (and SXM's failure to present any meaningful evidence to support its preferred inference) the grant of summary judgment in this case was likewise "impermissible."

#### 3. Other Factual Disputes Render Summary Judgment For SXM Improper, Including Whether Fraunhofer Had A "Clear Duty To Speak"

Rather than present undisputed evidence of "misleading" conduct, SXM makes the conclusory assertion that Fraunhofer had a clear "duty to speak" such that its "silence" between 2010 and 2015 could only be understood as misleading. Appx6484. Yet SXM never identifies any evidence supporting such a "duty" here. At most, SXM points to alleged business dealings between SXM and Fraunhofer, ignoring this Court's precedent that a mere commercial relationship is not enough to give rise to an affirmative duty to speak. *See, e.g.*, *Stickle v. Heublein, Inc.*, 716 F.2d

1550, 1554, 1559 (Fed. Cir. 1983) (no implied license or estoppel based on prolonged failure to assert infringement despite parties' "close business and personal relationship"); *Braun*, 124 F.3d at 1425 (no misleading conduct despite patentee's "silence" regarding infringement, where parties had commercial "relations" on another product); *see also Sprint Commc'ns Co. v. Time Warner Cable, Inc.*, 2017 WL 978107, at *3 (D. Kan. Mar. 14, 2017) (no "duty to speak" where contracting parties were both "knowledgeable and experienced enterprises engaged in arm's-length transactions"). If anything, in situations like this where the parties were "not in an adversarial stance," the "onus was upon [SXM] to communicate with [Fraunhofer], not the converse." *Hemstreet v. Comput. Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed. Cir. 1992).

Moreover, there are additional factual disputes pertaining to the "misleading" element that preclude summary judgment. For example, SXM and the Order assert there was no relevant change in the parties' relationship after 2010, claiming it was undisputed that they continued to do business "as usual." Appx2, Appx4; Appx5625, Appx5629. However, Fraunhofer strongly disputed this assertion as the record evidence demonstrated the parties' relationship meaningfully changed after 2010. Appx4380 at 252:12-253:11 (collaboration on satellite radio system was essentially "wrapped up" by 2010 with "no new work"), 251:6-25; Appx1827-28 at 89:6-90:17 (work on satellite radio development was "tapering off" by 2010 and "vast majority"

of subsequent interactions were with a "different organization" and a "separate group[] of people" at Fraunhofer regarding "potential other engagements"). At a minimum, the surrounding business context in which Fraunhofer's allegedly misleading "silence" took place presents a relevant factual dispute that precludes a finding of summary judgment for SXM. *SCA Hygiene*, 767 F.3d at 1350.

### B. SXM Failed To Establish Reliance On Any Allegedly Misleading Conduct By Fraunhofer

SXM also failed to meet its burden to prove the second element of the equitable estoppel defense: "reliance." If anything, the deficiency for this second element is even more clearly evident than the first, as SXM's motion identifies no supporting evidence showing "reliance" at all.

#### 1. SXM Did Not Present Evidence Of Reliance

SXM's motion dedicates only a few sentences to the reliance issue:

> SXM's expansion of its business based on the allegedly infringing system alone establishes detrimental reliance. [Case citation.] Beyond this, SXM would have migrated to the non-infringing alternative system if threatened with litigation. [Case citation.] In any event, FhG's "silence robbed [SXM] of the opportunity" to change plans or limit its exposure. [Case citation.]

Appx1470. These assertions are pure attorney argument, and SXM fails to provide even a single evidentiary citation showing that SXM indisputably ***relied*** on any purportedly "misleading" conduct from Fraunhofer. Instead, SXM vaguely refers to an alleged "expansion of its business" between 2010 and 2015, but without offering

any explanation or evidence as to what prompted that expansion, let alone any evidence that this expansion was prompted by Fraunhofer's alleged silence. And SXM's motion does not even attempt to provide any evidentiary support for its assertions that it "would have migrated to [a] non-infringing alternative system if threatened with litigation" or otherwise "changed plans [to] limit its exposure."

Moreover, when Fraunhofer pointed out this fatal evidentiary deficiency, SXM merely responded with more hypothetical conjecture: that SXM "logically would not have increased its potential exposure when there was an alternative." Appx6484. Of course, the operative question here is not merely whether it might have been "logical" for SXM to rely on any allegedly misleading conduct, but whether SXM actually did so based on undisputed evidence.

This Court has repeatedly rejected similar attempts to satisfy the reliance element with conclusory statements and attorney argument rather than evidence. For example, in *Meyers*, this Court reversed summary judgment of equitable estoppel where the defendant merely set forth "conclusory assertions that they relied on [plaintiff's] conduct" without presenting "undisputed facts to show that they did." 974 F.2d at 1309. Other cases from this Court reach similar results. *See, e.g.*, *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1558 (Fed. Cir. 1996) (vacating summary judgment of equitable estoppel that relied on "*post hoc* conclusory statements that [defendant] relied on [plaintiff's] conduct rather than any undisputed

contemporaneous evidence demonstrating such reliance"); *Gasser Chair*, 60 F.3d at 776 ("[t]his court has rejected similarly conclusory assertions as a basis for summary judgment of equitable estoppel"; reversing summary judgment).

In an effort to fill this evidentiary hole for the reliance element, the Order improperly points to some of the evidence that SXM cited in support of the separate "prejudice" element. Appx6-7. As an initial matter, this approach errs by conflating the distinct issues of reliance and prejudice—issues that this Court has warned are "frequently confused." *Aukerman*, 960 F.2d at 1043. "There is a difference between prejudice that *results from* a patentee's alleged misrepresentation and prejudice caused by *reliance upon* it." *SCA Hygiene*, 767 F.3d at 1350 (emphasis in original). Requiring separate analysis of "reliance and detriment as separate factors adds some clarity in this confusing area of the law." *Aukerman*, 960 F.2d at 1041.

The Order fails to heed this caution as it erroneously relies upon purported evidence as prejudice as a sort of proxy for reliance. The Order's purported analysis of reliance first describes how, "[f]ollowing the Sirius and XM family mergers … the new company had to decide which of the former pair's competing systems … to continue and which to retire." Appx5-6. At that time, approximately 65 percent of the automotive market was using the XM (or high-band) system and roughly 35 percent was using the Sirius (or low-band) system. Appx1849 at 179:10-19. Citing this evidence, the Order notes that SXM's choice of which system to continue

ultimately "came down to business pragmatics: SXM elected to shift over the smaller market share of the low-band system rather than shift over the larger market share of the high-band." Appx6. And given that only the high-band system is accused of infringement in this case, the Order concludes that the outcome of this effort was prejudicial to SXM: "a decade's unrecoverable effort changing over automobile installations." *Id.*

Simply put, none of this supports a finding of reliance. Even assuming for the sake of argument that SXM's decision to completely transition to the high-band system prejudiced SXM in some way (an issue addressed further below), that does not resolve the pertinent question here, namely whether that decision was made in ***reliance*** on any purported misleading behavior by Fraunhofer.

#### 2. The Evidentiary Record Affirmatively Demonstrates SXM Did Not Rely On Any Allegedly Misleading Conduct By Fraunhofer

In fact, far from demonstrating reliance on any alleged inaction by Fraunhofer, the evidence cited in the Order demonstrates just the opposite: that SXM's decision to pursue the high-band system was based on an entirely different rationale grounded in "business pragmatics" Appx6-7. Specifically, SXM's witnesses explained that SXM's decision was driven by the simple fact that were nearly twice as many high-band manufacturers as low-band manufacturers, and thus the most sensible course of action was the one that would minimize disruption (and associated transition

costs) for the greatest number of businesses. *See, e.g.*, Appx1851-52 at 274:22-275:7 ("It really boiled down to" the fact that "it was easier to move the 35 percent to the 65 percent than the reverse."), 319:15-320:2; Appx1849 at 179:10-19; Appx1843 at 150:22-151:5. Indeed, one of SXM's corporate designees openly admitted that the "lower lift" of moving just 35 percent of the market (versus 65 percent) was "really the ***only*** criteria we needed to look at" in making the decision to transition to the high-band system. Appx4099 at 37:15-24.

Moreover, SXM's insistence that it was certain of its rights under the Sublicense only tends to confirm further that it would not have made any difference if Fraunhofer had raised any infringement claim earlier. *Meyers*, 974 F.2d at 1309 (reversing summary judgment where "defendants have not shown that they would have altered their conduct if [plaintiff] had sued earlier"). For example, when SXM's general counsel was confronted with Fraunhofer's claim of infringement in 2015, he said nothing about any allegedly misleading silence from Fraunhofer, but rather asserted that SXM enjoyed "a valid sublicense" as a basis to refuse further discussion. Appx4074 at 162:21-164:6 ("You can sue us."); *see also* Appx4368 at 203:4-22 (SXM's corporate designee testifying he thought SXM had "irrevocable" rights to the Fraunhofer patents). Such evidence only undermines SXM's alleged theory of reliance in this case. *See Sprint*, 2017 WL 978107, at *5 (finding no reliance: "Although [defendant's] employees may have been mistaken in their belief

that the contracts gave [them] the right to [practice the patents] without fear of an infringement suit, the Court is persuaded that they nevertheless relied on those provisions and not on [plaintiff's] conduct in making the decision to launch."). Indeed, SXM admits it took no action to avoid infringement even after receiving notice of Fraunhofer's claims. Appx4394 at 308:23-309:2; Appx6285.

This Court has frequently taught that there can be no finding of reliance where the defendant's activities were undertaken not in reliance upon "supposed actions of [the plaintiff]" but rather "a business judgment of its own—a judgment which subsequent events may well prove to have been faulty." *Hemstreet*, 972 F.2d at 1294-95 (reversing summary judgment). For example, the Court has more than once found it improper to find equitable estoppel on summary judgment where the evidence suggested the defendant proceeded with infringement in reliance on a belief that the patent was invalid, rather than anything the patentee did or did not do. *See SCA Hygiene*, 767 F.3d at 1351 (no reliance where defendant may have simply "relied on its own opinion that the … patent was invalid"); *Hall*, 93 F.3d at 1558 (no reliance where defendant "may have acted due to its belief that the patent was invalid rather than due to any belief that [the patentee] would not sue under the patent"). The evidence here of SXM's other sources of reliance similarly precludes a finding of summary judgment.

### 3. Other Factual Disputes Render Summary Judgment For SXM Improper, Including Whether The Low-Band System Presented A Viable Alternative To Infringement

Another independent error in the Order's analysis of reliance is its flawed evaluation of whether the low-band system presented a truly viable alternative to infringement. Fraunhofer presented evidence that the low-band system was ***not*** a viable alternative as additional proof of the lack of reliance in this case. Appx6530 n.14 (citing Appx4355 at 152:10-24; Appx4359 at 169:1-11; Appx4387-88 at 281:3-18, 284:1-6). This evidence was offered to distinguish certain case law cited by SXM where the accused infringer's evidence of reliance encompassed plausible non-infringing alternatives. *See, e.g.*, *High Point*, 817 F.3d at 1331-32 (citing testimony regarding "several [non-infringing] options" that were not shown to be "unrealistic or infeasible"); *Hon Hai Precision Indus. Co. v. Asia Vital Components Co.*, 2004 WL 5806997, at *17 (C.D. Cal. Feb. 12, 2004) (evidence of "ability to switch to a non-infringing design"). The operative principle here is that reliance plainly implies a choice among alternative options; thus, where there are no options, there can be no reliance.

The Order nevertheless proceeds as if the low-band system's status as a viable alternative to infringement was an undisputed fact, when it clearly is not. To be sure, the legacy Sirius (low-band) system has continued in operation since 2010 for the purpose of providing ongoing service ***to low-band radio receivers***. *See, e.g.*,

Appx4358 at 162:18-19. However, the continued operation of the low-band system in no way implies there was a realistic solution in 2010 for the wholesale conversion of the millions of high-band customers to the low-band system. As SXM's corporate representative put it, this would have required a burdensome campaign of recalling and swapping out radio receivers for all of those high-band customers—an "ugly" option "that was not going to work" as a practical matter. Appx4355 at 152:9-153:5. For this reason, SXM's witness conceded that SXM "need[ed] to maintain" its high-band system. *Id.*

The record evidence thus demonstrates there was ***not*** any meaningful alternative to the continued use of Fraunhofer's patents, and certainly not any option that would have offset the significant "business pragmatics" that supported transition to the high-band system. Appx6; *see Sprint*, 2017 WL 978107, at *6 (evidence showed significant monetary gains from proceeding with project later accused of infringement; no "persuasive evidence" that defendant would have "acted differently" if infringement claims had been raised "earlier").

In any event, to the extent that there was any question about whether the low-band system truly presented a viable alternative for SXM to avoid infringement, this at most presented a factual dispute that should have precluded summary judgment. The same is true for other facts cited in the Order, such as the question of the timing of SXM's decision to transition to the high band. *See* Appx7 (citing Appx1841 at 37

("I really can't think of when that decision was made")). It was not proper to grant summary judgment for SXM in view of the factual disputes underlying SXM's alleged theory of reliance.

### C. SXM Failed To Establish Any Prejudice To SXM Caused By Fraunhofer's Allegedly Misleading Conduct

SXM likewise failed to satisfy the third element: "prejudice." This element requires proof of a "nexus" between the patentee's actions and the alleged harm: the defendant "must prove that the [detrimental] change in economic position would not have occurred had the patentee sued earlier." *Gasser Chair*, 60 F.3d at 775. "It is not enough that the alleged infringer changed his position"; rather, "[t]he change must be because of and as a result of the delay." *Hemstreet*, 972 F.2d at 1294.

The Order claims that the prejudice element is "undisputed" (Appx8), but this is not true. For example, Fraunhofer specifically argued there could be no prejudice here in the absence of causation, i.e., "where SXM lacked the 'ability to switch to a non-infringing design.'" Appx6530. And of course, Fraunhofer was under no obligation to ***disprove*** prejudice as it was ***SXM's*** burden to present undisputed evidence showing this element was satisfied as a matter of law. As Fraunhofer pointed out in opposing SXM's motion, SXM "fail[ed] to meet its burden" on the prejudice element as it relied on "mere 'conclusory assertions' without citing specific evidentiary support." Appx5709.

A review of the Order's discussion of prejudice only confirms SXM's failure of proof. The Order briefly mentions three forms of alleged prejudice. The first of these is described as "the Deutsche marks lost to history and the remaining hundreds of thousands of Euros paid to develop the high-band system before and after the supposed master-license termination." Appx8. Based on the accompanying record citation, this appears to be a reference to a few of the payments made to Fraunhofer for engineering work under the FFPC. *See* Appx6012-17; Appx6033-49. Yet those amounts cannot constitute prejudice as a matter of law as they were merely payment for services duly rendered and were not the result of any alleged misleading conduct by Fraunhofer. SXM presented no evidence to the contrary and in fact, the record reflects these costs were already incurred by 2010 and thus were payable to Fraunhofer regardless of any subsequent alleged delay in raising infringement concerns with SXM. *Id.*; *see Hall*, 93 F.3d at 1558 (no prejudice where defendant did not "demonstrate that the allegedly prejudicial events occurred after [the patentee] knew or should have known of the allegedly infringing activities").

The second form of prejudice described in the Order is an allegation of "hundreds of millions of dollars of equipment" that SXM either "installed … into peoples' cars" or "launched into space" between 2010 and 2020. Appx8. This allegation is similarly unsupported by the cited evidence. The Order cites to a few pages from the deposition transcript of Craig Wadin (Appx4355-57, Appx4359),

none of which discloses any actual equipment costs incurred by SXM during the relevant time frame. At most, Mr. Wadin testified that costs for a satellite could be in the "ballpark" of "hundreds of millions of dollars"—with the qualification that he "honestly [didn't] know" and was "completely guessing." Appx4356 at 157:17-25. But more to the point, ***none*** of this evidence cited in the Order proves that SXM in fact incurred "hundreds of millions of dollars" in equipment costs dedicated to the high-band system during the relevant time period or that any of the accused satellites were actually "launched into space" after 2010.

The third and final form of prejudice cited in the Order is an observation by way of "judicial notice" that "high-speed cellular data" now permits "music and podcast streaming to iPhones in cars across the nation." Appx8. According to the Order, "it's not just that SXM can't get its time back—from present vantage, that five-year period of Fraunhofer's silence may have been SXM's golden years." *Id.* The relevance (if any) of this argument to the prejudice analysis is unclear, and it is notable that SXM nowhere advances this argument in its briefing. In any event, the Order does not articulate what prejudice SXM may or may not be suffering on this point, much less identify undisputed evidence sufficient to compel the conclusion that SXM would have responded differently to the proliferation of iPhones and high-speed data if Fraunhofer had raised its infringement claims earlier.

In short, none of the cited evidence comes close to satisfying SXM's burden on summary judgment to demonstrate there is no genuine factual dispute that SXM was prejudiced by Fraunhofer's allegedly misleading behavior. At a minimum, the factual assertions on which the Order relies remain subject to multiple, meaningful disputes, including questions of causation, the scope and nature of SXM's alleged expenditures, the technical feasibility of any claimed alternatives, and more. Thus, even if SXM's prejudice theories were not invalid on their face, they would at most present factual disputes requiring resolution at trial.

Because it is clear on plenary review that SXM failed to identify undisputed evidence supporting ***any*** of the three equitable estoppel elements, the finding of summary judgment should be reversed. *Meyers*, 974 F.2d at 1306; *see also Aukerman*, 960 F.2d at 1041, 1043 (trial court lacks discretion to grant equitable estoppel on summary judgment where elements are in genuine dispute).

### D. The Existence Of An Express License On The Same Subject Precludes Any Finding Of An Implied License Here

Even if SXM had satisfied all three of the equitable estoppel elements, its bid for summary judgment would still fail as SXM did not prove the additional requirements needed to establish an implied license. *See Wang Lab'ys*, 103 F.3d at 1581 ("implied license defense" is "issue[] of law").

"[J]udicially implied licenses are rare under any doctrine." *Wang Lab'ys*, 103 F.3d at 1581. As this Court has pithily noted: "You get what you bargain for. And

we will not use the implied license doctrine to insert ourselves into that bargain and rewrite the contract." *Endo Pharms. Inc. v. Actavis, Inc.*, 746 F.3d 1371, 1378 (Fed. Cir. 2014). Thus, "[t]he existence of an express contract" will "preclude[] the existence of an implied contract dealing with the ***same subject***" while an implied contract may arise where it is "entirely unrelated to the express contract." *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990).

In this case, there can be no meaningful dispute that the FFPC between Fraunhofer and XM "deals with the same subject" as the implied license that SXM sought to have judicially created. The FFPC expressly seeks engineering work from Fraunhofer pertaining to XM's satellite radio system (i.e., the product accused of infringement here). *See, e.g.*, Appx1677-99 ("Statement of Work" describing components of contemplated digital audio radio system or "DARS"). The FFPC also addresses all four of the patents-in-suit, listing each of them in Exhibit D and explicitly stating: "All of the above listed patents related to MCM technology are exclusively licensed to WorldSpace. XM Radio will be in charge to obtain a license for these patents from WorldSpace." Appx1707; Appx4383-84 at 265:18-267:14. The parties fully understood the import of this language as confirmed by the testimony of SXM's witnesses (e.g., Appx4366 at 194:3-195:2; Appx4154-55 at 85:8-86:9), in addition to the fact that XM actually did enter into a Sublicense with WorldSpace. Appx1638-39. Thus, given the existence of an express bargain on this

subject, the District Court could not properly "insert [itself] into that bargain and rewrite the contract." *Endo Pharms.*, 746 F.3d at 1378.

The Order offers just three rationales for its finding of an implied license here, none of which withstands scrutiny. First, the Order finds it inconsistent that Fraunhofer would simultaneously argue that (1) the FFPC did not provide XM with a license to the asserted patents and (2) there is no implied license to those patents as a matter of law. Appx5. But as explained above, these arguments are entirely consistent and indeed reflect a basic articulation of this Court's precedent. *Endo*, 746 F.3d at 1378; *Atlas*, 895 F.2d at 754. Nowhere does Federal Circuit law suggest that a party must concede that patents have been expressly licensed as a prerequisite to arguing that no implied license exists.

Second, the Order attempts to rely on this Court's decision in *High Point* to suggest that the existence of "licenses on point" might not preclude a finding of implied license. Appx5. This line of reasoning not only disregards the precedent discussed above (including *Endo* and *Atlas*), but also fails to appreciate that *High Point* did not even involve an implied license. Indeed, the district court decision in that case specifically noted that the defendant was "not seeking an implied license." *High Point Sarl v. Sprint Nextel Corp.*, 67 F. Supp. 3d 1294, 1313 (D. Kan. 2014). Thus, *High Point* is inapposite on this issue.

Third, the Order opines that "SXM's reliance on the believed sublicense here is the exception that proves the rule." Appx5. As an initial matter, this argument seems to conflict with the Order's conclusion that it was Fraunhofer's misleading behavior upon which SXM relied—not the Sublicense. As explained above, SXM's failure to establish the "reliance" element provides an independent basis to reject its implied license. In any event, the suggestion that a party's subjective belief might be sufficient to create an implied license is simply contrary to law. "[A]n implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party." *Stickle*, 716 F.2d at 1559.

The creation of an implied license here was thus plainly contrary to law, and provides yet another independent rationale to reverse the finding of summary judgment for SXM.

### E. The Other Rationales Presented In The Order Fail To Support The Finding Of Summary Judgment

The Order suggests two additional rationales for its decision, neither of which provides any meaningful support for summary judgment in this case.

First, the opening of the Order's analysis gets off to a wrong start by emphasizing the purported unreasonableness of Fraunhofer's delay in bringing suit: "*Why the wait?*" Appx3. This framing reflects a basic misconception in the Order, as unreasonable delay is the touchstone of the (now largely defunct) defense of laches—***not*** equitable estoppel.

The Supreme Court has repeatedly emphasized the fundamental differences between laches and equitable estoppel. In *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), the Supreme Court substantially eliminated the laches defense in copyright cases, finding that Congress had already accounted for timing issues with an express statute of limitations. *Id.* at 677. Accordingly, there was no basis for courts to find anything inherently "untoward" about a litigant delaying suit, including "waiting to see" the effect of an "infringer's exploitation" before filing a complaint. *Id.* at 682-83 (acceptable for IP owner to "defer suit until she can estimate whether litigation is worth the candle"). Three years later, in *SCA Hygiene*, the Supreme Court reaffirmed the reasoning of *Petrella* and held that because Congress had already limited patent damages to six years before the filing of a lawsuit (35 U.S.C. § 286), there was no justification for courts to apply an additional penalty due to alleged "unreasonable" delay. 580 U.S. at 334-37. In both cases, the Supreme Court drew a contrast with the equitable estoppel defense given its distinctive (and "more exacting") requirements of "misleading representations," "detrimental reli[ance]" and "consequent loss." *Petrella*, 572 U.S. at 684; *SCA Hygiene*, 580 U.S. at 345-46. For equitable estoppel, "[d]elay may be involved, but is not an element of the defense." *Petrella*, 572 U.S. at 684-85.

This precedent underscores that the timing of Fraunhofer's lawsuit by itself does not preclude suit against SXM, as Congress has already specified the

appropriate consequences of any purported delay. In this case, Fraunhofer's damages are limited to six years before the filing of its complaint in 2017 under § 286, and thus Fraunhofer cannot recover any damages for infringement by SXM before February 2011. Moreover, because the patents-in-suit have expired (again, based on the limited term mandated by Congress), no additional damages for infringement are currently accruing, and injunctive relief against SXM is no longer available. There was no reason or obligation for Fraunhofer to justify or "explain [its alleged] delay" (*cf.* Appx3) as this already has been statutorily factored into the case. Whether the timing of Fraunhofer's lawsuit can be viewed as unreasonable—a proposition Fraunhofer strongly disputes—is simply irrelevant here.

Second, the Order errs in its reliance on the irrelevant XM Settlement that was executed in 2009 during the WorldSpace bankruptcy. The XM Settlement is referred to repeatedly in the Order, suggesting its perceived importance to the overall analysis and outcome. *See, e.g.*, Appx2 ("an earlier iteration of SXM paid WorldSpace a lump sum of $298,517 to maintain the irrevocable sublicense"), Appx3 (the "now-alleged infringer … had paid nearly $300,000 the year before to maintain the sublicense"), Appx4-5 ("the irrevocable sublicense it had just paid, with the Bankruptcy Court's approval, to maintain"), Appx5 ("the sublicense that SXM had just fully paid and could point to [the] Bankruptcy Court order approving"), Appx8 ("SXM …

believing it still had a valid and Bankruptcy Court approved sublicense to the asserted patents").

The Order's recurring invocation of the XM Settlement gets several things wrong. As a factual matter, it was ***not*** SXM (or even "an earlier iteration of SXM") that entered into this settlement, but rather the distinct entity XM. Appx1711. The SXM corporate entity ("Sirius XM Radio Inc.") was already in existence when the XM Settlement was negotiated and executed—indeed, SXM owned XM through a holding company at the time—yet the settlement on its face clearly does not name SXM as a party. *Id.* Thus, the Order cannot stand to the extent it relied on its mistaken understanding of the XM Settlement, which is simply "not supported by evidence." *Braun*, 124 F.3d at 1425; *Aukerman*, 960 F.2d at 1039 (reliance on "clearly erroneous factual underpinnings" constitutes abuse of discretion).

The XM Settlement also cannot plausibly be characterized as supporting any of the three elements of equitable estoppel in this case. First, there was no "misleading" action or inaction by Fraunhofer relative to the settlement, as Fraunhofer was not a party to that agreement, WorldSpace still had the exclusive rights to the patents-in-suit at the time, and the settlement did not purport to expand rights granted under the Sublicense in any way. Second, to the extent SXM relied on its own understanding of the impact of the settlement in pursuing its infringing activity (as opposed to relying on anything Fraunhofer did or did not do), that tends

to disprove any qualifying "reliance" by SXM. Third, any amount paid in 2009 under the settlement cannot logically constitute "prejudice" caused by any allegedly misleading action or inaction of Fraunhofer in 2010 or later. *See Hall*, 93 F.3d at 1558 (no prejudice where defendant did not "demonstrate that the allegedly prejudicial events occurred after [the patentee] knew or should have known of the allegedly infringing activities").

Nor is there any reason to find that any implied license could arise by virtue of the XM Settlement. Fraunhofer was not a party to the settlement, did not participate in its negotiation, and received no money thereby (the settlement payment went to WorldSpace alone). Appx1711-13. Moreover, even if SXM genuinely believed that it somehow obtained rights to the patents-in-suit under the settlement, the law is clear that "an implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party." *Stickle*, 716 F.2d at 1559. Simply put, the XM Settlement has no relevance to SXM's summary judgment motion.

In short, the Order fails to provide any proper legal or evidentiary basis sufficient to sustain summary judgment against Fraunhofer. Accordingly, that judgment should be reversed and the case remanded for further proceedings.

## II. FRAUNHOFER'S CROSS-MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED IN VIEW OF SXM'S FAILURE OF PROOF

In addition to reversing the finding of summary judgment for SXM, the Court should take the additional step of remanding with instructions to grant Fraunhofer's related summary judgment motion directed to SXM's defense of equitable estoppel and its corresponding implied license theory.

Because both of these defenses are issues on which the "nonmoving party [SXM] bears the burden of proof," Fraunhofer did not need to do anything in its summary judgment motion other than "point[] out to the district court … that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Nevertheless, in this case, Fraunhofer not only pointed out SXM's failure of proof on these defenses, but also provided additional legal and evidentiary support demonstrating that these defenses failed as a matter of law. *See* Appx1539-43 (implied license based on equitable estoppel), Appx1544-45 (equitable estoppel).

As shown in the detailed discussion above, SXM failed to satisfy any of the three elements of the equitable estoppel defense and likewise failed to demonstrate the existence of an implied license based on equitable estoppel. Thus, any one of these defects would suffice to justify summary judgment for Fraunhofer. For example, Fraunhofer demonstrated that SXM had not presented any evidence to support a finding that SXM had detrimentally relied on any supposedly misleading

words or conduct by Fraunhofer. Appx1541, Appx1544-45. To the contrary, the evidence showed that SXM had at most relied on its own mistaken judgment regarding the effect and impact of the Sublicense. *Id.* Fraunhofer also pointed to the FFPC, noting that it constituted an express contract relating directly to the accused product and Fraunhofer's related patents, thus precluding any implied license on the "same subject." Appx1542-43.

In opposing Fraunhofer's motion, SXM failed to identify any evidence from which a factfinder could conclude that SXM had met its burden of proof for either of these defenses. The vast majority of the evidence cited in SXM's summary judgment papers has already been discussed above. The Order correctly dismisses at least two other pieces of evidence cited by SXM based on objections raised by Fraunhofer. Appx4 n.2 (email lacking foundation and relevance); Appx6 n.3 (declining to "consider the late-arriving declaration of [SXM employee] Craig Wadin"). And the few remaining documents cited by SXM are so clearly irrelevant that they are not even mentioned in the Order. Appx1854 (unexplained chart of voluminous SXM chipset data); Appx6104 (2011 Fraunhofer annual report mentioning "the successful Sirius XM satellite radio system"); Appx4021-23 at 248:12-249-4, 252:13-253:12 (testimony from Fraunhofer inventor that XM was using Fraunhofer patents but declining to offer legal opinion regarding infringement or license status).

In short, SXM does not come even close to demonstrating it could satisfy its evidentiary burden with respect to its equitable estoppel defense and related implied license theory. Accordingly, summary judgment should be granted for Fraunhofer on these issues.

## III. THE SUMMARY JUDGMENT ORDER FAILED TO PROPERLY ADDRESS FRAUNHOFER'S OTHER THEORIES OF LIABILITY, WHICH SHOULD BE RESOLVED ON REMAND

Even if the Order's grant of summary judgment were affirmed, Fraunhofer submits that such a ruling should not operate to terminate this lawsuit in its entirety. That is because Fraunhofer has advanced multiple theories of liability in its infringement suit against SXM, and the ruling in the Order as properly understood applies only to one of them at most—leaving the other theories unresolved and requiring further proceedings on remand.

In circumstances such as these where the theory of implied license is based on equitable considerations, it is especially important to carefully tailor the scope of any relief granted. As this Court has held, "even where the three elements of equitable estoppel are established, [a court must] take into consideration any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the defense." *Aukerman*, 960 F.2d at 1043. For example, this Court has previously approved the application of equitable estoppel to bar part

but not all of a case. *See Radio Sys.*, 709 F.3d at 1131 (reversing finding of equitable estoppel as to one asserted patent but affirming as to a second patent).

In this case, the Order expressly predicates its analysis and ultimate decision on an assumption that the MLA and Sublicense were in fact terminated in 2010. Appx2. However, Fraunhofer has at least two other theories of liability that remain unresolved.

### A. Remand Is Needed To Consider Fraunhofer's Alternative Theory That The MLA And Sublicense Terminated In 2015

First, Fraunhofer has argued that the MLA and Sublicense alternatively may be found to have been terminated in 2015 rather than 2010. Both the 2010 and 2015 termination theories have been thoroughly litigated in this case, and both were addressed in the parties' summary judgment motions. *See, e.g.*, Appx1459-65; Appx1506-1513.

The ultimate decision on the timing of termination has a critical impact on SXM's claim to an implied license based on equitable estoppel. Indeed, if the MLA and Sublicense did not terminate until 2015, then the entire basis for SXM's summary judgment argument would indisputably collapse. That is because if SXM enjoyed full rights to the asserted patents until 2015, then Fraunhofer had no reason—and in fact, no legal right—to raise any issue of infringement between 2010 and 2015. Thus, Fraunhofer's alleged "silence" during that period could not have been misleading and could not have resulted in any prejudice or detrimental reliance.

*Ricoh Co. v. Nashua Corp.*, 185 F.3d 884, at *4 (Fed. Cir. 1999) (plaintiff "cannot be estopped for failing to speak up" in absence of cognizable infringement claim).

Although this Court held in the earlier appeal of this case that the question of termination would need to be decided on remand (940 F.3d at 1380), the District Court again declined to do so, going so far as to find Fraunhofer's summary judgment motions "moot" (Appx8) even though one of them expressly sought a judgment that the MLA and Sublicense terminated in 2015. Appx1510-19. This was error. Fraunhofer's alternative 2015 termination theory needs to be considered and decided (either on summary judgment or at trial) to fully resolve this lawsuit. *See Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1321 (Fed. Cir. 2001) (remanding for further consideration where district court was "obligated to rule on … matters" that were not "moot" and had not yet been "fully litigated").

### B. Remand Is Needed To Consider Fraunhofer's Independent Theory That SXM Never Received Any Rights Under The Sublicense Because It Was Not Properly Assigned To SXM

Fraunhofer further presented a third theory of liability in a separate summary judgment motion that was likewise wrongly dismissed as "moot." Appx1479-92. Under this theory, Fraunhofer argued it was impossible for SXM to claim any rights under the Sublicense, as SXM was not a party to the Sublicense, there was never any transfer of Sublicense rights from XM to SXM (whether by merger, agreement, or otherwise), and the Sublicense did not even include any provision permitting

assignment. *Id.*; *Relume Corp. Tr. v. GE Lighting Sols., LLC*, 2013 WL 6979467, at *2 (D. Del. Dec. 30, 2013) ("[P]atent licenses are not generally assignable without language expressly permitting assignment."), *aff'd*, 591 F. App'x 945 (Fed. Cir. 2015). Although SXM attempted to rely on the January 2011 merger with XM, that transaction was ineffective to transfer the Sublicense to SXM as a matter of law absent the formal consent of WorldSpace. *Id.; PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1093, 1096 (6th Cir. 1979) (rejecting license defense; merger transaction did not operate to transfer patent license to surviving entity, as "[i]t has long been held by federal courts that agreements granting patent licenses are personal and not assignable unless expressly made so").

Indeed, the restrictions on transfer of the Sublicense were known and specifically reiterated in the XM Settlement, which amended the Sublicense and confirmed that it could not be transferred without written consent. Appx1486; Appx1711-12 ("amend[ing], with respect to the above-named parties only, that certain TECHNOLOGY LICENSING AGREEMENT entered into on July 30, 1998 [the Sublicense]" and confirming "[t]his Agreement may not be assigned or transferred (by sale, merger, operation of law or otherwise) in whole or in part, without the prior written consent of all Parties.").

Under Fraunhofer's third independent theory of liability, SXM lacked any rights under the Sublicense regardless of the outcome of Fraunhofer's 2010 and 2015

termination theories. Appx1479-80. And there was no reason for Fraunhofer to raise any claim of infringement based on this theory prior to this lawsuit, as Fraunhofer did not learn until the discovery phase of this case that XM had never obtained the necessary consent from WorldSpace to assign the Sublicense to SXM. Appx1483; Appx2979; Appx2931. It therefore makes no sense to fault Fraunhofer for not having raised the issue earlier, much less claim that Fraunhofer misleadingly "delayed" in filing suit based on a theory that it had no reason to know even existed. *See Ferring B.V. v. Allergan, Inc.*, 980 F.3d 841, 855-57 (Fed. Cir. 2020) ("[i]n the absence of notice" regarding facts relevant to the parties' dispute, "a reasonable factfinder could find that [the plaintiff] did not mislead").

Accordingly, the Order erred in declining to reach this issue and denying Fraunhofer's corresponding motion as "moot." The parties' dispute was not and could not have been resolved by SXM's implied license defense based on equitable estoppel. Indeed, the Order appears to have misapprehended Fraunhofer's argument, stating the Order would "[a]ssume SXM's various mergers effected an assignment in violation of the sublicense and final settlement" (Appx2), when in fact Fraunhofer's position was that there was ***not*** any effective assignment. This independent theory of liability can and should be resolved on remand, whether on summary judgment or at trial. *See Fin Control*, 265 F.3d at 1321.

## IV. THE DISTRICT COURT ERRED IN DENYING FRAUNHOFER'S PRIVILEGE CLAIMS ON THE LEGALLY INCORRECT THEORY THAT A PATENTEE AND POTENTIAL LICENSEE CANNOT HAVE A COMMON INTEREST UNTIL A LICENSE IS EXECUTED

Finally, this Court should take the opportunity on appeal to address a pertinent ruling regarding privilege that was erroneously decided as a matter of law. The relevant dispute stems from a series of confidential written communications between Fraunhofer and the licensing entity IPXI in 2013 and 2014. Appx1252-53; Appx1270-72 (Fraunhofer-IPXI NDA). Some of these communications contained material subject to a claim of attorney-client privilege and/or work product protection by Fraunhofer (collectively "privilege"). Appx1252 (citing seven entries from Fraunhofer's privilege log). SXM did not dispute the underlying privilege but argued the documents forfeited their privileged status when shared with IPXI. Appx1024-25. Fraunhofer asserted that the privilege was preserved under a common legal interest between IPXI and Fraunhofer as they negotiated and entered into licensing agreements. Appx1252-53; Appx1274, Appx1334-63 (draft license); Appx1178-89 (License Option Agreement); Appx1191-228 (Master Agreement). This dispute was ultimately presented for judicial resolution, first by the Magistrate Judge and then the District Court. Appx15-18; Appx27-28.

SXM's motion to compel was granted in part. The District Court agreed with Fraunhofer that it shared a common legal interest with IPXI (Appx18, Appx28), but found this common interest did not exist until the parties had formally entered into

a licensing agreement. Appx27-28; Appx16-19. As a result, Fraunhofer was required to produce the five challenged documents that predated that agreement. *Id.* In essence, the District Court adopted a categorical, bright-line rule that no common interest can apply to communications between a patentee and licensee before a licensing agreement has been executed. Appx27 ("no common interest privilege applies to the communications that predated the Master Agreement").

The District Court's adoption of this bright-line rule was legal error inconsistent with this Court's precedent in *In re Regents of University of California*, 101 F.3d 1386 (Fed. Cir. 1996). *Regents* held that even a "***potential*** licensee" shares with the "inventor/patentee" the same legal interest in "strong and enforceable patents" that would support "royalty income"—the very common interest shared by Fraunhofer and IPXI in their private communications in this case. *Id.* at 1390.

Other courts have applied and relied on this holding of *Regents* in similar circumstances. *See, e.g.*, *Hilsinger Co. v. Eyeego, LLC*, 2015 WL 11120842, at *2 (D. Mass. Aug. 13, 2015) ("absence of an exclusive licensing agreement at the time … does not necessitate a finding that the parties … shared no common legal interest"); *TC Tech. LLC v. Sprint Corp.*, 2018 WL 6584122, at *3-4 (D. Del. Dec. 13, 2018) ("no reason why the formation date should be a hard cut-off for privilege" in view of common legal interest in "acquiring and enforcing a patent"); *Crane Sec. Techs., Inc. v. Rolling Optics*, 230 F. Supp. 3d 10, 19 (D. Mass. 2017)

("communications between parties … as they are negotiating exclusive license agreements are protected under the common-interest doctrine"). Indeed, a contrary rule would make little sense, as it would frustrate the ability of licensing parties to share important, privileged information in the course of working out a substantive contract on subjects where they share a common legal interest.

Because the District Court's privilege ruling was based on an erroneous conclusion of law, it should be reversed. This Court should find that the privileged Fraunhofer documents at issue remain protected under the common interest doctrine, and order that all copies of these documents previously disclosed to SXM's counsel should be returned or destroyed.

## CONCLUSION

Fraunhofer respectfully requests that the Court (1) reverse the finding of summary judgment for SXM, (2) remand with instructions to grant Fraunhofer's summary judgment motion with respect to SXM's equitable estoppel defense and related implied license defense, (3) reverse the mootness finding directed to Fraunhofer's summary judgment motions for its two alternative theories of liability and remand for further proceedings on those theories, and (4) reverse the finding that certain privileged Fraunhofer documents shared with IPXI were not protected by the common interest doctrine.

Respectfully submitted,

Dated: November 9, 2023 *_/s/ Ben J. Yorks_*

Ben J. Yorks
David C. McPhie
IRELL AND MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6324
Telephone: (949) 760-0991

*Attorneys for Appellant*
*Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V.*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRAUNHOFER-GESELLSCHAFT ZUR FORDERUNG DER ANGEWANDTEN FORSCHUNG E.V., Plaintiff, v. SIRIUS XM RADIO INC., Defendant. | 1:17CV184 MEMORANDUM AND ORDER |

A number of motions for summary judgment and to exclude expert testimony pend before the Court. D.I. 637, D.I. 639, D.I. 641, D.I. 643, D.I. 644, D.I. 646, D.I. 649, D.I. 651, D.I. 653, D.I. 654, D.I. 657, D.I. 658, D.I. 660, D.I. 663, D.I. 664, D.I. 667, D.I. 669, D.I. 671, D.I. 673, D.I. 675, D.I. 679, D.I. 681, D.I. 683. The Court finds this patent-infringement complaint equitably estopped.

In the 1990s, plaintiff, Munich-based research organization Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V. ("Fraunhofer"), obtained several United States patents claiming technology underlying satellite communication networks. Via an exclusive and irrevocable license to WorldSpace International Network Inc., dated March 4, 1998, and a sublicense dated that July 24 (made irrevocable by June 7, 1999, amendment), the technology came to defendant Sirius XM Radio Inc.'s ("SXM") predecessor, American Mobile Radio Corporation. Joint development of the technology ensued, employing both Fraunhofer's already sublicensed patents and more, per a July 16, 1999, consulting agreement. *Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372 (Fed. Cir. 2019); D.I. 676-1 (Exs. 3–5).

On October 17, 2008, WorldSpace filed for bankruptcy. Among the settlements, an earlier iteration of SXM paid WorldSpace a lump sum of $298,517 to maintain the irrevocable sublicense (Bankruptcy Court approved on July 13, 2009), and then a year later, in potential contradiction, WorldSpace and Fraunhofer rejected (the parties dispute the meaning of the term here) the master license agreement (approved June 2, 2010). 940 F.3d at 1376; D.I. 676-1 (Exs. 4, 6–13).

But if Fraunhofer believed the sublicense also terminated, it kept that to itself for more than five years and, in the meantime, continued consulting with SXM as usual. Not until October 2015 did Fraunhofer notify SXM of its alleged infringement. And on November 13, 2015, further complicating the interpretation of the bankruptcy settlements, Fraunhofer formally terminated (if it had not already) WorldSpace's master license. 940 F.3d at 1376; D.I. 676-1 (Exs. 16–19); D.I. 709-1 (Exs. 129–38).

This Court dismissed Fraunhofer's February 2017 complaint, reasoning that the sublicense provided a complete defense. D.I. 146, D.I. 175. But the Federal Circuit reversed, questioning whether the master license had been terminated, and if so, when, and whether the sublicense survived. 940 F.3d at 1379–80. The present dispositive motions follow eventful discovery.[1]

There's no use complicating matters. Assume SXM's various mergers effected an assignment in violation of the sublicense and final settlement. D.I. 644. Assume Fraunhofer properly terminated the master license in 2010, and the sublicense lapsed. D.I. 646. Assume the consulting agreement gives SXM no right to the asserted patents. D.I. 649. And ignore whether Fraunhofer, having perhaps left the master license in limbo

[1] Citing only American law in the relevant briefing, the parties seem to assume, and the Court accepts, its application to this international dispute.

in 2010, retained any latent right to terminate it in 2015. In other words, assume Fraunhofer's view: that SXM has been using Fraunhofer's patented technology without license since at least June 2010—and both knew it.

*Why the wait?* If, as Fraunhofer so forcefully argues, the master license conclusively terminated in June 2010, then its undisputed *more than five-year* delay in asserting, let alone mentioning, its patent rights against a *known* former sublicensee and now-alleged infringer—who, for that matter, had consulted with Fraunhofer in further developing that patented technology and had paid nearly $300,000 the year before to maintain the sublicense—amounts to a bait and switch. This equity estops.

It's noteworthy that Fraunhofer never attempts to explain the delay. Instead, quoting *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, Fraunhofer notes that "silence alone will not create an estoppel unless there was a clear duty to speak." D.I. 708 at 25. True enough in general. But in what the Court can only imagine to be unintentional drafting, Fraunhofer omits the material remainder of the quote—"*or* somehow the patentee's continued silence reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 767 F.3d 1339, 1349 (Fed. Cir. 2014) and 580 U.S. 328 (2017) (emphasis naturally added). Indeed, as the Federal Circuit has confirmed more recently: silence, "accompanied by some other factor which indicates that the silence was sufficiently misleading as to amount to bad faith," *can* equitably estop a patent suit. *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016).

*High Point* itself proves illustrative. To begin, Fraunhofer thinks relevant *only* its post(-alleged)-termination conduct. Granting the importance of that conduct, *High Point* nonetheless looked to the *entirety* of the patent owners' conduct during both licensed and unlicensed periods, where like here, Sprint and High Point's patent-owning predecessors had collaborated since the 1990s, with appropriate licenses. And there too, only after years of known and undisrupted unlicensed activity, High Point sued.

True enough, during that silence, High Point's predecessors had continued to work with Sprint and others in the relevant field, including "licensing arrangements involving the patents, discussing interoperability with other potentially infringing vendors, and continuing business relationships." 817 F.3d at 1331. But so too here, after Fraunhofer supposedly terminated the master license and extinguished the sublicense, it continued consulting as usual with SXM. D.I. 676-1 (Ex. 14); D.I. 709-1 (Ex. 129–31,[2] 133–38). Fraunhofer downplays the extent to which this continuing relationship implicated the asserted patents and notes most of SXM's later consulting payments had been due before the master license terminated. Accepting all this as true, it remains undisputed that SXM and Fraunhofer continued an otherwise ordinary business relationship for five-plus years following the supposed master-license termination before ever raising the matter of infringement.

Equity is a sliding scale. Where Sprint had *affirmatively exceeded* the bounds of its existing licenses, premised on equipment supplied by High-Point's predecessors or other approved vendors, by procuring unlicensed equipment from third parties, here SXM remained within the substantive bounds of the irrevocable sublicense it had just paid, with

[2] The Court accepts Fraunhofer's disavowal of SXM's Exhibit 132. D.I. 720 at 12, n. 11.

the Bankruptcy Court's approval, to maintain—the dispute being whether the agreement lapsed for other reasons. Sprint's greater deviation from the license logically required greater justification. At best for Fraunhofer, these differences come out awash.

Fraunhofer responds that courts generally refuse to recognize an implied license, which equitable estoppel effectively grants, where an agreement on point exists. But setting aside that licenses on point did not preclude estoppel in *High Point*, or that SXM's reliance on the believed sublicense here is the exception that proves the rule, Fraunhofer is talking out of both sides of its mouth. Its entire case rests on the premise that no license of the asserted patents exists between it and SXM (or WorldSpace for that matter). Similarly, Fraunhofer finds no absolution hiding behind its licensing intermediary. Fraunhofer told SXM to obtain a sublicence from WorldSpace, SXM did so, and Fraunhofer's case here is that it terminated the master license.

At bottom, if Fraunhofer believed that its 2010 rejection of the master license extinguished the sublicense that SXM had just fully paid and could point to Bankruptcy Court order approving, had consulted with Fraunhofer for years under, and would continue to consult in at least limited capacity for several more years, the record confirms that Fraunhofer *never said so* until five-plus years later. That undisputed and misleading silence-plus-more very reasonably implied approval of SXM's now-allegedly infringing activity.

SXM, unsurprisingly enough, relied on Fraunhofer's extended silence and conduct to its detriment. Following the Sirius and XM family mergers culminating in Sirius XM Radio in 2008, the new company had to decide which of the former pair's competing systems (referred to as the high-band and low-band systems) to continue and which to

retire. The high-band system employed Fraunhofer's patents and collaborative efforts; the low-band did not. Each move entailed shifting a substantial portion of carmakers from one hardware set to the other and launching and maintaining a network of satellites (*satellite* radio after all). Viewed favorably to Fraunhofer, the record appears to reflect that the high-band system carried some meaningful, but by no means dispositive, technical benefits, though undisputed testimony reveals that either option would have been technically feasible (indeed, SXM has maintained legacy low-band service as recently as discovery in this suit). Ultimately, as the parties agree, *e.g.*, D.I. 708 at 26, the choice came down to business pragmatics: SXM elected to shift over the smaller market share of the low-band system rather than shift over the larger market share of the high-band. And, again unsurprisingly, SXM's license (or so it thought) proved material. If barred from the high-band, SXM could and would have elected the low. D.I. 676-1 (Exs. 22–24, Paul David Krayeski, David A. Birks, and Craig P. Wadin Dep. Trs.); D.I. 685-103 at 11 (Denise Karkos Dep. Tr.); D.I. 685-121 (Ex. 119, Wadin Tr. 283).[3]

Instead of proffering evidence to the contrary, Fraunhofer recasts Mr. Wadin's testimony as admitting the low band's infeasibility. Review compels the opposite conclusion. First, Mr. Wadin explained that SXM's reliance on radio sets installed in consumers' cars presented an "ugly" challenge in picking a single system to proceed with—SXM couldn't just shut off one band and send everyone a replacement radio to re-install in their car. But that, instead of foreclosing the low-band system, in large part explains why SXM has kept the legacy low-band—the *alternative* to infringement—operational all these years. D.I. 685-121 (Wadin Tr. 150–54, 162–63). Second, Mr.

---

[3] The Court did not consider the late-arriving declaration of Craig Wadin, appended to SXM's opposition to Fraunhofer's third motion for summary judgment. D.I. 709-4 (Ex. 152).

Wadin explained that rolling out new equipment with each carmaker proved a prime obstacle, an effort that lasted from 2010 to 2020. *Id.* (Tr. 169). Yet again, instead of foreclosing the low-band as an option, this both reemphasizes the noninfringing alternative's feasibility (recall, SXM kept it running) and (looking ahead) highlights the prejudice here—a decade's unrecoverable effort changing over automotive installations. And third, Mr. Wadin did describe counsel's hypothetical immediate shutdown of the high-band system in 2010 due to patent infringement suit as "a real disaster scenario," given SXM would have had to quickly redesign a noninfringing solution and because "if you turn off the service, it's not viable." But the alternative remained: "as I understood your question, *low band is still operational*." So, aside from highlighting the five years Fraunhofer sat on its hands, this testimony again reaffirms the low band to be a feasible alternative. *Id.* (Tr. 278–83).

Fraunhofer next posits that SXM determined upon the high-band system sometime between its July 2008 formation and the master license termination, though none of Fraunhofer's record citations seem to support this assertion, and other witness testimony places the decision sometime between 2010 and 2012, D.I. 676-1 (Ex. 23, Birks. Tr. 37). Even assuming the earlier decision, however, that would hardly diminish SXM's reliance on Fraunhofer's apparent approval of its decision over the next five years of the ten-year effort to shift over equipment manufacturing.

Finally on reliance, Fraunhofer faults SXM's apparently brazen, well, *reliance* on its sublicense when Fraunhofer finally raised the matter of infringement in late 2015. But this just confirms SXM's heartfelt (if indignant) belief that it had a valid sublicense.

Prejudice, undisputed, requires little inquiry. Besides the Deutsche Marks lost to history and the remaining hundreds of thousands of Euros paid to develop the high-band system before and *after* the supposed master-license termination, work it now apparently *can't use* without Fraunhofer's permission, D.I. 709-1 (Exs. 129–31, 135–37), SXM irretrievably installed hundreds of millions of dollars of equipment into peoples' cars during the ten years it took to shift car manufacturers over to the new system—or launched it into space, D.I. 685-121 (Ex. 119, Wadin Tr. 152, 157–58, 169). And it's worth highlighting (judicial notice permitting), now that high-speed cellular data permits music and podcast streaming to iPhones in cars across the nation, it's not just that SXM can't get its time back—from present vantage, that five-year period of Fraunhofer's silence may have been SXM's golden years.

To conclude, an undisputed record establishes a more than five-year period during which Fraunhofer's silence and course of conduct (intentional or not) misled SXM into reasonably believing it still had a valid and Bankruptcy Court approved sublicense to the asserted patents, during which SXM substantially developed its business in reliance, in an expenditure of time, product development, manufacturing shifts, and installations that (aside from the money) SXM could not get back were this stale claim permitted. 817 F.3d at 1330.

THEREFORE, IT IS ORDERED THAT SXM's motion for summary judgment, D.I. 638, is granted in part. All remaining motions are denied as moot. Judgment to follow.

Dated this 10th day of July, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRAUNHOFER-GESELLSCHAFT ZUR FORDERUNG DER ANGEWANDTEN FORSCHUNG E.V.,<br><br>Plaintiff,<br><br>v.<br><br>SIRIUS XM RADIO INC.,<br><br>Defendant. | 1:17CV184<br><br>JUDGMENT |

Pursuant to the Memorandum and Order entered on this date, judgment is granted in favor of defendant Sirius MX Radio Inc. and against plaintiff Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V.

Dated this 10th day of July, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

FRAUNHOFER-GESELLSCHAFT ZUR FÖRDERUNG DER ANGEWANDTEN FORSCHUNG E.V.,

Plaintiff,

v.

SIRUS XM RADIO INC.,

Defendant.

Civil Action No. 17-184-JFB-SRF

**UNDER SEAL**

**MEMORANDUM ORDER**

At Wilmington this **28th** day of **June, 2022**, the court having considered defendant Sirius XM Radio Inc.'s ("SXM") motion to compel plaintiff Fraunhofer-Gesellschaft Zur Förderung der angewandten Forschung e.V. ("Fraunhofer") to produce certain documents involving Helmut Schubert that were identified on Fraunhofer's privilege log (D.I. 571 at 1-2), SXM's motion to compel Fraunhofer to produce IPXI documents allegedly subject to the common interest privilege (*id.* at 3-4), Fraunhofer's responses thereto (D.I. 573), and the arguments presented during the June 21, 2022 discovery dispute teleconference, IT IS HEREBY ORDERED THAT SXM's motions to compel are GRANTED-IN-PART for the reasons set forth below.

1. **Background.** Fraunhofer filed this case on February 22, 2017, alleging causes of action against SXM for infringement of U.S. Patent Nos. 6,314,289 ("the '289 patent"), 6,931,084 ("the '1084 patent"), 6,993,084 ("the '3084 patent"), and 7,061,997 ("the '997 patent;" collectively, the "patents-in-suit"). (D.I. 1 at ¶¶ 37-72) The patents-in-suit allegedly cover various aspects of SXM's satellite radio technology. Additional factual background relevant to the particular issues in dispute is addressed in conjunction with the court's analysis.

2. **Application of privilege to non-attorney.** The attorney-client privilege applies to: "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." *In re Grand Jury*, 705 F.3d 133, 160 (3d Cir. 2012) (internal quotations omitted). With a focus on the second element, SXM challenges Fraunhofer's assertion of privilege over certain communications on the privilege log identifying "H. Schubert, Esq." as an author or recipient. (D.I. 571 at 1-2) Specifically, SXM seeks disclosure of Entry Nos. 65, 71, 228, 325, 330, 381, 383, 386, and 387 based on its position that Mr. Schubert is not an attorney. (*Id.*, Ex. B at 7, 25, 38, 44-45) The court divides these privilege log entries into three categories for purposes of its analysis: Category 1 includes Entry Nos. 325, 330, and 383; Category 2 includes Entry Nos. 65 and 228; and Category 3 includes Entry Nos. 71, 381, 386, and 387.

3. As the party asserting the privilege, Fraunhofer bears the burden to show that each challenged category of documents is properly designated as privileged. *See Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 477-78 (D. Del. 2012) (party asserting attorney-client privilege has burden of demonstrating that privilege applies). For the reasons set forth below, SXM's motion to compel the production of improperly designated privilege log entries is DENIED with respect to log entries in Categories 1 and 2 and GRANTED with respect to log entries in Category 3.

4. ***Category 1.*** The court need not reach the issue of Mr. Schubert's status to determine that Fraunhofer has met its burden to show that Entry Nos. 325, 330, and 383 are privileged communications. Entry Nos. 325 and 330 identify Thomas Fischer as a recipient, and there is no dispute that Mr. Fischer is Fraunhofer's in-house counsel. (D.I. 571, Ex. E at 3) Fraunhofer concedes that Entry No. 383 was not sent or received by an attorney, but it notes that

the contents of the communication contained legal advice provided by Fraunhofer's counsel at the Schoppe law firm. (*Id.*) These representations are sufficient to establish the privileged nature of the communications. Therefore, SXM's motion to compel is DENIED with respect to the Category 1 log entries.

**5.** *Category 2.* The log entries in Category 2 describe communications to or from Mr. Schubert regarding patents and patent applications. (D.I. 571, Ex. B at 7, 25) SXM argues that these documents should be produced because Mr. Schubert is neither an attorney nor equivalent, and there has been no showing that the communications were "reasonably necessary" to prosecuting a patent application. (D.I. 571 at 2) In response, Fraunhofer contends that Mr. Schubert is a "Patentassessor" under German law whose role is equivalent to that of an in-house patent attorney. (D.I. 573 at 2) Accordingly, Fraunhofer alleges that Mr. Schubert was authorized to provide legal advice and his communications should remain privileged. (*Id.*)

**6.** Courts have drawn comparisons between a German "Patentassessor" and a patent agent or in-house patent counsel. *See Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., Ltd.*, 1996 WL 732522, at *10 (N.D. Ill. Dec. 18, 1996); *see also Cadence Pharm., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1022-23 (S.D. Cal. 2014) (explaining that communications with German patent agents are confidential under German law). Accordingly, communications to or from a patent assessor are deemed privileged when those communications reflect "legal advice to clients on such issues as patentability, patent infringement and validity." *See Heidelberg Harris*, 1996 WL 732522, at *10.

**7.** The privilege log describes Entry Nos. 65 and 228 as communications regarding legal advice about patent applications and the '289 patent, respectively. (D.I. 571, Ex. B at 7, 25) These topics fall within the ambit of Mr. Schubert's qualifications as a German patent

assessor. (D.I. 573, Ex. 8 at 4) Because these documents reflect confidential information communicated by or to Mr. Schubert for purposes of obtaining patent rights, they are protected under the privilege. *See Softview Computer Prods. Corp. v. Haworth, Inc.*, 2000 WL 351411, at *11 (S.D.N.Y. Mar. 31, 2000) (extending attorney-client privilege to communications of a foreign patent agent about a patent application). Consequently, SXM's motion is DENIED with respect to the Category 2 log entries.

**8.** ***Category 3.*** Fraunhofer argues that the privilege afforded to Mr. Schubert's communications should extend to the Category 3 log entries involving licensing negotiations. (D.I. 573 at 2-3) However, Fraunhofer has not met its burden to show that the full scope of protection under the attorney-client privilege should be extended to a non-attorney's communications on matters outside of the individual's technical patent expertise. "Because the privilege 'obstructs the truth-finding process, it is construed narrowly[.]'" *10x Genomics, Inc. v. Celsee, Inc.*, 505 F. Supp. 3d 334, 337 (D. Del. 2020) (quoting *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991)). Fraunhofer argues for an overly broad interpretation of the privilege protection that is not supported by the case law or the evidentiary record in this case.

**9.** The documents in Category 3 include communications regarding patent licensing negotiations and strategy. (D.I. 571, Ex. B at 7, 44-45) During his deposition in February of 2022, Mr. Schubert confirmed that he is not an attorney. (*Id.*, Ex. C at 9:16-21) Mr. Schubert further testified that "[t]he task of negotiating, setting up the contracts, was a task of the law group[,]" and he was not involved in that process. (*Id.*, Ex. C at 32:12-22) Although Mr. Schubert had the authority to sign the license agreements, he did not draft or review them, and he lacked the expertise to interpret them. (*Id.*, Ex. C at 33:14-19, 46:1-48:21) Under these

circumstances, Mr. Schubert cannot be said to have provided legal advice regarding the patent license agreements, as required to establish that those communications are privileged. *See In re Grand Jury*, 705 F.3d 133, 160 (3d Cir. 2012).

**10.** The cases cited by Fraunhofer do not support a broader application of the privilege. In *Cadence*, the court expressly recognized that "German law does not offer a blanket confidentiality protection for all communications between patent agents and their clients, and requires that communications relate to the rendition of legal services." 996 F. Supp. 2d at 1023; *see also Softview*, 2000 WL 351411, at *11 (declining to extend privilege to communications that did not reflect client confidences). Mr. Schubert's deposition testimony establishes that he was not in a position to provide legal advice regarding the license agreements. (D.I. 571, Ex. C at 33:14-19, 46:1-48:21) Moreover, a German patent professional's ability to provide legal advice is confined to guidance on efforts to obtain and defend patents. *See Heidelberg Harris*, 1996 WL 732522, at *10 (communications to or from a patent assessor are deemed privileged when those communications reflect "legal advice to clients on such issues as patentability, patent infringement and validity."); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 524 (S.D.N.Y. 1992) ("Since I conclude . . . that the communications concern solely a foreign non-party client's prosecution of a foreign patent, I conclude that the documents should be protected."). None of the cases cited by Fraunhofer expressly suggests that the confidentiality protections afforded to German patent assessors may extend to communications regarding contractual matters.

**11.** The record establishes that Mr. Schubert is not an attorney, and he does not possess qualifications or expertise in contract law in his role as a German patent assessor. (D.I. 571, Ex. C at 9:16-21; 32:12-22; 33:14-19, 46:1-48:21) Mr. Schubert's communications

regarding licensing negotiations are not protected from disclosure because they were not made between privileged persons for the purpose of providing legal assistance. *See In re Grand Jury*, 705 F.3d at 160. SXM's motion is therefore GRANTED with respect to the Category 3 log entries.

**12. Common interest privilege.** SXM also seeks the production of Entry Nos. 350, 351, 353, 354, 355, 370, and 371 on the privilege log, which are described as relating to Fraunhofer's patent licensing efforts with IPXI. (D.I. 571 at 3-4) In response, Fraunhofer contends that these documents are privileged because Fraunhofer and IPXI shared a common legal interest in the strength of the subject patent rights at the time the documents were created. (D.I. 573 at 3-4)

**13.** The common interest privilege is an extension of the attorney-client privilege, protecting from discovery communications among clients and attorneys "allied in a common legal cause." *10x Genomics, Inc. v. Celsee, Inc.*, 505 F. Supp. 3d 334, 337 (D. Del. 2020) (quoting *In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1389 (Fed. Cir. 1996) (citation omitted)). The privilege "is an exception to the general rule that an applicable privilege will be deemed waived if the relevant materials are disclosed to a third party." *Astellas US LLC v. Apotex Inc.*, C.A. No. 18-1675-CFC-CJB, 2021 WL 1518716, at *1 (D. Del. Apr. 8, 2021).

**14.** As the party asserting the privilege, Fraunhofer bears the burden of establishing that the privilege applies. *10x Genomics*, 505 F. Supp. 3d at 337 (citing *In re Grand Jury*, 705 F.3d 133, 160 (3d Cir. 2012)). To meet this burden, Fraunhofer must show that the interests it claims to hold in common are "identical, not similar," and the communications it seeks to protect "would not have been made but for the sake of securing, advancing, or supplying legal representation." *Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373, 376 (D. Del. 2010).

The privilege may extend to communications including discussions of business interests as long as those communications are "infused with legal concerns." *MobileMedia Ideas LLC v. Apple Inc.*, 890 F. Supp. 2d 508, 515 (D. Del. 2012). "[T]he key time period . . . is the time when the communications-at-issue were actually made." *Astellas*, 2021 WL 1518716, at *1.

**15.** Fraunhofer has not met its burden to show that it shared a common legal interest with IPXI between November 2013 and January 2014, during the time the communications identified at Entry Nos. 353, 354, 355, 370, and 371 were made. (D.I. 571, Ex. B at 41, 43) There is no dispute that these documents predate the License Option Agreement and Master Agreement executed between Fraunhofer and IPXI. (D.I. 571, Exs. L & M) Before the License Option Agreement and Master Agreement were executed, the prospect of Fraunhofer and IPXI sharing a common legal interest "was too remote, contingent and uncertain to allow for invocation of the common interest doctrine[.]" *Astellas*, 2021 WL 1518716, at *3.

**16.** Fraunhofer contends that it shared a common legal interest with IPXI before November 2013 because it executed the Nondisclosure Agreement ("NDA") with IPXI on April 17, 2013. (D.I. 573 at 3; Ex. 10) However, a review of the NDA shows that the parties viewed their relationship as commercial in nature, and IPXI was not given any legal rights or obligations regarding the patents at the time: "Nothing herein shall obligate any party to proceed with any transaction among them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning this business opportunity." (*Id.*, Ex. 10 at ¶ 5) The NDA was executed solely to allow the exchange of information between Fraunhofer and IPXI with the goal of later entering into a licensing agreement, and it imposed no duty on IPXI beyond the duty not to disclose confidential information. This is insufficient to create an identical legal interest. *See Carnegie Inst. of Washington v. Pure Grown Diamonds, Inc.*, 481 F.

Supp. 3d 276, 279 (S.D.N.Y. 2020) (sharing confidential information for contemplated purchase of license is not sufficient to create common legal interest); *Astellas*, 2021 WL 1518716, at *3 (finding that communications "accompanied by various legal buzzwords, such as notations that the content is 'privileged' or 'protected from discovery' or 'confidential[,]'" were insufficient to establish a common legal interest).

**17.** Fraunhofer also refers to a January 2013 Private Sponsor Confidential Information Memorandum from IPXI, containing a blank form which mirrors the terms of the Master Agreement, along with a blank form of Exhibit A without any patents listed. (D.I. 573, Ex. 11 at F00382616) A review of this document shows that it does not specifically identify or target Fraunhofer. (*Id.*) It includes a request that "each participating party return to IPXI the Form of Commitment Letter found herein no later than February 15, 2014," but the record before the court is devoid of any such Commitment Letter executed by Fraunhofer. (*Id.* at F00382536) Moreover, the materials were provided for informational purposes and fail to demonstrate a common legal interest. (*Id.* at F00382534, F00382536) The NDA executed by Fraunhofer and IPXI does not incorporate by reference or otherwise refer to this document. (*Id.*, Ex. 10) Consequently, neither the Private Sponsor Confidential Information Memorandum nor the NDA are sufficient to demonstrate the existence of a common legal interest between Fraunhofer and IPXI.

**18.** Although the common interest privilege does not apply to Entry Nos. 353, 354, 355, 370, and 371 for the reasons set forth above, Fraunhofer has met its burden to show that select portions of Entry Nos. 353, 355, 370, and 371 remain protected by the attorney-client privilege because they were never shared with IPXI. (D.I. 571, Ex. J at 5) Similarly, Entry No. 350 is protected by the attorney-client privilege in its entirety because Fraunhofer has confirmed

that the document was not shared with IPXI, and IPXI representatives I. McClure and B. Michalek were erroneously listed as recipients on the privilege log. (*Id.*) SXM challenges only Fraunhofer's assertion of the common interest privilege regarding these documents, and it has raised no objection to the applicability of the attorney-client privilege for the portions of the documents that were not shared with IPXI.

**19.** Fraunhofer has met its burden to establish the applicability of the common interest privilege with respect to Entry No. 351. This log entry is dated July 30, 2014, following the execution of the Master Agreement by Fraunhofer and IPXI, but before their September 2014 execution of the License Option Agreement. (D.I. 571, Ex. B at 41; Ex. L; Ex. M) A review of the Master Agreement establishes that Fraunhofer and IPXI were committed to an exclusive license agreement and had agreed to mutual obligations, for example, IPXI's right to seek a "Commercially Essential" Evaluation of the patents by an expert. As parties to the Master Agreement, they shared a common legal interest in strong and enforceable patents. (*Id.*, Ex. M at F00372183-84) Entry No. 351 is a communication allegedly made to obtain legal advice regarding IPXI's licensing of the patents. (D.I. 571, Ex. B at 41) Fraunhofer and IPXI were in the final stages of completing the licensing deal, and their common interest in the strength of the patents was established. *See TC Tech. LLC v. Sprint Corp.*, C.A. No. 16-153-RGA, 2018 WL 6584122, at *4-5 (D. Del. Dec. 13, 2018) (finding a shared legal interest in acquiring and enforcing patent-in-suit prior to formal agreement transferring rights in the patent based on the stage of the parties' negotiations to purchase the patent-in-suit and formation of an LLC to achieve that end). Therefore, SXM's motion to compel is DENIED with respect to Entry No. 351.

20. **Conclusion.** For the foregoing reasons, SXM's motions to compel (D.I. 571) are GRANTED-IN-PART as follows:

- SXM's motion to compel the production of Entry Nos. 71, 354, 381, 386, and 387 is GRANTED. Fraunhofer shall produce these documents within fourteen (14) days of the date of this Memorandum Order. *See* Standing Order for Objections Filed under Fed. R. Civ. P. 72, at ¶ 8 (D. Del. Mar. 7, 2022); *In re Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung E.V.*, 2022 WL 843420, at *1 (Fed. Cir. Mar. 22, 2022).
- SXM's motion to compel the production of Entry Nos. 65, 228, 325, 330, 350, 351, and 383 is DENIED.
- SXM's motion to compel the production of Entry Nos. 353, 355, 370, and 371 is GRANTED-IN-PART. Fraunhofer shall produce these documents, with the exception of portions not shared with IPXI which remained internal to Fraunhofer and Fraunhofer's counsel, within fourteen (14) days of the date of this Memorandum Order. *See* Standing Order for Objections Filed under Fed. R. Civ. P. 72, at ¶ 8 (D. Del. Mar. 7, 2022); *In re Fraunhofer*, 2022 WL 843420, at *1.

21. Given that the court has relied upon material that technically remains under seal, the court is releasing this Memorandum Order under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Memorandum Opinion should be redacted, the parties shall jointly submit a proposed redacted version by no later than **July 5, 2022**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re*

*Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)). If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within thirty (30) days of the date the Memorandum Order issued.

**22.** This Memorandum Order is filed pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a), and D. Del. LR 72.1(a)(2). The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Memorandum Order. Fed. R. Civ. P. 72(a). The objections and responses to the objections are limited to five (5) pages each.

**23.** The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, www.ded.uscourts.gov.

Sherry R. Fallon
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FRAUNHOFER-GESELLSCHAFT ZUR FORDERUNG DER ANGEWANDTEN FORSCHUNG E.V.,

Plaintiff,

v.

SIRIUS XM RADIO INC.,

Defendant.

1:17CV184

MEMORANDUM AND ORDER

This matter is before the Court on plaintiff Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung E.V.'s ("Fraunhofer") objections (D.I. 587) to an order of the magistrate judge dated June 28, 2022 regarding privileged documents (D.I. 579).

I. BACKGROUND

The background facts are set out in *Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372 (Fed. Cir. 2019) *der angewandten Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372, 1374–77 (Fed. Cir. 2019) and need not be repeated here. Briefly, Fraunhofer sued defendant Sirius XM Radio, Inc. ("Sirius") for alleged infringement of four patents.[1] This Court dismissed the action for failure to state a claim and denied leave to amend. D.I. 175. The United States Court of Appeals for the Federal Circuit vacated that judgment, reversed the denial of leave to amend, and

[1] Those are U.S. Patent Nos. 6,314,289 ("the '289 patent"), 6,931,084 ("the '1084 patent"), 6,993,084 ("the '3084 patent"), and 7,061,997 ("the '997 patent") (collectively, the "patents-in-suit"), that relate to the method, known as MCM, used to transmit data which splits components and sends them over separate carrier signals.

remanded for further proceedings. *Fraunhofer-Gesellschaft zur Forderung der Angewandten Forschung E.V.*, 940 F.3d at 1383.

The present discovery dispute involves two disputed categories of allegedly privileges documents: (1) documents having to do with a patent licensing entity named "IPXI" that communicated extensively with Fraunhofer regarding a potential joint licensing arrangement for Fraunhofer's '289 patent, culminating in a formal "Master Agreement" and "License Option Agreement" executed in July and September 2014; and (2) communications of Fraunhofer's patentassessor Helmut Schubert on log entries involving licensing negotiations.

The Magistrate Judge found Fraunhofer had not met its burden to show that it shared a common legal interest with IPXI between November 2013 and January 2014 when the challenged communications (identified at D.I. 571, Ex. B at 41, 43, Entry Nos. 353, 354, 355, 370, and 371) were made. D.I. 579, Magistrate Judge Order at 7. She found the documents predated the License Option Agreement and Master Agreement executed between Fraunhofer and IPXI and at that time "the prospect of Fraunhofer and IPXI sharing a common legal interest 'was too remote, contingent and uncertain to allow for invocation of the common interest doctrine[.]'" *Id.* (quoting *Astellas US LLC v. Apotex Inc.*, No. CV 18-1675-CFC-CJB, 2021 WL 1518716, at *3 (D. Del. Apr. 8, 2021)). She also found that Fraunhofer had not met its burden to show that a non-attorney's communications on matters outside of the individual's technical patent expertise (Category 3 documents) should be afforded the full scope of protection under the attorney-client privilege. *Id.* at 4.

Fraunhofer contends the Magistrate Judge erred on two critical legal issues: (1) the extent to which confidential discussions between parties pursuing an exclusive patent license deal are protected by the common interest privilege even before a final agreement is reached, and (2) the scope of privilege available to a unique type of German legal professional known as a "patentassessor" (analogous to in-house patent counsel). Fraunhofer argues that defendant SXM's challenges to Fraunhofer's privilege claims should be rejected in their entirety.

In response, Sirius argues that the Magistrate Judge correctly applied the governing law in concluding that Fraunhofer had not met its burden to establish any common interest privilege existed between Fraunhofer and IPXI prior to their execution of the Master Agreement and License Option Agreement. Further, it argues the Magistrate Judge did not err in failing to apply a wholesale privilege to patentassessor Helmut Schubert's communications because the communications at issue did not concern the prosecution of a patent.

## II. LAW

The standard of review is governed by 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b). The Supreme Court has construed the statutory grant of authority conferred on magistrate judges under 28 U.S.C. § 636 to mean that nondispositive pretrial matters are governed by § 636(b)(1)(A). *Gomez v. United States*, 490 U.S. 858, 873–74, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989); *see also* Fed. R. Civ. P. 72(a). Under 28 U.S.C. § 636(b)(1)(A), a district court may reconsider any pretrial matter under subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law. *See* *Equal Emp. Opportunity Comm'n v. City of Long Branch*, 866 F.3d 93, 99 (3d

Cir. 2017). "This standard requires the District Court to review findings of fact for clear error and to review matters of law de novo." *Id.* Rule 72(b)(3) requires de novo review of any recommendation that is dispositive of a claim or defense of a party.

A finding of fact can be set aside as clearly erroneous when the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Green v. Fornario*, 486 F.3d 100, 104 (3d Cir. 2007). The district court must accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009). "District courts have broad discretion to manage discovery." *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1558 (Fed. Cir. 1983)). The applicability of a privilege is a factual question and the determination of the scope of the privilege is a question of law. *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 124 (3d Cir. 1986).

It is clear "that a party who asserts a privilege has the burden of proving its existence and applicability." *In re Grand Jury Investigation*, 918 F.2d 374, 385 n.15 (3d Cir. 1990). "The common interest privilege is an extension of the attorney-client privilege, protecting from discovery communications among clients and attorneys 'allied in a common legal cause.'" *10x Genomics, Inc. v. Celsee, Inc.*, 505 F. Supp. 3d 334, 337 (D. Del. 2020) (quoting *In re Regents of Univ. of California*, 101 F.3d 1386, 1389 (Fed. Cir. 1996) (citation omitted)). The privilege "is an exception to the general rule that an applicable privilege will be deemed waived if the relevant materials are disclosed to a third party." *Leader Techs., Inc. v. Facebook, Inc.*, 719 F. Supp. 2d 373, 376 (D. Del.

2010). To meet the burden of showing that the privilege applies, the party asserting the privilege must demonstrate "that 'the disclosures would not have been made but for the sake of securing, advancing, or supplying legal representation.'" *Id.* (quoting *In re Regents of University of California*, 101 F.3d at 1389). Further, for a communication to be protected, the interests must be "identical, not similar, and be legal, not solely commercial." *Id.* (quoting *In re Regents of University of California*, 101 F.3d at 1390); *see Katz v. AT & T Corp.*, 191 F.R.D. 433, 438 (E.D. Pa. 2000) (affirming finding that the plaintiffs failed to meet their burden of showing the requisite identity of interests required under the doctrine because the parties had not reached an agreement, final or otherwise, as to the licensing issues prior to the signing of the agreement).

"American law typically applies to communications concerning 'legal proceedings in the United States' or 'advice regarding American law,' whereas foreign privilege law typically governs communications relating to 'foreign legal proceeding[s] or foreign law.'" *Cadence Pharms., Inc. v. Fresenius Kabi USA, LLC*, 996 F. Supp. 2d 1015, 1019 (S.D. Cal. 2014) (quoting *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 65 (S.D.N.Y. 2010)). "In the context of patent law, courts often look to the law of the country where legal advice was rendered or where the patent application is pending." *Id.* "Communications between a foreign client and a foreign patent agent 'relating to assistance in prosecuting patent applications in the United States' are governed by the U.S. privilege law." *Id.* (quoting *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 520 (S.D.N.Y. 1992)). "Communications 'relating to assistance in prosecuting' foreign patent applications or 'rendering legal advice . . . on the patent law' of foreign country are, as a matter of comity, governed by the privilege 'law of the foreign country in which the patent application is

filed,' even if the client is a party to a suit in the U.S." *Id.* (quoting *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1170–71 (D.S.C. 1974)). "Privilege for foreign patent agent communications should be 'strictly construed,' and all 'doubts should be resolved in favor of disclosure.'" *Cadence Pharmaceuticals, Inc.*, 996 F. Supp. 2d at 1019–20 (quoting *McCook Metals L.L.C. v. Alcoa Inc.*, 192 F.R.D. 242, 256 (N.D. Ill. 2000)).

Under German law, "[a] 'Patentassessor' is an in-house patent attorney who is qualified to practice before the German Patent Office, but who is not able to represent a client before the German District Court." *Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., Ltd.*, No. 95 C 0673, 1996 WL 732522, at *8–9 (N.D. Ill. Dec. 9, 1996). "Patentassessors are qualified to conduct any activities which take place before the German Patent Office, including the appealing of decisions of examiners on applications, and the filing and litigating of opposition proceedings" and "may also provide legal advice to clients on such issues as patentability, patent infringement and validity." *Id.* However, there is a distinction made between Patentassessors and a Rechtsanwalt, or an attorney-at-law, who appears before the civil and criminal courts. *Id.*; *see also Cadence Pharmaceuticals, Inc.*, 996 F. Supp. 2d at 1022–23 (recognizing that "German law does not offer a blanket confidentiality protection for all communications between patent agents and their clients, and requires that communications relate to the rendition of legal services). A German patent professional's ability to provide legal advice is confined to guidance on efforts to obtain and defend patents. *See Heidelberg Harris, Inc.*, 1996 WL 732522, at *10 (communications to or from a patent assessor are deemed privileged when those communications reflect "legal advice to clients on such issues as patentability, patent infringement and validity.")

## III. DISCUSSION

The Court finds the Magistrate Judge committed no clear error in finding that Fraunhofer had not shown it shared a common legal interest with IPXI before the Master Agreement was executed. The Court agrees that Fraunhofer had not shown any identical legal interest with IPXI between November 2013 and January 2014 when the challenged communications were made. Fraunhofer's reliance on *AgroFresh Inc. v. Essentiv LLC*, No. CV 16-662 (MN), 2019 WL 4917894, at *3 (D. Del. Oct. 4, 2019) for its proposition that the Magistrate Judge failed to follow established law is unavailing. That case involved a letter of intent, and not a nondisclosure agreement ("NDA") such as that involved here. An NDA does not create legal obligations beyond nondisclosure. The evidence supports the conclusion that Fraunhofer and IPXI were in discussions about a potential agreement without any obligations and thus no common interest privilege applies to the communications that predated the Master Agreement.

Further, the Court finds no error in the Magistrate Judge's refusal to apply a wholesale privilege to Helmut Schubert's communications. The Magistrate Judge properly held that the privilege applied to Schubert's communication concerning patent prosecution, but did not extend to is advice on licensing topics. The Court agrees that the confidentiality protections afforded to German patent assessors does not extend to communications regarding contractual matters. The Court is satisfied no mistake has been made and, accordingly, the Court will not set aside the Magistrate Judge's factual findings.

The Court has reviewed the parties' submissions and finds no error of fact or law in the Magistrate Judge's rulings. Therefore,

IT IS ORDERED THAT:

1. Plaintiff's objections (D.I. 587) to the order of the Magistrate Judge (D.I. 579) are overruled.

2. The order of the Magistrate Judge (D.I. 579) is affirmed in all respects.

3. The stay (D.I. 586) imposed on that portion of the Magistrate Judge's order that required production of documents by July 12, 2022, is lifted.

4. Sirius XM's motion to compel is granted with respect to the Category 3 log entries.

4. Sirius XM's motion to compel the production of D.I. Nos. 353, 355, 370, and 371 is granted in part. Fraunhofer shall produce those documents, with the exception of portions not shared with IPXI which remained internal to Fraunhofer and Fraunhofer's counsel, within fourteen (14) days of the date of this Order.

Dated this 2nd day of September, 2022.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

US006314289B1

(12) **United States Patent**
**Eberlein et al.**

(10) **Patent No.: US 6,314,289 B1**
(45) **Date of Patent: Nov. 6, 2001**

(54) **APPARATUS AND METHOD FOR TRANSMITTING INFORMATION AND APPARATUS AND METHOD FOR RECEIVING INFORMATION**

(75) Inventors: **Ernst Eberlein**, Grossenseebach; **Marco Breiling**, Erlangen; **Jan Stoessel**, Nürnberg; **Heinz Gerhäuser**, Waischenfeld, all of (DE)

(73) Assignee: **Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V.**, Munich (DE)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/202,729**

(22) PCT Filed: **Dec. 3, 1998**

(86) PCT No.: **PCT/EP98/07850**

§ 371 Date: **May 17, 1999**

§ 102(e) Date: **May 17, 1999**

(87) PCT Pub. No.: **WO00/36783**

PCT Pub. Date: **Jun. 22, 2000**

(51) **Int. Cl.**[7] ..... **H04Q 7/20**

(52) **U.S. Cl.** ..... **455/427**; 455/3.02; 455/10; 714/746; 714/758; 375/225

(58) **Field of Search** ..... 455/427, 3.02, 455/10, 12.1, 137; 714/701, 746, 764, 751, 752, 758, 767, 763, 786; 375/290, 264, 225, 250

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,881,241 11/1989 Pommier .

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

0 572 171 A1 5/1993 (EP) .

OTHER PUBLICATIONS

Samir Kallel, "Complementary Punctured Convolutional (CPC) Codes and Their Applications", IEEE Transactions on Communications, vol. 43, No. 6, Jun. 1999, pp 2005–2009.

(List continued on next page.)

*Primary Examiner*—William Trost
*Assistant Examiner*—Congvan Tran
(74) *Attorney, Agent, or Firm*—Dougherty & Clements LLP

(57) **ABSTRACT**

An apparatus for transmitting information comprises a bit-stream source for providing a bitstream representing the information, a redundancy adding encoder for generating an encoded bitstream, which is arranged to output, for a first number of input bits, a second number of output bits, the second number of output bits having at least twice as many output bits as the first number of input bits, wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits. The apparatus further comprises a partitioner for partitioning the second number of output bits into the two portions of output bits and a transmitter for transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel. An inventive receiving apparatus combines the signals received via the first and second channels and uses both channel signals for channel decoding by removing redundancy. Thus, the transmitting receiving system is suitable for providing time and/or space diversity and, in the optimal case, provides a C/N value which is greater than 4.3 dB with respect to a two-channel system comprising a duplicator in the transmitter and a channel-controlled switch in the receiver.

**35 Claims, 4 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,103,459 | * | 4/1992 | Gilhousen et al. | 375/200 |
| 5,258,987 | * | 11/1993 | Wei | 371/43 |
| 5,319,673 | | 6/1994 | Briskman . | |
| 5,485,485 | | 1/1996 | Briskman . | |
| 5,581,575 | * | 12/1996 | Zehavi et al. | 375/200 |
| 5,592,471 | | 1/1997 | Briskman . | |
| 5,617,333 | * | 4/1997 | Oyamada et al. | 364/524 A |
| 5,657,325 | | 8/1997 | Lou et al. . | |
| 5,659,569 | * | 8/1997 | Padovani et al. | 370/479 |
| 5,841,813 | | 11/1998 | van Nee . | |
| 5,896,368 | * | 4/1999 | Dalman et al. | 370/335 |
| 5,956,088 | * | 9/1999 | Shen et al. | 348/385 |
| 6,134,696 | * | 10/2000 | Morelos-Zaragoza et al. | 714/790 |
| 6,144,711 | * | 11/2000 | Raleigh et al. | 375/347 |
| 6,163,577 | * | 12/2000 | Ekudden et al. | 375/242 |

OTHER PUBLICATIONS

Brian Kroeger, "Robust Modem and Coding Techniques for FM Hybrid IBOC DAB", USA Digital Radio Home Page, www.usadr.com, pp 1–14.

Benelli G., "Two New Coding Techniques for Diversity Communication Systems", IEEE Transactions on Communications, Sep. 1, 1990, pp. 1530–1538, vol. 38, No. 9, New York, US.

Alamouti S M, A simple transmit diversity techique for wireless communications, IEEE Journal on Selected Areas in Communications, Oct. 1998, pp. 1451–1458, vol. 16 No. 8.

ETS 300 401, ETS I—European Telecommunications Standards Institute Valbonne, France, Jan. 1997, pp 149–158.

"Punctured Convolutional Codes of Rate (n–l)n and Simplified Maximum Likelihood Decoding" J. Bibb Cain et al, IEEE Transactions on Information Theory, vol. IT–25, No. 1, Jan. 1979.

"Channel Coding with Multilevel/Phase Signals", Gottfried Ungerboeck, IEEE Transactions on Information Theory, vol. IT–28, No. 1, pp 55–66, Jan. 1982.

* cited by examiner


Source
110
Encoder
120
Partitioner
130
Trans-
mitting
140
Coderate < 1/2
Transmitting
apparatus
100
Channel1
300
Channel2
400
R.#1
240a
R.#2
240b
Combiner
230
Decoder
220
Receiving
apparatus
200

Fig. 1



110
Bit steam source
120
Forward Error Correction
130
Partitioner
140a
Satellite #1
140c
Delay
300
240c
Delay
140b
Satellite #2
400
240a,b
R x
230
Combiner
220
Decoder


Fig. 2


121
122
125
130
g1
g2
g3
Convolutional encoder
Puncturing unit
Parallel to serial and De-multiplex to 2 bitstreams
Channel 1
Delay (e.g.4 seconds)
Channel 2
120
123
140c

Fig. 3


Input bit sequence:
403
401
402
time
After convolutional encoder:
411
412
E E E
E X L
L L L
413
time
E=Bit transmitted over early satellite
L=Bit transmitted over late satellite
X=not transmitted (punctured) bit
After parallel-to-serial converter:
E E E E L L L L
time
After demultiplexer:
410
E E E E
time
L L L L
420

Fig. 4




Fig. 5




Fig. 6




Fig. 7

# APPARATUS AND METHOD FOR TRANSMITTING INFORMATION AND APPARATUS AND METHOD FOR RECEIVING INFORMATION

## FIELD OF THE INVENTION

The present invention relates to concepts for digital broadcasting and, in particular, concepts for digital broadcasting suited for fading channels for wireless communication.

## BACKGROUND OF THE INVENTION

Satellite-based broadcasting systems provide an adequate communication link only in rural areas, in which only a small number of e.g. bridges exist. Additionally, rural areas usually do not have skyscrapers. Skyscrapers as well as bridges or, generally, densly built-up areas are obstacles to satellite-based communication systems, since carrier frequencies used for such communication links involve that a channel between a sender, e.g., a satellite, and a receiver, i. e. a mobile or stationary receiver, is characterised by the line of visual contact (line of sight) between the sender and the receiver. If a skyscraper comes into the line of visual contact, i.e., the transmission channel between the satellite and the receiver, which may be positioned in a car, the received signal power will decrease substantially.

Generally, it can be stated that in wireless systems (radio systems), changes in the physical environment cause the channel to fade. These changes include both relative movement between transmitter and receiver and moving scatters/reflectors in the surrounding space. In theoretical studies of wireless systems, the real channels are usually modelled so that they result in trackable analysis. The two major classes of fading characteristics are known as Rayleigh and Rician. A Rayleigh-fading environment assumes no line of sight and no fixed reflectors/scatters. The expected value of the fading is zero. If there is a line of sight, this can be modelled by Rician-fading, which has the same characteristics as the Rayleigh-fading, except for a non-zero expected radio.

Modern digital broadcasting systems know several means for reducing the impact of a channel fading. These concepts comprise channel coding on the one hand and several kinds of diversity on the other hand. The European standard for digital audio broadcasting (DAB), set out in Radio Broadcasting Systems; Digital Audio Broadcasting (DAB) To Mobile, Portable and Fixed Receivers, ETS 300 401, ETS I—European Telecommunications Standards Institute, Valbonne, France, February 1995, uses differential quadrature phase-shift keying (DQPSK) as modulation technique. The channel encoding process is based on punctured convolutional coding, which allows both equal and unequal error protection. As a mother code, a convolutional code having a code rate of 1/4, a constraint length 7, and octal polynominals is used. The puncturing procedure allows the effective code rate to vary between 8/9 and 1/4. Channel coding by means of punctured convolutional codes is described in "Punctured Convolutional Codes of Rate (n−1)/n and Simplified Maximum Likelihood Decoding", J. Bibb Cain et al., IEEE Transactions on Information Theory, Vol. IT-25, No. 1, January 1979.

Punctured convolutional codes can be used in connection with many modulation techniques, such as OFDM, BPSK, QAM, etc.

Different channel encoding techniques are outlined in "Channel Coding with Multilevel/Phase Signals", Gottfried Ungerboeck, IEEE Transactions on Information Theory, Vol. IT 28, No. 1, pages 55 to 66, January 1982.



Bitstreams encoded by means of a convolutional encoder can be decoded by a decoder, in which the well-known Viterbi algorithm is implemented. This algorithm is capable of using the channel state information (see P. Hoeher "TCM on Frequency-Selective Length-Mobile Fading Channels", Proc. Tirrenia International Workshop Digital Communication, Tirrenia, Italy, September 1991). The Viterbi algorithm can be modified to provide reliability estimates together with the decoded sequence. This enables soft decoding. By applying a soft-output Viterbi algorithm, an improvement of about 2 dB is obtained in comparison to systems that implement "hard" decision.

## DESCRIPTION OF PRIOR ART

With reference to FIG. **6**, a simplified overview of a transmitter receiver system described in the European DAB Standard is illustrated. The transmitter receiver system generally comprises a transmitter section **60** and a receiver section **70**. The transmitter section **60**, in the simplest case, comprises a bitstream source **62**, a channel encoder **64** and a transmitter **66**. The receiver section **70**, in the simplest case, comprises a receiver **72** and a channel decoder **74**.

FIG. **7** illustrates a transmitting receiving setup providing for time diversity as well as space diversity. The transmitter section **60'** comprises the bitstream source **62** and the encoder **64** that have already been described with respect to FIG. **6**. In addition, the receiver section **60'** comprises a first transmitter **66*a*** and a second transmitter **66*b***. Both transmitters **66*a*** and **66*b*** are fed by the same signal output by the encoder **64** that is duplicated by a duplicator **67**.

To obtain time diversity, a delay element **68** is coupled between the duplicator **67** and the second transmitter **66*b***.

In the case of satellite communication, the transmitters **66*a*** and **66*b*** are realised by two satellites that reside on different orbital positions spaced apart from each other.

The first channel is defined by the line of sight between the first transmitter and the receiver, for example, a car, whereas the second channel is defined by the line of sight between the second transmitter **66*b*** and the car that comprises the receiving section **70'**. In the scenario, in which the car travels on a street to the right and to the left of which are high buildings, the possibility is increased that the car will receive the transmitted signal from at least one satellite.

When the case is considered, in which the car is driving through a tunnel or under a bridge, the lines of sight to both transmitters **66*a*** and **66*b*** are interrupted. The time diversity method implemented by this system shown in FIG. **7**, however, ensures that the receiver will not be affected by the interrupted channel, since the transmission signal is delayed by the delay stage **68**. Optimally, no transmission interruption will result, when the delay time is equal to or greater than the travelling time of the car through the tunnel or under the bridge. Thus, the receiving section will, once again, receive the transmission signal sent by the transmitter **66*a***, when it was under the bridge, via a channel **2**. Naturally, the receiving section **70'** comprises another delay stage **78**. As it is shown in FIG. **7**, the delay stage **78** of the receiving section has to be in the channel that has not been delayed in the transmitter section. Thus, the signals at the output of the receivers **72*a*** and **72*b*** are identical, when the delay values of the delay stages **78** and **68** are equal.

A decision stage **79**, which is symbolised as a switch in FIG. **7**, determines which channel provides the signal with the better signal to noise ratio. When it is determined that channel **1** provides the stronger signal, the decision stage **79** is operative to conduct the signal received by the receiver

72*a* into the channel decoder **74** When it is determined in block **79** that the signal transmitted over the other channel (channel **2**) is the stronger one, the decision stage **79** is operative to conduct the signal received by the receiver 72*b* to the channel decoder **74**.

To summarise, the system illustrated in FIG. **7** comprises the following essential features:

the signal output by the encoder **64** is duplicated by the duplicator **67**;

exactly the same signals, whether delayed or not, are transmitted via both channels;

the signals transmitted over both channels are derived from the bitstream output by the bitstream source **62** in exactly the same way by means of the encoding process carried out in the redundancy adding encoder **64** (repetition code);

the decision stage **79** compares the signal to noise ratio of both channels and selects the channel in which the signal having the better signal to noise ratio is transmitted;

the signal transmitted via the other channel is discarded; and

the channel decoder **74** only uses one channel, i.e., the channel determined by the decision stage **79**, for channel decoding.

Besides the technique of channel encoding using a redundancy adding encoder like a convolutional encoder, different types of diversity, e.g., time diversity and space diversity, can be implemented to ease the impact of fading channels.

The bitstream source **62** can be implemented as an audio encoder as defined by ISO-MPEG. It provides a bitstream comprising useful information, i.e., encoded spectral values of a block of audio samples, and side information. To enhance the robustness of the communication link, a forward error correction encoding is performed by the convolutional encoder **64**. In general, the convolutional encoding procedure generates redundancy in the transmitted datastream in order to provide ruggedness against transmission distortion.

Usually, convolutional encoders consist of a specific number of shift registers and a number of XOR gates. The convolutional encoder described in the ETS Standard is a convolutional encoder having a code rate of 1/4. This means that the convolutional encoder produces four output bits for one input bit. As it is well known in the art, each output bit is derived from the current input bit and a specific combination of a certain number of preceding input bits stored in the shift registers. The specific combination of the current input bit and certain preceding input bits for each encoder output bit is defined by the so-called generator polynominals. The octal forms of the generator polynominals defined in the ETS 300 401 are **133**, **171**, **145** and **133**.

The encoded bitstream can be punctured for raising the code rate from 1/4 to another code rate, e.g., 8/9. "Puncturing" means that certain bits in the convolutional encoder output bits are discarded and not forwarded to the transmitter **66**. Thus, puncturing operates to again reduce redundancy in an encoded bitstream, which has been added by the convolutional encoder.

The transmitter **66** may comprise usual transmitter elements, such as a QPSK modulator, an IFFT block (IFFT= Inverse Fast Fourier Transform) for performing orthogonal frequency division multiplexing, a guard interval inserter, a synchronisation sequence inserter and modulation means for modulating the signal onto a high frequency carrier.

Analogously, the receiver **72** comprises an HF front end, an analog/digital converter, and a QPSK demodulator. The signal output by the receiver is input in the decoder **74**. The decoder **74** is operative to decode the encoded bitstream output by the receiver **72**. In modern communication systems, the decoder **74** implements the above-outlined soft-input Viterbi algorithm. As it has already been outlined, the Viterbi decoder performs a maximum likelihood decoding using the channel state information, which is also called "metric". Different algorithms are known for Rician and Rayleigh channels.

Especially in satellite-based communication systems, design engineers are confronted with strong demands for reducing transmitter power. Reduced transmitter power directly translates into system costs. Generally, the costs for designing and transporting the satellite(s) into its (their) orbital position(s) are directly proportional to the power supply needed on board of the satellite. Higher transmitter power on board of the satellite also means higher energy producing capabilities of the satellite. Thus, it can be stated that, under costs aspects, reducing transmitter power is essential.

Therefore, the system described in FIG. **7** is disadvantageous in that, in the receiver, only one channel is used for retrieving information, whereas the other channel is discarded. In extreme situations, in which one channel has faded totally, no transmitter power from one transmitter, i.e., one satellite, will reach the receiver. Normally, however, the channels will not fade totally. Instead, both channels will fade more or less. Thus, the decision stage **79** has to select one out of two useful signals. When the case is considered that both signals output by the receivers **72***a* and **72***b* have identical signal to noise ratios, only one signal is selected, whereby the transmitter power from the satellite transmitting via the other channel is wasted totally.

## SUMMARY OF THE INVENTION

It is the object of the present invention to provide an apparatus and method of transmitting information and an apparatus and method of receiving information, which result in better receiver output signal quality and/or reduced transmitter power demands.

In accordance with a first aspect of the present invention, this object is attained by an apparatus for transmitting information, comprising a bitstream source for providing a bitstream representing the information; a redundancy adding encoder for generating an encoded bitstream based on the bitstream provided by the bitstream source wherein the encoder is arranged to output, for a first number of input bits, a second number of output bits, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits; a partitioner for partitioning the second number of output bits into the two portions of output bits; and a transmitter for transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel.

In accordance with a second aspect of the present invention, this object is attained by an apparatus for receiving information, the information being represented by an encoded bitstream, the encoded bitstream being encoded such that its redundancy is at least doubled with respect to a bitstream from which the encoded bitstream is derived, and

that, for a first number of bits of the bitstream, the encoded bitstream comprises a second number of bits, the second number of bits having at least twice as many bits as the first number, and wherein the second number of bits includes two portions of bits, each portion of bits individually allowing the retrieval of information represented by the first number of bits, and the first portion of the bits being encoded in a different way with respect to the second portion of bits, the apparatus comprising a receiver for receiving the first portion of bits via a first channel and the second portion of bits via a second channel, the first and the second channels being spatially different from each other; a combiner for combining the first and the second portions; and a decoder for decoding the coded bitstream by removing redundancy from the coded bitstream, the decoder using the first and second portions of bits combined by the combiner.

In accordance with a third aspect of the present invention, this object is attained by a method of transmitting information, comprising the following steps: providing a bitstream representing the information; generating a redundancy added encoded bitstream based on the bitstream provided in the step of providing, wherein for a first number of input bits, a second number of output bits is generated, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits; partitioning the second number of output bits into the two portions of output bits; and transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel.

In accordance with a fourth aspect of the present invention, this object is attained by a method of receiving information, the information being represented by an encoded bitstream, the encoded bitstream being encoded such that its redundancy is at least doubled with respect to a bitstream from which the encoded bitstream is derived, and that, for a first number of bits of the bitstream, the encoded bitstream comprises a second number of bits, the second number of bits having at least twice as many bits as the first number, and wherein the second number of bits includes two portions of bits, each portion of bits individually allowing the retrieval of information represented by the first number of bits, and the first portion of the bits being encoded in a different way with respect to the second portion of bits, the method comprising the following steps: receiving the first portion of bits via a first channel and the second portion of bits via a second channel, the first and the second channels being spatially different from each other; combining the first and the second portions; and decoding the coded bitstream by removing redundancy from the coded bitstream, wherein the first and second portions of bits combined in the step of combining are used in the step of decoding.

The present invention is based on the finding that, although there are two physically different channels both channels are considered as one single channel from the viewpoint of the channel decoder located in the receiving section. This means that the channel decoder in the receiving section does not know that the signals it decodes stem from two physically, i. e. spatially, different channels. However, the inventive system, in fact, provides two different physical channels to allow for time and/or space diversity.

The space diversity can be obtained by two terrestrial transmitters, by two satellite transmitters or by one satellite transmitter and one terrestrial transmitter.

In accordance with the present invention, an apparatus for transmitting information comprises a bitstream source for providing a bitstream representing the information. A redundancy adding encoder for generating an encoded bitstream based on the bitstream provided by the bitstream source is arranged to output, for a first number of input bits, a second number of output bits, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits. A means for partitioning, i.e., a partitioner, receives the output of the redundancy adding encoder and partitions the second number of output bits into the two portions of output bits. Means for transmitting transmit the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, wherein the second channel is spatially different from the first channel.

In accordance with another aspect of the present invention, an apparatus for receiving information comprises a receiver for receiving the first portion of bits via a first channel and the second portion of bits via a second channel, a combiner for combining the first and the second portions and a decoder for decoding the coded bitstream by removing redundancy from the coded bitstream, the decoder using the first and second portions of bits combined by the combiner.

This inventive transmitter receiver concept provides the following advantages:

- two channels allow time and/or space diversity;
- the partitioner partitions rather than duplicates the output signal of the encoder into two portions of output bits;
- the combiner in the receiver combines rather than selects the signals received from both channels and feeds the combined signal into the channel decoder;
- the signals from both channels are used for decoding all the time;
- in the best case, in which the signal powers in both channels are identical, transmitter power used for transmitting via each channel can be halved at least, thus, halving system costs with respect to the system illustrated in FIG. 7; and
- when the transmitter powers are not changed, the signal quality output by the channel decoder can be considerably improved.

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features and advantages of the invention will become more readily apparent from the following detailed description of preferred embodiments which proceeds with reference to the drawings.

FIG. 1 shows a principle overview of a transmission receiving system in accordance with the present invention, comprising an inventive transmitter and an inventive receiver.

FIG. 2 shows a more detailed block diagram of the transmission receiving system shown in FIG. 1, in which time and space diversity are embodied.

FIG. 3 shows a detailed block diagram of an inventive transmitter section.

FIG. 4 shows an input bit sequence and an output bit pattern of a convolutional encoder used in an inventive transmitter section.

FIG. 5 shows a detailed view of an inventive receiver section.

FIG. 6 shows a generalised block diagram of a prior art transmitting receiving system.

FIG. 7 shows a block diagram of a transmitter receiver system implementing time and space diversity, in which the output of the transmitter encoder is duplicated and a channel selection is performed in the receiver.

## DESCRIPTION OF PREFERRED EMBODIMENTS

In FIG. **1** a general block diagram of an inventive apparatus for transmitting **100** and an inventive apparatus for receiving **200** is illustrated. The transmitting apparatus **100** comprises a bitstream source **110**, a redundancy adding encoder **120** and a partitioner **130**. The bitstream source **110** may be an MPEG encoder as described above. The encoder **120** is generally a redundancy adding encoder for generating an encoded bitstream on its output, wherein the encoder **120** is arranged to output, for a first number of input bits, a second number of output bits, the second number of output bits having at least twice as many output bits as the first number of input bits. This means that the encoder **120** implements a code rate equal to or less than 1/2. As it is known in the art, the code rate is defined by the number of input bits divided by the number of output bits produced by the encoder based on the number of input bits. In other words, a code rate 1/2 means that for each input bit, two output bits are produced. Analogously, a code rate of 1/3 means that for each input bit, three output bits are produced. Similarly, a code rate of 3/8 means that for three input bits, eight output bits are produced.

The code rate of the encoder **120** is set to be smaller than 1/2, such that the second number of output bits can be sub-divided into two portions of output bits, such that each portion of output bits individually allows the retrieval of information represented by the first number of input bits This means that a decoder **220** located in the receiving apparatus is able to retrieve information represented by the bitstream output by the bitstream source **110** when only one channel, i.e., channel 1 **300** or channel 2 **400** provides a useful signal, whereas the other channel has faded totally.

Another feature of the encoder **120** is that the first portion of output bit is coded based on the bitstream in a different way with respect to the second portion of output bits. In contrast to a simple repetition code in which redundancy is doubled by simply duplicating a signal to transmitted coded, the channel decoder **220** capabilities are enhanced, since the signal is transmitted over the channels **300** and **400** are derived from the bitstream output by the bitstream source **110** independently of each other. The partitioner **130** feeds means for transmitting, i.e., a transmitter, **140** for transmitting the first portion of output bits via the first channel **300** and the second portion of output bits via the second channel **400**. It is to be noted that both channels **300** and **400** are spatially different from each other.

As usual, a channel between the transmitter and the receiver is defined by the line of sight connection between the transmitter and the receiver. Thus, two channels are different from each other when a mobile receiver has moved with respect to a single transmitter, or when two transmitters exist positioned in different locations, e.g., orbital positions. In this case, it does not play any role whether the receiver is a mobile or a stationary receiver.

Thus, the transmitting means **140** may comprise one transmitter, e.g., one satellite and a delay stage, such that two different channels are created between the single transmitter and a mobile receiver, when the mobile receiver is at a first position and between the single transmitter and the mobile receiver when the mobile receiver has moved to a second position after the period defined by the delay stage in the transmitter. This concept is called time diversity for mobile receivers. Naturally, it is not possible to create two channels different from each other between a single stationary transmitter and a stationary receiver.

Alternatively, as it is described with reference to FIG. **2**, the transmitting means **140** comprise two transmitters positioned in different locations, to obtain space diversity.

The receiving apparatus **200** illustrated in FIG. **1** comprises receiving means **240*a*** and **240*b***, the receiving means, i.e., the receiver, comprising a first receiver **240*a*** for receiving the first portion of output bits transmitted via the first channel **300** and a second receiver **240*b*** for receiving the second portion of output bits via the second channel **400**.

In accordance with the present invention, the output signals of the receiving means **240*a*** and **240*b*** are combined in a combiner **230** such that the output signals of both receivers are used in the channel decoder **220**.

FIG. **2** illustrates a transmission receiving system in accordance with the preferred embodiment of the present invention. The transmitting apparatus comprises, as already described in FIG. **1**, the bitstream source **110**, the encoder **120** generally termed as forward error correction, the partitioner **130** and transmitting means comprising a first satellite **140*a***, a second satellite **140*b*** and a delay stage **140*c***.

The receiving apparatus comprises the channel decoder **220**, the combiner **230** and the receiving means (Rx) comprising the first and second receivers **240*a***, **240*b*** and a delay stage **240*c***. The transmitting apparatus and the receiving apparatus are "connected" by the first channel **300** and the second channel **400**.

By using the delay stages **140*c*** and **240*c***, which are positioned in opposite channels, time diversity is implemented in the transmission receiving system shown in FIG. **2**. Furthermore, by means of the provision of two transmitters, i.e., the first satellite **140*a*** and the second satellite **140*b***, space diversity or spatial diversity is implemented into the inventive transmission receiving system.

With reference to FIG. **3**, a more detailed block diagram of the transmitting apparatus is described. The encoder **120** in the transmitting apparatus is implemented as a convolutional encoder in accordance with the present invention. As it is shown in FIG. **3**, the convolutional encoder comprises three generator polynominals, i.e., a first generator polynominal g1 **121**, a second generator polynominal g2 **122** and a third generator polynominal g3 **123**. Thus, the convolutional encoder **120** has a code rate of 1/3, since, for one input bit, the encoder produces three output bits. The transmitting apparatus shown in FIG. **3** further comprises a puncturing unit **125** that reduces the number of bits, i.e., the number of output bits, such that an even number of output bits to be transmitted over the first and second channel is obtained. The puncturing unit **125** is connected to the partitioner **130**, that, in accordance with the preferred embodiments of the present invention, comprises a parallel-to-serial converter and a demultiplexer to demultiplex the serial bitstream produced by the parallel-to-serial converter into two bitstreams. The block diagram in FIG. **3** further comprises the delay stage **140*c*** of the transmitting means. The first transmitter and the second transmitter are not shown in FIG. **3**.

Thus, the first portion of output bits is transmitted via the first channel, whereas the second portion of output bits is delayed by the delay stage, transmitted via the second channel.

With reference to FIG. **4**, the functionality of the convolutional encoder **120**, the puncturing unit **125** and the partitioner **130** will be described. In FIG. **4**, an input bit sequence having bits **401**, **402** and **403** is illustrated. The convolutional encoder **120** will produce three parallel arranged output bits **411**, **412** and **413** for each input bit **401**, **402** and **403**. The notation of the output bits **411** to **413** relates to the channel, over which the respective bit is transmitted. Thus, bits termed E are transmitted over the early satellite, i.e., satellite **140***a* (FIG. **2**), whereas the bits termed L are transmitted over the late satellite, i.e., the satellite **140***b* (FIG. **2**), which input is delayed by the delay stage **140***c*. The bit termed X is not transmitted at all. This bit is discarded by the puncturing unit **125** to obtain a second number of output bits, which is an even number. In accordance with the preferred embodiment of the present invention, an even number of output bits to be transmitted by the transmitting means **140** (FIG. **1**) is required, since two channels exist and the number of bits transmitted over each channel are equal in the preferred embodiment. It has to be noted that equal numbers of bits in each channel are not essential for the present invention.

The output of the puncturing unit **125** is fed into a parallel-to-serial converter included in the combiner **130** (FIG. **3**) such that a serial bitstream, i.e., the second number of output bits, is obtained. The demultiplexer included in the partitioner **130** demultiplexes the serial bitstream output by the parallel-to-serial converter into two bitstreams, in order to produce the first portion **410** and the second portion **420** of output bits.

It has to be noted that the number of bits in each of the first and second portions **410** and **420** is larger than the first number of input bits **401**, **402** and **403** input into the convolutional encoder **120**. Thus, some redundancy still exists to be used by the channel decoder **220** (FIG. **2**), when one channel is totally lost, for instance, when a mobile receiver is under a bridge. In general, however, it is not required that the first and second portion of output bits comprise more bits than the first number of input bits, since both portions together still have a code rate of 1/2, whereas each portion of output bits **410**, **420** has a code rate of 1 when the convolutional encoder **120** has a code rate of 1/2.

Referring back to FIG. **4**, a convolutional encoder having a code rate of 3/8 is described. This means that for a first number of input bits, the first number being **3**, a second number of output bits, the second number being **8**, is produced.

Referring to FIG. **5**, a preferred embodiment of the receiving apparatus is described. Optionally, the receiving means comprises a QPSK demodulator **240***d* for receiving the first channel and a QPSK demodulator **240***e* for receiving the second channel. Naturally, the QPSK demodulators **240***d* and **240***e* only have to be provided when the transmitting apparatus has performed a QPSK modulation. The output of the QPSK demodulator is fed into the delay stage **240***c* and then into a multiplexer **230***a*. The output of the QPSK demodulator **240***e* is directly fed into the multiplexer **230***a*. Thus, the multiplexer **230***a* receives the first portion of output bits (**410** in FIG. **4**) and the second portion of output bits (**420** in FIG. **4**) for producing one single serial bitstream comprised of the first portion and the second portion. This continuous serial bitstream is input into a depuncturing unit **230***b* for undoing the puncturing carried out by the puncturing unit **125** (FIG. **3**).

Then, the depunctured bitstream, i.e., the combined bitstream output by the combiner that comprises the multiplexer **230***a* and the depuncturing unit **230***b*, is input into the channel decoder that, in accordance with the preferred embodiment of the present invention, comprises the Viterbi decoder **220***a* and a Reed-Solomon decoder **220***b*. Those skilled in the art will know that the Reed-Solomon decoder only has to be provided when a Reed-Solomon coding has been carried out in the transmitting apparatus. In accordance with the preferred embodiment of the present invention, the transmitting apparatus causes a concatenated forward error correction encoder having a convolutional encoder and a Reed-Solomon encoder. Thus, the receiving apparatus has to comprise a Viterbi decoder **220***a* and a Reed-Solomon decoder **220***b*. It is known in the art that convolutional encoders may create small burst errors. The Reed-Solomon encoder, however, is well suited for such burst errors.

In the following, the inventive transmitting receiving system illustrated in FIG. **1**, which makes use of an encoder having a code rate less than 1/2, and has a partitioner and a combiner is compared to the transmission receiving system shown in FIG. 7 that makes use of a duplicator and a channel decision controlled switch.

To ease the comparison of both systems, it is assumed that the encoders **120** (FIG. **1**) and **64** (FIG. **7**) comprise a convolutional encoder and a Reed-Solomon encoder. Furthermore, it is assumed that the convolutional encoder included in the redundancy adding encoder **120** of FIG. **1** implements a code rate of 3/8, whereas the convolutional encoder included in the redundancy adding encoder **64** of FIG. **7** encodes based on a code rate of 3/4. Since the transmitting apparatus shown in FIG. **7** transmits eight output bits for three input bits, i.e., the duplicator effectively doubles the output bits to be transmitted, it can be regarded as a redundancy adding encoder having a code rate of 3/8. The signals transmitted over the first and the second channels, however, are identical and identically derived from the bitstream output by the bitstream source **62**.

According to the code rate of 3/4 (convolutional coder only), for three information bits, four channel bits are transmitted over each satellite in the system of FIG. **7** Using two satellites, eight channel bits are transmitted for three information bits. Thus, it is clear that the system shown in FIG. **7** can be regarded as a system having a code rate of 3/8.

According to the literature and system simulation results, the following $E_b/N_o$ performance can be assumed. It is noted that the term $E_b/N_o$ represents the ratio of the energy per useful bit rate (unit factor: W/sec) to noise power density (unit facor: W/sec). Thus, the "unit factor" of $E_b/N_o$ is 1. For QPSK, the C/N (=Power of transmitted signal/noise power within effective bandwidth) can be calculated by the following equation:

$$C/N = E_b/N_o + 10 \cdot \log(R) + 3 \text{ dB} \quad (C/N \text{ and } E_b/N_o \text{ values in dB})$$

In this equation, R is the code rate. It is to be noted that the term C/N represents the "link margin". If the real C/N is higher than the link margin, a useful communication link is obtained. If the real C/N is lower than the C/N defined by the above-outlined equation, no satisfying communication link can be established.

The following Table gives the C/N in dB for three different code rates. The first line of the Table relates to the system shown in FIG. **7**, whereas the third line of the Table relates to the inventive system shown in FIG. **1**. The factor

(223/255) relates to the Reed-Solomon encoder. The factors 3/4, 1/2 and 3/8 relate to the convolutional coders "Rate".

TABLE

| Code rate (convol. + Reed-Solomon) | Eb/NO [dB] | C/N [dB] |
|---|---|---|
| 3/4 * (223/255) = 0.66 | 3.7 | 4.9 |
| 1/2 * (223/255) = 0.44 | 2.7 | 2.1 |
| 3/8 * (223/255) = 0.33 | app. 2.4 | 0.6 |

In the following, the Table is explained. The required C/N value also applies to a system where the bitstream is de-multiplexed to two streams and transmitted using two QPSK modulators. The overall transmitted power is defined as:

$$C=C_{sat1}+C_{sat2}.$$

The noise power is defined as follows:

$$N=N_1+N_2.$$

It is assumed that the signal power is identical for satellites **1** and **2**, which is the best case for the inventive method. With $N_1=N_2$ and $C_{Sat1}=C_{Sat2}$ (the effective bandwidth is identical for both signals, i.e., channels), the following equation applies:

$$\frac{C}{N}=\frac{C_{Sat1}+C_{Sat2}}{N_1+N_2}=\frac{2C_{Sat1}}{2N_1}=\frac{C_{Sat1}}{N_1}=\frac{C_{Sat2}}{N_2}$$

Assuming the available signal power (=C) and the QPSK symbol rate are kept, the method in accordance with the present invention can give a gain of 4.3 dB compared to the required C/N, if one signal is decoded only (system of FIG. **7**). It is assumed that for other scenarios, i.e., both channels show different fading characteristics, the gain is lower. At least for the scenario $C_{Sat1}/N$ or $C_{Sat2}/N$ being greater than 4.9 dB, no gain is required. The output signal is error free in any case. The overall gain of the inventive transmission receiving system depends on the probability of the scenario. In other words, it is possible to receive the signal down to a C/N of 0.6 dB, which is a theoretical value that does not include implementation loss. If only one satellite signal is available, the required $C/N_o$ is equal to 67 dBHz (not including implementation loss). The unit factor dBHz represents power divided by power density in logarithmical terms.

As it has been described with respect to FIGS. **3** and **4**, a convolutional encoder with a code rate of 1/3 is preferred The output of the convolutional enocoder is punctured to a code rate of 3/8 by not transmitting one channel bit out of 9. The output of the convolutional encoder and puncturing unit is converted into a serial form and demultiplexed. Four bits out of 8 are transmitted over satellite **1**, i.e., the first portion of output bits. The other four bits are transmitted over satellite **2**, i.e., the second portion of output bits. Optionally, an additional time interlever can be used.

As it has been outlined in the introductory portion, the polynominals g1, g2 and g3 describe the shift registers and modulo-2 adders or XOR gates which generate the convolutional code having a code rate of 1/3. The proposed polynominals are as follows:

g1=1100111 (binary)=147 (octal)

g2=1011101 (binary)=135 (octal)

g3=1110011 (binary)=163 (octal)



It should be noted that generator polynomials different from the above mentioned generator polynomials combined with certain puncturing schemes may be used as well (see J. Bibb Cain supra). However, the above given generator polynomials work very well in connection with the puncturing scheme described herein.

The receiver shown in FIG. **5** requires one Viterbi decoder only. The optimal combining with respect to the signal quality of the two signals is automatically performed by the Viterbi decoder. The Viterbi decoder performs maximum likelihood decoding using the channel state information, also called "metric". Algorithms known for Rician and Rayleigh channels can be adapted. If only one signal is available, i.e., one channel is faded totally, the input of the Viterbi decoder can be considered as a convolutional encoder having a code rate of 1/3 punctured to a code rate of 3/4. The equivalent puncturing scheme is:

For the early satellite

111

100

000

and for the late satellite

000

001

111

In accordance with a preferred embodiment of the present invention, a Viterbi decoder implementing a soft decision based on probabilities is used. Thus, the depuncturing unit inserts probabilities rather than actual bit states. Since the depuncturing unit does not have any information about the bits punctured by the puncturing unit in the transmitting apparatus, it inserts probabilities of 0.5 for the low and the high states of the bits.

Optionally, the combiner **230** (FIG. **1**) additionally comprises a channel estimator, that evaluates the signal to noise ratio of signals received from each channel. When the channel estimator determines low signal to noise ratios, it is adapted to insert 0.5 probabilities rather than the actual probabilities derived from the channel having a low signal to noise ratio. Thus, it can be ascertained that the maximum likelihood decoder is not misled by signals received via a channel having a low signal to noise ratio.

Although the preferred embodiment of the present invention has been described with respect to two channels, the inventive concept can also be applied to a transmission system comprising three or more channels. In the case of three channels, the code rate of the channel encoder **120** (FIG. **1**) is to be 1/3 or less. Additionally, the partitioner produces three portions of output bits rather than two portions of output bits. In this case, the transmitting apparatus as described in FIG. **3** can be used. However, no puncturing unit is necessary and the demultiplexer multiplexes three bitstreams, one for each of the three channels. After reading this specification, it is obvious for those skilled in the art that the present invention even can be extended to four or more channels.

Although the preferred embodiment of the present invention uses a convolutional encoder which is optionally extended by means of a Reed-Solomon encoder, other redundancy adding encoders can be adapted. These redundancy adding encoders, however, have to produce two portions of output bits that are coded differently with respect to each other, such that a "real" code rate of, for example, 3/8 in contrast to a doubled 3/4 code rate can be obtained.

The delay imposed by the different delay stages can be set in accordance with the real environment. Normally, a delay

of four seconds is regarded as appropriate. However, other delay values can be adapted. It is to be noted, however, that high delay values result in high memory capacities for the transmitter and the receiver.

What is claimed is:

1. An apparatus for transmitting information, comprising:

a bitstream source for providing a bitstream representing the information;

a redundancy adding encoder for generating an encoded bitstream based on the bitstream provided by the bitstream source wherein the encoder is arranged to output, for a first number of input bits, a second number of output bits, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits;

a partitioner for partitioning the second number of output bits into the two portions of output bits;

a transmitter for transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel;

the transmitter being a single transmitter;

the first channel being defined by the single transmitter and a first position of a mobile receiver;

the second channel being defined by the single transmitter and a second position of the mobile receiver; and

the transmitter further includes delay means for delaying the second portion of output bits transmitted via the second channel such that time diversity is obtained.

2. An apparatus for transmitting information, comprising:

a bitstream source for providing a bitstream representing the information;

a redundancy adding encoder for generating an encoded bitstream based on the bitstream provided by the bitstream source wherein the encoder is arranged to output, for a first number of input bits, a second number of output bits, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits;

a partitioner for partitioning the second number of output bits into the two portions of output bits; and

means for transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel;

the means for transmitting including a first transmitter and a second transmitter spaced apart from the first transmitter;

the first channel being defined by the first transmitter and the receiver; and

the second channel being defined by the second transmitter and the receiver such that space diversity is obtained.

3. The apparatus of claim 2, in which:

the first and second transmitters include two satellites in different orbital positions, such that the first channel is defined by an uplink connection from earth to the first satellite and a downlink connection from the first satellite to a receiver on earth, and such that the second channel is defined by a uplink connection from earth to the second satellite and a downlink connection from the second satellite to the receiver on earth.

4. The apparatus of claim 2, in which:

one transmitter includes a satellite; and

the other transmitter includes a terrestrial sender such that terrestrial diversity is obtained.

5. The apparatus of claim 2, in which the transmitter further includes delay means for delaying the second portion of output bits transmitted via the second channel such that time diversity is obtained.

6. An apparatus for transmitting information, comprising:

a bitstream source for providing a bitstream representing the information;

a redundancy adding encoder for generating an encoded bitstream based on the bitstream provided by the bitstream source wherein the encoder is arranged to output, for a first number of input bits, a second number of output bits, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits, the redundancy adding encoder including a convolutional encoder for obtaining a code rate less than or equal to 0.5, wherein the code rate is the ratio of the first number of input bits to the second number of output bits, the convolutional encoder combining a current input bit to be encoded with at least one of a certain number of preceding input bits;

a partitioner for partitioning the second number of output bits into the two portions of output bits; and

a transmitter for transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel.

7. The apparatus of claim 6, in which:

the certain number of preceding bits is 6; and

the convolutional encoder comprises three generator polynominals $g_1$, $g_2$ and $g_3$ having the following binary form:

$g_1$=1100111,

$g_2$=1011101, and

$g_3$=1110011.

8. The apparatus of claim 6 which further comprises a puncturing unit operative to discard at least one predetermined bit of the encoded bitstream such that the second number of output bits is an even number, wherein the first and second portions of output bits comprise the same number of output bits.

9. An apparatus for transmitting information, comprising:

a bitstream source for providing a bitstream representing the information;

a redundancy adding encoder for generating an encoded bitstream based on the bitstream provided by the bit-

stream source wherein the encoder is arranged to output, for a first number of input bits, a second number of output bits, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits;

a partitioner for partitioning the second number of output bits into the two portions of output bits; and

a transmitter for transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel;

the redundancy adding encoder is operative to code the bitstream provided by the bitstream source in a bit-by-bit fashion;

the partitioner includes a parallel storage for storing a predetermined amount of output bits of the convolutional encoder;

a parallel-to-serial converter for producing a serial stream of the stored bits to be partitioned into the first and second portion of output bits is provided; and

a de-multiplexer for performing the partition of the serial stream of output bits into the first and second portions is provided.

**10**. An apparatus for receiving information, the information being represented by an encoded bitstream, the encoded bitstream being encoded such that its redundancy is at least doubled with respect to a bitstream from which the encoded bitstream is derived, and that, for a first number of bits of the bitstream, the encoded bitstream comprises a second number of bits, the second number of bits having at least twice as many bits as the first number, and wherein the second number of bits includes two portions of bits, each portion of bits individually allowing the retrieval of information represented by the first number of bits, and the first portion of the bits being encoded in a different way with respect to the second portion of bits, the apparatus comprising:

receiving means for receiving the first portion of bits via a first channel and the second portion of bits via a second channel, the first and the second channels being spatially different from each other;

a combiner for combining the first and the second portions the combiner including a depuncturing unit for performing a depuncturing operation on the first and second portions of bits to compensate for a puncturing operation performed in a transmitter; and

a decoder for decoding the coded bitstream by removing redundancy from the coded bitstream, the decoder using the first and second portions of bits combined by the combiner.

**11**. The apparatus of claim **10**, in which the receiving means further includes delay means for delaying the portion of bits received via one channel to compensate for a delay imposed on the portion of bits received via the other channel.

**12**. The apparatus of claim **11**, in which the combiner includes a multiplexer for multiplexing first and second portions into a form suitable for the decoder.

**13**. An apparatus for receiving information, the information being represented by an encoded bitstream, the encoded bitstream being encoded such that its redundancy is at least doubled with respect to a bitstream from which the encoded bitstream is derived, and that, for a first number of bits of the bitstream, the encoded bitstream comprises a second number of bits, the second number of bits having at least twice as many bits as the first number, and wherein the second number of bits includes two portions of bits, each portion of bits individually allowing the retrieval of information represented by the first number of bits, and the first portion of the bits being encoded in a different way with respect to the second portion of bits, the apparatus comprising:

receiving means for receiving the first portion of bits via a first channel and the second portion of bits via a second channel, the first and the second channels being spatially different from each other;

a combiner for combining the first and the second portions;

a decoder for decoding the coded bitstream by removing redundancy from the coded bitstream, the decoder using the first and second portions of bits combined by the combiner,

the decoder comprising a soft decision decoder processing probabilities in that a received bit represents a high or low state rather than an actual wave form characteristic of the received bitstream; and

depuncturing means for compensating for a puncturing operation in a transmitter is provided and attributes to a bit to be depunctured equal probabilites for the high and low states.

**14**. The apparatus of claim **13** in which the decoder includes a Viterbi decoder performing maximum likelihood decoding using the state information of the first and second channels.

**15**. The apparatus of claim **14** in which the decoder further comprises a Reed-Solomon decoder fed by the Viterbi decoder for undoing a Reed-Solomon encoding performed in the transmitter.

**16**. The apparatus of claim **13** in which:

the decoder comprises a signal to noise ratio evaluating means for determining a channel having a low signal to noise ratio; and

a bit replacing means for replacing the bits of a portion of bits received via a channel having a low signal to noise ratio by values equivalent to a lower reliability for the high and low states.

**17**. The apparatus of claim **13** in which the receiving means comprises, for each channel, a QPSK demodulator for providing the first and the second portions of bits.

**18**. A method of transmitting information, comprising the following steps:

providing a bitstream representing the information;

generating a redundancy added encoded bitstream based on the bitstream provided in the step of providing, wherein for a first number of input bits, a second number of output bits is generated, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits;

partitioning the second number of output bits into the two portions of output bits; and

transmitting by use of a single transmitter the output bits of the first portion via a first channel and the output bits

of the second portion via a second channel, the second channel being spatially different from the first channel;

the first channel being defined by the single transmitter and a first position of a mobile receiver;

the second channel being defined by the single transmitter and a second position of the mobile receiver; and

the step of transmitting comprising the following substeps: transmitting the first portion of output bits; and delaying the second portion of output bits before transmitting via the second channel such that time diversity is obtained.

**19**. A method of transmitting information, comprising the following steps:

providing a bitstream representing the information;

generating a redundancy added encoded bitstream based on the bitstream provided in the step of providing, wherein for a first number of input bits, a second number of output bits is generated, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits;

partitioning the second number of output bits into the two portions of output bits; and transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel

the step of transmitting being carried out by a first transmitter and a second transmitter spaced apart from the first transmitter;

the first channel being defined by the first transmitter and the receiver; and

the second channel being defined by the second transmitter and the receiver such that space diversity is obtained.

**20**. The method of claim **19**, in which:

the first and second transmitters include two satellites in different orbital positions, such that the first channel is defined by an uplink connection from earth to the first satellite and a downlink connection from the first satellite to a receiver on earth, and such that the second channel is defined by a uplink connection from earth to the second satellite and a downlink connection from the second satellite to the receiver on earth.

**21**. The method of claim **19**, in which:

one transmitter includes a satellite; and

the other transmitter includes a terrestrial sender such that terrestrial diversity is obtained.

**22**. The method of claim **19**, in which the step of transmitting further includes the following substeps: delaying the second portion of output bits transmitted via the second channel such that time diversity is obtained.

**23**. A method of transmitting information, comprising the following steps:

providing a bitstream representing the information;

generating a redundancy added encoded bitstream based on the bitstream provided in the step of providing, wherein for a first number of input bits, a second number of output bits is generated, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits;

the generating step being carried out by means of a convolutional encoder for obtaining a code rate less than or equal to 0.5, wherein the code rate is the ratio of the first number of input bits to the second number of output bits, the convolutional encoder combining a current input bit to be encoded with at least one of a certain number of preceding input bits;

partitioning the second number of output bits into the two portions of output bits; and

transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel.

**24**. The method of claim **23**, in which:

the certain number of preceding bits is 6; and

the convolutional encoder comprises three generator polynominals $g_1$, $g_2$ and $g_3$ having the following binary form:

$g_1$=1100111,

$g_2$=1011101, and

$g_3$=1110011.

**25**. The method of claim **23** which further comprises the step of puncturing to discard at least one predetermined bit of the encoded bitstream such that the second number of output bits is an even number, wherein the first and second portions of output bits comprise the same number of output bits.

**26**. A method of transmitting information, comprising the following steps:

providing a bitstream representing the information;

generating a redundancy added encoded bitstream based on the bitstream provided in the step of providing, by coding the bitstream provided by the bitstream source in a bit-by-bit fashion, wherein for a first number of input bits, a second number of output bits is generated, the second number of output bits having at least twice as many output bits as the first number of input bits, and wherein the second number of output bits includes two portions of output bits, each portion of output bits individually allowing the retrieval of information represented by the first number of input bits, and the first portion of output bits being coded based on the bitstream in a different way with respect to the second portion of output bits;

producing a serial stream of the stored bits to be partitioned into the first and second portion of output bits by the step of parallel-to-serial converting;

partitioning the second number of output bits into the two portions of output bits by de-multiplexing; and

transmitting the output bits of the first portion via a first channel and the output bits of the second portion via a second channel, the second channel being spatially different from the first channel.

**27**. A method of receiving information, the information being represented by an encoded bitstream, the encoded bitstream being encoded such that its redundancy is at least doubled with respect to a bitstream from which the encoded bitstream is derived, and that, for a first number of bits of the bitstream, the encoded bitstream comprises a second number

of bits, the second number of bits having at least twice as many bits as the first number, and wherein the second number of bits includes two portions of bits, each portion of bits individually allowing the retrieval of information represented by the first number of bits, and the first portion of the bits being encoded in a different way with respect to the second portion of bits, the method comprising the following steps:

receiving the first portion of bits via a first channel and the second portion of bits via a second channel, the first and the second channels being spatially different from each other;

combining the first and the second portions;

performing a depuncturing operation on the first and second portions of bits to compensate for a puncturing operation performed in a transmitter; and

decoding the coded bitstream by removing redundancy from the coded bitstream, wherein the first and second portions of bits combined in the step of combining are used in the step of decoding.

**28**. The method of claim **27**, in which the step of receiving further includes the step of delaying the portion of bits received via one channel to compensate for a delay imposed on the portion of bits received via the other channel.

**29**. The method of claim **27**, in which the step of combining includes the step of multiplexing the first and second portions into a form suitable for the step of decoding.

**30**. The method of claim **27**, in which the step of receiving comprises, for each channel, the step of QPSK demodulating for providing the first and the second portions of bits.

**31**. A method of receiving information, the information being represented by an encoded bitstream, the encoded bitstream being encoded such that its redundancy is at least doubled with respect to a bitstream from which the encoded bitstream is derived, and that, for a first number of bits of the bitstream, the encoded bitstream comprises a second number of bits, the second number of bits having at least twice as many bits as the first number, and wherein the second number of bits includes two portions of bits, each portion of bits individually allowing the retrieval of information represented by the first number of bits, and the first portion of the bits being encoded in a different way with respect to the second portion of bits, the method comprising the following steps:

receiving the first portion of bits via a first channel and the second portion of bits via a second channel, the first and the second channels being spatially different from each other;

combining the first and the second portions; and

decoding the coded bitstream by removing redundancy from the coded bitstream by soft decision decoding to process probabilities such that a received bit represents a high or low state rather than an actual wave form characteristic of the received bitstream, wherein the first and second portions of bits combined in the step of combining are used in the step of decoding; and

a step of depuncturing for compensating for a puncturing operation in a transmitter is carried out and attributes to a bit to be depunctured equal probabilites for the high and low states.

**32**. The method of claim **31** in which the step of decoding includes a Viterbi decoder performing maximum likelihood decoding using the state information of the first and second channels.

**33**. The method of claim **32** in which the step of decoding further comprises a Reed-Solomon decoder fed by the Viterbi decoder for undoing a Reed-Solomon encoding performed in the transmitter.

**34**. The method of claim **31**, in which:

the step of decoding includes the step of signal to noise ratio evaluating for determining a channel having a low signal to noise ratio; and

the step of bit replacing for replacing the bits of a portion of bits received via a channel having a low signal to noise ratio by equal probabilities for the high and low states is carried out.

**35**. The method of claim **31**, in which the step of receiving comprises, for each channel, the step of QPSK demodulating for providing the first and second portions of bits.

* * * * *

US006931084B1

(12) **United States Patent**
**Eberlein et al.**

(10) **Patent No.: US 6,931,084 B1**
(45) **Date of Patent: Aug. 16, 2005**

(54) **DIFFERENTIAL CODING AND CARRIER RECOVERY FOR MULTICARRIER SYSTEMS**

(75) Inventors: **Ernst Eberlein**, Grossenseebach (DE); **Sabah Badri**, Erlangen (DE); **Stefan Lipp**, Erlangen (DE); **Stephan Buchholz**, Munich (DE); **Albert Heuberger**, Erlangen (DE); **Heinz Gerhaeuser**, Waischenfeld (DE); **Robert Fischer**, Erlangen (DE)

(73) Assignee: **Fraunhofer-Gesellschaft zur Foerderung der angewandten Forschung e.V.**, Munich (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/673,266**

(22) PCT Filed: **Apr. 14, 1998**

(86) PCT No.: **PCT/EP98/02167**

§ 371 (c)(1),
(2), (4) Date: **Nov. 29, 2000**

(87) PCT Pub. No.: **WO99/53664**

PCT Pub. Date: **Oct. 21, 1999**

(51) **Int. Cl.**[7] .......................... **H03D 1/04**; H03D 1/06; H03K 5/01; H03K 6/04; H04B 1/10; H04L 1/00
(52) **U.S. Cl.** ...................................................... **375/346**
(58) **Field of Search** ....................... 375/346; 370/32.1; 379/410

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,968,955 A * 11/1990 Yoshida et al. ............. 329/304
5,166,924 A * 11/1992 Moose ....................... 370/289
5,202,643 A * 4/1993 Sato ........................... 329/309
5,732,105 A * 3/1998 Andren et al. .............. 375/226
5,771,224 A 6/1998 Seki et al. .................. 370/206
5,790,516 A * 8/1998 Gudmundson et al. ..... 370/210
5,889,759 A * 3/1999 McGibney .................. 370/207
5,946,292 A * 8/1999 Tsujishita et al. ........... 370/204
5,999,129 A * 12/1999 Rose .......................... 342/394
6,292,777 B1 * 9/2001 Inoue et al. ................ 704/230
6,377,683 B1 * 4/2002 Dobson et al. ........ 379/406.12
6,466,958 B1 * 10/2002 Van Wechel et al. ....... 708/422
6,574,283 B1 * 6/2003 Sakoda et al. .............. 375/262
6,690,745 B1 * 2/2004 Horii et al. ................. 375/316

FOREIGN PATENT DOCUMENTS

EP 1193934 A2 * 4/2002 ........... H04L 27/26
JP 8265293 10/1996

(Continued)

OTHER PUBLICATIONS

Moose, "Differentially Coded Multi-Frequency Modulation for Digital Communications", *Signal Processing V—Theories and Applications*, Proceedings of EUSIPCO-90 Fifth European Signal Processing Conference, Barcelona, Spain, vol. III, pp. 1807-1810 (Sep. 1990).

(Continued)

*Primary Examiner*—Stephen Chin
*Assistant Examiner*—Harry Vartanian
(74) *Attorney, Agent, or Firm*—Roylance, Abrams, Berdo & Goodman, L.L.P.

(57) **ABSTRACT**

A method of performing an echo phase offset correction in a multi-carrier demodulation system involves the step of differential phase decoding phase shifts based on a phase difference between simultaneous carriers having different frequencies. An echo phase offset is determined for each decoded phase shift by eliminating phase shift uncertainties related to the transmitted information from the decoded phase shift. The echo phase offsets are averaged in order to generate an averaged offset. Finally, each decoded phase shift is corrected based on the averaged offset.

**16 Claims, 7 Drawing Sheets**



FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 9149092 | 6/1997 |
| JP | 1041991 | 2/1998 |
| WO | 9205646 | 4/1992 |
| WO | 9800946 | 1/1998 |

OTHER PUBLICATIONS

Moose, "A Technique for Orthogonal Frequency Division Multiplexing Frequency Offset Correction", *IEEE Transactions on Communications,* vol. 42, No. 10, pp. 2908-2914 (Oct. 1994).

Keller and Hanzo; "Orthogonal Frequency Division Multiplex Synchronisation Techniques for Wireless Local Area Networks", *IEEE International Symposium on Personal, Indoor and Mobile Radio Communications*, pp. 963-967 (Oct. 1996).

Zou and Wu, "COFDM: An Overview", *IEEE Transactions on Broadcasting*, vol. 41, No. 1, pp. 1-8 (Mar. 1995).

* cited by examiner


MCM symbols 200
202
208
204
206
K subcarriers
time
frequency
= MCM symbol
= subcarrier
= reference subcarrier

FIG.1


MCM symbols
K subcarriers
time
frequency
= MCM symbol
= subcarrier

FIG.8


236
Inverse Discrete Fourier Transform
NFFT complex values
guard band
K+1 carriers are used
guard band
MCM symbol
200
frequency
234
reference symbol
232
factor*
THETA[k]
$z^{-1}$
224
222
230
phi[k]
226
228
220
input
bitstream

FIG.2



real axis
imaginary axis
-5 -4 -3 -2 -1 0 1 2 3 4 5
5 4 3 2 1 0 -1 -2 -3 -4 -5


FIG.3B



real axis
imaginary axis
-5 -4 -3 -2 -1 0 1 2 3 4 5
5 4 3 2 1 0 -1 -2 -3 -4 -5


FIG.3A


signal from MCM transmitter
122
mobile channel
time
132
receiver frontend
140
FFT
142
differential de-mapping along the frequency axis
400
Q
I
402
Echo Phase Offset Correction (EPOC) algorithm
404
Q
I
signal for the metric calculation

FIG.4


138
removal of guard band carriers
142
differential demapper
K complex signal points
500
( . )4
514
512
abs(.)
arg( . )
const. "0"
518
527
buffer for K complex signal points
control signal
516
cntr>=threshold
cntr<threshold
510
524
phase rotation
v_K' = v_K · e^{jφ̄}
Hold K times
522
Integrate & Dump
φ̄ = 1/K Σ_{i=1}^{K} φ_i
520
526
soft-metric calculation

FIG.5




FIG.6


100
MCM Transmitter
102
data (bitsream) source
106
110
inverse FFT
114
guard interval insertion
116
add framing information
120
D A C
transmitter frontend
122
channel
118
preamble insertion
115
cyclic prefix
112
108
104
0 1 0 1
132
receiver frontend
A D C
134
symbol framing / carrier frequency synchronization unit
130
136
extract framing information
138
guard interval removal
140
FFT
142
MCM Receiver
144
data (bitsream) sink

FIG.7

# DIFFERENTIAL CODING AND CARRIER RECOVERY FOR MULTICARRIER SYSTEMS

## FIELD OF THE INVENTION

The present invention relates to methods and apparatus for performing modulation and de-modulation in multi-carrier modulation systems (MCM systems) and, in particular, to methods and apparatus for differential mapping and de-mapping of information onto carriers of multi-carrier modulation symbols in such systems. Furthermore, the present invention relates to methods and apparatus for performing an echo phase offset correction when decoding information encoded onto carriers of multi-carrier modulation symbols in multi-carrier modulation systems.

## BACKGROUND OF THE INVENTION

The present invention generally relates to broadcasting of digital data to mobile receivers over time-variant multipath channels. More specifically, the present invention is particularly useful in multipath environments with low channel coherence time, i.e. rapidly changing channels. In preferred embodiments, the present invention can be applied to systems implementing a multicarrier modulation scheme. Multi-carrier modulation (MCM) is also known as orthogonal frequency division multiplexing (OFDM).

In a MCM transmission system binary information is represented in the form of a complex spectrum, i.e. a distinct number of complex subcarrier symbols in the frequency domain. In the modulator a bitstream is represented by a sequence of spectra. Using an inverse Fourier-transform (IFFT) a MCM time domain signal is produced from this sequence of spectra.

FIG. **7** shows a MCM system overview. At **100** a MCM transmitter is shown. A description of such a MCM transmitter can be found, for example, in William Y. Zou, Yiyan Wu, "COFDM: AN OVERVIEW", IEEE Transactions on Broadcasting, vol. 41, No. 1, March 1995.

A data source **102** provides a serial bitstream **104** to the MCM transmitter. The incoming serial bitstream **104** is applied to a bit-carrier mapper **106** which produces a sequence of spectra **108** from the incoming serial bitstream **104**. An inverse fast Fourier transform (FFT) **110** is performed on the sequence of spectra **108** in order to produce a MCM time domain signal **112**. The MCM time domain signal forms the useful MCM symbol of the MCM time signal. To avoid intersymbol interference (ISI) caused by multipath distortion, a unit **114** is provided for inserting a guard interval of fixed length between adjacent MCM symbols in time. In accordance with a preferred embodiment of the present invention, the last part of the useful MCM symbol is used as the guard interval by placing same in front of the useful symbol. The resulting MCM symbol is shown at **115** in FIG. **7**.

A unit **116** for adding a reference symbol for each predetermined number of MCM symbols is provided in order to produce a MCM signal having a frame structure. Using this frame structure comprising useful symbols, guard intervals and reference symbols it is possible to recover the useful information from the MCM signal at the receiver side.

The resulting MCM signal having the structure shown at **118** in FIG. **7** is applied to the transmitter front end **120**. Roughly speaking, at the transmitter front end **120**, a digital/analog conversion and an up-converting of the MCM signal is performed. Thereafter, the MCM signal is transmitted through a channel **122**.



Following, the mode of operation of a MCM receiver **130** is shortly described referring to FIG. **7**. The MCM signal is received at the receiver front end **132**. In the receiver front end **132**, the MCM signal is down-converted and, furthermore, a digital/analog conversion of the down-converted signal is performed. The down-converted MCM signal is provided to a frame synchronization unit **134**. The frame synchronization unit **134** determines the location of the reference symbol in the MCM symbol. Based on the determination of the frame synchronization unit **134**, a reference symbol extracting unit **136** extracts the framing information, i.e. the reference symbol, from the MCM symbol coming from the receiver front end **132**. After the extraction of the reference symbol, the MCM signal is applied to a guard interval removal unit **138**.

The result of the signal processing performed so far in the MCM receiver are the useful MCM symbols. The useful MCM symbols output from the guard interval removal unit **138** are provided to a fast Fourier transform unit **140** in order to provide a sequence of spectra from the useful symbols. Thereafter, the sequence of spectra is provided to a carrier-bit mapper **142** in which the serial bitstream is recovered. This serial bitstream is provided to a data sink **144**.

As it is clear from FIG. **7**, every MCM transmitter **100** must contain a device which performs mapping of the transmitted bitstreams onto the amplitudes and/or phases of the sub-carriers. In addition, at the MCM receiver **130**, a device is needed for the inverse operation, i.e. retrieval of the transmitted bitstream from the amplitudes and/or phases of the sub-carriers.

For a better understanding of MCM mapping schemes, it is preferable to think of the mapping as being the assignment of one ore more bits to one or more sub-carrier symbols in the time-frequency plane. In the following, the term symbol or signal point is used for the complex number which represents the amplitude and/or phase modulation of a subcarrier in the equivalent baseband. Whenever all complex numbers representing all subcarrier symbols are designated, the term MCM symbol is used.

## DESCRIPTION OF PRIOR ART

In principle, two methods for mapping the bitstream into the time-frequency plane are used in the prior art:

A first method is a differential mapping along the time axis. When using differential mapping along the time axis one or more bits are encoded into phase and/or amplitude shifts between two subcarriers of the same center frequency in adjacent MCM symbols. Such an encoding scheme is shown in FIG. **8**. The arrows depicted between the subcarrier symbols correspond to information encoded in amplitude and/or phase shifts between two subcarrier symbols.

A system applying such a mapping scheme is defined in the European Telecommunication standard ETS 300 401 (EU147-DAB). A system compliant to this standard uses Differential Quadrature Phase Shift Keying (DQPSK) to encode every two bits into a 0, 90, 180 or 270 degrees phase difference between two subcarriers of the same center frequency which are located in MCM symbols adjacent in time.

A second method for mapping the bitstream into the time-frequency plane is a non-differential mapping. When using non-differential mapping the information carried on a sub-carrier is independent of information transmitted on any other subcarrier, and the other subcarrier may differ either in

frequency, i.e. the same MCM symbol, or in time, i.e. adjacent MCM symbols. A system applying such a mapping scheme is defined in the European Telecommunication standard ETS 300 744 (DVB-T). A system compliant to this standard uses 4, 16 or 64 Quadrature Amplitude Modulation (QAM) to assign bits to the amplitude and phase of a subcarrier.

The quality with which transmitted multi-carrier modulated signals can be recovered at the receiver depends on the properties of the channel. The most interesting property when transmitting MCM signals is the time interval at which a mobile channel changes its characteristics considerably. The channel coherence time $T_c$ is normally used to determine the time interval at which a mobile channel changes its characteristics considerably. $T_c$ depends on the maximum Doppler shift as follows:

$$f_{Doppler,max}=v \cdot f_{carrier}/c \quad \text{(Eq.1)}$$

with

v: speed of the mobile receiver in [m/s]

fcarrier: carrier frequency of the RF signal [Hz]

c: speed of light ($3 \cdot 10^8$ m/s)

The channel coherence time $T_c$ is often defined to be

$$T_c|_{50\%} = \frac{9}{16\pi f_{Doppler,max}} \text{ or } T_c|_{2nd\,Def.} = \frac{9}{16\pi f^2_{Doppler,max}} \quad \text{(Eq. 2)}$$

It becomes clear from the existence of more than one definition, that the channel coherence time $T_c$ is merely a rule-of-thumb value for the stationarity of the channel. As explained above, the prior art time-axis differential mapping requires that the mobile channel be quasi stationary during several MCM symbols periods, i.e. required channel coherence time Tc>>MCM symbol period. The prior art non-differential MCM mapping only requires that the mobile channel be quasi stationary during one symbol interval, i.e. required channel coherence time>MCM symbol period.

Thus, both prior art mapping schemes have specific disadvantages. For differential mapping into time axis direction the channel must be quasi stationary, i.e. the channel must not change during the transmission of two MCM symbols adjacent in time. If this requirement is not met, the channel induced phase and amplitude changes between MCM symbols will yield an increase in bit error rate.

With non-differential mapping exact knowledge of the phase of each subcarrier is needed (i.e. coherent reception). For multipath channels, coherent reception can only be obtained if the channel impulse response is known. Therefore, a channel estimation has to be part of the receiver algorithm. The channel estimation usually needs additional sequences in the transmitted waveform which do not carry information. In case of rapidly changing channels, which necessitate update of the channel estimation at short intervals, the additional overhead can quickly lead to insufficiency of non-differential mapping.

P. H. Moose: "Differentially Coded Multi-Frequency Modulation for Digital Communications", SIGNAL PROCESSING THEORIES AND APPLICATIONS, 18.–21. September 1990, pages 1807–1810, Amsterdam, NL, teaches a differentially coded multi-frequency modulation for digital communications. A multi-frequency differential modulation is described in which symbols are differentially encoded within each baud between adjacent tones. At the receiver, following a digital Fourier transform (DFT), the complex product between the DFT coefficient of digital frequency k and the complex conjugate of the DFT coefficient of digital frequency k−1 is formed. Thereafter, the result is multiplied by appropriate terms such that the differentially encoded phase bits are realigned to the original constellations. Thus, the constellation following the differential decoding must correspond to the original constellation.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide methods and devices for performing an echo phase offset correction in a multi-carrier demodulation system.

In accordance with a first aspect, the present invention provides a method of performing an echo phase offset correction in a multi-carrier demodulation system, comprising the steps of:

differential phase decoding phase shifts based on a phase difference between simultaneous carriers having different frequencies;

determining an echo phase offset for each decoded phase shift by eliminating phase shift uncertainties related to the transmitted information from the decoded phase shift;

averaging the echo phase offsets in order to generate an averaged offset; and

correcting each decoded phase shift based on the averaged offset.

In accordance with a second aspect, the present invention provides a method of performing an echo phase offset correction in a multi-carrier demodulation system, comprising the steps of:

differential phase decoding phase shifts based on a phase difference between simultaneous carriers having different frequencies, the phase shifts defining signal points in a complex plane;

pre-rotating the signal points into the sector of the complex plane between −45° and +45°;

determining parameters of a straight line approximating the location of the pre-rotated signal points in the complex plane;

determining a phase offset based on the parameters; and

correcting each decoded phase shift based on the phase offset.

In accordance with a third aspect, the present invention provides an echo phase offset correction device for a multi-carrier demodulation system, comprising:

a differential phase decoder for decoding phase shifts based on a phase difference between simultaneous carriers having different frequencies;

means for determining an echo phase offset for each decoded phase shift by eliminating phase shift uncertainties related to the transmitted information from the decoded phase shift;

means for averaging the echo phase offsets in order to generate an averaged offset; and

means for correcting each decoded phase shift based on the averaged offset.

In accordance with a fourth aspect, the present invention provides an echo phase offset correction device for a multi-carrier demodulation system, comprising:

a differential phase decoder for decoding phase shifts based on a phase difference between simultaneous carriers having different frequencies, the phase shifts defining signal points in a complex plane;

means for pre-rotating the signal points into the sector of the complex plane between −45° and +45°;

means for determining parameters of a straight line approximating the location of the pre-rotated signal points in the complex plane;

means for determining a phase offset based on the parameters; and

means for correcting each decoded phase shift based on the phase offset.

The present invention provides methods and devices for performing an echo phase offset correction, suitable for multi-carrier (OFDM) digital broadcasting over rapidly changing multipath channels, comprising differential encoding of the data along the frequency axis such that there is no need for channel stationarity exceeding one multicarrier symbol.

When using the mapping process along the frequency axis it is preferred to make use of a receiver algorithm that will correct symbol phase offsets that can be caused by channel echoes.

The mapping scheme along the frequency axis for multi-carrier modulation renders the transmission to a certain extent independent of rapid changes in the multipath channel without introducing a large overhead to support channel estimation. Especially systems with high carrier frequencies and/or high speeds of the mobile carrying the receiving unit can benefit from such a mapping scheme.

Thus, the mapping scheme of a differential encoding along the frequency axis does not exhibit the two problems of the prior art systems described above. The mapping scheme is robust with regard to rapidly changing multipath channels which may occur at high frequencies and/or high speeds of mobile receivers.

The controlled respective parameters of the subcarriers are the phases thereof, such that the information is differentially phase encoded.

In accordance with the mapping described above, mapping is also differential, however, not into time axis direction but into frequency axis direction. Thus, the information is not contained in the phase shift between subcarriers adjacent in time but in the phase shift between subcarriers adjacent in frequency. Differential mapping along the frequency axis has two advantages when compared to prior art mapping schemes.

Because of differential mapping, no estimation of the absolute phase of the subcarriers is required. Therefore, channel estimation and the related overhead are not necessary. By choosing the frequency axis as direction for differentially encoding the information bitstream, the requirement that the channel must be stationary during several MCM symbols can be dropped. The channel only has to remain unchanged during the current MCM symbol period. Therefore, like for non-differential mapping it holds that

required channel coherence time≧MCM symbol period.

The present invention provides methods and apparatus for correction of phase distortions that can be caused by channel echoes. As described above, differential mapping into frequency axis direction solves problems related to the stationarity of the channel. However, differential mapping into frequency axis direction may create a new problem. In multipath environments, path echoes succeeding or preceding the main path can lead to systematic phase offsets between sub-carriers in the same MCM symbol. In this context, the main path is thought of being the path echo with the highest energy content. The main path echo will determine the position of the FFT window in the receiver of an MCM system.

According to the present invention, the information will be contained in a phase shift between adjacent subcarriers of the same MCM symbol. If not corrected for, the path echo induced phase offset between two subcarriers can lead to an increase in bit error rate. Therefore, application of the MCM mapping scheme presented in this invention will preferably be used in combination with a correction of the systematic subcarrier phase offsets in case of a multipath channel.

The introduced phase offset can be explained from the shifting property of the Discrete Fourier Transform (DFT):

$$x[((n-m))_N] \overset{DFT}{\longleftrightarrow} X[k]e^{\,j\frac{2\pi}{N}km} \qquad \text{(Eq. 3)}$$

with

$x[n]$: sampled time domain signal $(0 \le n \le N-1)$

$X[k]$: $DFT$ transformed frequency domain signal $(0 \le k \le N-1)$

$N$: length of $DFT$

$(\ldots)_N$: cyclic shift of the $DFT$ window in the time

$m$: length of $DFT$-Shift in the time domain

Equation 3 shows, that in a multipath channel, echoes following the main path will yield a subcarrier dependent phase offset. After differential demapping in the frequency axis direction at the receiver, a phase offset between two neighboring symbols remains. Because the channel induced phase offsets between differentially demodulated symbols are systematic errors, they can be corrected by an algorithm.

In the context of the following specification, algorithms which help correcting the phase shift are called Echo Phase offset correction (EPOC) algorithms. Two such algorithms are described as preferred embodiments for the correction of phase distortions that can be caused by channel echoes. These algorithms yield a sufficient detection security for MCM frequency axis mapping even in channels with echoes close to the limits of the guard interval.

In principle, an EPOC algorithm must calculate the echo induced phase offset from the signal space constellation following the differential demodulation and subsequently correct this phase offset.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the following, preferred embodiments of the present invention will be explained in detail on the basis of the drawings enclosed, in which:

FIG. 1 shows a schematic view representing a mapping scheme used according to the invention;

FIG. 2 shows a functional block diagram of an embodiment of a mapping device;

FIGS. 3A and 3B show scatter diagrams of the output of an differential de-mapper of a MCM receiver for illustrating the effect of an echo phase offset correction;

FIG. 4 shows a schematic block diagram for illustrating the position and the functionality of an echo phase offset correction unit;

FIG. 5 shows a schematic block diagram of an embodiment of an echo phase offset correction device according to the present invention;

FIG. **6** shows schematic views for illustrating a projection performed by another embodiment of an echo phase offset correction device according to the present invention;

FIG. **7** shows a schematic block diagram of a generic multi-carrier modulation system; and

FIG. **8** shows a schematic view representing a prior art differential mapping scheme.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In a preferred embodiment thereof, the present invention is applied to a MCM system as shown in FIG. **7**. With respect to this MCM system, the present invention relates to the bit-carrier mapper **106** of the MCM transmitter **100** and the carrier-bit mapper **142** of the MCM receiver **130**, which are depicted with a shaded background in FIG. **7**.

An preferred embodiment of an inventive mapping scheme used by the bit-carrier mapper **106** is depicted in FIG. **1**. A number of MCM symbols **200** is shown in FIG. **1**. Each MCM symbol **200** comprises a number of sub-carrier symbols **202**. The arrows **204** in FIG. **1** illustrate information encoded between two sub-carrier symbols **202**. As can be seen from the arrows **204**, the bit-carrier mapper **106** uses a differential mapping within one MCM symbol along the frequency axis direction.

In the embodiment shown in FIG. **1**, the first sub-carrier (k=0) in an MCM symbol **200** is used as a reference sub-carrier **206** (shaded) such that information is encoded between the reference sub-carrier and the first active carrier **208**. The other information of a MCM symbol **200** is encoded between active carriers, respectively.

Thus, for every MCM symbol an absolute phase reference exists. In accordance with FIG. **1**, this absolute phase reference is supplied by a reference symbol inserted into every MCM symbol (k=0). The reference symbol can either have a constant phase for all MCM symbols or a phase that varies from MCM symbol to MCM symbol. A varying phase can be obtained by replicating the phase from the last subcarrier of the MCM symbol preceding in time.

In FIG. **2** a preferred embodiment of a device for performing a differential mapping along the frequency axis is shown. Referring to FIG. **2**, assembly of MCM symbols in the frequency domain using differential mapping along the frequency axis according to the present invention is described.

FIG. **2** shows the assembly of one MCM symbol with the following parameters:

NFFT designates the number of complex coefficients of the discrete Fourier transform, number of subcarriers respectively.

K designates the number of active carriers. The reference carrier is not included in the count for K.

According to FIG. **2**, a quadrature phase shift keying (QPSK) is used for mapping the bitstream onto the complex symbols. However, other M-ary mapping schemes (MPSK) like 2-PSK, 8-PSK, 16-QAM, 16-APSK, 64-APSK etc. are possible.

Furthermore, for ease of filtering and minimization of aliasing effects some subcarriers are not used for encoding information in the device shown in FIG. **2**. These subcarriers, which are set to zero, constitute the so-called guard bands on the upper and lower edges of the MCM signal spectrum.

At the input of the mapping device shown in FIG. **2**, complex signal pairs b**0**[k], b**1**[k] of an input bitstream are received. K complex signal pairs are assembled in order to form one MCM symbol. The signal pairs are encoded into the K differential phase shifts phi[k] needed for assembly of one MCM symbol. In this embodiment, mapping from Bits to the 0, 90, 180 and 270 degrees phase shifts is performed using Gray Mapping in a quadrature phase shift keying device **220**.

Gray mapping is used to prevent that differential detection phase errors smaller than 135 degrees cause double bit errors at the receiver.

Differential phase encoding of the K phases is performed in a differential phase encoder **222**. At this stage of processing, the K phases phi[k] generated by the QPSK Gray mapper are differentially encoded. In principal, a feedback loop **224** calculates a cumulative sum over all K phases. As starting point for the first computation (k=0) the phase of the reference carrier **226** is used. A switch **228** is provided in order to provide either the absolute phase of the reference subcarrier **226** or the phase information encoded onto the preceding (i.e. $z^{-1}$, where $z^{-1}$ denotes the unit delay operator) subcarrier to a summing point **230**. At the output of the differential phase encoder **222**, the phase information theta [k] with which the respective subcarriers are to be encoded is provided. In preferred embodiments of the present invention, the subcarriers of a MCM symbol are equally spaced in the frequency axis direction.

The output of the differential phase encoder **222** is connected to a unit **232** for generating complex subcarrier symbols using the phase information theta[k]. To this end, the K differentially encoded phases are converted to complex symbols by multiplication with

$$\text{factor}*e^{j*[2*pi*(theta[k]+PHI)]} \qquad \text{(Eq.4)}$$

wherein factor designates a scale factor and PHI designates an additional angle. The scale factor and the additional angle PHI are optional. By choosing PHI=45° a rotated DQPSK signal constellation can be obtained.

Finally, assembly of a MCM symbol is effected in an assembling unit **234**. One MCM symbol comprising $N_{FFT}$ subcarriers is assembled from $N_{FFT}$-K−1 guard band symbols which are "zero", one reference subcarrier symbol and K DQPSK subcarrier symbols. Thus, the assembled MCM symbol **200** is composed of K complex values containing the encoded information, two guard bands at both sides of the NFFT complex values and a reference subcarrier symbol.

The MCM symbol has been assembled in the frequency domain. For transformation into the time domain an inverse discrete Fourier transform (IDFT) of the output of the assembling unit **234** is performed by a transformator **236**. In preferred embodiments of the present invention, the transformator **236** is adapted to perform a fast Fourier transform (FFT).

Further processing of the MCM signal in the transmitter as well as in the receiver is as described above referring to FIG. **7**.

At the receiver a de-mapping device **142** (FIG. **7**) is needed to reverse the operations of the mapping device described above referring to FIG. **2**. The implementation of the de-mapping device is straightforward and, therefore, need not be described herein in detail.

However, systematic phase shifts stemming from echoes in multipath environments may occur between subcarriers in the same MCM symbol. This phase offsets can cause bit errors when demodulating the MCM symbol at the receiver.

Thus, it is preferred to make use of an algorithm to correct the systematic phase shifts stemming from echoes in mul-

tipath environments. Preferred embodiments of echo phase offset correction algorithms are explained hereinafter referring to FIGS. **3** to **6**.

In FIGS. **3A** and **3B**, scatter diagrams at the output of a differential demapper of a MCM receiver are shown. As can be seen from FIG. **3A**, systematic phase shifts between subcarriers in the same MCM symbol cause a rotation of the demodulated phase shifts with respect to the axis of the complex coordinate system. In FIG. **3B**, the demodulated phase shifts after having performed an echo phase offset correction are depicted. Now, the positions of the signal points are substantially on the axis of the complex coordinate system. These positions correspond to the modulated phase shifts of 0°, 90°, 180° and 270°, respectively.

An echo phase offset correction algorithm (EPOC algorithm) must calculate the echo induced phase offset from the signal space constellation following the differential demodulation and subsequently-correct this phase offset.

For illustration purposes, one may think of the simplest algorithm possible which eliminates the symbol phase before computing the mean of all phases of the subcarriers. To illustrate the effect of such an EPOC algorithm, reference is made to the two scatter diagrams of subcarriers symbols contained in one MCM symbol in FIGS. **3A** and **3B**. This scatter diagrams have been obtained as result of an MCM simulation. For the simulation a channel has been used which might typically show up in single frequency networks. The echoes of this channel stretched to the limits of the MCM guard interval. The guard interval was chosen to be 25% of the MCM symbol duration in this case.

FIG. **4** represents a block diagram for illustrating the position and the functionality of an echo phase offset correction device in a MCM receiver. The signal of a MCM transmitter is transmitted through the channel **122** (FIGS. **4** and **7**) and received at the receiver frontend **132** of the MCM receiver. The signal processing between the receiver frontend and the fast Fourier transformator **140** has been omitted in FIG. **4**. The output of the fast Fourier transformator is applied to the de-mapper, which performs a differential de-mapping along the frequency axis. The output of the de-mapper are the respective phase shifts for the subcarriers. The phase offsets of this phase shifts which are caused by echoes in multipath environments are visualized by a block **400** in FIG. **4** which shows an example of a scatter diagram of the subcarrier symbols without an echo phase offset correction.

The output of the de-mapper **142** is applied to the input of an echo phase offset correction device **402**. The echo phase offset correction device **402** uses an EPOC algorithm in order to eliminate echo phase offsets in the output of the de-mapper **142**. The result is shown in block **404** of FIG. **4**, i.e. only the encoded phase shifts, 0°, 90°, 180° or 270° are present at the output of the correction device **402**. The output of the correction device **402** forms the signal for the metric calculation which is performed in order to recover the bitstream representing the transmitted information.

A first embodiment of an EPOC algorithm and a device for performing same is now described referring to FIG. **5**.

The first embodiment of an EPOC algorithm starts from the assumption that every received differentially decoded complex symbol is rotated by an angle due to echoes in the multipath channel. For the subcarriers equal spacing in frequency is assumed since this represents a preferred embodiment of the present invention. If the subcarriers were not equally spaced in frequency, a correction factor would have to be introduced into the EPOC algorithm.

FIG. **5** shows the correction device **402** (FIG. **4**) for performing the first embodiment of an EPOC algorithm.

From the output of the de-mapper **142** which contains an echo phase offset as shown for example in FIG. **3A**, the phase shifts related to transmitted information must first be discarded. To this end, the output of the de-mapper **142** is applied to a discarding unit **500**. In case of a DQPSK mapping, the discarding unit can perform a "$(.)^4$" operation. The unit **500** projects all received symbols into the first quadrant. Therefore, the phase shifts related to transmitted information is eliminated from the phase shifts representing the subcarrier symbols. The same effect could be reached with a modulo-4 operation.

Having eliminated the information related symbol phases in unit **500**, the first approach to obtain an estimation would be to simply compute the mean value over all symbol phases of one MCM symbol. However, it is preferred to perform a threshold decision before determining the mean value over all symbol phases of one MCM symbol. Due to Rayleigh fading some of the received symbols may contribute unreliable information to the determination of the echo phase offset. Therefore, depending on the absolute value of a symbol, a threshold decision is performed in order to determine whether the symbol should contribute to the estimate of the phase offset or not.

Thus, in the embodiment shown in FIG. **5**, a threshold decision unit **510** is included. Following the unit **500** the absolute value and the argument of a differentially decoded symbol is computed in respective computing units **512** and **514**. Depending on the absolute value of a respective symbol, a control signal is derived. This control signal is compared with a threshold value in a decision circuit **516**. If the absolute value, i.e. the control signal thereof, is smaller than a certain threshold, the decision circuit **516** replaces the angle value going into the averaging operation by a value equal to zero. To this end, a switch is provided in order to disconnect the output of the argument computing unit **514** from the input of the further processing stage and connects the input of the further processing stage with a unit **518** providing a constant output of "zero".

An averaging unit **520** is provided in order to calculate a mean value based on the phase offsets $\phi_i$ determined for the individual subcarrier symbols of a MCM symbol as follows:

$$\bar{\varphi} = \frac{1}{K}\sum_{i=1}^{K} \varphi_i \qquad \text{(Eq. 5)}$$

In the averaging unit **520**, summation over K summands which have not been set to zero in the unit **516** is performed. The output of the averaging unit **520** is provided to a hold unit **522** which holds the output of the averaging unit **520** K times. The output of the hold unit **522** is connected with a phase rotation unit **524** which performs the correction of the phase offsets of the K complex signal points on the basis of the mean value $\bar{\phi}$.

The phase rotation unit **524** performs the correction of the phase offsets by making use of the following equation:

$$v'_k = v_k \cdot e^{-j\bar{\varphi}} \qquad \text{(Eq.6)}$$

In this equation, $v'_k$ designates the K phase corrected differentially decoded symbols for input into the soft-metric calculation, whereas $v_k$ designates the input symbols. As long as a channel which is quasi stationary during the

duration of one MCM symbols can be assumed, using the mean value over all subcarriers of one MCM symbol will provide correct results.

A buffer unit **527** may be provided in order to buffer the complex signal points until the mean value of the phase offsets for one MCM symbol is determined. The output of the phase rotation unit **524** is applied to the further processing stage **526** for performing the soft-metric calculation.

With respect to the results of the above echo phase offset correction, reference is made again to FIGS. **3**A and **3**B. The two plots stem from a simulation which included the first embodiment of an echo phase offset correction algorithm described above. At the instant of the scatter diagram snapshot shown in FIG. **3**A, the channel obviously distorted the constellation in a way, that a simple angle rotation is a valid assumption. As shown in FIG. **3**B, the signal constellation can be rotated back to the axis by applying the determined mean value for the rotation of the differentially detected symbols.

A second embodiment of an echo phase offset correction algorithm is described hereinafter. This second embodiment can be preferably used in connection with multipath channels that have up to two strong path echoes. The algorithm of the second embodiment is more complex than the algorithm of the first embodiment.

What follows is a mathematical derivation of the second embodiment of a method for echo phase offset correction. The following assumptions can be made in order to ease the explanation of the second embodiment of an EPOC algorithm.

In this embodiment, the guard interval of the MCM signal is assumed to be at least as long as the impulse response h[q], q=0, 1, . . . , Qh−1 of the multipath channel.

At the transmitter every MCM symbol is assembled using frequency axis mapping explained above. The symbol of the reference subcarrier equals 1, i.e. 0 degree phase shift. The optional phase shift PHI equals zero, i.e. the DQPSK signal constellation is not rotated.

Using an equation this can be expressed as

$$a_k = a_{k-1} a_k^{inc} \tag{Eq. 7}$$

with

$k$: index $k = 1, 2, \ldots, K$ of the active subcarrier;

$a_k^{inc} = e^{j\frac{\pi}{2}m}$: complex phase increment symbol; $m = 0, 1, 2, 3$ is the $QPSK$ symbol number which is derived from Gray encoding pairs of 2 Bits;

$a_0 = 1$: symbol of the reference subcarrier.

At the DFT output of the receiver the decision variables

$$e_k = a_k H_k \tag{Eq.8}$$

are obtained with

$$H_k = \sum_{i=0}^{Q_h-1} h[i] \cdot e^{-j\frac{2\pi}{K}ki} \tag{Eq. 9}$$

being the DFT of the channel impulse response h[q] at position k.

With $|a_k|^2=1$ the differential demodulation yields

$$v_k = e_k \cdot e_{k-1}^* = a_k^{inc} H_k H_{k-1}^* \tag{Eq.10}$$

For the receiver an additional phase term $\phi_k$ is introduced, which shall be used to correct the systematic phase offset caused by the channel. Therefore, the final decision variable at the receiver is

$$v'_k = v_k \cdot e^{j\phi_k} = a_k^{inc} \cdot e^{j\phi_k} \cdot H_k H_{k-1}^* \tag{Eq.11}$$

As can be seen from the Equation 11, the useful information $a_k^{inc}$ is weighted with the product $e^{j\phi_k} \cdot H_k \cdot H_{k-1}^*$ (rotation and effective transfer function of the channel). This product must be real-valued for an error free detection. Considering this, it is best to choose the rotation angle to equal the negative argument of $H_k \cdot H_{k-1}^*$. To derive the desired algorithm for 2-path channels, the nature of $H_k \cdot H_{k-1}^*$ is investigated in the next section.

It is assumed that the 2-path channel exhibits two echoes with energy content unequal zero, i.e. at least two dominant echoes. This assumption yields the impulse response

$$h[q] = c_1 \delta_0[q] + c_2 \delta_0[q - q_0] \tag{Eq.12}$$

with

$c_1, c_2$: complex coefficients representing the path echoes;

$q_0$: delay of the second path echo with respect to the first path echo;

$\delta_0$: Dirac pulse; $\delta_0[k]=1$ for k=0

$\delta_0[k]=0$ else

The channel transfer function is obtained by applying a DFT (Eq.9) to Equation 12:

$$H_k = H\left(e^{j\frac{2\pi}{K}k}\right) = c_1 + c_2 \cdot e^{-j\frac{2\pi}{K}kq_0} \tag{Eq. 13}$$

With Equation 13 the effective transfer function for differential demodulation along the frequency axis is:

$$\begin{aligned} H_k \cdot H_{k-1}^* &= \left(c_1 + c_2 e^{-j\frac{2\pi}{K}kq_0}\right) \cdot \left(c_1^* + c_2^* e^{+j\frac{2\pi}{K}(k-1)q_0}\right) \\ &= c_a + c_b \cos\left(\frac{\pi}{K} q_0 (2k-1)\right) \end{aligned} \tag{Eq. 14}$$

Assuming a noise free 2-path channel, it can be observed from Equation 14 that the symbols on the receiver side are located on a straight line in case the symbol 1+j0 has been send (see above assumption). This straight line can be characterized by a point

$$c_a = |c_1|^2 + |c_2|^2 \cdot e^{-j\frac{2\pi}{K}q_0} \tag{Eq. 15}$$

and the vector

$$c_b = 2 c_1 c_2^* \cdot e^{-j\frac{\pi}{K}q_0} \tag{Eq. 16}$$

which determines its direction.

With the above assumptions, the following geometric derivation can be performed. A more suitable notation for the geometric derivation of the second embodiment of an EPOC algorithm is obtained if the real part of the complex

plane is designated as x=Re{z}, the imaginary part as y=Im{z}, respectively, i.e. z=x+jy. With this new notation, the straight line, on which the received symbols will lie in case of a noise-free two-path channel, is

$$f(x) = a + b \cdot x \quad \text{(Eq. 17)}$$

with

$$a = \mathrm{Im}\{c_a\} - \frac{\mathrm{Re}\{c_a\}}{\mathrm{Re}\{c_b\}} \cdot \mathrm{Im}\{c_b\} \quad \text{(Eq. 18)}$$

and

$$b = -\frac{\mathrm{Im}\{c_a\} - \frac{\mathrm{Re}\{c_a\}}{\mathrm{Re}\{c_b\}} \cdot \mathrm{Im}\{c_b\}}{\mathrm{Re}\{c_a\} - \frac{\mathrm{Im}\{c_a\}}{\mathrm{Im}\{c_b\}} \cdot \mathrm{Re}\{c_b\}} \quad \text{(Eq. 19)}$$

Additional noise will spread the symbols around the straight line given by Equations 17 to 19. In this case Equation 19 is the regression curve for the cluster of symbols.

For the geometric derivation of the second embodiment of an EPOC algorithm, the angle $\phi_k$ from Equation 11 is chosen to be a function of the square distance of the considered symbol from the origin:

$$\phi_k = f_K(|z|^2) \quad \text{(Eq.20)}$$

Equation 20 shows that the complete signal space is distorted (torsion), however, with the distances from the origin being preserved.

For the derivation of the algorithm of the second embodiment, $f_K(\cdot)$ has to be determined such that all decision variables $v'_k$ (assuming no noise) will come to lie on the real axis:

$$\mathrm{Im}\left\{(x + j\mathrm{f}(x)) \cdot e^{j f_K(|z|^2)}\right\} = 0 \quad \text{(Eq. 21)}$$

Further transformations of Equation 21 lead to a quadratic equation which has to be solved to obtain the solution for $\phi_k$.

In case of a two-path channel, the echo phase offset correction for a given decision variable $v_k$ is

$$v'_k = v_k \cdot e^{j\varphi_k} \quad \text{(Eq. 22)}$$

with

$$\varphi_k = \begin{cases} -a\tan\left(\dfrac{a + b\sqrt{|v_k|^2(1+b^2) - a^2}}{-ab + \sqrt{|v_k|^2(1+b^2) - a^2}}\right) & \text{for } |v_k|^2 \geq \dfrac{a^2}{1+b^2} \\ a\tan\left(\dfrac{1}{b}\right) & \text{for } |v_k|^2 < \dfrac{a^2}{1+b^2} \end{cases} \quad \text{(Eq. 23)}$$

From the two possible solutions of the quadratic equation mentioned above, Equation 23 is the one solution that cannot cause an additional phase shift of 180 degrees.

The two plots in FIG. **15** show the projection of the EPOC algorithm of the second embodiment for one quadrant of the complex plane. Depicted here is the quadratic grid in the sector |arg(z)|≦π/4 and the straight line y=f(x)=a+b·x with a =−1.0 and b=0.5 (dotted line). In case of a noise-free channel, all received symbols will lie on this straight line if 1+j0 was send. The circle shown in the plots determines the boarder line for the two cases of Equation 23. In the left part, FIG. **15** shows the situation before the projection, in the right part, FIG. **15** shows the situation after applying the projection algorithm. By looking on the left part, one can see, that the straight line now lies on the real axis with 2+j0 being the fix point of the projection. Therefore, it can be concluded that the echo phase offset correction algorithm according to the second embodiment fulfills the design goal.

Before the second embodiment of an EPOC algorithm can be applied, the approximation line through the received symbols has to be determined, i.e. the parameters a and b must be estimated. For this purpose, it is assumed that the received symbols lie in sector |arg(z)|≦π/4, if 1+j0 was sent. If symbols other than 1+j0 have been sent, a modulo operation can be applied to project all symbols into the desired sector. Proceeding like this prevents the necessity of deciding on the symbols in an early stage and enables averaging over all signal points of one MCM symbol (instead of averaging over only ¼ of all signal points).

For the following computation rule for the EPOC algorithm of the second embodiment, $x_i$ is used to denote the real part of the i-th signal point and $y_i$ for its imaginary part, respectively (i=1, 2, . . . , K). Altogether, K values are available for the determination. By choosing the method of least squares, the straight line which has to be determined can be obtained by minimizing

$$(a, b) = \underset{(\tilde{a},\tilde{b})}{\arg\min} \sum_{i=1}^{K} \left(y_i - (\tilde{a} + \tilde{b} \cdot x_i)\right)^2 \quad \text{(Eq. 24)}$$

The solution for Equation 24 can be found in the laid open literature. It is

$$b = \frac{\sum_{i=1}^{K} (x_i - \overline{x}) \cdot y_i}{\sum_{i=1}^{K} (x_i - \overline{x})^2}, \quad a = \overline{y} - \overline{x} \cdot b \quad \text{(Eq. 25)}$$

with mean values

$$\overline{x} = \frac{1}{N} \sum_{i=1}^{K} x_i, \quad \overline{y} = \frac{1}{N} \sum_{i=1}^{K} y_i \quad \text{(Eq. 26)}$$

If necessary, an estimation method with higher robustness can be applied. However, the trade-off will be a much higher computational complexity.

To avoid problems with the range in which the projection is applicable, the determination of the straight line should be separated into two parts. First, the cluster's centers of gravity are moved onto the axes, following, the signal space is distorted. Assuming that a and b are the original parameters of the straight line and α is the rotation angle, $f_K(\cdot)$ has to be applied with the transformed parameters

$$b' = \frac{b \cdot \cos(\alpha) - \sin(\alpha)}{\cos(\alpha) + b \cdot \sin(\alpha)}, \quad a' = a \cdot (\cos(\alpha) - b' \cdot \sin(\alpha)) \quad \text{(Eq.27)}$$

Besides the two EPOC algorithms explained above section, different algorithms can be designed that will, however, most likely exhibit a higher degree of computational complexity.

The new mapping method for Multicarrier Modulation schemes presented herein consists in principal of two important aspects. Differential mapping within one MCM symbol along the frequency axis direction and correction of the channel echo related phase offset on the subcarriers at the receiver side. The advantage of this new mapping scheme is its robustness with regard to rapidly changing multipath channels which may occur at high frequencies and/or high speeds of mobile receivers.

What is claimed is:

**1**. A method of performing an echo phase offset correction in a multi-carrier demodulation system, comprising the steps of:

differential phase decoding phase shifts based on a phase difference between simultaneous carriers having different frequencies;

determining an echo phase offset for each decoded phase shift by eliminating phase shift uncertainties related to the transmitted information from said decoded phase shift;

averaging said echo phase offsets in order to generate an averaged offset;

correcting each decoded phase shift based on said averaged offset; and

further comprising a step of comparing an absolute value of a symbol associated with a respective decoded phase shift with a threshold, wherein only phase shifts having associated therewith symbols having an absolute value exceeding said threshold are used in said step of averaging said echo phase offsets.

**2**. The method according to claim **1**, wherein said step of differential phase decoding comprises the step of differential phase decoding phase shifts based on a phase difference between simultaneous carriers which are adjacent in the frequency axis direction.

**3**. The method according to claim **1**, wherein said step of differential phase decoding comprises the step of differential phase decoding phase shifts based on phase differences between at least three simultaneous carriers which are equally spaced in the frequency axis direction.

**4**. A method of performing an echo phase offset correction in a multi-carrier demodulation system, comprising the steps of:

differential phase decoding phase shifts based on a phase difference between simultaneous carriers having different frequencies, said phase shifts defining signal points in a complex plane;

pre-rotating said signal points into the sector of said complex plane between −45° and +45°;

determining parameters a, b of a straight line approximating the location of said pre-rotated signal points in said complex plane;

determining a phase offset based on said parameters a, b; and

correcting each decoded phase shift based on said phase offset.

**5**. The method according to claim **4**, wherein said simultaneous carriers are equally spaced in the frequency axis direction.

**6**. The method according to claim **4**, wherein said step of determining said parameters a, b comprises a least squares method for selecting those parameters which minimize the deviations of said pre-rotated signal points from said straight line.

**7**. The method according to claim **6**, wherein said parameters a, b are determined as follows:

$$b = \frac{\sum_{i-1}^{K} (x_i - \overline{x}) \cdot y_i}{\sum_{i-1}^{K} (x_i - \overline{x})^2}, \quad a = \overline{y} - \overline{x} \cdot b$$

$$\overline{x} = \frac{1}{N} \sum_{i=1}^{K} x_i, \quad \overline{y} = \frac{1}{N} \sum_{i=1}^{K} y_i$$

wherein

x and y designate the coordinates of the signal points in the complex plane,

i is an index from 1 to N, and

K is the numer of signal points.

**8**. The method according to claim **7**, wherein said phase offset $\phi_k$ is determined as follows:

$$\varphi_k = \begin{cases} -a\tan\left(\dfrac{a + b\sqrt{|v_k|^2(1+b^2) - a^2}}{-ab + \sqrt{|v_k|^2(1+b^2) - a^2}}\right) & \text{for } |v_k|^2 \geq \dfrac{a^2}{1+b^2} \\ a\tan\left(\dfrac{1}{b}\right) & \text{for } |v_k|^2 < \dfrac{a^2}{1+b^2} \end{cases}$$

wherein $v_k$ is a given decision variable.

**9**. An echo phase offset correction device for a multicattier demodulation system, comprising:

a differential phase decoder for decoding phase shifts based on a phase difference between simultaneous carriers having different frequencies;

means for determining an echo phase offset for each decoded phase shift comprising means for eliminating phase shift uncertainties related to the transmitted information from said decoded phase shift;

means for averaging said echo phase offsets in order to generate an averaged offset;

means for correcting each decoded phase shift based on said averaged offset; and

means for comparing an absolute value of a symbol associated with a respective decoded phase shift with a threshold, wherein said means for averaging said phase offsets only uses phase shifts having associated therewith symbols having an absolute value exceeding said threshold.

**10**. The device according to claim **9**, wherein said differential phase decoder is adapted for decoding said phase shifts based on a phase difference between simultaneous carriers which are adjacent in the frequency axis direction.

**11**. The device according to claim **9**, wherein said differential phase decoder is adapted for decoding said phase shifts based on phase differences between at least three simultaneous carriers which are equally spaced in the frequency axis direction.

**12**. An echo phase offset correction device for a multicarrier demodulation system, comprising:

a differential phase decoder for decoding phase shifts based on a phase difference between simultaneous

carriers having different frequencies, said phase shifts defining signal points in a complex plane;

means for pre-rotating said signal points into the sector of said complex plane between −45° and +45°;

means for determining parameters a, b of a straight line approximating the location of said pre-rotated signal points in said complex plane;

means for determining a phase offset based on said parameters a, b; and

means for correcting each decoded phase shift based on said phase offset.

**13**. The device according to claim **12**, wherein said differential phase decoder comprises means for decoding phase shifts of at least three simultaneous carriers which are equally spaced in the frequency axis direction.

**14**. The device according to claim **12**, wherein said means for determining said parameters a, b comprises means for performing a least squares method for selecting those parameters which minimize the deviations of said pre-rotated signal points from said straight line.

**15**. The device according to claim **14**, wherein said means for determining said parameters a, b calculates said parameters a, b as follows:

$$b = \frac{\sum_{i=1}^{K} (x_i - \overline{x}) \cdot y_i}{\sum_{i=1}^{K} (x_i - \overline{x})^2}, \quad a = \overline{y} - \overline{x} \cdot b$$

-continued

$$\overline{x} = \frac{1}{N} \sum_{i=1}^{K} x_i, \quad \overline{y} = \frac{1}{N} \sum_{i=1}^{K} y_i$$

wherein

x and y designate the coordinates of the signal points in the complex plane,

i is an index from 1 to N, and

K is the number of signal points.

**16**. The device according to claim **15**, wherein said means for determining said phase offset $\phi_k$ calculates said phase offset $\phi_k$ as follows:

$$\varphi_k = \begin{cases} -a \tan\left( \frac{a + b\sqrt{|v_k|^2(1+b^2) - a^2}}{-ab + \sqrt{|v_k|^2(1+b^2) - a^2}} \right) & \text{for } |v_k|^2 \geq \frac{a^2}{1+b^2} \\ a \tan\left( \frac{1}{b} \right) & \text{for } |v_k|^2 < \frac{a^2}{1+b^2} \end{cases}$$

wherein $v_k$ is a given decision variable.

* * * * *

US006993084B1

(12) **United States Patent**
**Eberlein et al.**

(10) **Patent No.: US 6,993,084 B1**
(45) **Date of Patent: Jan. 31, 2006**

# (54) COARSE FREQUENCY SYNCHRONISATION IN MULTICARRIER SYSTEMS

(75) Inventors: **Ernst Eberlein**, Grossenseebach (DE); **Sabah Badri**, Erlangen (DE); **Stefan Lipp**, Erlangen (DE); **Stephan Buchholz**, Munich (DE); **Albert Heuberger**, Erlangen (DE); **Heinz Gerhaeuser**, Waischenfeld (DE)

(73) Assignee: **Fraunhofer-Gesellschaft zur Foerderung der angewandten Forschung e.V.**, Munich (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/673,271**

(22) PCT Filed: **Apr. 14, 1998**

(86) PCT No.: **PCT/EP98/02169**

§ 371 (c)(1),
(2), (4) Date: **Nov. 28, 2000**

(87) PCT Pub. No.: **WO99/53665**

PCT Pub. Date: **Oct. 21, 1999**

(51) **Int. Cl.**
*H04L 27/28* (2006.01)

(52) **U.S. Cl.** .................................................... **375/260**

(58) **Field of Classification Search** ................ 375/132, 375/130, 135, 261, 326, 379, 295, 376, 324, 375/266, 268, 140, 260, 262, 271; 370/206, 370/517, 203, 204, 207, 208, 216, 343, 480, 370/210, 347, 510, 509, 470, 279, 209; 35/138
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,191,576 A 3/1993 Pommier et al. ............. 370/18
5,550,812 A * 8/1996 Philips ...................... 370/203

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0631406 12/1994

(Continued)

OTHER PUBLICATIONS

Moose, "A Technique for Orthogonal Frequency Division Multiplexing Frequency Offset Correction", *IEEE Transactions on Communications*, vol. 42, No. 10, pp. 2908-2914 (Oct. 1994).

(Continued)

*Primary Examiner*—Emmanuel Bayard
(74) *Attorney, Agent, or Firm*—Roylance, Abrams, Berdo & Goodman, L.L.P.

(57) **ABSTRACT**

A method for generating a signal having a frame structure, each frame of the frame structure comprising at least one useful symbol, a guard interval associated to the at least one useful symbol and a reference symbol, comprises the steps of performing an amplitude modulation of a bit sequence such that the envelope of the amplitude modulated bit sequence defines a reference pattern of the reference symbol and inserting the amplitude modulated bit sequence into said signal as said reference symbol. A method for frame synchronization of a signal having such a frame structure comprises the steps of receiving the signal, down-converting the received signal, performing an amplitude-demodulation of the down-converted signal in order to generate an envelope, correlating the envelope with a predetermined reference pattern in order to detect a signal reference pattern of the reference symbol in the signal, and performing the frame synchronization based on the detection of the signal reference pattern.

**46 Claims, 3 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,602,835 | A | * | 2/1997 | Seki et al. | 370/206 |
| 5,631,610 | A | * | 5/1997 | Sandberg et al. | 332/170 |
| 5,646,935 | A | * | 7/1997 | Ishikawa et al. | 370/207 |
| 5,657,313 | A | * | 8/1997 | Takahashi et al. | 370/491 |
| 5,694,389 | A | * | 12/1997 | Seki et al. | 370/208 |
| 5,771,224 | A | * | 6/1998 | Seki et al. | 370/206 |
| 5,832,387 | A | * | 11/1998 | Bae et al. | 455/522 |
| 6,009,073 | A | * | 12/1999 | Kaneko | 370/203 |
| 6,092,122 | A | * | 7/2000 | Liu et al. | 709/227 |
| 6,151,296 | A | * | 11/2000 | Vijayan et al. | 370/208 |
| 6,173,016 | B1 | * | 1/2001 | Suzuki | 375/295 |
| 6,175,550 | B1 | * | 1/2001 | van Nee | 370/206 |
| 6,359,933 | B1 | * | 3/2002 | Aslanis et al. | 375/260 |
| 6,363,175 | B1 | * | 3/2002 | Scheirer et al. | 382/232 |
| 6,687,315 | B2 | * | 2/2004 | Keevill et al. | 375/341 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0722235 | 7/1996 |
| JP | 62502932 | 11/1987 |
| JP | 08251135 | 9/1996 |
| JP | 9116465 | 5/1997 |
| JP | 9214464 | 8/1997 |
| WO | 8607223 | 12/1986 |
| WO | 9800946 | 1/1998 |

OTHER PUBLICATIONS

Keller and Hanzo; "Orthogonal Frequency Division Multiplex synchronisation Techniques for Wireless Local Area Networks", *IEEE International Symposium on Personal, Indoor and Mobile Radio Communications*, pp. 963-967 (Oct. 1996).

Palacherla, "DSP-$\mu$P Routine Computes Magnitude", *EDN Electrical Design News*, vol. 34, No. 22, pp. 225-226 (Oct. 1989).

Warner and Leung, "OFDM/FM Frame Synchronization for Mobile Radio Data Communication", *IEEE Transactions On Vehicular Technology*, vol. 42, pp. 302-313 (Aug. 1993).

Classen and Meyr, "Synchronization Algorithms for an OFDM System for Mobile Communication", Condierung für Quelle, Kanal and Übertragung: ITG-Fachbericht, pp. 105-114 (Oct. 1994).

Schmidl and Cox, "Low-Overhead, Low-Complexity [Burst] Synchronization for OFDM", *Proc. IEEE Int. Conf. on Commun.*, pp. 1301-1306 (1996).

ver de Beek, Sandell, Isaksson and Börjesson, "Low-Complex Frame Synchronization in OFDM Systems", *Proc. of the ICUPC* (1995).

Lambrette, Horstmannshoff and Metr, "Techniques for Frame Synchronization on Unknown Frequency Selctive Channels", *Proc. Vehic. Technology Conference* (1997).

Zou and Wu, "COFDM: An Overview", *IEEE Transactions on Broadcasting*, vol. 41, No. 1, pp. 108 (Mar. 1995).

Adams and Brady, "Magnitude Approximations for Microprocessor Implementation", *IEEE Micro*, vol. 3, No. 5, pp. 27-31 (Oct. 1983).

Lambrette, Speth and Meyr, "OFDM Burst Frequency Synchronization by Single Carrier Training Data", *IEEE Coun. Letters*, vol. 1, No. 2, pp. 46-48 (mar. 1997).

* cited by examiner


14
12
10
MCM symbol
16
10
reference symbol
reference symbol
1 FRAME

FIG.1


154
Frame/Timing coarse Frequency Synchronization with AM sequence
framing
frequency
156
Receiver Front-end
ADC
MCM demodulator
158
150
152

FIG.3



100
MCM Transmitter
102
data (bit-stream) source
104
106
mapping bit->carrier
108
110
inverse FFT
112
114
guard interval insertion
115
cyclic prefix
116
add reference symbol
118
reference symbol insertion
120
transmitter frontend
DAC
122
channel
130
MCM Receiver
132
receiver frontend
ADC
134
frame synchronization unit
136
extract framing information
138
guard interval removal
140
FFT
142
mapping carrier->bits
144
data (bit-stream) sink


FIG.2


122
132
174
136/138
receiver frontend
LPF
reference symbol/ guard/ extraction
fast AGC
amplitude determin-ing
Corre-lator
Thres-hold
weight-ing
Max. Pos
162
164
166
168
170
172

FIG.4


abs(cir)
time
max. about 60 usec

FIG.5

# COARSE FREQUENCY SYNCHRONISATION IN MULTICARRIER SYSTEMS

## FIELD OF THE INVENTION

The present invention relates to methods and apparatus for generating a signal having a frame structure, wherein each frame of the frame structure is composed of useful symbols, a guard interval associated to each useful symbol and one reference symbol. In addition, the present invention relates to methods and apparatus for frame synchronization of signals having the above structure.

The present invention is particularly useful in a MCM transmission system (MCM=Multi-carrier modulation) using an orthogonal frequency division multiplexing (OFDM) for digital broadcasting.

## BACKGROUND OF THE INVENTION

In a MCM (OFDM) transmission system the binary information is represented in the form of a complex spectrum, i.e. a distinct number of complex subcarrier symbols in the frequency domain. In the modulator a bitstream is represented by a sequence of spectra. Using an inverse Fourier-transform (IFFT) a MCM time domain signal is produced from this sequence of spectra.

In case of a transmission of this described MCM signal via a multipath channel with memory, intersymbol interference (ISI) occurs due to multipath dispersion. To avoid ISI a guard interval of fixed length is added between adjacent MCM symbols in time. The guard interval is chosen as cyclic prefix. This means that the last part of a time domain MCM symbol is placed in front of the symbol to get a periodic extension. If the fixed length of the chosen guard interval is greater than the maximum multipath delay, ISI will not occur.

In the receiver the information which is in the frequency and time domain (MCM) has to be recovered from the MCM time domain signal. This is performed in two steps. Firstly, optimally locating the FFT window, thus eliminating the guard interval in front of each MCM time domain symbol. Secondly, performing a Fourier Transform of the sequence of useful time samples thus obtained.

As a result a sequence of spectral symbols is thus recovered. Each of the symbols contains a distinct number of information carrying subcarrier symbols. Out of these, the information bits are recovered using the inverse process of the modulator.

Performing the above described method, the following problem occurs in the receiver. The exact position of the guard interval and hence the position of the original useful parts of the time domain MCM symbols is generally unknown. Extraction of the guard interval and the subsequent FFT-transform of the resulting useful part of the time signal is not possible without additional information. To provide this additional information, a known (single carrier) sequence in the form of a (time domain) reference symbol is inserted into the time signal. With the knowledge about the positions of the reference symbols in the received signal, the exact positions of the guard intervals and thus the interesting information carrying time samples are known.

The periodical insertion of the reference symbol results in a frame structure of the MCM signal. This frame structure of a MCM signal is shown in FIG. 1. One frame of the MCM signal is composed of a plurality of MCM symbols **10**. Each MCM symbol **10** is formed by an useful symbol **12** and a



guard interval **14** associated therewith. As shown in FIG. 1, each frame comprises one reference symbol **16**.

A functioning synchronization in the receiver, i.e. frame, frequency, phase, guard interval synchronization is necessary for the subsequent MCM demodulation. Consequently, the first and most important task of the base band processing in the receiver is to find and synchronize to the reference symbol.

## DESCRIPTION OF THE PRIOR ART

Most prior art methods for frame synchronization have been developed for single carrier transmission over the AWGN channel (AWGN=Additive White Gaussian Noise). These prior art methods based on correlation are, without major changes, not applicable for transmission over multipath fading channels with large frequency offsets or MCM transmission systems that use, for example, an orthogonal frequency division multiplexing.

For MCM transmission systems particular frame synchronization methods have been developed.

Warner, W. D., Leung C.: OFDM/FM Frame Synchronization for Mobile Radio Data Communication, IEEE Trans. On Vehicular Technology, vol. VT-**42**, August 1993, pp. 302 to 313, teaches the insertion of reference symbols in the form of tones in parallel with the data into the MCM symbol. The reference symbols occupy several carriers of the MCM signal. In the receiver, the synchronization carriers are extracted in the frequency domain, after a FFT transform (FFT=fast Fourier transform) using a correlation detector. In the presence of large frequency offsets, this algorithm becomes very complex because several correlators must be implemented in parallel.

A further prior art technique is to insert a periodic reference symbol into the modulated MCM signal. This reference symbol is a CAZAC sequence (CAZAC=Constant Amplitude Zero Autocorrelation). Such techniques are taught by: Classen, F., Meyr, H.: Synchronization algorithms for an OFDM system *Vehic. Technology Conference,* 1997; Schmidl, T. M., Cox, D. C.: Low-Overhead, Low-Complexity [Burst] Synchronization for OFDM Transmission, *Proc. IEEE Int. Conf. on Commun.,* 1996. In such systems, the receiver's processor looks for a periodic repetition. For these algorithms coarse frequency synchronization has to be achieved prior to or at least simultaneously with frame synchronization.

Van de Beek, J, Sandell, M., Isaksson, M, Börjesson, P.: Low-Complex Frame Synchronization in OFDM Systems, *Proc. of the ICUPC,* 1995, avoid the insertion of additional reference symbols or pilot carriers and use instead the periodicity in the MCM signal which is inherent in the guard interval and the associated cyclical extension. This method is suitable only for slowly varying fading channels and small frequency offsets.

U.S. Pat. No. 5,191,576 relates to a method for the diffusion of digital data designed to be received notably by mobile receivers moving in an urban environment. In this method, the header of each frame of a broadcast signal having a frame structure has a first empty synchronization symbol and a second unmodulated wobbled signal forming a two-stage analog synchronization system. The recovery of the synchronization signal is achieved in an analog way, without prior extraction of a clock signal at the binary level.

EP 0631406 A relates to data signals, COFDM signals, for example, and to methods and apparatus for diffusing said signals. The COFDM signals comprises a sequence of symbols, each symbol having an useful portion and a guard

interval. Two symbols of a COFDM signal are provided as synchronization symbols. One of the two symbols is a zero symbol, whereas the other thereof is a synchronization symbol which is formed by an unmodulated multiplex of the carrier frequencies having a constant envelope. Beside the two symbols as synchronization symbols, it is taught in EP 0631406 A to modulate the pilot frequency of the data signal with a reference signal which carries the synchronization information. This reference signal modulated on the pilot frequency of the data signal can be used by a MABLR demodulator.

WO 98/00946 A relates to a system for a timing and frequency synchronization of OFDM signals. Two OFDM training symbols are used to obtain full synchronization in less than two data frames. The OFDM training symbols are placed into the OFDM signal, preferably at least once every frame. The first OFDM training symbol is produced by modulating the even-numbered OFDM sub-carriers whereas the odd-numbered OFDM sub-carriers are suppressed. Thus, in accordance with WO 98/00946 A, the first OFDM training symbol is produced by modulating the even-numbered carriers of this symbol with a first predetermined PN sequence.

Moose: "A technique for orthogonal frequency division multiplexing frequency offset correction", IEEE TRANSACTIONS ON COMMUNICATIONS, Vo. 42, No. 10, October 1994, pages 2908 to 2914, teaches methods for correcting frequency offsets in OFDM digital communications. The methods involve repetition of a data symbol and comparison of the phases of each of the carriers between the successive symbols. The phase shift of each of the carriers between the repeated symbols is due to the frequency offset since the modulation phase values are not changed in the repeated symbols.

Keller; Hanzo: "Orthogonal frequency division multiplex synchronization techniques for wireless local area networks", IEEE INTERNATIONAL SYMPOSIUM ON PERSONAL, INDOOR AND MOBILE RADIO COMMUNICATIONS, Oct. 15, 1996, pages 963 to 967, teach frequency acquisition, frequency tracking, symbol synchronization and frame synchronization techniques. Regarding the frame synchronization, it is taught to use a reference symbol which consists of repetitive copies of a synchronization pattern of pseudo-random samples. The frame synchronization is achieved by autocorrelation techniques using the periodic synchronization segments such that for the synchronization algorithms proposed no a priori knowledge of the synchronization sequences is required.

The methods for frame synchronization available up to date require either prior achieved frequency synchronization or become very complex when the signal in the receiver is corrupted by a large frequency offset.

If there is a frequency offset in the receiver, as can easily be the case when a receiver is powered-on and the frequency synchronization loop is not yet locked, problems will occur. When performing a simple correlation there will only be noise at the output of the correlator, i.e. no maximum can be found if the frequency offset exceeds a certain bound. The size of the frequency offset depends on the length (time) of the correlation to be performed, i.e. the longer it takes, the smaller the allowed frequency offset becomes. In general, frequency offset increases implementation complexity.

Frequency offsets occur after power-on or later due to frequency deviation of the oscillators used for down-conversion to baseband. Typical accuracies for the frequency of a free running local oscillator (LO) are at ±50 ppm of the carrier frequency. With a carrier frequency in S-band (e.g. 2.34 GHz) there will be a maximum LO frequency deviation of above 100 kHz (117.25 kHz). A deviation of this magnitude puts high demands on the above methods.

In the case of multipath impaired transmission channel, a correlation method yields several correlation maxima in addition to the distinct maximum for an AWGN channel. The best possible frame header position, i.e. the reference symbol, has to be selected to cope with this number of maxima. In multipath channels, frame synchronization methods with correlations can not be used without major changes. Moreover, it is not possible to use data demodulated from the MCM system, because the demodulation is based on the knowledge of the position of the guard interval and the useful part of the MCM symbol.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a method and an apparatus for generating a signal having a frame structure that allow a frame synchronization after the signals have been transmitted even in the case of a carrier frequency offset or in the case of a transmission via a multipath fading channel.

It is a further object of the present invention to provide a method and an apparatus for frame synchronization of a signal having a frame structure even in the case of a carrier frequency offset.

In accordance with a first aspect, the present invention provides a method for generating a signal having a frame structure, each frame of the frame structure comprising at least one useful symbol, a guard interval associated to the at least one useful symbol and a reference symbol, the method comprising the steps of performing an amplitude modulation of a bit sequence, the envelope of the amplitude modulated bit sequence defining the reference pattern of the reference symbol and inserting the amplitude modulated bit sequence into said signal as said reference symbol.

In accordance with a second aspect, the present invention provides a method for generating a multi-carrier modulated signal having a frame structure, each frame of the frame structure comprising at least one useful symbol, a guard interval associated to the at least one useful symbol and a reference symbol, the method comprising the steps of:

providing a bitstream;

mapping bits of the bitstream to carriers in order to provide a sequence of spectra;

performing an inverse Fourier transform in order to provide multi-carrier modulated symbols;

associating a guard interval to each multi-carrier modulated symbol;

generating the reference symbol by performing an amplitude modulation of a bit sequence, the envelope of the amplitude modulated bit sequence defining the reference pattern of the reference symbol;

associating the reference symbol to a predetermined number of multi-carrier modulated symbols and associated guard intervals in order to define the frame; and

inserting said amplitude modulated bit sequence into said signal as said reference symbol.

In accordance with a third aspect, the present invention provides a method for frame synchronization of a signal having a frame structure, each frame of the frame structure comprising at least one useful symbol, a guard interval associated with the at least one useful symbol and a reference symbol, the method comprising the steps of:

receiving the signal;

down-converting the received signal;

performing an amplitude-demodulation of the down-converted signal in order to generate an envelope;

correlating the envelope with a predetermined reference pattern in order to detect the signal reference pattern of the reference symbol in the signal; and

performing the frame synchronization based on the detection of the signal reference pattern.

In accordance with a fourth aspect, the present invention provides a method for frame synchronization of a multi-carrier modulated signal having frame structure, each frame of the frame structure comprising at least one useful symbol, a guard interval associated to the at least one useful symbol and a reference symbol, the method comprising the steps of:

receiving the multi-carrier modulated signal;

down-converting the received multi-carrier modulated signal;

performing an amplitude-demodulation of the down-converted multi-carrier modulated signal in order to generate an envelope;

correlating the envelope with a predetermined reference pattern in order to detect the signal reference pattern of the reference symbol in the multi-carrier modulated signal;

performing the frame synchronization based on the detection of the signal reference pattern;

extracting the reference symbol and the at least one guard interval from the down-converted received multi-carrier modulated signal based on the frame synchronization;

performing a Fourier transform in order to provide a sequence of spectra from the at least one useful symbol;

de-mapping the sequence of spectra in order to provide a bitstream.

In accordance with a fifth aspect, the present invention provides an apparatus for generating a signal having a frame structure, each frame of the frame structure comprising at least one useful symbol, a guard interval associated to the at least one useful symbol and a reference symbol, the apparatus comprising an amplitude modulator for performing an amplitude modulation of a bit sequence, the envelope of the amplitude modulated bit sequence defining the reference pattern of the reference symbol; and

means for inserting the amplitude modulated bit sequence into said signal as said reference symbol.

In accordance with a sixth aspect, the present invention provides an apparatus for generating a multi-carrier modulated signal having a frame structure, each frame of the frame structure comprising at least one useful symbol, a guard interval associated to the at least one useful symbol and a reference symbol, the apparatus comprising:

means for providing a bitstream;

means for mapping bits of the bitstream to carriers in order to provide a sequence of spectra;

means for performing an inverse Fourier transform in order to provide multi-carrier modulated symbols;

means for associating a guard interval to each multi-carrier modulated symbol;

means for generating the reference symbol by an amplitude modulator for performing an amplitude modulation of a bit sequence, the envelope of the amplitude modulated bit sequence defining the reference pattern of the reference symbol;

means for associating the reference symbol to a predetermined number of multi-carrier modulated symbols and associated guard intervals in order to define the frame; and

means for inserting the amplitude modulated bit sequence into said signal as said reference symbol.

In accordance with a seventh aspect, the present invention provides an apparatus for frame synchronization of a signal having a frame structure, each frame of the frame structure comprising at least one useful symbol, a guard interval associated to the at least one useful symbol and a reference symbol, the apparatus comprising:

receiving means for receiving the signal;

a down-converter for down-converting the received signal;

an amplitude-demodulator for performing an amplitude demodulation of the down-converted signal in order to generate an envelope;

a correlator for correlating the envelope with a predetermined reference pattern in order to detect the signal reference pattern of the reference symbol in the signal; and

means for performing the frame synchronization based on the detection of the signal reference pattern.

In accordance with a eighth aspect, the present invention provides an apparatus for frame synchronization of a multi-carrier modulated signal having a frame structure, each frame of the frame structure comprising at least one useful symbol, a guard interval associated to the at least one useful symbol and a reference symbol, the apparatus comprising:

a receiver for receiving the multi-carrier modulated signal;

a down-converter for down-converting the received multi-carrier modulated signal;

an amplitude-demodulator for performing an amplitude-demodulation of the down-converted multi-carrier modulated signal in order to generate an envelope;

a correlator for correlating the envelope with a predetermined reference pattern in order to detect the signal reference pattern of the reference symbol in the multi-carrier modulated signal;

means for performing the frame synchronization based on the detection of the signal reference pattern;

means for extracting the reference symbol and the at least one guard interval from the down-converted received multi-carrier modulated signal based on the frame synchronization in order to generate the at least one useful symbol;

means for performing a Fourier transform in order to provide a sequence of spectra from the at least one useful symbol; and

means for de-mapping the sequence of spectra in order to provide a bitstream.

The present invention provides a novel structure of the reference symbol along with a method to determine the position of the reference symbol and thus the start of a frame in a signal having a frame structure as shown for example in FIG. 1.

The invention relates to a method for finding frame headers independently of other synchronization information and thus for positioning the FFT windows correctly. This includes the extraction of a guard interval. The method is based on the detection of a known reference symbol of the frame header in the reception signal, e.g. in the digital complex baseband. The new frame synchronization will be performed as the first synchronization task.

Synchronization to the reference symbol, i.e. the frame header is the first step to initiate radio reception. The reference symbol is structured to accomplish this. The information contained in the reference symbol must therefore be independent of other synchronization parameters, e.g. frequency offset. For this reason, in accordance with the present invention, the form of the reference symbol selected is an amplitude modulated sequence (AM sequence) in the complex baseband. Thus, the information contained in the reference symbol is only that given in the amplitude and not that in the phase. Note that the phase information will be corrupted by a possible frequency offset. In preferred embodiments of the present invention, the AM information is constructed from a bit sequence with special features. The information sequence is selected in a way which makes it easy and secure to find it in the time domain. A bit sequence with good autocorrelation properties is chosen. Good autocorrelation properties means a distinct correlation maximum in a correlation signal which should be as white as possible.

A pseudo random bit sequence (PRBS) having good autocorrelation properties meets the above requirements.

Using the envelope of the signal to carry bit information offers additional flexibility. First it has to be decided which envelope values should correspond to the binary values of 0 and 1. The parameters are mean amplitude and modulation rate. Attention should be paid to selecting the mean amplitude of the reference symbol (performance) identically to the mean amplitude of the rest of the frame. This is due to the amplitude normalization (AGC; AGC=Automatic Gain Control) performed in the receiver. It is also possible to select the mean amplitude of the reference symbol higher than the mean signal amplitude, but then care has to be taken that the time constant of the AGC (1/sensitivity) is selected high enough to secure that the strong (boosted) signal of the reference symbol does not influence the AGC control signal and thus attenuate the signal following the reference symbol.

Another degree of freedom can be characterized as modulation degree d. This parameter is responsible for the information density of the modulating signal mod(t) formed out of the binary sequence bin(t) as follows: mod(t)=bin(t/d). This modulation degree can be chosen as free parameter fixed by an integer or real relation to the sampling rate. It is appropriate to choose the modulation degree d as an integer value because of the discrete values of the binary sequence:

| | | |
|---|---|---|
| d = 1: mod (m) | = bin (m) | |
| d = 2: mod (m) | = bin (m/2) | for m even |
| | = bin_int (m/2) | for m odd |
| d = 3: mod (m) | = bin (m/3) | for m = 0, ±3, ±6, ±9, |
| | bin_int (m/3) | else |

The signal values bin_int(m/d) are computed from the binary sequence bin(m) by ideal interpolation (between the discrete integer values m) with the factor of d. This is similar to an ideal sampling rate expansion (with sin(x)/x interpolation), but the sampling rate remains, only less bits of the binary sequence bin(m) correspond to the resulting interpolated sequence mod(m). This parameter m indicates the discrete time.

With increasing m the modulating signal mod(t) is expanded in time relative to the basic binary sequence, this results in a bandwidth compression of the resulting AM spectrum with regard to the basic binary sequence. A time expansion by a factor 2 results in a bandwidth compression by the same factor 2. In addition to the bandwidth compression, a further advantage of a higher modulation degree d is a reduced complexity of the search method in the receiver due to the fact that only each dth sample has a corresponding binary value. Choosing the factor d=1 is not preferred since this would result in aliasing due to disregard of the sampling theorem. For this reason, in a preferred embodiment of the present invention d is chosen to be 2.

The choice of length and repetition rate of the reference symbol is, on the one hand, dominated by the channel properties, e.g. the channel's coherence time. On the other hand the choice depends on the receiver requirements concerning mean time for initial synchronization and mean time for resynchronization after synchronization loss due to a channel fade.

In the receiver, the first step after the down-conversion of the received signal is to perform an amplitude-demodulation of the down-converted signal in order to generate an envelope, i.e. in order to determine the amplitude of the signal. This envelope is correlated with a replica reference pattern in order to detect the signal reference pattern of the reference symbol in the signal. In the case of a AWGN channel, the result of this correlation will be a white noise signal with zero mean value and with a clearly visible (positive) maximum. In the case of a multipath channel, several maxima will occur in the correlation signal computed by this correlation. In the former case, the location of the reference symbol is determined based on the signal maximum, whereas in the latter case a weighting procedure is performed in order to find out the maximum corresponding to the location of the reference symbol.

Thus, the present invention shows how to find a reference symbol by a detection method which is simple. Furthermore, the present invention can be used for one-carrier or multicarrier systems. The present invention is particularly useful in multi-carrier modulation systems using an orthogonal frequency division multiplexing, for example in the field of digital broadcasting. The synchronization methods according to the present invention are independent of other synchronization steps. Since the information needed for the synchronization is contained in the envelope of the preamble, i.e. the reference symbol, the reference symbol is independent of possible frequency offsets. Thus, a derivation of the correct down sampling timing and the correct positioning of the FFT window can be achieved. The reference symbol of the present invention can be detected even if the frequency synchronization loop is not yet locked or even in the case of a carrier frequency offset. The frame synchronization method in accordance with the present invention is preferably performed prior to other and without knowledge of other synchronization efforts.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the following, preferred embodiments of the present invention will be explained in detail on the basis of the drawings enclosed, in which:

FIG. **1** shows a schematic view of a signal having a frame structure;

FIG. **2** shows a block diagram of a MCM system to which the present invention can be applied;

FIG. **3** shows a schematic block diagram of a frame and frequency synchronization system in a MCM receiver;

FIG. **4** shows a schematic diagram of an apparatus for frame synchronization; and

FIG. **5** shows a typical channel impulse response of a single frequency network in S-band.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Although the present invention is explained mainly referring to a MCM system, it is obvious that the present invention can be used in connection with different signal transmissions that are based on different kinds of modulation.

FIG. **2** shows a MCM system overview on the basis of which the present invention will be described in detail. At **100** a MCM transmitter is shown that substantially corresponds to a prior art MCM transmitter except for the kind of the reference symbol being added to each frame of a MCM signal. A description of such a MCM transmitter can be found, for example, in William Y. Zou, Yiyan Wu, "COFDM: AN OVERVIEW", IEEE Transactions on Broadcasting, vol. 41, No. **1**, March 1995.

A data source **102** provides a serial bitstream **104** to the MCM transmitter. The incoming serial bitstream **104** is applied to a bit-carrier mapper **106** which produces a sequence of spectra **108** from the incoming serial bitstream **104**. An inverse fast Fourier transform (FFT) **110** is performed on the sequence of spectra **108** in order to produce a MCM time domain signal **112**. The MCM time domain signal forms the useful MCM symbol of the MCM time signal. To avoid intersymbol interference (ISI) caused by multipath distortion, a unit **114** is provided for inserting a guard interval of fixed length between adjacent MCM symbols in time. In accordance with a preferred embodiment of the present invention, the last part of the useful MCM symbol is used as the guard interval by placing same in front of the useful symbol. The resulting MCM symbol is shown at **115** in FIG. **2** and corresponds to the MCM symbol **10** depicted in FIG. **1**. signal transmitted through the channel **122** is received at the receiver front end **132**. The down-converted MCM signal is sampled at the receiver front end **132** and is, in the preferred embodiment, provided to a fast running automatic gain control (time constant<MCM symbol duration) in order to eliminate fast channel fluctuations (channel coherence time=MCM symbol duration). The fast AGC **162** is used in addition to the normally slow AGC in the signal path, in the case of transmission over a multipath channel with long channel impulse response and frequency selective fading. The fast AGC adjusts the average amplitude range of the signal to the known average amplitude of the reference symbol. The so processed symbol is provided to an amplitude determining unit **164**.

The amplitude determining unit **164** can use the simple $\text{alpha}_{max+}$ $\text{beta}_{min-}$ method in order to calculate the amplitude of the signal. This method is described for example in Palachels A.: DSP-mP Routine Computes Magnitude, EDN, Oct. 26, 1989; and Adams, W. T., and Bradley, J.: Magnitude Approximations for Microprocessor Implementation, IEEE Micro, Vol. 3, No. 5, October 1983.

The output signal of the amplitude determining unit **164** is applied to a correlator **166**. In the correlator **166**, a cross correlation between the amplitude signal output from the amplitude determining unit **164** and a known ideal amplitude information is computed. The known ideal amplitude information is stored in the correlator. For both, the amplitude and the known ideal amplitude information, their amplitudes are symmetrically to zero relative to their average amplitude.

In the ideal AWGN case, the result will be a white noise signal with zero mean value and with a clearly visible positive maximum. In this ideal AWGN case, the position of the single maximum is evaluated in a maximum position unit **172**. On the basis of this evaluation, the reference symbol and the guard intervals are extracted from the MCM signal in a combined reference symbol/guard extraction unit **136**/**138**. Although these units are shown as a combined unit **136**/**138** in FIG. **4**, it is clear that separate units can be provided. The MCM signal is transmitted from the RF front end **150** to the reference symbol/guard extraction unit **136**/**138** via a low pass filter **174**.

In the case of time spreading encountered in a multipath channel, several maxima corresponding to the number of clusters in the channel impulse response occur in the output signal of the correlator. A schematic view of three such clusters located in a time window of maximum about 60 microseconds is shown in FIG. **5**. Out of the several maxima caused by the time spreading encountered in a multipath channel, the best one has to be selected as the position of the frame header, i.e. the reference symbol. Therefore, a threshold unit **168** and a weighting unit **170** are provided between the correlator **166** and the maximum position unit **172**. The threshold unit **168** is provided to remove maxima having an amplitude below a predetermined threshold. The weighting unit **164** is provided in order to perform a weighting procedure on the remaining maxima such that the maximum corresponding to the reference symbol can be determined. An examplary weighting procedure performed in the weighting unit **170** is as follows.

The first significant maximum is considered to be the best one. The output signal of the correlator is observed from the first detected maximum onwards for the maximum length of the channel impulse response and an amplitude weighting function is applied to the signal. Because the actual channel impulse response length is unknown, the following fact can be remembered. During system design, the length of the channel impulse response has to be investigated. In a MCM system, the guard interval shall be equal or longer than the maximum expected channel impulse response. For this reason, the part (interval with $l_r$ samples, $l_r$ corresponding to the maximum expected channel impulse response, i.e. the guard interval length) of the correlation output signal starting with the first maximum,

$$I_{k0}(n)=r(k_0+n),\ 0\leqq n\leqq l_r-1 \qquad \text{(Eq. 1)}$$

with $k_0$ being the position of the first maximum, will be examined to find the best frame start position. The above signal part is weighted with the function

$$W(n)=10^{-\frac{weight_dB}{10}\cdot\frac{n}{l_i-1}} \qquad \text{(Eq. 2)}$$

The position ($n_{max}$) of the maximum in the resulting signal interval

$$l_{k,weighted}(n)=[r(k_0+n)W(n)]=\left[r(k_0+n)10^{-\frac{weight_dB}{10}\cdot\frac{n}{l_i-1}}\right] \qquad \text{(Eq. 3)}$$

$$0\le n\le l_i-1$$

will be chosen as best frame start position.

r(k) designates the output signal of the correlator (**166**) at the time k. The signal is present with a clock frequency which is determined by the multiplication: oversampling factor*subcarrier symbol frequency. The parameter k designates the discrete time in sample clocks. This signal is

windowed with information from the threshold unit **168**. An interval having the length of $l_I$ values is extracted from the signal r(k). The first value being written into the interval is the correlation start value at the time $k_0$, at which the output value $r(k_0)$ exceeds the threshold value of the threshold unit **168** for the first time. The interval with the windowed signal is designated by the term $I(k_0)$. The parameter n designates the relative time, i.e. position, of a value inside the interval.

Using the described weighting operation, the earlier correlation maxima are more likely to be chosen as right frame start position. A later coming maximum will only be chosen as frame start position, if the value of the maximum is significantly higher than the earlier one. This operation is applicable especially for MCM, because here it is better to detect the frame start positions some samples too early than some samples too late. Positioning the frame start some samples too early leads to positioning the FFT window a little bit into the guard interval, this contains information of the same MCM symbol and therefore leads to little effects. If the frame start position is detected some samples too late, then the FFT window includes some samples of the following guard interval.

This leads to a more visible degradation, because the following guard interval contains information of the following MCM symbol (ISI occurs).

It is important to know that the first visible correlation maximum after receiver power-on does not necessarily correspond to the first CIR (channel impulse response) cluster. It is possible that it is corresponding to a later cluster, see FIG. **5**. For this reason during power-on one should wait for a second frame start before starting demodulation.

It is clear that amplitude determining methods different from the described $alpha_{max+}$ $beta_{min-}$ method can be used. For simplification, it is possible to reduce the amplitude calculation to a detection as to whether the current amplitude is above or below the average amplitude. The output signal then consists of a −1/+1 sequence which will be correlated with a known bit sequence, also in −1/+1 values. This correlation can easily be performed using a simple integrated circuit (IC).

In addition, an oversampling of the signal received at the RF front end can be performed. For example, the received signal can be expressed with two times oversampling.

This oversampled signal is passed to a fast running AGC to eliminate fast channel fluctuations before the amplitude of the signal is calculated. The amplitude information will be hard quantized. Values larger than the mean amplitude, mean amplitude is 1, will be expressed as +1, values smaller than the mean amplitude will be expressed as −1. This −1/+1 signal is passed to the correlator that performs a cross correlation between the quantized signal and the stored ideal amplitude values of the reference symbol:

amp_sto(k)=2*bin(k/4),

if k=2(oversampling factor)*2(interpolation factor)* 1,2,3 . . . 92

(92 for 184 reference symbol and interpolation factor 2)

amp_sto(k)=0, else, k<=2(oversampling factor)* plary weighting procedure performed in the weighting unit **170** is as follows.

The first significant maximum is considered to be the best one. The output signal of the correlator is observed from the first detected maximum onwards for the maximum length of the channel impulse response and an amplitude weighting function is applied to the signal. Because the actual channel impulse response length is unknown, the following fact can be remembered. During system design, the length of the channel impulse response has to be investigated. In a MCM system, the guard interval shall be equal or longer than the maximum expected channel impulse response. For this reason, the part (interval with lI samples, lI corresponding to the maximum expected channel impulse response, i.e. the guard interval length) of the correlation output signal starting with the first maximum,

$$I_{k0}(n)=r(k_0+n),\ 0\#\ n\ \#\ l_I-1 \qquad \text{(Eq.1)}$$

with $k_0$ being the position of the first maximum, will be examined to find the best frame start position. The above signal part is weighted with the function

$$W(n) = 10^{-\frac{\text{weight_dB}}{10}\frac{n}{l_I-1}} \qquad \text{(Eq. 2)}$$

(Eq.2)

The position ($n_{max}$) of the maximum in the resulting signal interval

$$I_{k0,weighted}(n) = [r(k_0+n)W(n)] = \left[r(k_0+n)10^{-\frac{\text{weight_dB}}{10}\frac{n}{l_I-1}}\right] \qquad \text{(Eq. 3)}$$

$$0\ \#\ n\ \#\ l_I\text{▒}1$$

(Eq.3)

will be chosen as best frame start position.



r(k) designates the output signal of the correlator **(166)** at the time k. The signal is present with a clock frequency which is determined by the multiplication: oversampling factor*subcarrier symbol frequency. The parameter k designates the discrete time in sample clocks. This signal is windowed with information from the threshold unit **168**. An interval having the length of $l_I$ values is extracted from the signal r(k). The first value being written into the interval is the correlation start value at the time $k_0$, at which the output value $r(k_0)$ exceeds the threshold value of the threshold unit **168** for the first time. The interval with the windowed signal is designated by the term $I(k_0)$. The parameter n designates the relative time, i.e. position, of a value inside the interval.

Using the described weighting operation, the earlier correlation maxima are more likely to be chosen as right frame start position. A later coming maximum will only be chosen as frame start position, if the value of the maximum is significantly higher than the earlier one. This operation is applicable especially for MCM, because here it is better to detect the frame start positions some samples too early than some samples too late. Positioning the frame start some samples too early leads to positioning the FFT window a little bit into the guard interval, this contains information of the same MCM symbol and therefore leads to little effects. If the frame start position is detected some samples too late, then the FFT window includes some samples of the following guard interval. This leads to a more visible degradation, because the following guard interval contains information of the following MCM symbol (ISI occurs).

It is important to know that the first visible correlation maximum after receiver power-on does not necessarily correspond to the first CIR (channel impulse response) cluster. It is possible that it is corresponding to a later cluster, see FIG. **5**. For this reason during power-on one should wait for a second frame start before starting demodulation.

It is clear that amplitude determining methods different from the described $alpha_{+}$ $beta_{min-}$ method can be used. For

simplification, it is possible to reduce the amplitude calculation to a detection as to whether the current amplitude is above or below the average amplitude. The output signal then consists of a −1/+1 sequence which will be correlated with a known bit sequence, also in −1/+1 values. This correlation can easily be performed using a simple integrated circuit (IC).

In addition, an oversampling of the signal received at the RF front end can be performed. For example, the received signal can be expressed with two times oversampling.

This oversampled signal is passed to a fast running AGC to eliminate fast channel fluctuations before the amplitude of the signal is calculated. The amplitude information will be hard quantized. Values larger than the mean amplitude, mean amplitude is 1, will be expressed as +1, values smaller than the mean amplitude will be expressed as −1. This −1/+1 signal is passed to the correlator that performs a cross correlation between the quantized signal and the stored ideal amplitude values of the reference symbol:

amp_sto(k)=2*bin(k/4),

if k=2(oversampling factor)*2(interpolation factor)* 1,2,3 . . . 92

(92 for 184 reference symbol and interpolation factor 2)

amp_sto(k)=0, else, k<=2(oversampling factor) *2(interpolation factor)*92

(first part of amp_sto=[0 0 0 −1 0 0 0 1 0 0 0 1 0 0 0 −1 0 . . . ]).

With this algorithm a correlation maximum of 92 is achievable.

Again, the maxima in the correlator output signal correspond to different frame start positions due to different multipath clusters. In this signal with various maxima the best frame start position has to be chosen. This is done in the following steps: The output of the correlator is given to a threshold detection. If the signal first time exceeds the threshold (a threshold of 50 has proved to be applicable) the best position search algorithm is initialized. The correlator output signal in the interval following the threshold exceeding value will be weighted with the weighting function, see above. The position of the resulting maximum in the weighted signal will be chosen as best frame start position. With the knowledge about the best frame start position the guard interval extraction and the following MCM demodulation will be performed.

Some more efforts can be carried out to increase frame synchronization accuracy. These methods will be explained in the following.

A postprocessing of the frame start decision is performed in order a) to increase the reliability of the frame synchronization; b) to secure that no frame start position is disregarded; and c) to optimize the frame start position in case of varying CIR cluster positions.

Using information of other frame start positions. It is known that in front of each frame a reference symbol is inserted into the signal. If the position of the currently detected frame start has changed significantly regarding the last detected frame start, demodulation of the two frames in total and completely independent from each other is possible. It is also possible to buffer the last signal frame and to perform the required shift of the frame start position step by step with the MCM symbols of the frame. This results in an interpolative positioning of the single MCM symbols including simultaneous asynchronous guard interval extraction for the different MCM symbols.

Such an interpolative positioning of the FFT window is also possible if one frame start position is missing, i.e. the frame start has not been detected. If one frame start position is missing the guard interval extraction can be performed the same way as in the frame before without large performance degradation. This is due to the normally only slowly varying CIR cluster positions, but only if the signal strength is good enough. Stopping demodulation and waiting for the next detected frame start position is also imaginable but not desirable because of the long interrupt.

What follows is an example of a reference symbol of 184 samples (subcarrier symbols) as provided by the inventive apparatus for generating a signal having a frame structure.

The underlying binary sequence of length 92 is:

```
bin = [0 1 1 0 1 1 0 1 0 1 1 0 1 0 1 0
       0 0 1 1 1 0 0 0 0 0 0 0 0 1 1 0
       1 1 1 1 1 0 0 0 1 1 1 0 0 0 0 0
       0 0 1 1 1 0 1 1 1 0 0 1 1 0 1 1
       1 0 1 1 0 1 0 1 0 1 1 0 1 1 0 1
       1 0 1 0 0 0 0 1 0 1 1 0]
```

The modulated binary sequence is:

```
i_q =  [0.5 1.5 1.5 0.5 1.5 1.5 0.5 1.5 0.5 1.5 1.5 0.5 1.5
        0.5 1.5 0.5 0.5 0.5 1.5 1.5 1.5 0.5 0.5 0.5 0.5 0.5
        0.5 0.5 0.5 1.5 1.5 0.5 1.5 1.5 1.5 1.5 1.5 0.5 0.5
        0.5 1.5 1.5 1.5 0.5 0.5 0.5 0.5 0.5 0.5 0.5 1.5 1.5
        1.5 0.5 1.5 1.5 1.5 0.5 0.5 1.5 1.5 0.5 1.5 1.5 1.5
        0.5 1.5 1.5 0.5 1.5 0.5 1.5 0.5 1.5 1.5 0.5 1.5 1.5
        0.5 1.5 0.5 1.5 0.5 0.5 0.5 0.5 1.5 0.5 1.5 1.5 0.5]
```

This modulated binary sequence i_q is interpolated in order to produce an interpolated sequence i q int:

```
i_q_int =  [0.5000 1.0635 1.5000 1.7195 1.5000 0.8706 0.5000
            0.8571 1.5000 1.7917 1.5000 0.8108 0.5000 1.0392
            1.5000 1.0392 0.5000 0.8108 1.5000 1.7984 1.5000
            0.8108 0.5000 1.0460 1.5000 0.9997 0.5000 0.9603
            1.5000 1.1424 0.5000 0.3831 0.5000 0.4293 0.5000
            0.9997 1.5000 1.5769 1.5000 1.5769 1.5000 1.0065
            0.5000 0.3899 0.5000 0.5325 0.5000 0.4931 0.5000
            0.4999 0.5000 0.4931 0.5000 0.5325 0.5000 0.3967
            0.5000 0.9603 1.5000 1.7522 1.5000 0.8571 0.5000
            0.8965 1.5000 1.6422 1.5000 1.4669 1.5000 1.4737
            1.5000 1.6096 1.5000 0.9929 0.5000 0.4226 0.5000
            0.4226 0.5000 0.9997 1.5000 1.5769 1.5000 1.5769
            1.5000 1.0065 0.5000 0.3899 0.5000 0.5325 0.5000
            0.4931 0.5000 0.4931 0.5000 0.5325 0.5000 0.3899
            0.5000 1.0065 1.5000 1.5701 1.5000 1.6096 1.5000
            0.8965 0.5000 0.8965 1.5000 1.6096 1.5000 1.5633
            1.5000 1.0392 0.5000 0.2867 0.5000 0.9929 1.5000
            1.7454 1.5000 0.8571 0.5000 0.9033 1.5000 1.6028
            1.5000 1.6028 1.5000 0.9033 0.5000 0.8503 1.5000
            1.7917 1.5000 0.8108 0.5000 1.0460 1.5000 0.9929
            0.5000 0.9929 1.5000 1.0460 0.5000 0.8108 1.5000
            1.7917 1.5000 0.8571 0.5000 0.8571 1.5000 1.7849
            1.5000 0.8571 0.5000 0.8571 1.5000 1.7917 1.5000
            0.8176 0.5000 1.0065 1.5000 1.1424 0.5000 0.3436
            0.5000 0.5788 0.5000 0.3436 0.5000 1.1424 1.5000
            1.0065 0.8312 1.5000 1.7263 1.5000 1.0635 0.5000
            0.0637]
```

*amp_int=i_q_int+j*i_q_int*

amp_int is the reference symbol inserted periodically into the signal after the guard interval insertion.

As it is clear from the above specification, the present invention provides methods and apparatus for generating a signal having a frame structure and methods and apparatus for frame synchronization when receiving such signals which are superior when compared with prior art systems. The frame synchronization algorithm in accordance with the present invention provides all of the properties shown in Table 1 in contrary to known frame synchronization procedures. Table 1 shows a comparison between the system in accordance with the present invention using an AM sequence as reference symbol and prior art systems (single carrier and MCM Eureka 147).

TABLE 1

| | Single carrier (e.g. QPSK like WS) | MCM Eureka 147 | MCM with AM sequence |
|---|---|---|---|
| Carrier offset allowed | no | yes | yes |
| Constant power achieved at Rx input | yes | no | yes |
| Coarse frequency offset estimation possible | no | no | yes |
| Coarse channel estimation possible (cluster estimation) | yes | no | yes |

As can be seen from Table 1 different synchronization tasks and parameters can be derived using the frame synchronization with an AM sequence in accordance with the present invention. The frame synchronization procedure MCM Eureka 147 corresponds to the procedure described in U.S. Pat. No. 5,191,576.

What is claimed is:

1. A method for generating a signal having a frame structure, each frame of said frame structure comprising at least one useful symbol, a guard interval associated to said at least one useful symbol and a reference symbol, said method comprising the step of

performing an amplitude modulation of a bit sequence, an envelope of the amplitude modulated bit sequence defining a reference pattern of said reference symbol; and

inserting, in time domain, the reference symbol into said signal, wherein said reference symbol comprises a real part and an imaginary part, said real part and said imaginary part being equal and being formed by said amplitude modulated bit sequence.

**2**. The method according to claim **1**, wherein said signal is an orthogonal frequency division multiplexed signal.

**3**. The method according to claim **1**, wherein said amplitude modulation is performed such that a mean amplitude of said reference symbol substantially corresponds to a mean amplitude of the remaining signal.

**4**. The method according to claim **1**, wherein said bit sequence is a pseudo random bit sequence having good autocorrelation characteristics.

**5**. The method according to claim **1**, wherein a number of useful symbols in each frame is defined depending on channel properties of a channel through which the signal or a multi-carrier modulated signal is transmitted.

**6**. A method for generating a multi-carrier modulated signal having a frame structure, each frame of said frame structure comprising at least one useful symbol, a guard interval associated to said at least one useful symbol and a reference symbol, said method comprising the steps of:

providing a bitstream;

mapping bits of said bitstream to carriers in order to provide a sequence of spectra;

performing an inverse Fourier transform in order to provide multi-carrier modulated symbols;

associating a guard interval to each multi-carrier modulated symbol;

generating said reference symbol by performing an amplitude modulation of a bit sequence, an envelope of the amplitude modulated bit sequence defining a reference pattern of said reference symbol;

associating said reference symbol to a predetermined number of multi-carrier modulated symbols and associated guard intervals in order to define said frame; and

inserting, in time domain, said reference symbol into said signal, wherein said reference symbol comprises a real part and an imaginary part, said real part and said imaginary part being equal and being formed by said amplitude modulated bit sequence.

**7**. The method according to claim **6**, wherein said multi-carrier modulated signal is an orthogonal frequency division multiplex signal.

**8**. The method according to claim **6**, wherein said amplitude modulation is performed such that a mean amplitude of said reference symbol substantially corresponds to a mean amplitude of the remaining multi-carrier modulated signal.

**9**. A method for frame synchronization of a signal having a frame structure, each frame of said frame structure comprising at least one useful symbol, a guard interval associated with said at least one useful symbol and a reference symbol, said reference symbol comprising a real part and an imaginary part, said real part and said imaginary part being equal and being formed by an amplitude modulated bit sequence, said method comprising the steps of:

receiving said signal;

down-converting said received signal;

in time domain, performing an amplitude-demodulation of said down-converted signal in order to generate an envelope;

in time domain, correlating said envelope with a predetermined reference pattern in order to detect a signal reference pattern of said reference symbol in said signal; and

performing said frame synchronization based on the detection of said signal reference pattern.

**10**. The method according to claim **9**, further comprising the step of performing a fast automatic gain control of said received down-converted signal prior to the step of performing said amplitude-demodulation.

**11**. The method according to claim **9**, wherein the step of performing said amplitude-demodulation comprises the step of calculating an amplitude of said signal using the $\text{alpha}_{max+}$ $\text{beta}_{min-}$ method.

**12**. The method according to claim **9**, further comprising the steps of sampling respective amplitudes of said received down-converted signal and comparing said sampled amplitudes with a predetermined threshold in order to generate a bit sequence in order to perform said amplitude demodulation.

**13**. The method according to claim **12**, wherein the step of sampling respective amplitudes of said received down-converted signal further comprises the step of performing an over-sampling of said received down-converted signal.

**14**. The method according to claim **9**, further comprising the step of applying a result of the frame synchronization for a frame in said signal to at least one subsequent frame in said signal.

**15**. The method according to claim **9**, further comprising the step of detecting a location of said signal reference pattern based on an occurrence of a maximum of a correlation signal when correlating said envelope with said predetermined reference pattern.

**16**. The method according to claim **15**, further comprising the steps of:

weighting a plurality of maxima of said correlation signal such that a maximum occurring first is weighted stronger than any subsequently occurring maximum; and

detecting said location of said signal reference pattern based on the greatest one of said weighted maxima.

**17**. The method according to claim **16**, further comprising the step of:

disabling the step of performing said frame synchronization for a predetermined period of time after having switched-on a receiver performing said method for frame synchronization.

**18**. A method for frame synchronization of a multi-carrier modulated signal having frame structure, each frame of said frame structure comprising at least one useful symbol, a guard interval associated to said at least one useful symbol and a reference symbol, said reference symbol comprising a real part and an imaginary part, said real part and said imaginary part being equal and being formed by an amplitude modulated bit sequence, said method comprising the steps of:

receiving said multi-carrier modulated signal;

down-converting said received multi-carrier modulated signal;

in time domain, performing an amplitude-demodulation of said down-converted multi-carrier modulated signal in order to generate an envelope;

in time domain, correlating said envelope with a predetermined reference pattern in order to detect a signal reference pattern of said reference symbol in said multi-carrier modulated signal;

performing said frame synchronization based on the detection of said signal reference pattern;

extracting said reference symbol and said at least one guard interval from said down-converted received multi-carrier modulated signal based on said frame synchronization;

performing a Fourier transform in order to provide a sequence of spectra from said at least one useful symbol; and

de-mapping said sequence of spectra in order to provide a bitstream.

**19**. The method according to claim **18**, further comprising the step of performing a fast automatic gain control of said received down-converted multi-carrier modulated signal prior to the step of performing said amplitude-demodulation.

**20**. The method according to claim **18**, wherein the step of performing said amplitude-demodulation comprises the step of calculating an amplitude of said multi-carrier modulated signal using the $alpha_{max+}$ $beta_{min-}$ method.

**21**. The method according to claim **18**, further comprising the steps of sampling respective amplitudes of said received down-converted multi-carrier modulated signal and comparing said sampled amplitudes with a predetermined threshold in order to generate a bit sequence in order to perform said amplitude demodulation.

**22**. The method according to claim **21**, wherein the step of sampling respective amplitudes of said received down-converted multi-carrier modulated signal further comprises the step of performing an over-sampling of said received down-converted multi-carrier modulated signal.

**23**. The method according to claim **18**, further comprising the step of applying a result of the frame synchronization for a frame in said signal to at least one subsequent frame in said multi-carrier modulated signal.

**24**. An apparatus for generating a signal having a frame structure, each frame of said frame structure comprising at least one useful symbol, a guard interval associated to said at least one useful symbol and a reference symbol, said apparatus comprising:

an amplitude modulator for performing an amplitude modulation of a bit sequence, an envelope of the amplitude modulated bit sequence defining a reference pattern of said reference symbol; and

means for inserting, in time domain, the reference symbol into said signal, wherein said reference symbol comprises a real part and an imaginary part, said real part and said imaginary part being equal and being formed by said amplitude modulated bit sequence.

**25**. The apparatus according to claim **24**, wherein said signal is an orthogonal frequency division multiplexed signal.

**26**. The apparatus according to claim **24**, wherein a mean amplitude of said reference symbol substantially corresponds to a mean amplitude of the remaining signal.

**27**. The apparatus according to claim **24**, comprising means for determining a number of useful symbols in each frame depending on channel properties of a channel through which the signal or a multi-carrier modulated signal is transmitted.

**28**. An apparatus for generating a multi-carrier modulated signal having a frame structure, each frame of said frame structure comprising at least one useful symbol, a guard interval associated to said at least one useful symbol and a reference symbol, said apparatus comprising:

means for providing a bitstream;

means for mapping bits of said bitstream to carriers in order to provide a sequence of spectra;

means for performing an inverse Fourier transform in order to provide multi-carrier modulated symbols;

means for associating a guard interval to each multi-carrier modulated symbol;

means for generating said reference symbol comprising an amplitude modulator for performing an amplitude modulation of a bit sequence, an envelope of the amplitude modulated bit sequence defining a reference pattern of said reference symbol;

means for associating said reference symbol to a predetermined number of multi-carrier modulated symbols and associated guard intervals in order to define said frame; and

means for inserting, in time domain, the reference symbol into said signal, wherein said reference symbol comprises a real part and an imaginary part, said real part and said imaginary part being equal and being formed by said amplitude modulated bit sequence.

**29**. The apparatus according to claim **28**, wherein said multi-carrier modulated signal is an orthogonal frequency division multiplex signal.

**30**. The apparatus according to claim **28**, wherein said means for generating said reference symbol performs the amplitude modulation such that a mean amplitude of said

reference symbol substantially corresponds to a mean amplitude of the remaining multi-carrier modulated signal.

**31**. The apparatus according to claim **28**, wherein said means for generating said reference symbol generates a pseudo random bit sequence having good autocorrelation characteristics as said bit sequence.

**32**. An apparatus for frame synchronization of a signal having a frame structure, each frame of said frame structure comprising at least one useful symbol, a guard interval associated to said at least one useful symbol and a reference symbol, said reference symbol comprising a real part and an imaginary part, said real part and said imaginary part being equal and being formed by an amplitude modulated bit sequence, said apparatus comprising:

receiving means for receiving said signal;

a down-converter for down-converting said received signal;

an amplitude-demodulator for performing, in time domain, an amplitude demodulation of said down-converted signal in order to generate an envelope;

a correlator for correlating, in time domain, said envelope with a predetermined reference pattern in order to detect a signal reference pattern of said reference symbol in said signal; and

means for performing said frame synchronization based on the detection of said signal reference pattern.

**33**. The apparatus according to claim **32**, further comprising means for performing a fast automatic gain control of said received down-converted signal preceding said amplitude-demodulator.

**34**. The apparatus according to claim **32**, wherein said amplitude-demodulator comprises means for calculating an amplitude of said signal using the $\text{alpha}_{max+}$ $\text{beta}_{min-}$ method.

**35**. The apparatus according to claim **32**, further comprising means for sampling respective amplitudes of said received down-converted signal, wherein said amplitude-demodulator comprises means for comparing said sampled amplitudes with a predetermined threshold in order to generate a bit sequence.

**36**. The apparatus according to claim **35**, wherein said means for sampling comprises means for over-sampling said received down-converted signal.

**37**. The apparatus according to claim **32**, further comprising means for applying a result of the frame synchronization for a frame in said signal to at least one subsequent frame in said signal.

**38**. The apparatus according to claim **32**, further comprising means for detecting a location of said signal reference pattern based on an occurrence of a maximum of a correlation signal output of said correlator.

**39**. The apparatus according to claim **38**, further comprising means for weighting a plurality of maxima of said correlation signal such that a maximum occurring first is weighted stronger than any subsequently occurring maximum; and

means for detecting said location of said signal reference pattern based on the greatest one of said weighted maxima.

**40**. The apparatus according to claim **39**, further comprising means for disabling said means for performing said frame synchronization for a predetermined period of time after having switched-on a receiver comprising said apparatus for frame synchronization.

**41**. An apparatus for frame synchronization of a multi-carrier modulated signal having a frame structure, each frame of said frame structure comprising at least one useful symbol, a guard interval associated to said at least one useful symbol and a reference symbol, said reference symbol comprising a real part and an imaginary part, said real part and said imaginary part being equal and being formed by an amplitude modulated bit sequence,

said apparatus comprising:

a receiver for receiving said multi-carrier modulated signal;

a down-converter for down-converting said received multi-carrier modulated signal;

an amplitude-demodulator for performing, in the time domain, an amplitude-demodulation of said down-converted multi-carrier modulated signal in order to generate an envelope;

a correlator for correlating, in the time domain, said envelope with a predetermined reference pattern in order to detect a signal reference pattern of said reference symbol in said multi-carrier modulated signal;

means for performing said frame synchronization based on the detection of said signal reference pattern;

means for extracting said reference symbol and said at least one guard interval from said down-converted received multi-carrier modulated signal based on said frame synchronization in order to generate said at least one useful symbol;

means for performing a Fourier transform in order to provide a sequence of spectra from said at least one useful symbol; and

means for de-mapping said sequence of spectra in order to provide a bitstream.

**42**. The apparatus according to claim **41**, further comprising means for performing a fast automatic gain control of said received down-converted multi-carrier modulated signal preceding said amplitude-demodulator.

**43**. The apparatus according to claim **41**, wherein said amplitude-demodulator comprises means for calculating an amplitude of said multi-carrier modulated signal using the $\text{alpha}_{max+}$ $\text{beta}_{min-}$ method.

**44**. The apparatus according to claim **41**, further comprising means for sampling respective amplitudes of said received down-converted multi-carrier modulated signal, wherein said amplitude-demodulator comprises means for comparing said sampled amplitudes with a predetermined threshold in order to generate a bit sequence.

**45**. The apparatus according to claim **44**, wherein said means for sampling comprises means for over-sampling said received down-converted multi-carrier modulated signal.

**46**. The apparatus according to claim **41**, further comprising means for applying a result of the frame synchronization for a frame in said multi-carrier modulated signal to at least one subsequent frame in said multi-carrier modulated signal.

* * * * *

US007061997B1

(12) **United States Patent**
**Eberlein et al.**

(10) **Patent No.: US 7,061,997 B1**
(45) **Date of Patent: Jun. 13, 2006**

(54) **METHOD AND APPARATUS FOR FINE FREQUENCY SYNCHRONIZATION IN MULTI-CARRIER DEMODULATION SYSTEMS**

(75) Inventors: **Ernst Eberlein**, Grossenseebach (DE); **Sabah Badri**, Erlangen (DE); **Stefan Lipp**, Erlangen (DE); **Stephan Buchholz**, Munich (DE); **Albert Heuberger**, Erlangen (DE); **Heinz Gerhaeuser**, Waischenfeld (DE)

(73) Assignee: **Fraunhofer-Gesellschaft zur Foerderung der angewandten Forschung e.V.**, Munich (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/673,270**

(22) PCT Filed: **Apr. 14, 1998**

(86) PCT No.: **PCT/EP98/02184**

§ 371 (c)(1), (2), (4) Date: **Nov. 29, 2000**

(87) PCT Pub. No.: **WO99/53667**

PCT Pub. Date: **Oct. 21, 1999**

(51) **Int. Cl.**
***H03D 3/22*** (2006.01)
***H01J 11/00*** (2006.01)

(52) **U.S. Cl.** ........................................ **375/332**; 370/210

(58) **Field of Classification Search** ................ 375/332, 375/200; 370/203, 200, 207, 480, 210
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,347,483 A * 8/1982 Flasza et al. ................. 331/12
5,267,273 A * 11/1993 Dartois et al. .............. 375/355
5,345,440 A * 9/1994 Gledhill et al. ............. 370/210

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0822682 2/1998

(Continued)

OTHER PUBLICATIONS

Keller and Hanzo; "Orthogonal Frequency Division Multiplex Synchronisation Techniques for Wireless Local Area Networks", *IEEE International Symposium on Personal, Indoor and Mobile Radio Communications*, pp. 963-967 (Oct. 1996).

(Continued)

*Primary Examiner* Stephen Chin
*Assistant Examiner*—Cicely Ware
(74) *Attorney, Agent, or Firm*—Roylance,Abrams,Berdo & Goodman, L.L.P.

(57) **ABSTRACT**

A method and an apparatus relating to a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency in a multi-carrier demodulation system of the type capable of carrying out a differential phase decoding of multi-carrier modulated signals, the signals comprising a plurality of symbols, each symbol being defined by phase differences between simultaneous carriers having different frequencies. A phase difference between phases of the same carrier in different symbols is determined. Thereafter, a frequency offset is determined by eliminating phase shift uncertainties related to the transmitted information from the phase difference making use of a M-PSK decision device. Finally, a feedback correction of the carrier frequency deviation is performed based on the determined frequency offset. Alternatively, an averaged frequency offset can be determined by averaging determined frequency offsets of a plurality of carriers. Then, the feedback correction of the frequency deviation is performed based on the averaged frequency offset.

**7 Claims, 13 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,694,389 | A * | 12/1997 | Seki et al. | 370/208 |
| 5,771,224 | A | 6/1998 | Seki et al. | 370/206 |
| 6,192,068 | B1 * | 2/2001 | Fattouche et al. | 375/130 |
| 6,219,333 | B1 * | 4/2001 | Ahn | 370/203 |
| 6,226,337 | B1 * | 5/2001 | Klank et al. | 375/367 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 8265293 | 10/1996 |
| JP | 1041991 | 2/1998 |
| WO | 9205646 | 4/1992 |
| WO | 9800946 | 1/1998 |

OTHER PUBLICATIONS

Moose, "A Technique for Orthogonal Frequency Division Multiplexing Frequency Offset Correction", *IEEE Transactions on Communications*, vol. 42, No. 10, pp. 2908-2914 (Oct. 1994).

Classen and Meyr, "Synchronization Algorithms for an OFDM System for Mobile Communication", Condierung für Quelle, Kanal and Übertragung: ITG-Fachbericht, pp. 105-114 (Oct. 1994).

Schmidl and Cox, "Low-Overhead, Low-Complexity [Burst] Synchronization for OFDM", *Proc. IEEE Int. Conf. on Commun.*, pp. 1301-1306 (1996).

Zou and Wu, "COFDM: An Overview", *IEEE Transactions on Broadcasting*, vol. 41, No. 1, pp. 1-8 (Mar. 1995).

Palacherla, "DSP-μP Routine Computes Magnitude", *EDN Electrical Design News*, vol. 34, No. 22, pp. 225-226 (Oct. 1989).

Adams and Brady, "Magnitude Approxmations for Microprocessor Implementation", *IEEE Micro*, vol. 3, No. 5, pp. 27-31 (Oct. 1983).

Luise and Regiannini, "Carrier Frequency Acquisition and Tracking for OFDM Systems", *IEEE Transactions on Communications*, vol. 44, No. 11, pp. 1590-1598 (Nov. 1996).

Tuisel and Kammeyer, "Carrier-Recovery for Multicarrier-Transmission Over Mobile Radio Channels", *Int. Conf. on Acoustics, Speech and Signal Processing* (*ICASSP 92*), San Francisco, Band 4, pp. 677-680 (1992).

Moose, "Differentially Coded Multi-Frequency Modulation for Digital Communications", *Signal Processing V—Theories and Applications*, Proceedings of EUSIPCO-90 Fifth European Signal Processing Conference, Barcelona, Spain, vol. III, pp. 1807-1810 (Sep. 1990).

* cited by examiner



MCM Transmitter
100
102
data (bitsream) source
106
mapping bit->carrier
110
inverse FFT
114
guard interval insertion
116
add framing information
120
D A C
transmitter frontend
104
0 1 0 1
t
108
I
Q
f
112
114
cyclic prefix
preamble insertion
118
122
channel
130
132
receiver frontend
A D C
134
symbol framing / carrier frequency synchronization unit
136
extract framing information
138
guard interval removal
140
FFT
142
mapping carrier->bit
144
data (bitsream) sink
MCM Receiver


FIG.1


MCM symbols 200
202
204
206
208
K subcarriers
+1
time
frequency
= MCM symbol
= subcarrier
= reference subcarrier

FIG.2B


MCM symbols
K subcarriers
time
frequency
= MCM symbol
= subcarrier

FIG.2A


236
Discrete Fourier Transform
N FFT complex values
guard band
K+1 carriers are used
guard band
MCM symbol
200
"0"
"0"
234
k=K
k=0
factor*
232
224
THETA[k]
$z^{-1}$
k>1
222
230
phi[k]
k=1
226
228
220
(00)
(01)
(10)
(11)
Q
I
input
bitstream

FIG.3



frequency axis
C432/T1
C432/T2
C2/T1
C2/T2
C3/T3
C1/T1
C1/T2
C1/T3
C1/T4
time axis
200


FIG.4


im
real
300
302
302
300
300
302
302
300
MCM Symbol-1
MCM Symbol-2

FIG.5


310
312
326
132
314
316
318
ADC
Low Pass Filter & Decimator
Remove Guard
MCM De-modulator
Differential Decoding
De-mapping
NCO
Loop Filter
Fine Frequency Error Detector
322
324
320

FIG.6


Fine Freq.
Error Detector
output
344
340
M-PSK
Decision Device
342
336
432
Differential Detector in the
Time axis
FFT output
z-1
(...)*
330
332
334

FIG.7


Demapping in the frequ. axis & Decision Device
318
Differential Decoding
316
Fine Frequency Error Detector
320
MCM De-modulator
314
Loop Filter
324
Remove Guard
132
Coarse frequency correction
350
Low Pass Filter & Decimator
312
NCO
322
ADC
310
326

FIG.8


366
MCM demodulator
362
Coarse Frequency Synchronization with AM sequence
364
Frequency Offset Correction
360
Frame/Timing Synchronization with AM sequence
ADC
310
Receiver Front-end
132

FIG.9


L/2
L/2
370

FIG.10


reference symbol
160
1 FRAME
160
162
MCM symbol
164
166
reference symbol

FIG.11


real axis
imaginary axis
-5 -4 -3 -2 -1 0 1 2 3 4 5
real axis
imaginary axis
-5 -4 -3 -2 -1 0 1 2 3 4 5

FIG.12


signal from MCM transmitter
mobile channel
time
122
receiver frontend
132
FFT
140
differential de-mapping along the frequency axis
142
Echo Phase Offset Correction (EPOC) algorithm
402
Q
t
400
Q
t
404
SIGNAL FOR THE METRIC CALCULATION

FIG.13


526
soft-metic calculation
522
520
524
phase rotation
$v_k' = v_k \cdot e^{j\bar{\varphi}}$
Hold K times
Integrate & Dump
$\bar{\varphi} = \frac{1}{K}\sum_{i=1}^{K}\varphi_i$
516
cntr>=threshold
cntr<threshold
510
527
buffer for K complex signal points
control signal
512
abs(.)
arg(.)
const. "0"
518
514
$(.)^4$
500
K complex signal points
142
differential demapper
138
removal of guard band carriers

FIG.14




FIG.15

# METHOD AND APPARATUS FOR FINE FREQUENCY SYNCHRONIZATION IN MULTI-CARRIER DEMODULATION SYSTEMS

This application is a 371 of PCT/EP98/02184 Apr. 14, 1998.

## FIELD OF THE INVENTION

The present invention relates to methods and apparatus for performing a fine frequency synchronization in multi-carrier demodulation systems, and in particular to methods and apparatus for performing a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency in a multi-carrier demodulation system of the type capable of carrying out a differential phase decoding of multi-carrier modulated signals, wherein the signals comprise a plurality of symbols, each symbol being defined by phase differences between simultaneous carriers having different frequencies.

## BACKGROUND OF THE INVENTION

In a multi carrier transmission system (MCM, OFDM), the effect of a carrier frequency offset is substantially more considerable than in a single carrier transmission system. MCM is more sensitive to phase noise and frequency offset which occurs as amplitude distortion and inter carrier interference (ICI). The inter carrier interference has the effect that the subcarriers are no longer orthogonal in relation to each other. Frequency offsets occur after power on or also later due to frequency deviation of the oscillators used for down-conversion into baseband. Typical accuracies for the frequency of a free running oscillator are about ±50 ppm of the carrier frequency. With a carrier frequency in the S-band of 2.34 Ghz, for example, there will be a maximum local oscillator (LO) frequency deviation of above 100 kHz (117.25 kHz). The above named effects result in high requirements on the algorithm used for frequency offset correction.

## DESCRIPTION OF PRIOR ART

Most prior art algorithms for frequency synchronization divide frequency correction into two stages. In the first stage, a coarse synchronization is performed. In the second stage, a fine correction can be achieved. A frequently used algorithm for coarse synchronization of the carrier frequency uses a synchronization symbol which has a special spectral pattern in the frequency domain. Such a synchronization symbol is, for example, a CAZAC sequence (CAZAC=Constant Amplitude zero Autocorrelation). Through comparison, i.e. the correlation, of the power spectrum of the received signal with that of the transmitted signal, the frequency carrier offset can be coarsely estimated. These prior art algorithms all work in the frequency domain. Reference is made, for example, to Ferdinand Claβen, Heinrich Meyr, "Synchronization Algorithms for an OFDM System for Mobile Communication", ITG-Fachtagung 130, Codierung für Quelle, Kanal und Übertragung, pp. 105–113, Oct. 26–28, 1994; and Timothy M. Schmidl, Donald C. Cox, "Low-overhead, Low-Complexity [Burst] synchronization for OFDM", in Proceedings of the IEEE International conference on communication ICC 1996, pp. 1301–1306 (1996).



For the coarse synchronization of the carrier frequency, Paul H. Moose, "A Technique for orthogonal Frequency Division Multiplexing Frequency offset Correction", IEEE Transaction on communications, Vol. 42, No. 10, October 1994, suggest increasing the spacing between the subcarriers such that the subcarrier distance is greater than the maximum frequency difference between the received and transmitted carriers. The subcarrier distance is increased by reducing the number of sample values which are transformed by the Fast Fourier Transform. This corresponds to a reduction of the number of sampling values which are transformed by the Fast Fourier Transform.

WO 9205646 A relates to methods for the reception of orthogonal frequency division multiplexed signals comprising data which are preferably differentially coded in the direction of the time axis. Phase drift of the demodulated samples from one block to the next is used to indicate the degree of local oscillator frequency error. Phase drift is assessed by multiplying complex values by the complex conjugate of an earlier sample demodulated from the same OFDM carrier and using the resulting measure to steer the local oscillator frequency via a frequency locked loop.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide methods and apparatus for performing a fine frequency synchronization which allow a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency in a MCM transmission system which makes use of MCM signals in which information is differential phase encoded between simultaneous sub-carriers having different frequencies.

In accordance with a first aspect, the present invention provides a method of performing a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency in a multi-carrier demodulation system of the type capable of carrying out a differential phase decoding of multi-carrier modulated signals, the signals comprising a plurality of symbols, each symbol being defined by phase differences between simultaneous carriers having different frequencies, the method comprising the steps of:

determining a phase difference between phases of the same carrier in different symbols;

determining a frequency offset by eliminating phase shift uncertainties related to the transmitted information from the phase difference making use of a M-PSK decision device; and

performing a feedback correction of the carrier frequency deviation based on the determined frequency offset.

In accordance with a second aspect, the present invention provides a method of performing a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency in a multi-carrier demodulation system of the type capable of carrying out a differential phase decoding of multi-carrier modulated signals, the signals comprising a plurality of symbols, each symbol being defined by phase differences between simultaneous carriers having different frequencies, the method comprising the steps of:

determining respective phases of the same carrier in different symbols;

eliminating phase shift uncertainties related to the transmitted information from the phases to determine respective phase deviations making use of a M-PSK decision device;

determining a frequency offset by determining a phase difference between the phase deviations; and

performing a feedback correction of said carrier frequency deviation based on the determined frequency offset.

In accordance with a third aspect, the present invention provides an apparatus for performing a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency, for a multi-carrier demodulation system of the type capable of carrying out a differential phase decoding of multi-carrier modulated signals, the signals comprising a plurality of symbols, each symbol being defined by phase differences between simultaneous carriers having different frequencies, the apparatus comprising:

means for determining a phase difference between phases of the same carrier in different symbols;

M-PSK decision device for determining a frequency offset by eliminating phase shift uncertainties related to the transmitted information from the phase difference; and

means for performing a feedback correction of the frequency deviation based on the determined frequency offset.

In accordance with a fourth aspect, the present invention provides an apparatus for performing a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency, for a multi-carrier demodulation system of the type capable of carrying out a differential phase decoding of multi-carrier modulated signals, said signals comprising a plurality of symbols, each symbol being defined by phase differences between simultaneous carriers having different frequencies, the apparatus comprising:

means for determining respective phases of the same carrier in different symbols;

M-PSK decision device for eliminating phase shift uncertainties related to the transmitted information from the phases to determine respective phase deviations;

means for determining a frequency offset by determining a phase difference between the phase deviations; and

means for performing a feedback correction of the frequency deviation based on the determined frequency offset.

The present invention relates to methods and apparatus for performing a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency. This fine frequency synchronization is preferably performed after completion of a coarse frequency synchronization, such that the frequency offsets after the coarse frequency synchronization are smaller than half the sub-carrier distance in the MCM signal. Since the frequency offsets which are to be corrected by the inventive fine frequency synchronization methods and apparatus, a correction of the frequency offsets by using a phase rotation with differential decoding and de-mapping in the time axis can be used. The frequency offsets are detected by determining the frequency differences between time contiguous sub-carrier symbols along the time axis. The frequency error is calculated by measuring the rotation of the I-Q Cartesian coordinates of each sub-carrier and, in preferred embodiments, averaging them over all n sub-carriers of a MCM symbol.

Firstly, the phase ambiguity or uncertainty is eliminated by using a M-PSK decision device and correlating the output of the decision device with the input signal for a respective sub-carrier symbol. Thus, the phase offset for a sub-carrier symbol is determined and can be used for restructuring the frequency error in form of a feed-backward structure. Alternatively, the phase offsets of the sub-carrier symbols of one MCM symbol can be averaged over all of the active carriers of a MCM symbol, wherein the averaged phase offset is used to restructure the frequency error.

In accordance with the present invention, the determination of the frequency offset is performed in the frequency domain. The feedback correction in accordance with the inventive fine frequency synchronization is performed in the time domain. To this end, a differential decoder in the time domain is provided in order to detect frequency offsets of sub-carriers on the basis of the phases of timely successive sub-carrier symbols of different MCM symbols.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the following, preferred embodiments of the present invention will be explained in detail on the basis of the drawings enclosed, in which:

FIG. **1** shows a schematic overview of a MCM transmission system to which the present application can be applied;

FIGS. **2**A and **2**B show schematic views representing a scheme for differential mapping in the time axis and a scheme for differential mapping in the frequency axis;

FIG. **3** shows a functional block diagram for performing a differential mapping in the frequency axis;

FIG. **4** shows a representation of time variation of all sub-carriers in MCM symbols;

FIG. **5** shows a QPSK-constellation for each sub-carrier with a frequency offset;

FIG. **6** shows a general block diagram illustrating the position of the inventive fine frequency synchronization device in a MCM receiver;

FIG. **7** shows a block diagram of the fine frequency error detector shown in FIG. **6**;

FIG. **8** shows a block diagram of a MCM receiver comprising a coarse frequency synchronization unit and a fine frequency synchronization unit;

FIG. **9** shows a block diagram of a unit for performing a coarse frequency synchronization;

FIG. **10** shows a schematic view of a reference symbol used for performing a coarse frequency synchronization;

FIG. **11** shows a schematic view of a typical MCM signal having a frame structure;

FIG. **12** shows scatter diagrams of the output of an (differential de-mapper of an MCM receiver for illustrating the effect of an echo phase offset correction;

FIG. **13** shows a schematic block diagram for illustrating the position and the functionality of an echo phase offset correction unit;

FIG. **14** shows a schematic block diagram of a preferred form of an echo phase offset correction device; and

FIG. **15** shows schematic views for illustrating a projection performed by another echo phase offset correction algorithm.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

Before discussing the present invention in detail, the mode of operation of a MCM transmission system is described referring to FIG. **1**.

Referring to FIG. **1**, at **100** a MCM transmitter is shown that substantially corresponds to a prior art MCM transmitter. A description of such a MCM transmitter can be found, for example, in William Y. Zou, Yiyan Wu, "COFDM: AN OVERVIEW", IEEE Transactions on Broadcasting, vol. 41, No. 1, March 1995.

A data source **102** provides a serial bitstream **104** to the MCM transmitter. The incoming serial bitstream **104** is

applied to a bit-carrier mapper **106** which produces a sequence of spectra **108** from the incoming serial bitstream **104**. An inverse fast Fourier transform (IFFT) **110** is performed on the sequence of spectra **108** in order to produce a MCM time domain signal **112**. The MCM time domain signal forms the useful MCM symbol of the MCM time signal. To avoid intersymbol interference (ISI) caused by multipath distortion, a unit **114** is provided for inserting a guard interval of fixed length between adjacent MCM symbols in time. In accordance with a preferred embodiment of the present invention, the last part of the useful MCM symbol is used as the guard interval by placing same in front of the useful symbol. The resulting MCM symbol is shown at **115** in FIG. **1** and corresponds to a MCM symbol **160** depicted in FIG. **11**.

FIG. **11** shows the construction of a typical MCM signal having a frame structure. One frame of the MCM time signal is composed of a plurality of MCM symbols **160**. Each MCM symbol **160** is formed by an useful symbol **162** and a guard interval **164** associated therewith. AS shown in FIG. **11**, each frame comprises one reference symbol **166**. The present invention can advantageously be used with such a MCM signal, however, such a signal structure being not necessary for performing the present invention as long as the transmitted signal comprises a useful portion and at least one reference symbol.

In order to obtain the final frame structure shown in FIG. **11**, a unit **116** for adding a reference symbol for each predetermined number of MCM symbols is provided.

In accordance with the present invention, the reference symbol is an amplitude modulated bit sequence. Thus, an amplitude modulation of a bit sequence is performed such that the envelope of the amplitude modulated bit sequence defines a reference pattern of the reference symbol. This reference pattern defined by the envelope of the amplitude modulated bit sequence has to be detected when receiving the MCM signal at a MCM receiver. In a preferred embodiment of the present invention, a pseudo random bit sequence having good autocorrelation properties is used as the bit sequence that is amplitude modulated.

The choice of length and repetition rate of the reference symbol depends on the properties of the channel through which the MCM signal is transmitted, e.g. the coherence time of the channel. In addition, the repetition rate and the length of the reference symbol, in other words the number of useful symbols in each frame, depends on the receiver requirements concerning mean time for initial synchronization and mean time for resynchronization after synchronization loss due to a channel fade.

The resulting MCM signal having the structure shown at **118** in FIG. **1** is applied to the transmitter front end **120**. Roughly speaking, at the transmitter front end **120**, a digital/analog conversion and an up-converting of the MCM signal is performed. Thereafter, the MCM signal is transmitted through a channel **122**.

Following, the mode of operation of a MCM receiver **130** is shortly described referring to FIG. **1**. The MCM signal is received at the receiver front end **132**. In the receiver front end **132**, the MCM signal is down-converted and, furthermore, an analog/digital conversion of the down-converted signal is performed.

The down-converted MCM signal is provided to a symbol frame/carrier frequency synchronization unit **134**.

A first object of the symbol frame/carrier frequency synchronization unit **134** is to perform a frame synchronization on the basis of the amplitude-modulated reference symbol. This frame synchronization is performed on the basis of a correlation between the amplitude-demodulated reference symbol and a predetermined reference pattern stored in the MCM receiver.

A second object of the symbol frame/carrier frequency synchronization unit is to perform a coarse frequency synchronization of the MCM signal. To this end, the symbol frame/carrier frequency synchronization unit **134** serves as a coarse frequency synchronization unit for determining a coarse frequency offset of the carrier frequence caused, for example, by a difference of the frequencies between the local oscillator of the transmitter and the local oscillator of the receiver. The determined frequency is used in order to perform a coarse frequency correction. The mode of operation of the coarse frequency synchronization unit is described in detail referring to FIGS. **9** and **10** hereinafter.

As described above, the frame synchronization unit **134** determines the location of the reference symbol in the MCM symbol. Based on the determination of the frame synchronization unit **134**, a reference symbol extracting unit **136** extracts the framing information, i.e. the reference symbol, from the MCM symbol coming from the receiver front end **132**. After the extraction of the reference symbol, the MCM signal is applied to a guard interval removal unit **138**. The result of the signal processing performed hereherto in the MCM receiver are the useful MCM symbols.

The useful MCM symbols output from the guard interval removal unit **138** are provided to a fast Fourier transform unit **140** in order to provide a sequence of spectra from the useful symbols. Thereafter, the sequence of spectra is provided to a carrier-bit mapper **142** in which the serial bitstream is recovered. This serial bitstream is provided to a data sink **144**.

Next, referring to FIGS. **2**A and **2**B, two modes for differential mapping are described. In FIG. **2**A, a first method of differential mapping along the time axis is shown. AS can be seen from FIG. **2**A, a MCM symbol consists of K subcarriers. The sub-carriers comprise different frequencies and are, in a preferred embodiment, equally spaced in the frequency axis direction. When using differential mapping along the time axis, one or more bits are encoded into phase and/or amplitude shifts between two sub-carriers of the same center frequency in adjacent MCM symbols. The arrows depicted between the sub-carrier symbols correspond to information encoded in amplitude and/or phase shifts between two sub-carrier symbols.

A second method of differential mapping is shown in FIG. **2**B. The present invention is adapted for MCM transmission system using the mapping scheme shown in FIG. **2**B. This mapping scheme is based on a differential mapping inside one MCM symbol along the frequency axis. A number of MCM symbols **200** are shown in FIG. **2**B. Each MCM symbol **200** comprises a number of sub-carrier symbols **202**. The arrows **204** in FIG. **2**B illustrate information encoded between two sub-carrier symbols **202**. As can be seen from the arrows **204**, this mapping scheme is based on a differential mapping within one MCM symbol along the frequency axis direction.

In the embodiment shown in FIG. **2**B, the first sub-carrier (k=0) in an MCM symbol **200** is used as a reference sub-carrier **206** (shaded) such that information is encoded between the reference sub-carrier and the first active carrier **208**. The other information of a MCM symbol **200** is encoded between active carriers, respectively.

Thus, for every MCM symbol an absolute phase reference exists. In accordance with FIG. **2**B, this absolute phase reference is supplied by a reference symbol inserted into every MCM symbol (k=0). The reference symbol can either

have a constant phase for all MCM symbols or a phase that varies from MCM symbol to MCM symbol. A varying phase can be obtained by replicating the phase from the last subcarrier of the MCM symbol preceding in time.

In FIG. **3** a preferred embodiment of a device for performing a differential mapping along the frequency axis is shown. Referring to FIG. **3**, assembly of MCM symbols in the frequency domain using differential mapping along the frequency axis according to the present invention is described.

FIG. **3** shows the assembly of one MCM symbol with the following parameters:

NFFT designates the number of complex coefficients of the discrete Fourier transform, number of subcarriers respectively.

K designates the number of active carriers. The reference carrier is not included in the count for K.

According to FIG. **3**, a quadrature phase shift keying (QPSK) is used for mapping the bitstream onto the complex symbols. However, other M-ary mapping schemes (MPSK) like 2-PSK, 8-PSK, 16-QAM, 16-APSK, 64-APSK etc. are possible.

Furthermore, for ease of filtering and minimization of aliasing effects some subcarriers are not used for encoding information in the device shown in FIG. **3**. These subcarriers, which are set to zero, constitute the so-called guard bands on the upper and lower edges of the MCM signal spectrum. At the input of the mapping device shown in FIG. **3**, complex signal pairs **b0**[k], **b1**[k] of an input bitstream are received. K complex signal pairs are assembled in order to form one MCM symbol. The signal pairs are encoded into the K differential phase shifts phi[k] needed for assembly of one MCM symbol. In this embodiment, mapping from Bits to the **0**, 90, 180 and 270 degrees phase shifts is performed using Gray Mapping in a quadrature phase shift keying device **220**.

Gray mapping is used to prevent that differential detection phase errors smaller than 135 degrees cause double bit errors at the receiver.

Differential phase encoding of the K phases is performed in a differential phase encoder **222**. At this stage of processing, the K phases phi[k] generated by the QPSK Gray mapper are differentially encoded. In principal, a feedback loop **224** calculates a cumulative sum over all K phases. As starting point for the first computation (k–0) the phase of the reference carrier **226** is used. A switch **228** is provided in order to provide either the absolute phase of the reference subcarrier **226** or the phase information encoded onto the preceding (i.e. $z^{-1}$, where $z^{-1}$ denotes the unit delay operator) subcarrier to a summing point **230**. At the output of the differential phase encoder **222**, the phase information theta [k] with which the respective subcarriers are to be encoded is provided. In preferred embodiments of the present invention, the subcarriers of a MCM symbol are equally spaced in the frequency axis direction.

The output of the differential phase encoder **222** is connected to a unit **232** for generating complex subcarrier symbols using the phase information theta[k]. To this end, the K differentially encoded phases are converted to complex symbols by multiplication with

$$\text{factor}*e^{j*[2*pi*(theta[k]+PHI)]} \quad \text{(Eq.1)}$$

wherein factor designates a scale factor and PHI designates an additional angle. The scale factor and the additional angle PHI are optional. By choosing PHI=45° a rotated DQPSK signal constellation can be obtained.

Finally, assembly of a MCM symbol is effected in an assembling unit **234**. One MCM symbol comprising $N_{FFT}$ subcarriers is assembled from $N_{FFT}$-K−1 guard band symbols which are "zero", one reference subcarrier symbol and K DQPSK subcarrier symbols. Thus, the assembled MCM symbol **200** is composed of K complex values containing the encoded information, two guard bands at both sides of the $N_{FFT}$ complex values and a reference subcarrier symbol.

The MCM symbol has been assembled in the frequency domain. For transformation into the time domain an inverse discrete Fourier transform (IDFT) of the output of the assembling unit **234** is performed by a transformator **236**. In preferred embodiments of the present invention, the transformator **236** is adapted to perform a fast Fourier transform (FFT).

Further processing of the MCM signal in the transmitter as well as in the receiver is as described above referring to FIG. **1**.

At the receiver a de-mapping device **142** (FIG. **1**) is needed to reverse the operations of the mapping device described above referring to FIG. **3**. The implementation of the de-mapping device is straightforward and, therefore, need not be described herein in detail.

The differential mapping along the frequency axis direction is suitable for multi-carrier (OFCM) digital broadcasting over rapidly changing multi path channels. In accordance with this mapping scheme, there is no need for a channel stationarity exceeding one multi-carrier symbol. However, differential mapping into frequency axis direction may create a new problem. In multi path environments, path echoes succeeding or preceding the main path can lead to systematic phase offsets between sub-carriers in the same MCM symbol. Thus, it will be preferred to provide a correction unit in order to eliminate such phase offsets. Because the channel induced phase offsets between differential demodulated symbols are systematic errors, they can be corrected by an algorithm. In principle, such an algorithm must calculate the echo induced phase offset from the signal space constellation following the differential demodulation and subsequently correct this phase offset.

Examples for such echo phase correction algorithms are described at the end of this specification referring to FIGS. **12** to **15**.

Next, the fine frequency synchronization in accordance with the present invention will be described referring to FIGS. **4** to **8**. As mentioned above, the fine frequency synchronization in accordance with the present invention is performed after completion of the coarse frequency synchronization. Preferred embodiments of the coarse frequency synchronization which can be performed by the symbol frame/carrier frequency synchronization unit **134** are described hereinafter referring to FIGS. **9** and **10** after having described the fine frequency synchronization in accordance with the present invention.

With the fine frequency synchronization in accordance with the present invention frequency offsets which are smaller than half the sub-carrier distance can be corrected. Since the frequency offsets are low and equal for all sub-carriers the problem of fine frequency synchronization is reduced to sub-carrier level. FIG. **4** is a schematical view of MCM symbols **200** in the time-frequency plane. Each MCM symbol **200** consists of 432 sub-carrier symbols $C_1$ to $C_{432}$. The MCM symbols are arranged along the time axis, the first MCM symbol **200** shown in FIG. **4** having associated therewith a time $T_1$, the next MCM symbol having associated therewith a time $T_2$ and so on. In accordance with a preferred embodiment of the present invention, the fine

frequency synchronization is based on a phase rotation which is derived from the same sub-carrier of two MCM symbols which are adjacent in the time axis direction, for example $C_1/T_1$ and $C_1/T_2$.

In the following, the present invention is described referring to QPSK mapping (QPSK=Quadrature Phase Shift Keying). However, it is obvious that the present invention can be applied to any MPSK mapping, wherein M designates the number of phase states used for encoding, for example 2, 4, 8, 16 . . . .

FIG. **5** represents a complex coordinate system showing a QPSK constellation for each sub-carrier with frequency offset. The four possible phase positions of a first MCM symbol, MCM-symbol-**1** are shown at **300**. Changing from the sub-carrier (sub-carrier n) of this MCM symbol to the same sub-carrier of the next MCM symbol, MCM-symbol-**2**, the position in the QPSK constellation will be unchanged in case there is no frequency offset. If a frequency offset is present, which is smaller than half the distance between sub-carriers, as mentioned above, this frequency offset causes a phase rotation of the QPSK constellation of MCM-symbol-**2** compared with MCM-symbol-**1**. The new QPSK constellation, that is the four possible phase positions for the subject sub-carrier of MCM-symbol-**2** are shown at **302** in FIG. **5**. This phase rotation θ can be derived from the following equation:

$$C_n(kT_{MCM})=e^{j2\pi f_{offset}T_{MCM}}C_n((k-1)T_{MCM})$$

$$\theta=2\pi f_{offset}T_{MCM} \qquad \text{(Eq.2)}$$

$C_n$ designates the QPSK constellation of a sub-carrier n in a MCM symbol. n is an index running from 1 to the number of active sub-carriers in the MCM symbol. Information regarding the frequency offset is contained in the term $e^{j2\pi f_{offset}T_{MCM}}$ of equation 2. This frequency offset is identical for all sub-carriers. Therefore, the phase rotation θ is identical for all sub-carriers as well. Thus, averaging overall sub-carrier of a MCM symbol can be performed.

FIG. **6** shows a block diagram of a MCM receiver in which the present invention is implemented. An analog/digital converter **310** is provided in order to perform an analog/digital conversion of a down-converted signal received at the receiver front end **132** (FIG. **1**). The output of the analog/digital converter **310** is applied to a low path filter and decimator unit **312**. The low path filter is an impulse forming filter which is identical to an impulse forming filter in the MCM transmitter. In the decimator, the signal is sampled at the MCM symbol frequency. As described above referring to FIG. **1**, guard intervals in the MCM signal are removed by a guard interval removal unit **132**. Guard intervals are inserted between two MCM symbols in the MCM transmitter in order to avoid intersymbol interference caused by channel memory.

The output of the guard interval removal unit **132** is applied to a MCM demodulator **314** which corresponds to the fast Fourier transformator **140** shown in FIG. **1**. Following the MCM demodulator **314** a differential decoding unit **316** and a de-mapping unit **318** are provided. In the differential decoding unit **316**, phase information is recovered using differential decoding. In the demapping unit **318**, demapping along the frequency axis direction is performed in order to reconstruct a binary signal from the complex signal input into the demapping unit **318**.

The output of the MCM demodulator **314** is also applied to fine frequency error detector **320**. The fine frequency error detector **320** produces a frequency error signal from the output of the MCM demodulator. In the depicted embodiment, the output of the fine frequency error detector **320** is applied to a numerical controlled oscillator **322** via a loop filter **324**. The loop filter **324** is a low pass filter for filtering superimposed interference portions of a higher frequency from the slowly varying error signal. The numerical controlled oscillator **322** produces a carrier signal on the basis of the filtered error signal. The carrier signal produced by the numerical controlled oscillator **322** is used for a frequency correction which is performed by making use of a complex multiplier **326**. The inputs to the complex multiplier **326** are the output of the low pass filter and decimator unit **312** and the output of the numerical controlled oscillator **322**.

A description of a preferred embodiment of the fine frequency error detector **320** is given hereinafter referring to FIG. **7**.

The fine frequency error detector **320** comprises a differential detector in the time axis **330**. The output of the MCM demodulator **314**, i.e. the FFT output (FFT=Fast Fourier Transform) is applied to the input of the differential detector **330** which performs a differential detection in the time axis in order to derive information on a frequency offset from the same sub-carrier of two subsequently arriving MCM symbols. In the embodiment shown in FIG. **7**, the number of active sub-carriers is **432**. Thus, the differential detector **330** performs a correlation between the first and the 433rd sample. The first sample is associated with MCM-symbol-1 (FIG. **5**), whereas the 433rd sample is associated with MCM-symbol-2 (FIG. **5**). However, both of these samples are associated with the same sub-carrier.

To this end, the input signal $Y_k$ is applied to a $z^{-1}$-block **332** and thereafter to a unit **334** in order to form the complex conjugate of the output of the $z^{-1}$-block **332**. A complex multiplier **336** is provided in order to multiply the output of the unit **334** by the input signal $Y_k$. The output of the multiplier **336** is a signal $Z_k$.

The function of the differential detector **330** can be expressed as follows:

$$Z_k=Y_{k+K}\cdot Y_k^* \qquad \text{(Eq.3)}$$

$$Y=[Y_1, Y_2 \ldots, Y_k \ldots] \qquad \text{(Eq.4)}$$

$$Y=[C_1/T_1, C_2/T_1, \ldots, C_{432}/T_1, C_1/T_2 \ldots] \qquad \text{(Eq.5)}$$

$Y_k$ designates the output of the MCM modulator **314**, i.e. the input to the differential detector **330**, at a time k. $Z_k$ designates the output of the differential detector **330**. K designates the number of active carriers.

The output $Z_k$ of the differential detector **330** contains an M-fold uncertainty corresponding to codeable phase shifts. In case of the QPSK mapping, this M-fold uncertainty is a 4-fold uncertainty, i.e., in the 0°, 90°, 180° and 270° phase shifts. This phase shift uncertainty is eliminated from the output $Z_k$ by using an M-PSK decision device **340**. Such decision devices are known in the art and, therefore, are not described here in detail. The output of the decision device **340** $(\hat{a}_k)^*$ represents the complex conjugate of the codeable phase shift decided by the decision device **340**. This output of the decision device **340** is correlated with the output of the differential detector **330** by performing a complex multiplication using a multiplier **342**.

The output the multiplier **342** represents the phase offset for the respective sub-carriers. The phase offsets for the respective sub-carriers are averaged over one MCM symbol in an averaging unit **344** in accordance with a preferred

embodiment of the present invention. The output of the averaging units **344** represent the output of the fine frequency error detector **320**.

The mathematical description for this procedure is as follows:

$$f_{offset} = \frac{1}{2\pi K T_{MCM}} \arg\left\{ \sum_{n=1}^{K} Z_n \cdot (\hat{a}_n)^* \right\} \quad \text{(Eq. 6)}$$

In accordance with preferred embodiments of the present invention, the frequency control loop has a backward structure. In the embodiment shown in FIG. **6**, the feedback loop is connected between the output of the MCM demodulator **314** and the input of the guard interval removal unit **132**.

In FIG. **8**, a block diagram of a MCM receiver comprising a coarse frequency correction unit **350** and a fine frequency correction unit as described above is shown. As shown in FIG. **8**, a common complex multiplier **326** can be used in order to perform the coarse frequency correction and the fine frequency correction. As shown in FIG. **8**, the multiplier **326** can be provided preceding the low pass filter and decimator unit **312**. Depending on the position of the multiplier **326**, a hold unit has to be provided in the fine frequency synchronization feedback loop. In an alternative embodiment, it is possible to use two separate multipliers for the coarse frequency correction and for the fine frequency correction. In such a case, the multiplier for the coarse frequency correction will be arranged preceding the low path filter and decimator unit, whereas the multiplier for the fine frequency correction will be arranged following the low path filter and decimator unit.

Following, preferred embodiments for implementing a coarse frequency synchronization will be described referring to FIGS. **9** and **10**.

As it is shown in FIG. **9**, the output of the receiver front end **132** is connected to an analog/digital converter **310**. The down-converted MCM signal is sampled at the output of the analog/digital converter **310** and is applied to a frame/timing synchronization unit **360**. In a preferred embodiment, a fast running automatic gain control (AGC) (not shown) is provided preceding the frame/timing synchronization unit in order to eliminate fast channel fluctuations. The fast AGC is used in addition to the normally slow AGC in the signal path, in the case of transmission over a multipath channel with long channel impulse response and frequency selective fading. The fast AGC adjusts the average amplitude range of the signal to the known average amplitude of the reference symbol.

As described above, the frame/timing synchronization unit uses the amplitude-modulated sequence in the received signal in order to extract the framing information from the MCM signal and further to remove the guard intervals therefrom. After the frame/timing synchronization unit **360** it follows a coarse frequency synchronization unit **362** which estimates a coarse frequency offset based on the amplitude-modulated sequence of the reference symbol of the MCM signal. In the coarse frequency synchronization unit **362**, a frequency offset of the carrier frequency with respect to the oscillator frequency in the MCM receiver is determined in order to perform a frequency offset correction in a block **364**. This frequency offset correction in block **364** is performed by a complex multiplication.

The output of the frequency offset correction block **364** is applied to the MCM demodulator **366** formed by the Fast Fourier Transformator **140** and the carrier-bit mapper **142** shown in FIG. **1**.

In order to perform the coarse frequency synchronization described herein, an amplitude-demodulation has to be performed on a preprocessed MCM signal. The preprocessing may be, for example, the down-conversion and the analog/digital conversion of the MCM signal. The result of the amplitude-demodulation of the preprocessed MCM signal is an envelope representing the amplitude of the MCM signal.

For the amplitude demodulation a simple $\text{alpha}_{max+}\,\text{beta}_{min-}$ method can be used. This method is described for example in Palacherla A.: DSP-μP Routine Computes Magnitude, EDN, Oct. 26, 1989; and Adams, W. T., and Bradley, J.: Magnitude Approximations for Microprocessor Implementation, IEEE Micro, vol. 3, No. 5, October 1983.

It is clear that amplitude determining methods different from the described $\text{alpha}_{max+}\,\text{beta}_{min-}$ method can be used. For simplification, it is possible to reduce the amplitude calculation to a detection as to whether the current amplitude is above or below the average amplitude. The output signal then consists of a −1/+1 sequence which can be used to determine a coarse frequency offset by performing a correlation. This correlation can easily be performed using a simple integrated circuit (IC).

In addition, an oversampling of the signal received at the RF front end can be performed. For example, the received signal can be expressed with two times oversampling.

In accordance with a first embodiment, a carrier frequency offset of the MCM signal from an oscillator frequency in the MCM receiver is determined by correlating the envelope obtained by performing the amplitude-demodulation as described above with a predetermined reference pattern.

In case there is no frequency offset, the received reference symbol r(k) will be:

$$r(k)=S_{AM}(k)+n(k) \quad \text{(Eq.7)}$$

wherein n(k) designates "additive Gaussian noise" and $S_{AM}$ denotes the AM sequence which has been sent. In order to simplify the calculation the additive Gaussian noise can be neglected. It follows:

$$r(k) \cong S_{AM}(k) \quad \text{(Eq.8)}$$

In case a constant frequency offset Δf is present, the received signal will be:

$$\tilde{r}(k)=S_{AM}(k)\cdot e^{j2\pi\Delta f k T_{MCM}} \quad \text{(Eq.9)}$$

Information regarding the frequency offset is derived from the correlation of the received signal $\tilde{r}(k)$ with the AM sequence $s_{AM}$ which is known in the receiver:

$$\sum_{k=1}^{\frac{L}{2}} \tilde{r}(k)\cdot S_{AM}^*(k) = \sum_{k=1}^{\frac{L}{2}} |S_{AM}(k)|^2 e^{j2\pi\Delta f k T_{MCM}} \quad \text{(Eq. 10)}$$

Thus, the frequency offset is:

$$\Delta f = \frac{1}{2\pi T_{MCM}} \arg\left\{ \sum_{k=1}^{\frac{L}{2}} r(k)\cdot S_{AM}^*(k) \right\} - \quad \text{(Eq. 11)}$$

-continued

$$\frac{1}{2\pi T_{MCM}}\arg\left(\sum_{k=1}^{\frac{L}{2}}|S_{AM}(k)|^2\right)$$

Since the argument of $|S_{AM}(k)|^2$ is zero the frequency offset is:

$$\Delta f=\frac{1}{2\pi T_{MCM}}\arg\left(\sum_{k=1}^{\frac{L}{2}}\tilde{r}(k)\cdot S_{AM}^*\right) \quad \text{(Eq. 12)}$$

In accordance with a second embodiment of the coarse frequency synchronization algorithm, a reference symbol comprising at least two identical sequences **370** as shown in FIG. **10** is used. FIG. **10** shows the reference symbol of a MCM signal having two identical sequences **370** of a length of L/2 each. L designates the number of values of the two sequences **370** of the reference symbol.

AS shown in FIG. **10**, within the amplitude-modulated sequence, there are at least two identical sections devoted to the coarse frequency synchronization. Two such sections, each containing L/2 samples, are shown at the end of the amplitude-modulated sequence in FIG. **10**. The amplitude-modulated sequence contains a large number of samples. For a non-ambiguous observation of the phase, only enough samples to contain a phase rotation of 2π should be used. This number is defined as L/2 in FIG. **10**.

Following, a mathematical derivation of the determination of a carrier frequency deviation is presented. In accordance with FIG. **10**, the following equation applies for the two identical sequences **370**:

$$s\left(0<k\le\frac{L}{2}\right)\equiv s\left(\frac{L}{2}<k\le L\right) \quad \text{(Eq. 13)}$$

If no frequency offset is present, the following equation 14 will be met by the received signal:

$$r\left(k+\frac{L}{2}\right)\equiv r(k)\;0<k\le\frac{L}{2} \quad \text{(Eq. 14)}$$

r(k) designates the values of the identical sequences. k is an index from one to L/2 for the respective samples.

If there is a frequency offset of, for example, Δf, the received signal is:

$$\tilde{r}(k)=r(k)\cdot e^{j2\pi\Delta f k T_{MCM}} \quad \text{(Eq.15)}$$

$$\tilde{r}\left(k+\frac{L}{2}\right)=r(k)\cdot e^{j2\pi\Delta f\left(k+\frac{L}{2}\right)T_{MCM}} \quad \text{(Eq. 16)}$$

r(k) designates sample values of the received portion which are based on the identical sequences. Information regarding the frequency offset is derived from the correlation of the received signal r̃(k+L/2) with the received signal r̃(k). This correlation is given by the following equation:

$$\sum_{k=1}^{\frac{L}{2}}\tilde{r}^*\left(k+\frac{L}{2}\right)\tilde{r}(k)=\sum_{k=1}^{\frac{L}{2}}|r(k)|^2 e^{-j2\pi\Delta f\frac{L}{2}T_{MCM}} \quad \text{(Eq. 17)}$$

r̃* designates the complex conjugate of the sample values of the portion mentioned above.

Thus, the frequency offset is

$$\Delta f=\frac{1}{2\pi\frac{L}{2}T_{MCM}}\arg\left(\sum_{k=1}^{\frac{L}{2}}\tilde{r}\left(k+\frac{L}{2}\right)\cdot\tilde{r}^*(k)\right)-\frac{1}{2\pi\frac{L}{2}T_{MCM}}\arg\left(\sum_{k=1}^{\frac{L}{2}}|\tilde{r}(k)|^2\right) \quad \text{(Eq. 18)}$$

Since the argument of $|\tilde{r}(k)|^2$ equals zero, the frequency offset becomes

$$\Delta f=\frac{1}{2\pi\frac{L}{2}T_{MCM}}\arg\left(\sum_{k=1}^{\frac{L}{2}}\tilde{r}\left(k+\frac{L}{2}\right)\cdot\tilde{r}^*(k)\right) \quad \text{(Eq. 19)}$$

Thus, it is clear that in both embodiments, described above, the frequency position of the maximum of the resulting output of the correlation determines the estimated value of the offset carrier. Furthermore, as it is also shown in FIG. **9**, the correction is performed in a feed forward structure.

In case of a channel with strong reflections, for example due to a high building density, the correlations described above might be insufficient for obtaining a suitable coarse frequency synchronization. Therefore, in accordance with a third embodiment of the present invention, corresponding values of the two portions (i.e., which are correlated in accordance with a second embodiment) can be weighted with corresponding values of stored predetermined reference patterns corresponding to said two identical sequences of the reference symbol. This weighting can maximize the probability of correctly determining the frequency offset. The mathematical description of this weighting is as follows:

$$\Delta f=\frac{1}{2\pi\frac{L}{2}T_{MCM}}\arg\left(\sum_{k=1}^{\frac{L}{2}}\left[\tilde{r}\left(k+\frac{L}{2}\right)\cdot\tilde{r}^*(k)\right]\cdot\left[S_{AM}(k)S_{AM}^*\left(k+\frac{L}{2}\right)\right]\right) \quad \text{(Eq. 20)}$$

$S_{AM}$ designates the amplitude-modulated sequence which is known in the receiver, and $S_{AM}^*$ designates the complex conjugate thereof.

If the above correlations are calculated in the frequency domain, the amount of

$$\sum_{k-1}^{\frac{L}{2}}\left[\tilde{r}\left(k+\frac{L}{2}\right)\cdot\tilde{r}^*(k)\right]\cdot\left[S_{AM}(k)S_{AM}^*\left(k+\frac{L}{2}\right)\right] \quad \text{(Eq. 21)}$$

is used rather than the argument. This amount is maximized as a function of a frequency correction. The position of the maximum determines the estimation of the frequency deviation. As mentioned above, the correction is performed in a feed forward structure.

Preferred embodiments for performing an echo phase offset correction when using a differential mapping in the frequency axis will be described hereinafter referring to FIGS. **12** to **15**.

Systematic phase shifts stemming from echoes in multipath environments may occur between subcarriers in the same MCM symbol. These phase offsets can cause bit errors when demodulating the MCM symbol at the receiver. Thus, it is preferred to make use of an algorithm to correct the systematic phase shifts stemming from echoes in multipath environments.

In FIG. **12**, scatter diagrams at the output of a differential demapper of an MCM receiver are shown. As can be seen from the left part of FIG. **12**, systematic phase shifts between subcarriers in the same MCM symbol cause a rotation of the demodulated phase shifts with respect to the axis of the complex coordinate system. In the right part of FIG. **12**, the demodulated phase shifts after having performed an echo phase offset correction are depicted. Now, the positions of the signal points are substantially on the axis of the complex coordinate system. These positions correspond to the modulated phase shifts of 0°, 90°, 180° and 270°, respectively.

An echo phase offset correction algorithm (EPOC algorithm) must calculate the echo induced phase offset from the signal space constellation following the differential demodulation and subsequently correct this phase offset.

For illustration purposes, one may think of the simplest algorithm possible which eliminates the symbol phase before computing the mean of all phases of the subcarriers. To illustrate the effect of such an EPOC algorithm, reference is made to the two scatter diagrams of subcarrier symbols contained in one MCM symbol in FIG. **12**. These scatter diagrams have been obtained as result of an MCM simulation. For the simulation, a channel has been used which might typically show up in single frequency networks. The echoes of this channel stretched to the limits of the MCM guard interval. The guard interval was chosen to be 25% of the MCM symbol duration in this case.

FIG. **13** represents a block diagram for illustrating the position and the functionality of an echo phase offset correction device in an MCM receiver. The signal of a MCM transmitter is transmitted through the channel **122** (FIGS. **1** and **13**) and received at the receiver frontend **132** of the MCM receiver. The signal processing between the receiver frontend and the fast Fourier transformator **140** has been omitted in FIG. **13**. The output of the fast Fourier transformator is applied to the de-mapper, which performs a differential de-mapping along the frequency axis. The output of the de-mapper are the respective phase shifts for the subcarriers. The phase offsets of these phase shifts, which are caused by echoes in multipath environments, are illustrated by block **400** in FIG. **13**, which shows an example of a scatter diagram of the subcarrier symbols without an echo phase offset correction.



The output of the de-mapper **142** is applied to the input of an echo phase offset correction device **402**. The echo phase offset correction device **402** uses an EPOC algorithm in order to eliminate echo phase offsets in the output of the demapper **142**. The result is shown in block **404** of FIG. **13**, i.e. only the encoded phase shifts, 0°, 90°, 180° or 270° are present at the output of the correction device **402**. The output of the correction device **402** forms the signal for the metric calculation which is performed in order to recover the bitstream representing the transmitted information.

A first embodiment of an EPOC algorithm and a device for performing the same is now described referring to FIG. **14**.

The first embodiment of an EPOC algorithm starts from the assumption that every received differentially decoded complex symbol is rotated by an angle due to echoes in the multipath channel. For the subcarriers equal spacing in frequency is assumed since this represents a preferred embodiment. If the subcarriers were not equally spaced in frequency, a correction factor would have to be introduced into the EPOC algorithm.

FIG. **14** shows the correction device **402** (FIG. **13**) for performing the first embodiment of an EPOC algorithm.

From the output of the de-mapper **142** which contains an echo phase offset as shown for example in the left part of FIG. **12**, the phase shifts related to transmitted information must first be discarded. To this end, the output of the de-mapper **142** is applied to a discarding unit **500**. In case of a DQPSK mapping, the discarding unit can perform a "$(.)^4$" operation. The unit **500** projects all received symbols into the first quadrant. Therefore, the phase shifts related to transmitted information is eliminated from the phase shifts representing the subcarrier symbols. The same effect could be reached with a modulo-4 operation.

Having eliminated the information related symbol phases in unit **500**, the first approach to obtain an estimation would be to simply compute the mean value over all symbol phases of one MCM symbol. However, it is preferred to perform a threshold decision before determining the mean value over all symbol phases of one MCM symbol. Due to Rayleigh fading some of the received symbols may contribute unreliable information to the determination of the echo phase offset. Therefore, depending on the absolute value of a symbol, a threshold decision is performed in order to determine whether the symbol should contribute to the estimate of the phase offset or not.

Thus, in the embodiment shown in FIG. **14**, a threshold decision unit **510** is included. Following the unit **500** the absolute value and the argument of a differentially decoded symbol is computed in respective computing units **512** and **514**. Depending on the absolute value of a respective symbol, a control signal is derived. This control signal is compared with a threshold value in a decision circuit **516**. If the absolute value, i.e. the control signal thereof, is smaller than a certain threshold, the decision circuit **516** replaces the angle value going into the averaging operation by a value equal to zero. To this end, a switch is provided in order to disconnect the output of the argument computing unit **514** from the input of the further processing stage and connects the input of the further processing stage with a unit **518** providing a constant output of "zero".

An averaging unit **520** is provided in order to calculate a mean value based on the phase offsets $\phi_i$ determined for the individual subcarrier symbols of a MCM symbol as follows:

$$\overline{\varphi} = 1/K\sum_{i=1}^{K}\varphi_i \qquad \text{(Eq. 22)}$$

In the averaging unit **520**, summation over K summands is performed. The output of the averaging unit **520** is provided to a hold unit **522** which holds the output of the averaging unit **520** K times. The output of the hold unit **522** is connected with a phase rotation unit **524** which performs the correction of the phase offsets of the K complex signal points on the basis of the mean value $\overline{\phi}$.

The phase rotation unit **524** performs the correction of the phase offsets by making use of the following equation:

$$v_k' = v_k \cdot e^{-j\overline{\phi}} \qquad \text{(Eq.23)}$$

In this equation, $v_k'$ designates the K phase corrected differentially decoded symbols for input into the soft-metric calculation, whereas $v_k$ designates the input symbols. As long as a channel which is quasi stationary during the duration of one MCM symbols can be assumed, using the mean value over all subcarriers of one MCM symbol will provide correct results.

A buffer unit **527** may be provided in order to buffer the complex signal points until the mean value of the phase offsets for one MCM symbol is determined. The output of the phase rotation unit **524** is applied to the further processing stage **526** for performing the soft-metric calculation.

With respect to the results of the above echo phase offset correction, reference is made again to FIG. **12**. The two plots stem from a simulation which included the first embodiment of an echo phase offset correction algorithm described above. At the instant of the scatter diagram snapshot shown in the left part of FIG. **12**, the channel obviously distorted the constellation in such a way, that a simple angle rotation is a valid assumption. As shown in the right part of FIG. **12**, the signal constellation can be rotated back to the axis by applying the determined mean value for the rotation of the differentially detected symbols.

A second embodiment of an echo phase offset correction algorithm is described hereinafter. This second embodiment can be preferably used in connection with multipath channels that have up to two strong path echoes. The algorithm of the second embodiment is more complex than the algorithm of the first embodiment.

What follows is a mathematical derivation of the second embodiment of a method for echo phase offset correction. The following assumptions can be made in order to ease the explanation of the second embodiment of an EPOC algorithm.

In this embodiment, the guard interval of the MCM signal is assumed to be at least as long as the impulse response h[q], q=0, 1, . . . , Qh−1 of the multipath channel.

At the transmitter every MCM symbol is assembled using frequency axis mapping explained above. The symbol of the reference subcarrier equals 1, i.e. 0 degree phase shift. The optional phase shift PHI equals zero, i.e. the DQPSK signal constellation is not rotated.

Using an equation this can be expressed as

$$a_k = a_{k-1} a_k^{inc} \qquad \text{(Eq.24)}$$

with

| | |
|---|---|
| k | index k = 1, 2, . . . , K of the active subcarrier; |
| $a_k^{inc} = e^{j\frac{\pi}{2}m}$ | complex phase increment symbol; m = 0, 1, 2, 3 is the QPSK symbol number which is derived from Gray encoding pairs of 2 Bits; |
| a0 = 1 | symbol of the reference subcarrier. |

At the DFT output of the receiver the decision variables

$$e_k = a_k H_k \qquad \text{(Eq.25)}$$

are obtained with

$$H_k = \sum_{i=0}^{Q_h-1} h[i] \cdot e^{-j\frac{2\pi}{K}ki} \qquad \text{(Eq. 26)}$$

being the DFT of the channel impulse response h[q] at position k.

With $|a_k|^2 = 1$ the differential demodulation yields

$$v_k = e_k \cdot e_{k-1}^* = a_k^{inc} H_k H_{k-1}^* \qquad \text{(Eq.27)}$$

For the receiver an additional phase term $\phi_k$ is introduced, which shall be used to correct the systematic phase offset caused by the channel. Therefore, the final decision variable at the receiver is

$$v_k' = v_k \cdot e^{j\phi_k} = a_k^{inc} \cdot e^{j\phi_k} \cdot H_k \cdot H_{k-1}^* \qquad \text{(Eq.28)}$$

As can be seen from the Equation 28, the useful information $a_k^{inc}$ is weighted with the product $e^{j\phi_k} \cdot H_k \cdot H_{k-1}^*$ (rotation and effective transfer function of the channel). This product must be real-valued for an error free detection. Considering this, it is best to choose the rotation angle to equal the negative argument of $H_k \cdot H_{k-1}^*$. To derive the desired algorithm for 2-path channels, the nature of $H_k \cdot H_{k-1}^*$ is investigated in the next section.

It is assumed that the 2-path channel exhibits two echoes with energy content unequal zero, i.e. at least two dominant echoes. This assumption yields the impulse response

$$h[q] = c_1 \delta_0[q] + c_2 \delta_0[q-q_0] \qquad \text{(Eq.29)}$$

with

| | | |
|---|---|---|
| $c_1$, $c_2$: | complex coefficients representing the path echoes; | |
| $q_0$: | delay of the second path echo with respect to the first path echo; | |
| $\delta_0$: | Dirac pulse; | $\delta_0[\kappa] = 1$ for k = 0<br>$\delta_0[\kappa] = 0$ else |

The channel transfer function is obtained by applying a DFT to Equation 29:

$$H_k = H\left(e^{j\frac{2\pi}{K}k}\right) = c_1 + c_2 \cdot e^{-j\frac{2\pi}{K}kq_0} \qquad \text{(Eq. 30)}$$

With Equation 30 the effective transfer function for differential demodulation along the frequency axis is:

$$H_k \cdot H_{k-1}^* = \left(c_1 + c_2 e^{-j\frac{2\pi}{K}kq_0}\right) \cdot \left(c_1^* + c_2^* e^{-j\frac{2\pi}{K}(k-1)q_0}\right) = c_a + c_b \cos\left(\frac{\pi}{K} q_0 (2k-1)\right) \quad \text{(Eq. 31)}$$

Assuming a noise free 2-path channel, it can be observed from Equation 31 that the symbols on the receiver side are located on a straight line in case the symbol 1+j0 has been send (see above assumption). This straight line can be characterized by a point

$$c_a = |c_1|^2 + |c_2|^2 \cdot e^{-j\frac{2\pi}{K}q_0} \quad \text{(Eq. 32)}$$

and the vector

$$c_b = 2c_1 c_2^* \cdot e^{-j\frac{\pi}{K}q_0} \quad \text{(Eq. 33)}$$

which determines its direction.

With the above assumptions, the following geometric derivation can be performed. A more suitable notation for the geometric derivation of the second embodiment of an EPOC algorithm is obtained if the real part of the complex plane is designated as x=Re{z}, the imaginary part as y=Im{z}, respectively, i.e. z=x+jy. With this new notation, the straight line, on which the received symbols will lie in case of a noise-free two-path channel, is

$$f(x) = a + b \cdot x \quad \text{(Eq.34)}$$

with

$$a = \text{Im}\{c_a\} - \frac{\text{Re}\{c_a\}}{\text{Re}\{c_b\}} \cdot \text{Im}\{c_b\} \quad \text{(Eq. 35)}$$

and

$$b = -\frac{\text{Im}\{c_a\} - \frac{\text{Re}\{c_a\}}{\text{Re}\{c_b\}} \cdot \text{Im}\{c_b\}}{\text{Re}\{c_a\} - \frac{\text{Im}\{c_a\}}{\text{Im}\{c_b\}} \cdot \text{Re}\{c_b\}} \quad \text{(Eq. 36)}$$

Additional noise will spread the symbols around the straight line given by Equations 34 to 36. In this case Equation 36 is the regression curve for the cluster of symbols.

For the geometric derivation of the second embodiment of an EPOC algorithm, the angle $\phi_k$ from Equation 28 is chosen to be a function of the square distance of the considered symbol from the origin:

$$\phi_k = f_K(|z|^2) \quad \text{(Eq.37)}$$

Equation 37 shows that the complete signal space is distorted (torsion), however, with the distances from the origin being preserved.

For the derivation of the algorithm of the second embodiment, $f_K(\cdot)$ has to be determined such that all decision variables $v_k'$ (assuming no noise) will come to lie on the real axis:

$$Im\{(x + jf(x)) \cdot e^{jf_K(|z|^2)}\} = 0 \quad \text{(Eq.38)}$$

Further transformations of Equation 38 lead to a quadratic equation which has to be solved to obtain the solution for $\phi_k$.

In case of a two-path channel, the echo phase offset correction for a given decision variable $v_k$ is

$$v_k' = v_k \cdot e^{j\phi_k} \quad \text{(Eq.39)}$$

with

$$\varphi_k = \begin{cases} -a\tan\left(\dfrac{a + b\sqrt{|v_k|^2(1+b^2) - a^2}}{-ab + \sqrt{|v_k|^2(1+b^2) - a^2}}\right) & \text{for } |v_k|^2 \geq \dfrac{a^2}{1+b^2} \\ a\tan\left(\dfrac{1}{b}\right) & \text{for } |v_k|^2 < \dfrac{a^2}{1+b^2} \end{cases} \quad \text{(Eq. 40)}$$

From the two possible solutions of the quadratic equation mentioned above, Equation 40 is the one solution that cannot cause an additional phase shift of 180 degrees.

The two plots in FIG. **15** show the projection of the EPOC algorithm of the second embodiment for one quadrant of the complex plane. Depicted here is the quadratic grid in the sector $|\arg(z)| \leqq \pi/4$ and the straight line y=f(x)=a+b·x with a =−1.0 and b=0.5 (dotted line). In case of a noise-free channel, all received symbols will lie on this straight line if 1+j0 was sent. The circle shown in the plots determines the boarder line for the two cases of Equation 40. In the left part, FIG. **15** shows the situation before the projection, in the right part, FIG. **15** shows the situation after applying the projection algorithm. By looking on the left part, one can see, that the straight line now lies on the real axis with 2+j0 being the fix point of the projection. Therefore, it can be concluded that the echo phase offset correction algorithm according to the second embodiment fulfills the design goal.

Before the second embodiment of an EPOC algorithm can be applied, the approximation line through the received symbols has to be determined, i.e. the parameters a and b must be estimated. For this purpose, it is assumed that the received symbols lie in sector $|\arg(z)| \leqq \pi/4$, if 1+j0 was sent. If symbols other than 1+j0 have been sent, a modulo operation can be applied to project all symbols into the desired sector. Proceeding like this prevents the necessity of deciding on the symbols in an early stage and enables averaging over all signal points of one MCM symbol (instead of averaging over only ¼ of all signal points).

For the following computation rule for the EPOC algorithm of the second embodiment, $x_i$ is used to denote the real part of the i-th signal point and $y_i$ for its imaginary part, respectively (i=1, 2, . . . , K). Altogether, K values are available for the determination. By choosing the method of least squares, the straight line which has to be determined can be obtained by minimizing

$$(a, b) = \arg\min_{(\tilde{a}, \tilde{b})} \sum_{i=1}^{K} \left(y_i - (\tilde{a} + \tilde{b} \cdot x_i)\right)^2 \quad \text{(Eq. 41)}$$

The solution for Equation 41 can be found in the laid open literature. It is

$$b=\frac{\sum_{i=1}^{K}(x_i-\overline{x})\cdot y_i}{\sum_{i=1}^{K}(x_i-\overline{x})^2},\quad a=\overline{y}-\overline{x}\cdot b \qquad \text{(Eq. 42)}$$

with mean values

$$\overline{x}=\frac{1}{N}\sum_{i=1}^{K}x_i,\quad \overline{y}=\frac{1}{N}\sum_{i=1}^{K}y_i \qquad \text{(Eq. 43)}$$

If necessary, an estimation method with higher robustness can be applied. However, the trade-off will be a much higher computational complexity.

To avoid problems with the range in which the projection is applicable, the determination of the straight line should be separated into two parts. First, the cluster's centers of gravity are moved onto the axes, following, the signal space is distorted. Assuming that a and b are the original parameters of the straight line and a is the rotation angle, $f_K(\cdot)$ has to be applied with the transformed parameters

$$b'=\frac{b\cdot\cos(\alpha)-\sin(\alpha)}{\cos(\alpha)+b\cdot\sin(\alpha)},\quad a'=a\cdot(\cos(\alpha)-b'\cdot\sin(\alpha)) \qquad \text{(Eq. 44)}$$

Besides the two EPOC algorithms explained in the above section, different algorithms can be designed that will, however, most likely exhibit a higher degree of computational complexity.

The invention claimed is:

**1**. A method of performing a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency in a multi-carrier demodulation system capable of carrying out a differential phase decoding of multi-carrier modulated signals, said signals comprising a plurality of symbols, each symbol being differentially coded in the direction of the frequency axis, said method comprising the steps of:

a) determining a phase difference between phases of the same carrier in different symbols;

b) determining a frequency offset by eliminating phase shift uncertainties related to the transmitted information from said phase difference making use of a M-PSK decision device; and

c) performing a feedback correction of said carrier frequency deviation based on said determined frequency offset, wherein

said steps a) and b) are performed for a plurality of carriers in said symbols,

an averaged frequency offset is determined by averaging said determined frequency offsets of said plurality of carriers, and

said feedback correction of said frequency deviation is performed based on said averaged frequency offset.

**2**. The method according to claim **1**, wherein said step a) comprises the step of determining a phase difference between phases of the same carrier in symbols which are adjacent in the time axis direction.

**3**. The method according to claim **1**, wherein said step b) comprises the step of eliminating phase shift uncertainties corresponding to M-ary phase shifts.

**4**. An apparatus for performing a fine frequency synchronization compensating for a carrier frequency deviation from an oscillator frequency, for a multi-carrier demodulation system capable of carrying out a differential phase decoding of multi-carrier modulated signals, said signals comprising a plurality of symbols, each symbol being defined by

phase differences between simultaneous carriers having different frequencies, said apparatus comprising:

means for determining respective phases of the same carrier in different symbols;

M-PSK decision device for eliminating phase shift uncertainties related to the transmitted information from said phases to determine respective phase deviations;

means for determining a frequency offset by determining a phase difference between said phase deviations; and

means for performing a feedback correction of said frequency deviation based on said determined frequency offset;

wherein said means for determining respective phases comprises means for determining respective phases of the same carrier in symbols which are adjacent in the time axis direction.

**5**. The apparatus according to claim **4**, further comprising:

means for determining an averaged frequency offset by averaging determined frequency offsets of a plurality of carriers, wherein

said means for performing a feedback correction performs said feedback correction of said frequency deviation based on said averaged frequency offset.

**6**. The apparatus according to claim **4**, wherein said means for performing a feedback correction of said frequency deviation comprises a numerical controlled oscillator and a complex multiplier.

**7**. The apparatus according to claim **6**, wherein said means for performing a feedback correction of said frequency deviation further comprises a low path filter preceding said numerical controlled oscillator.

* * * * *

## CERTIFICATE OF SERVICE

I certify that on November 9, 2023, Fraunhofer's Principal Brief was filed electronically using the CM/ECF system and served via the CM/ECF system on the following counsel for Defendant-Appellee:

Gary P. Naftalis
Mark Baghdassarian
Alan R. Friedman
Jason M. Moff
Shannon H. Hedvat
Tobias B. Jacoby
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036-2714

Dated: November 9, 2023

*/s/ Ben J. Yorks*

Ben J. Yorks
David C. McPhie
IRELL AND MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6324
Telephone: (949) 760-0991

*Attorneys for Appellant*
*Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) or Fed. R. App. P. 28.1(e). The brief contains 13,940 words, excluding the parts of the brief exempted by Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) or Fed. R. App. P. 28.1(e) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Word 2010 in size 14 Times New Roman font.

Dated: November 9, 2023

*/s/ Ben J. Yorks*

Ben J. Yorks
David C. McPhie
IRELL AND MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6324
Telephone: (949) 760-0991

*Attorneys for Appellant*
*Fraunhofer-Gesellschaft zur Forderung der angewandten Forschung e.V.*