**2023-2267**

# United States Court of Appeals for the Federal Circuit

FRAUNHOFER-GESELLSCHAFT ZUR FORDERUNG DER ANGEWANDTEN FORSCHUNG E.V.,

*Plaintiff-Appellant,*

– v. –

SIRIUS XM RADIO INC.,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the District of Delaware in No. 1:17-cv-00184-JFB-SRF, Hon. Joseph F. Bataillon*

## BRIEF FOR DEFENDANT-APPELLEE

GARY P. NAFTALIS
MARK A. BAGHDASSARIAN
ALAN R. FRIEDMAN
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
gnaftalis@kramerlevin.com
mbaghdassarian@kramerlevin.com
afriedman@kramerlevin.com

*Counsel for Defendant-Appellee*

JANUARY 18, 2024

CP COUNSEL PRESS    (800) 4-APPEAL • (326425)

## CERTIFICATE OF INTEREST

Counsel for Appellee Sirius XM Radio Inc. certifies the following:

1. The full name of all entities represented by undersigned counsel:

   Sirius XM Radio Inc.

2. The names of the real parties in interest for the entities.  Do not list the real parties if they are the same as the entities:

   None.

3. All parent corporations and any other publicly held companies that own 10 percent or more of the stock in the entities:

   Sirius XM Holdings Inc.
   Liberty Media Corporation

4. The names of all law firms and the partners or associates that appeared for Sirius XM Radio Inc. before the United States District Court for the District of Delaware or are expected to appear in this court are:

   Gary P. Naftalis, Mark A. Baghdassarian, Alan R. Friedman, Jonathan S. Caplan, Aaron M. Frankel, Eileen M. Patt, Jason M. Moff, Tobias B. Jacoby, Shannon H. Hedvat, P. Bradley O'Neill, Marcus A. Colucci, Harry P. Morgenthau, Chase H. Mechanick, and Carlos J. Tirado of Kramer Levin Naftalis & Frankel LLP

   Philip A. Rovner and Jonathan A. Choa of Potter Anderson & Corroon LLP

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

   None.

6. All information required by Fed. R. App. P. 26.1(b) and (c) in criminal cases and bankruptcy cases.

   None.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF RELATED CASES .....................................................1

COUNTERSTATEMENT OF THE ISSUES.............................................2

INTRODUCTION ..............................................................................2

COUNTERSTATEMENT OF THE CASE................................................3

      A.    Fraunhofer Is A Multi-Billion-Dollar Company, Touting
That Its Customers May Use The Results Of Its Work
For Them ...........................................................................4

      B.    SXM's Predecessor Co-Develops Satellite Radio
Technology Solutions With Fraunhofer And WorldSpace ..................5

      C.    WorldSpace Grants SXM's Predecessor A Sublicense To
The Patents-In-Suit...............................................................5

      D.    SXM's Predecessor Pays Fraunhofer To Help Develop
Its High-Band Satellite Radio System........................................6

      E.    The High-Band System Begins Commercial Operation
And XM And Sirius Subsequently Merge, Resulting In A
Profitable Company...............................................................8

      F.    WorldSpace Declares Bankruptcy And XM Enters Into A
Settlement Agreement With WorldSpace .....................................8

      G.    The MLA Is Deemed "Rejected" During WorldSpace's
Bankruptcy .........................................................................9

      H.    Fraunhofer And SXM Continue A Business-As-Usual
Relationship For Five Years After The MLA Is Deemed
"Rejected" ..........................................................................9

      I.    SXM Makes Significant Business Decisions Between
2010 And 2015 ...................................................................12

i

J.     After Five Years Of Silence, Fraunhofer Notifies SXM That Its Patent Rights Allegedly Terminated Years Earlier .................................................................................14

K.     Six Years Of Litigation Follow Fraunhofer's Filing Of This Lawsuit ............................................................15

L.     The Parties Both Move For Summary Judgment On Equitable Estoppel ................................................17

SUMMARY OF ARGUMENT .............................................................18

STANDARD OF REVIEW ....................................................................21

ARGUMENT .........................................................................................22

I.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY FINDING THAT EQUITABLE ESTOPPEL BARS FRAUNHOFER'S CLAIMS ........................22

A.     The District Court Did Not Abuse Its Discretion By Concluding That Fraunhofer Misled SXM .........................23

1.     Fraunhofer's Silence And Affirmative Conduct Between 2010 And 2015 Misled SXM Into Believing SXM Had Permission To Continue To Use The High-Band System.....................................23

2.     Fraunhofer's Counterarguments Lack Merit ...........................26

a.     The Undisputed Record Supports The District Court's Conclusion, Whether Viewing The Evidence In Its Entirety Or In Isolation ........................................26

b.     Fraunhofer Ignores The Law Confirming That Its  Continued Silence Reinforcing The Misleading Inference Warrants Equitable Estoppel ........................................30

      c.     Fraunhofer's Unsupported And Unreasonable "Alternative" Inferences Cannot Avoid The Only Inference From Fraunhofer's Silence And Conduct: That Fraunhofer Did Not Object To SXM's Continued Use Of The Allegedly-Infringing System.....................................................33

      d.     Fraunhofer Mischaracterizes The Order As Relying On Laches And Mischaracterizes The Order's Reference To The Settlement....................37

B.    The District Court Did Not Abuse Its Discretion By Concluding SXM Relied On Fraunhofer's Misleading Silence and Conduct...........................................................38

    1.     Fraunhofer Seeks To Apply An Erroneously High Burden Of Proof Contravening This Court's Precedents ....................................................40

    2.     The Low-Band System Was A Viable Alternative..................42

    3.     Fraunhofer's Speculation That SXM Would Have Migrated To The High-Band System Even If Fraunhofer Raised Infringement Does Not Raise Material Issues Of Fact ............................................43

    4.     There Is No Material Dispute About When SXM Decided To Migrate To The High-Band System....................47

C.    The District Court Did Not Abuse Its Discretion By Concluding SXM Was Prejudiced .......................................48

D.    The FFPC Does Not Bar Equitable Estoppel.......................51

E.    Fraunhofer's Cross-Motion On Equitable Estoppel Should Not Be Granted ........................................................56

F.    The Court Should Not Remand The Case To Consider Fraunhofer's Alternative Sublicense Termination Dates....................59

    1.     Fraunhofer Forfeited Its Remand Arguments..........................59

iii

2.    Equitable Estoppel Applies Even Assuming Fraunhofer's Alternative Arguments That The Sublicense Terminated In 2015 Or 2011 ..................................61

     a.    The Order's Equitable Estoppel Ruling Applies To Fraunhofer's Argument That It Terminated The Sublicense In 2015 .............................62

     b.    The Order's Equitable Estoppel Ruling Applies To Fraunhofer's Argument That The Sublicense Did Not Pass To SXM In The 2011 Merger .............................................63

3.    The Merits Of Fraunhofer's Merger "Theory Of Liability" Are Not Before This Court .......................................64

II.    THE DISTRICT COURT'S NON-FINAL DISCOVERY ORDER IS NOT PROPERLY BEFORE THE COURT AND IN ANY CASE IS CORRECT ....................................................66

CONCLUSION ....................................................................68

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) ......................................................................*passim*

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
  52 F.3d 1062 (Fed. Cir. 1995) ......................................................................*passim*

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
  828 F. Supp. 1386 (E.D. Wis. 1993) ...................................................................45

*Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*,
  605 F.3d 1305 (Fed. Cir. 2010) .................................................................*passim*

*Atlas Corp. v. United States*,
  895 F.2d 745 (Fed. Cir. 1990) ..............................................................53, 54, 55

*B. Braun Medical, Inc. v. Abbott Lab'ys*,
  124 F.3d 1419 (Fed. Cir. 1997) .........................................................................31

*Endo Pharms. Inc. v. Actavis, Inc.*,
  746 F.3d 1371 (Fed. Cir. 2014) .................................................. 53 & n.10, 54, 55

*Fin Control Sys. Pty, Ltd. v. OAM, Inc.*,
  265 F.3d 1311 (Fed. Cir. 2001) .........................................................................61

*Fraunhofer-Gesellschaft zur Förderung der angewandten
  Forschung e.V. v. Sirius XM Radio Inc.*,
  940 F.3d 1372 (Fed. Cir. 2019) ..................................................................15, 16

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
  582 F.3d 1288 (Fed. Cir. 2009) ..................................................................48, 60

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,
  60 F.3d 770 (Fed. Cir. 1995) ........................................................... 41 & n.8, 45

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
  527 F.3d 1318 (Fed. Cir. 2008) ..................................................................33, 60

*Hall v. Aqua Queen Mfg., Inc.*,
   93 F.3d 1548 (Fed. Cir. 1996) ........................................................ 41 & n.8, 45

*Hemstreet v. Computer Entry Sys. Corp.*,
   972 F.2d 1290 (Fed. Cir. 1992) ...........................................................32, 44 n.9

*High Point SARL v. Sprint Nextel Corp.*,
   817 F.3d 1325 (Fed. Cir. 2016) ...................................................................*passim*

*High Point SARL v. Sprint Nextel Corp.*,
   67 F. Supp. 3d 1294 (D. Kan. 2014) ......................................................46, 47

*High Point SARL v. T-Mobile USA, Inc.*,
   53 F. Supp. 3d 797 (D.N.J. 2014) ...............................................................42

*Mass. Inst. of Tech. v. Abacus Software*,
   462 F.3d 1344 (Fed. Cir. 2006) .................................................................66

*Meyers v. Asics Corp.*,
   974 F.2d 1304 (Fed. Cir. 1992) ........................................................ 41 & n.8, 45

*In re MTBE Prods. Liab. Litig.*,
   2014 WL 494522 (S.D.N.Y. Feb. 6, 2014) ..............................................65, 66

*Orion Tech., Inc. v. United States*,
   704 F.3d 1344 (Fed. Cir. 2013) .................................................................21

*Peter v. United States*,
   6 Cl. Ct. 768 (1984) ....................................................................................52

*Radio Sys. Corp. v. Lalor*,
   2012 WL 254026 (W.D. Wash. Jan. 26, 2012) .................................................45

*Radio Sys. Corp. v. Lalor*,
   709 F.3d 1124 (Fed. Cir. 2013) ...................................................38, 50, 51, 63

*In re Regents of University of California*,
   101 F.3d 1386 (Fed. Cir. 1996) .................................................................67

*Ricoh Co. v. Nashua Corp.*,
   1999 WL 88969 (Fed. Cir. Feb. 18, 1999) ...................................................63

*Rockies Exp. Pipeline LLC v. Salazar*,
730 F.3d 1330 (Fed. Cir. 2013) ............................................................61

*SCA Hygiene Prods. v. First Quality Baby Prods.*,
767 F.3d 1339 (Fed. Cir. 2014) ....................................................*passim*

*Scholle Corp. v. Blackhawk Molding Co.*,
133 F.3d 1469 (Fed. Cir. 1998) .....................................21, 22, 25, 52

*Semcon Tech, LLC v. Micron Tech., Inc.*,
660 F. App'x 908 (Fed. Cir. 2016) ..............................................56, 57

*Spence v. City of Philadelphia*,
147 F. App'x 289 (3d Cir. 2005) ..................................................60, 66

*Sprint Commc'ns Co. v. Time Warner Cable, Inc.*,
2017 WL 978107 (D. Kan. Mar. 14, 2017) ....................31 n.6, 45, 46

*Stauffer v. Brooks Bros. Grp., Inc.*,
758 F.3d 1314 (Fed. Cir. 2014) ..................................................48, 60

*Stickle v. Heublein, Inc.*,
716 F.2d 1550 (Fed. Cir. 1983) ..................................................31, 56

*TC Tech. LLC v. Sprint Corp.*,
2018 WL 6584122 (D. Del. Dec. 13, 2018) ........................ 67 & n.12

*Thomas v. Dep't of Housing & Urban Dev.*,
124 F.3d 1439 (Fed. Cir. 1997) .........................................................55

*Tindle v. Pulte Home Corp.*,
607 F.3d 494 (7th Cir. 2010) .............................................................33

*Wafer Shave, Inc. v. Gillette Co.*,
857 F. Supp. 112 (D. Mass. 1993) ................................................38 n.7

*Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*,
103 F.3d 1571 (Fed. Cir. 1997) ..................................................28, 56

*In re Weinstein Co. Holdings LLC*,
997 F.3d 497 (3d Cir. 2021) ..............................................................33

vii

**Statutes & Rules**

Fed. R. Civ. P. 26(e)(1)...........................................................................65

**Other Authorities**

17 C.J.S. Contracts § 16.........................................................................54

## **STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, Sirius XM Radio Inc. ("SXM") hereby identifies the following related cases.

This case was previously before this Court in Appeal No. 2018-2400, in which the Court issued an opinion on October 17, 2019, pertaining to SXM's motion to dismiss Fraunhofer's original complaint in the underlying litigation before the U.S. District Court for the District of Delaware.

On September 7, 2021, this Court issued an opinion in Appeal No. 20-2319 relating to an IPR proceeding pertaining to one of the patents-in-suit in the underlying litigation. On March 22, 2022, this Court issued an order in the Petition for Writ of Mandamus No. 22-125 pertaining to a discovery order in the underlying litigation.

The United States Court of Appeals for the District of Columbia Circuit also issued an opinion in Appeal No. 22-7001 on February 17, 2023, relating to a miscellaneous third-party discovery matter before the District Court for the District of Columbia pertaining to the underlying litigation.

No other cases are related to or may be directly affected by the Court's decision in this appeal.

## COUNTERSTATEMENT OF THE ISSUES

Did the district court abuse its discretion by granting summary judgment to SXM based on equitable estoppel?

## INTRODUCTION

The district court did not abuse its discretion by finding "this patent-infringement complaint equitably estopped." Appx1. Indeed, if ever there was a case for equitable estoppel, this is it. It presents an even more compelling case for equitable estoppel than *High Point* and other cases in which this Court has affirmed equitable estoppel on summary judgment.

The material facts are not in dispute. Fraunhofer helped build a satellite radio system for SXM, a known sublicensee, and even alleges it "built the infringing aspects" of that system. In its Order, the district court "assume[d] Fraunhofer's view: that SXM has been using Fraunhofer's patented technology without license" since 2010. Although Fraunhofer knew SXM was using the high-band system after SXM purportedly became unlicensed, Fraunhofer continued to have extensive business contacts with SXM and said nothing about SXM's alleged infringement for more than five years. SXM relied to its detriment on Fraunhofer's misleading silence and conduct. Among other things, SXM migrated its core satellite radio business, and drove carmakers and millions of subscribers, to the allegedly-infringing high-band system instead of an indisputably non-infringing alternative system.

2

Fraunhofer does not meaningfully grapple with the undisputed evidence supporting equitable estoppel. Instead, Fraunhofer distorts the record, presents speculative inferences without evidentiary support, raises new and unpreserved arguments, misapplies the law, and attempts to re-write the Order to create error where none exists.

The introduction to Fraunhofer's brief is emblematic of its tactics. Contrary to Fraunhofer's insinuations, Fraunhofer had ample opportunity to argue equitable estoppel in response to SXM's motion as well as in its own summary judgment motion on that defense. Its suggestion that the district did not follow this Court's prior decision to determine if SXM had an express license ignores that the district court assumed *Fraunhofer's view* that SXM lost its license in 2010. And Fraunhofer incorrectly contends the district court found an implied license. In fact, the district court only noted, as this Court has done, that equitable estoppel *effectively* grants a license.

For the reasons explained below, SXM requests that this Court affirm the Order and put an end to Fraunhofer's misguided infringement action.

## COUNTERSTATEMENT OF THE CASE

Fraunhofer's Statement of the Case fails to provide the complete and accurate context in which Fraunhofer did not raise infringement for five years after SXM allegedly became unlicensed in 2010. Fraunhofer said nothing even though it:

(i) allegedly built the patents-in-suit into SXM's high-band system; (ii) knew SXM was using the patents-in-suit in that system; (iii) continued an extensive business-as-usual relationship with SXM; and (iv) knew SXM had taken multiple steps to shore up permission to use the patents-in-suit. To its detriment, SXM made numerous, critical business decisions while lulled into a sense of security by Fraunhofer's misleading silence and conduct.

### A. Fraunhofer Is A Multi-Billion-Dollar Company, Touting That Its Customers May Use The Results Of Its Work For Them

Fraunhofer is a German research organization that offers applied technology research to companies as a fee-based service. Appx434. Fraunhofer is not a typical non-profit entity. It generated $1.9 billion in revenue through contract research alone in 2010—the year SXM allegedly became unlicensed. Appx3580.

In Fraunhofer's own words, its "[c]ustomers . . . receive the rights they need to use the inventions, intellectual property rights and know-how generated by Fraunhofer in the course of the project." Appx6009. As Albert Heuberger, Director of the Fraunhofer Institute for Integrated Circuits, put it, Fraunhofer's customers "rightly expect to be able to use the results [of Fraunhofer's work] in their business or application." Appx3346. No one would retain Fraunhofer if they could not actually obtain the benefit of that work.

**B.     SXM's Predecessor Co-Develops Satellite Radio Technology Solutions With Fraunhofer And WorldSpace**

In the late 1990s, Fraunhofer collaborated with American Mobile Radio Corporation ("AMRC"), a predecessor to XM Satellite Radio Inc. ("XM"), and with WorldSpace, Inc., a principal founding shareholder of AMRC, to develop satellite radio technology. Appx3289. In 1996, WorldSpace entered into a Frame Agreement with Fraunhofer to develop certain technology for a satellite radio system in Africa. Appx3289-3290. By the fall of 1997, AMRC had pursued a satellite radio business in North America by obtaining an FCC license for radio spectrum that came to be known as "high-band." Appx4442. After AMRC teamed up with Fraunhofer and WorldSpace, the three companies met repeatedly to discuss their collective efforts on WorldSpace's and AMRC's satellite radio systems. Appx5894-6005.

**C.     WorldSpace Grants SXM's Predecessor A Sublicense To The Patents-In-Suit**

In connection with these efforts, Fraunhofer and WorldSpace entered into a Master License Agreement ("MLA") on March 4, 1998 that granted WorldSpace a "worldwide, exclusive, irrevocable license" to the patents-in-suit as well as a "right to sublicense" those patents. Appx1627-1636.[1]

---

[1] The MLA granted an exclusive license to Multi-Carrier Modulation ("MCM") patents. SXM assumed for purposes of summary judgment that the MCM patents include all the patents-in-suit. Appx1454.

5

On July 24, 1998, AMRC and WorldSpace entered into a Technology License Agreement ("TLA" or "Sublicense"), granting AMRC a sublicense to the patents-in-suit. Appx1638-1652. On June 6, 1999, after AMRC changed its name to XM, Appx4636, WorldSpace and XM amended the TLA to specify that XM's Sublicense was "irrevocable." Appx1655. The amended TLA further provided that, even if XM breached the agreement, "XM's irrevocable right to use the technology licensed thereunder shall not be terminated." Appx1656. XM publicly filed the TLA and its amendment with the SEC in August 1999. Appx6215-6229.

### D.    SXM's Predecessor Pays Fraunhofer To Help Develop Its High-Band Satellite Radio System

On July 16, 1999, XM and Fraunhofer directly entered into a Firm Fixed Price Contract ("FFPC"), under which XM agreed to pay Fraunhofer millions of dollars to help develop XM's high-band system. Appx1660-1708, Appx1700-1705.

According to Fraunhofer, it "built the infringing aspects" of that system under the FFPC by incorporating the four patents-in-suit. Appx441. Fraunhofer's Mr. Heuberger testified that "[t]he expectation at the time was that we negotiated and signed the [FFPC] together with which *XM radio would be able to use the results of work performed for them by Fraunhofer*." Appx6212-6213, *see also* Appx4368.[2]

---

[2] In this brief, all emphasis to quoted material has been added and all internal quotes and citations removed, except where otherwise noted.

Section 10.2(a) of the FFPC granted XM and its successors a license to computer code developed for the high-band system under the contract and to patents for inventions "performed or developed" in connection with such code. Appx1664. Fraunhofer alleges this code cannot be used without practicing the patents-in-suit. Appx441.

Section 10.5 granted XM and its successors a license to "FhG Background IP," defined as "the intellectual property listed in Exhibit D." Appx1666. Exhibit D listed the patents-in-suit and also included "all other" Fraunhofer intellectual property "necessary for [Fraunhofer] to fulfill its obligations under the [FFPC]." Appx1707. Fraunhofer alleges the patents-in-suit were required for Fraunhofer to perform the FFPC. Appx441.

Exhibit D noted that certain listed "patents related to MCM technology are exclusively licensed to WorldSpace" and "XM Radio will be in charge to obtain a license for these patents from WorldSpace." Appx1707. XM had, in fact, already obtained the Sublicense from WorldSpace, and Fraunhofer assumed XM had done so. Appx6207. The FFPC provided that the body of the contract would take precedence over exhibits in the event of a conflict or inconsistency. Appx1669.[3]

---

[3] Fraunhofer claims the FFPC did not grant SXM a license to the patents-in-suit. SXM disputes this but assumed it is correct (as did the district court) for purposes of SXM's equitable estoppel motion. Appx1468, Appx2.

7

**E.    The High-Band System Begins Commercial Operation And XM And Sirius Subsequently Merge, Resulting In A Profitable Company**

XM commenced commercial operation of its high-band system in September 2001. Appx3293. Meanwhile, Sirius Satellite Radio Inc. ("Sirius"), then a separate company, contemporaneously developed another satellite radio system based on an FCC license to "low-band" frequencies. Sirius commenced commercial operation in February 2002. Appx3296.

For every year through 2008, XM and Sirius each suffered operating losses. Appx3573. The two companies merged in July 2008, with XM becoming a wholly-owned subsidiary of Sirius. Appx3298, Appx4767. Sirius then changed its name to SXM. Appx4767. In January 2011, XM merged into SXM. Appx5186. In 2009, the newly merged SXM earned $228 million, its first annual operating profit, leading to profits of $465 million in 2010 and then more than $1 billion by 2013. Appx3573.

**F.    WorldSpace Declares Bankruptcy And XM Enters Into A Settlement Agreement With WorldSpace**

WorldSpace filed for Chapter 11 bankruptcy in 2008. On June 10, 2009, XM and WorldSpace entered into a settlement agreement ("Settlement") in which the parties agreed to continue the Sublicense. Appx1711-1713. After WorldSpace publicly moved, with notice to Fraunhofer, for bankruptcy court approval of the Settlement on June 18, 2009, Appx1715-1723, Fraunhofer did not object. The bankruptcy court approved the Settlement on July 14, 2009. Appx1725-1726.

8

Fraunhofer knew the written terms of the Sublicense at the latest when it was disclosed in WorldSpace's bankruptcy. Appx6207.

### G. The MLA Is Deemed "Rejected" During WorldSpace's Bankruptcy

On May 19, 2010, WorldSpace sought bankruptcy court approval for an agreement to sell substantially all of its assets to Yazmi USA LLC ("Yazmi"). Appx1728-1750. The sale agreement identified the MLA as an "Excluded Contract" not to be sold or assigned to Yazmi. Appx1754, Appx1760. At the hearing to approve the sale, Fraunhofer, WorldSpace, and Yazmi announced, without prior notice to SXM or anyone else, that they had separately agreed the MLA would be assumed and assigned to Yazmi if Fraunhofer and Yazmi reached a business arrangement within 90 days; but, without such arrangement, the MLA would be "deemed rejected." Appx1765-1766, Appx1769-1770. The bankruptcy court orally approved this agreed resolution. Appx1767. The MLA was then deemed "rejected" when no business arrangement was reached. Fraunhofer nonetheless alleges the MLA and Sublicense "terminated" at that time. Appx443-444, Br.10.

### H. Fraunhofer And SXM Continue A Business-As-Usual Relationship For Five Years After The MLA Is Deemed "Rejected"

In the five years after the MLA's rejection, Fraunhofer and SXM continued a business-as-usual relationship, working on ongoing engagements and exploring new business.

Among other things, the parties continued work relating to the high-band system. For example, after 2010, SXM had "ongoing engagements" with Fraunhofer concerning "audio technology." Appx4155. Fraunhofer also continued pre-existing projects after 2010 like "finalizing the hierarchical decoder" for use with the high-band system. Appx4380, Appx4153. In August 2014, Fraunhofer assisted SXM in obtaining license rights to a "Turbo Interleaver" in connection with "overlay development" of the high-band system for which Fraunhofer charged SXM €120,000 under the FFPC. Appx2350, Appx4165, Appx4178.

Fraunhofer tries to downplay the importance of its numerous meetings and communications with SXM after 2010 by labeling them "friendly contacts." Br.11. But, as the examples below show, these undisputed interactions reflected ordinary business contacts and were not just friendly banter.

- SXM's VP Paul Krayeski continued to meet with Fraunhofer in Germany four times a year through 2012; those meetings "tapered off" after 2012 but did not cease. Appx4155.

- In August 2012, Fraunhofer and SXM explored whether Fraunhofer's "backchannel link" technology could be "implemented as an overlay on [SXM's] existing [high-band] system." Appx6023-6024.

10

- In October 2012, Fraunhofer and SXM planned to gather executives to explore "[a]reas of [s]ynergy" between the two companies. Appx6030, Appx2338-2341.

- In May 2013, Fraunhofer executive Michael Schlicht, who had worked with SXM and XM since 1999, approached SXM to discuss new business opportunities in connection with "our further sat[ellite] and terr[estrial] activities." Appx6051.

Fraunhofer and SXM also continued to discuss invoices and payment requests, including in connection with Fraunhofer's work on the high-band system. Appx6016, Appx6033.

Fraunhofer and SXM even negotiated an entirely new amendment to the FFPC in February 2013—years after Fraunhofer alleges SXM became unlicensed. Appx1796-1797, Appx6042-6049. The 2013 FFPC Amendment confirmed SXM had accepted delivery of work under the FFPC, resolved outstanding payments thereunder, and confirmed all other terms of the FFPC were in "full force and effect." Appx1797.

Throughout this period, from 2010 to 2015, SXM knew from the parties' close interactions that Fraunhofer was aware SXM was using the high-band system. *E.g.*, Appx6023-6024, Appx2350. SXM also publicly disclosed its use of the system in

11

SEC filings. Appx5068, Appx5277, Appx5384. And, of course, Fraunhofer had helped build the high-band system precisely so SXM could use it.

Fraunhofer was so "proud of the XM system" it had helped build that, in its 2011 annual report, Fraunhofer publicly touted the "successful Sirius XM satellite radio system" as an example of Fraunhofer's work. Appx6104, Appx4022. Similarly, in August 2012, Fraunhofer invited SXM's Chief Technology Officer to speak at a conference hosted by Fraunhofer because the high-band system "was a commercial success," making it "a good reference" for Fraunhofer. Appx4021-4022.

Notably, Fraunhofer admitted at deposition that it "knew" SXM was "using our patents" after 2010. Appx4022. One Fraunhofer executive even testified that, in 2012, he had asked "internally" whether and how SXM had rights to the patents. Appx4019-4020. According to Fraunhofer, it "carr[ies] out in regular intervals" "inspection of our Fraunhofer IPR portfolio." Appx1800.

Fraunhofer thus conducted business-as-usual while knowing that SXM was allegedly using the patents-in-suit and, as noted above, that SXM had taken steps to shore up permission to use those patents. Yet it is undisputed that Fraunhofer never said anything to SXM about alleged infringement during the entire five-year period.

## I.     SXM Makes Significant Business Decisions Between 2010 And 2015

SXM made a number of significant business decisions between 2010 and 2015. By 2010, SXM had conducted a thorough analysis to determine whether to migrate

its satellite radio business to XM's high-band system or Sirius's low-band system. SXM determined the two systems were "equivalent" on the consumer, cost, and technical levels, and concluded "it was easier to move the 35 percent [low-band installations by carmaker] to the 65 percent [high-band installations by carmaker] than the reverse." Appx4386, Appx4156-4158.

The migration took ten years, until 2020, to complete. Appx4359, Appx4362, Appx4148. The shift did not gain momentum until 2013, when high-band installations rose to 59.5% of total new installations (up from 55.3%, 53.7%, and 55.3% in the prior three years). Appx6807. By 2014 and 2015, that percentage rose to 64.5% and 69%, respectively. Appx6807.

SXM also significantly expanded its total high-band business from 2010 to 2015, adding millions of installations and subscribers each year. Appx6807, Appx6809. Fraunhofer does not dispute that SXM incurred costs developing, migrating to, and expanding its business on the high-band system.

At the same time SXM was migrating to the high-band system, it stopped improving and marketing the non-infringing low-band system because "[t]he company made a choice to focus all of the development and marketing efforts behind the high-band system." Appx1841.

**J.     After Five Years Of Silence, Fraunhofer Notifies SXM That Its Patent Rights Allegedly Terminated Years Earlier**

Notwithstanding the parties' long-standing business relationship, including Fraunhofer's work helping build the high-band system since the late 1990s and its extensive post-2010 interactions with SXM, Fraunhofer never raised any issue concerning SXM's rights to use the patents-in-issue until, possibly, July 30, 2015. Even then, Fraunhofer merely sent SXM a one-page letter by regular mail not addressed to any particular individual. Fraunhofer did this despite explicitly acknowledging in the letter the "long term relationship between our companies," which included work with specific SXM executives for whom Fraunhofer had direct contact information. Appx1800.

The letter only cryptically asserted that Fraunhofer had "detected an issue regarding specific patent families, which we deem of relevance for SiriusXM," claiming "[t]he situation" arose from WorldSpace's bankruptcy. Appx1800. On September 23, 2015, Fraunhofer finally forwarded a copy of the letter to a specific individual at SXM, but Fraunhofer only first hinted that SXM was infringing in an email sent on October 1, 2015. Appx1799, Appx1802.

Over the following month, counsel for SXM and Fraunhofer discussed Fraunhofer's newly revealed position that the Sublicense had terminated more than five years earlier when the MLA was rejected in 2010. Appx1805-1809. Those

14

discussions culminated on November 4, 2015, when Fraunhofer told SXM that it would commence an adversary proceeding to ask the bankruptcy court to confirm that the Sublicense had terminated. Appx1809. Fraunhofer never filed such a proceeding. Instead, on November 13, 2015, Fraunhofer sent a letter to WorldSpace's bankruptcy trustee purporting to "terminate[ ]" the MLA, but did not copy SXM. Appx1812. After Fraunhofer stated it would commence an adversary proceeding, SXM did not hear from Fraunhofer again until Fraunhofer filed this action fifteen months later in February 2017. SXM first learned of the November 13, 2015 letter during motion practice in this case. Appx307.

### K. Six Years Of Litigation Follow Fraunhofer's Filing Of This Lawsuit

Fraunhofer's initial complaint, filed on February 22, 2017, alleged that SXM had lost its license rights in 2010 when the MLA was "rejected." Appx173-174. The district court dismissed the action based on the Sublicense but this Court vacated the judgment. The Court held that "WorldSpace's rejection of the [MLA] in bankruptcy did not unilaterally terminate the [MLA]" and "[t]herefore, WorldSpace's rejection does not 'terminate the contract' or 'vaporize[]' SXM's rights." *Fraunhofer v. SXM*, 940 F.3d 1372, 1378 (Fed. Cir. 2019). However, the Court allowed Fraunhofer to proceed on other theories and directed the parties to conduct discovery on whether the Sublicense survived any termination of the MLA. *Id.* at 1379-82. The Court also

noted the importance of considering on remand whether Fraunhofer had given "notice within a reasonable time." *Id.* at 1379.[4]

On remand, Fraunhofer filed an amended complaint and discovery proceeded for more than three years. During that time, the parties' interrogatory responses disclosed their positions on SXM's license defenses and SXM's ongoing rights to use the patents-in-suit, including based on equitable estoppel. Appx5735-5750, Appx5764-5773, Appx2930-2932, Appx5794-5807, Appx2968-2981. However, Fraunhofer never asserted that the Sublicense had terminated when XM merged into SXM in January 2011 even though SXM's interrogatories asked Fraunhofer to provide a "complete response" to SXM's license defenses. Appx5755, Appx5764-5773. Fraunhofer merely stated that "SXM is also not a signatory to the Sublicense," but said nothing about Fraunhofer's current argument that the Sublicense was not "transferred" to SXM in the 2011 merger. Appx2931. Fraunhofer raised its merger argument for the first time on summary judgment in 2023. Appx1479-1480, Appx1492.

---

[4] Fraunhofer alleged below that the MLA and the Sublicense terminated in 2010 because Fraunhofer and WorldSpace terminated the MLA by *mutual* agreement. The Court need not reach this issue, since, for purposes of SXM's equitable estoppel motion, it was assumed the Sublicense terminated in 2010.

**L.    The Parties Both Move For Summary Judgment On Equitable Estoppel**

On April 4, 2023, six months before trial, the parties filed thirteen summary judgment motions. SXM and Fraunhofer both moved for summary judgment on equitable estoppel. Appx1468 (SXM's Motion), Appx1521 ("Plaintiff Fraunhofer's Motion For Summary Judgment No. 3: Defendant Sirius XM Radio Inc. Is Not Licensed Under The FFPC; Does Not Have An Implied License; And Other Affirmative Equitable Defenses Fail As A Matter Of Law"). The parties fully briefed the defense. Appx1468-1470, Appx5709-5710, Appx6483-6484, Appx1540-1541, Appx1544-1545, Appx5615-5616, Appx5624-5630, Appx6528-6530. SXM's motion expressly assumed it became unlicensed in 2010 for purposes of equitable estoppel. Appx1468-1469. Fraunhofer did not dispute this assumption in its opposition or its own motion. Appx5709-5710, Appx1540-1541, Appx1544-1545, Appx6528-6530.

On July 10, 2023, the district court found Fraunhofer's "patent-infringement complaint equitably estopped." Appx1. The district court first "assume[d] Fraunhofer's view" that (1) Fraunhofer terminated the MLA and Sublicense in 2010, (2) SXM lost license rights due to the XM-SXM merger in 2011, and (3) SXM has no rights to the patents-in-suit under the FFPC. Appx2-3. The court then found the undisputed record supports all three equitable estoppel elements and exercised its

discretion to conclude that: Fraunhofer misled SXM; SXM relied on Fraunhofer's misleading silence and conduct; and SXM was prejudiced by its reliance. Appx2-8.

On July 24, 2023, the district court approved a stipulation by the parties providing that any motion for attorneys' fees or costs and/or "reassertion of Defendant's motion for sanctions pursuant to Fed. R. Civ. P. 37, 28 U.S.C. § 1927, or Local Rule 1.3," must be filed within fourteen days after this Court issues its mandate. Stipulation, *Fraunhofer v. SXM*, Case No. 1:17-cv-00184 (D. Del. July 24, 2023), D.I. 820; *see also* Memorandum and Order, *Fraunhofer v. SXM*, Case No. 1:17-cv-00184 (D. Del. Nov. 29, 2022), D.I. 616. Fraunhofer filed a notice of appeal on August 4, 2023.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion by granting summary judgment. The court assumed Fraunhofer's view that SXM's license terminated in 2010, reviewed the undisputed record, drew all reasonable inferences in Fraunhofer's favor, and properly found Fraunhofer's "patent-infringement complaint equitably estopped." Appx1. All three equitable estoppel elements were met.

Fraunhofer's silence and conduct misled SXM. Fraunhofer helped develop SXM's allegedly-infringing high-band system. After SXM allegedly became unlicensed in 2010, Fraunhofer knew SXM was using that system yet continued to do extensive business with SXM and said nothing about infringement for more than

five years. The only reasonable inference from these undisputed facts is that SXM had permission to use the system. Despite multiple motions below, Fraunhofer now presents new and unpreserved arguments that "alternative" inferences could be drawn. Nevertheless, those inferences are unreasonable and not supported by any evidence.

SXM relied on Fraunhofer's misleading silence and conduct. Fraunhofer lulled SXM into a false sense of security. This led SXM to, among other things, expand and migrate its satellite radio business to the allegedly-infringing high-band system, instead of the non-infringing low-band system. Fraunhofer's appellate arguments demand levels of proof that are not required under controlling precedent and that would make equitable estoppel impossible in circumstances where, as here, the patentee never raised infringement, including while the alleged infringer was making critical decisions and taking business-altering actions.

And SXM's prejudice from Fraunhofer's misleading silence and conduct was undisputed. Fraunhofer forfeited any arguments challenging prejudice by not raising them below. But prejudice is amply shown by, among other things, SXM's expansion and migration to the high-band system in reliance on Fraunhofer's misleading silence and conduct.

Fraunhofer's last-ditch arguments all fail. First, the FFPC does not bar equitable estoppel. If, as Fraunhofer assumes for Point I.D of its brief, SXM proved

"all three of the equitable estoppel elements," then there are no "additional requirements" needed for the Court to affirm. Likewise, Fraunhofer's attempt to change the district court's equitable estoppel determination into one finding an implied license should be rejected. The district court did not find an implied license but only stated, consistent with *High Point*, that equitable estoppel has *the effect* of a license. Nevertheless, even under an implied-license theory, there would be no contradiction with the FFPC, which contemplated SXM would have licenses so Fraunhofer could do its work under the contract and SXM could "use the results."

Second, the district court should not be directed to grant Fraunhofer's cross-motion for summary judgment. The denial of Fraunhofer's motion is not on appeal, and the district court should be the first to decide that motion.

Third, Fraunhofer forfeited the arguments underlying its request to remand the case to consider Fraunhofer's alternative 2011 and 2015 Sublicense termination dates. Fraunhofer never argued below that if the district court found or assumed the Sublicense terminated in 2010 and that resulted in equitable estoppel, then Fraunhofer would abandon the 2010 termination date or the court should assume the Sublicense terminated in 2011 or 2015. In any event, there is no basis to remand because the Order's equitable estoppel ruling applies even if the Sublicense terminated in 2011 or 2015.

Finally, the discovery order Fraunhofer challenges is unrelated to the final judgment and thus not appealable. Even so, the district court adopted no "bright-line" common interest rules. The court merely exercised its discretion to affirm the magistrate judge's factual findings that, at the time of the communications, 6-8 months before Fraunhofer and IPXI entered into a license agreement, the "prospect" of a common legal interest was "remote, contingent and uncertain."

## STANDARD OF REVIEW

The Court "review[s] for abuse of discretion decisions on equitable estoppel rendered on summary judgment unless genuine issues of material fact preclude summary judgment." *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1328 (Fed. Cir. 2016). The Court thus "initially review[s] de novo whether the district court erred in finding the existence of no genuine issue of material fact. The district court's finding of equitable estoppel is then reviewed under an abuse of discretion standard." *Scholle Corp. v. Blackhawk Molding Co.*, 133 F.3d 1469, 1471 (Fed. Cir. 1998). The abuse-of-discretion standard applies both to the overall applicability of equitable estoppel and the district court's conclusions as to each element of the doctrine. *See ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1064 (Fed. Cir. 1995) ("The trial court's finding of misleading action was not an abuse of discretion."). The Court can affirm "upon any ground supported by the record." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1350 (Fed. Cir. 2013).

21

# **ARGUMENT**

## I.    **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY FINDING THAT EQUITABLE ESTOPPEL BARS FRAUNHOFER'S CLAIMS**

Equitable estoppel "serve[s] as an absolute bar to a patentee's claim of infringement." *Scholle*, 133 F.3d at 1471. Thus, "[t]he effect of equitable estoppel is a license to use the invention that extends throughout the life of the patent." *High Point*, 817 F.3d at 1331.

"Three elements must be established for equitable estoppel to bar a patentee's suit: (1) the patentee, through misleading conduct (or silence), leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim." *Id.* at 1330. However, equitable estoppel is "not a matter of precise formula," *id.*, and is "not limited to a particular factual situation nor subject to resolution by simple or hard and fast rules." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992).

An accused infringer must establish the equitable estoppel elements only by a "preponderance of evidence." *SCA Hygiene Prods. v. First Quality Baby Prods.*, 767 F.3d 1339, 1343 (Fed. Cir. 2014). Here, the district court properly exercised its discretion to find "this patent-infringement complaint equitably estopped." Appx1.

22

### A.     The District Court Did Not Abuse Its Discretion By Concluding That Fraunhofer Misled SXM

The district court correctly concluded that Fraunhofer's "undisputed and misleading silence-plus-more very reasonably implied approval of SXM's now-allegedly infringing activity." Appx5.

### 1.     Fraunhofer's Silence And Affirmative Conduct Between 2010 And 2015 Misled SXM Into Believing SXM Had Permission To Continue To Use The High-Band System

The facts establishing Fraunhofer's misleading silence and conduct are undisputed:

- From 1998 to at least 2010, Fraunhofer helped develop SXM's allegedly-infringing system and, Fraunhofer claims, even "built the infringing aspects" of that system under the FFPC. Appx3, Appx441, Appx4155, Appx1660-1708.

- SXM was known to Fraunhofer as a sublicensee allegedly using its patents. Appx3. The FFPC contemplated that SXM would obtain a sublicense, Fraunhofer assumed SXM had done so, and Fraunhofer knew the terms of that sublicense by 2010. Appx1707, Appx6207.

- Fraunhofer asserts SXM's Sublicense terminated in 2010 when the MLA was rejected in bankruptcy. Appx443-Appx444, Br.10.

23

- For the next *five years*, Fraunhofer and SXM "continued an otherwise ordinary business relationship." Appx4. The parties:

  o had extensive "ongoing engagements" concerning "audio technology," Appx4155, Appx4380;

  o explored new business together, Appx6023-6024, Appx6051;

  o had meetings and exchanged correspondence, Appx4155;

  o discussed payments to Fraunhofer for work developing the high-band system, Appx6016-6017, Appx6033-6035; and

  o negotiated and executed an FFPC amendment that confirmed SXM had accepted delivery of work under the FFPC, resolved outstanding payments thereunder, and confirmed all other terms of the FFPC were in full force and effect, including terms directly granting licenses to SXM. Appx1796-1797, Appx6042-6049.

- All the while, SXM knew from its close interactions with Fraunhofer that Fraunhofer was aware SXM was using the allegedly-infringing system to provide satellite radio to customers—SXM's core business—just as Fraunhofer had helped build it to do. Appx6023-6024, *see also* Appx6104, Appx4021-4022. SXM also publicly disclosed the use of its system and the increase in SXM subscribers over time. Appx5068, Appx5277, Appx5306, Appx5384, Appx5412.

- Despite all this, Fraunhofer said nothing about infringement *until late 2015—more than five years after SXM allegedly became unlicensed*. Appx3-4.

These undisputed facts lead to only one inference: Fraunhofer's silence and conduct "reasonably implied approval of SXM's now-allegedly infringing activity." Appx5.

*High Point*, as the court below observed, "proves illustrative." Appx4. "Sprint and High Point's patent-owning predecessors had collaborated since the 1990s, with appropriate licenses. And there too, only after years of known and undisrupted unlicensed activity, High Point sued." Appx4. This Court held such silence misleading because the patentee "helped [Sprint] build [the allegedly-infringing] communications network" but, after Sprint's "activity fell outside the licenses," the patentee and its successor did not raise infringement for "more than six years." *High Point*, 817 F.3d at 1326-31.

"Misleading conduct occurs when the alleged infringer … knows or can reasonably infer that the patentee has known of the allegedly infringing activities for some time." *Id.* at 1330. That indisputably occurred here. And Fraunhofer's lengthy five-year delay strengthens the inference from its silence and conduct. *See Aukerman*, 960 F.2d at 1044 ("[T]he longer the delay, the stronger the inference becomes."); *Scholle*, 133 F.3d at 1472 (estoppel based on three-and-a-half-year silence); *Aspex*

*Eyewear, Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1308 (Fed. Cir. 2010) (three-year silence).

### 2. Fraunhofer's Counterarguments Lack Merit

#### a. The Undisputed Record Supports The District Court's Conclusion, Whether Viewing The Evidence In Its Entirety Or In Isolation

Fraunhofer improperly analyzes the evidence in isolation rather than looking to "the *entirety* of the patent owners' conduct" as required for equitable estoppel. Appx4, citing *High Point*. Fraunhofer's arguments fail nevertheless.

Fraunhofer starts by arguing a strawman, claiming there was no misleading conduct between 1998 to 2010 because XM was licensed in that period. Br.23-25. SXM never argued, and the district court never held, that Fraunhofer's silence before 2010 was misleading.

However, Fraunhofer's *pre*-2010 conduct reinforces the misleading nature of Fraunhofer's *post*-2010 silence and conduct. Given the parties' pre-existing twelve-year relationship and Fraunhofer's claim that it incorporated the patents-in-suit into SXM's system, Fraunhofer would "have been expected" to raise infringement after SXM became unlicensed. Br.24. Fraunhofer's silence and business-as-usual conduct from 2010 to 2015 reasonably gave rise to the inference that Fraunhofer approved SXM's use of the system Fraunhofer helped build. Appx4 (*High Point* "looked to

the *entirety* of the patent owners' conduct during both licensed and unlicensed periods").

Fraunhofer argues the 2013 FFPC Amendment shows "Fraunhofer sought to ensure it had been paid in full for work that Fraunhofer had already performed years ago for XM." Br.25. But Fraunhofer's active pursuit of money from SXM for Fraunhofer's system-related work only reinforces the inference that Fraunhofer would have raised infringement if it objected to SXM's use of that system. That the amendment and its negotiations did not reference the patents and were otherwise "routine" is precisely what made Fraunhofer's conduct misleading. Br.26.

Fraunhofer contends its silence did not convey an unwillingness to enforce the patents-in-suit because it had "substantially completed" work on the allegedly-infringing system "by 2010" and the "vast majority" of SXM's post-2010 interactions were with a "'different organization' at Fraunhofer" on other topics. Br.26. This is a non sequitur.

To begin, there is no "factual dispute" whether Fraunhofer continued to do business with SXM "as usual." Br.32. By "as usual," the district court meant the parties "continued an otherwise ordinary business relationship." Appx4. There is no dispute Fraunhofer did so for five years without raising infringement.

Beyond this, even if development of the high-band system stopped after 2010, that would not explain why Fraunhofer did not raise infringement when it knew

27

SXM was continuing to use that system. And even if SXM's post-2010 interactions were not with Fraunhofer's original systems team (although many were), they were still *with Fraunhofer—as Fraunhofer admits*. Br.11 ("'different organization' *within Fraunhofer*"), Br.26 ("'different organization' *at Fraunhofer*"), Br.28 ("different team *at Fraunhofer*").

In *ABB*, this Court held that a patentee's relationship with an alleged infringer's *parent company* supported inferring from the patentee's silence that it did not intend to enforce its patent. 52 F.3d at 1064. SXM's direct relationship with Fraunhofer—the patentee and plaintiff in this lawsuit—supports the equitable estoppel finding even more strongly.

Furthermore, Fraunhofer's argument is belied by its own admissions and the undisputed evidence. As the district court held, Fraunhofer's silence and conduct were misleading even if Fraunhofer's post-2010 work did not implicate the patents-in-suit. Appx4. But Fraunhofer did more than just keep silent while continuing an ordinary business relationship. Fraunhofer *actively encouraged* SXM's use of the allegedly-infringing system after 2010. *See Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1582 (Fed. Cir. 1997) (Wang's effort to "coax" Mitsubishi into the market, its provision of "designs, suggestions, and samples," and its purchases from Mitsubishi led Mitsubishi to "infer consent" to sell patented products).

Fraunhofer's encouragement, while unnecessary to affirm, cannot be disputed:

- **Fraunhofer admits** it did *some* work on the allegedly-infringing system after 2010. Br.11, Br.26, Br.28 (Fraunhofer had "*substantially*" completed system work by 2010), Br.26 (the parties' communications on system development were "significantly *reduced*" after 2010), Br.28 (post-2010 interactions were "*primarily*" with "different team").

- In 2011 and 2012, Fraunhofer publicly touted the system as a "success" and invited SXM to speak at a conference because the system was a "good reference" for Fraunhofer's work. Appx6104, Appx4021-4022.

- In 2014, SXM paid Fraunhofer under the FFPC to obtain a third-party license for a new component for the high-band system. Appx2350.

- Fraunhofer's undisputed post-2010 *audio* work supported SXM's use of the allegedly-infringing system because SXM's primary, core business was delivering *audio* programming to customers via satellites. Appx5068, Appx5277, Appx5384.

Finally, Fraunhofer incorrectly argues that emails in which SXM and Fraunhofer's systems team "explore[d] new projects" have "no relevance." Br.27. Not so. First, SXM would not have expected Fraunhofer to explore *any* new projects with SXM if Fraunhofer objected to SXM's use of the high-band system. Second,

29

contrary to Fraunhofer's contention, the new projects did relate to SXM's satellite system. Appx6023-6024, Appx6051. And third, the correspondence shows SXM knew the specific Fraunhofer team that helped build the system was aware SXM continued to use that system after 2010. *Id.*

> **b.      Fraunhofer Ignores The Law Confirming That Its Continued Silence Reinforcing The Misleading Inference Warrants Equitable Estoppel**

Fraunhofer claims a "factual dispute" exists regarding whether Fraunhofer had a "duty to speak." Br.31-32. But the law does not require a "duty to speak." As it did below, Fraunhofer ignores *SCA*'s holding that silence creates estoppel when there is a duty to speak "***or*** somehow the patentee's continued silence re[i]nforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested." *SCA*, 767 F.3d at 1349; Appx3 (district court noting "Fraunhofer omits the material remainder of the [*SCA*] quote" about silence).

Indeed, *Aukerman* held that silence satisfies the first element when "combined with *other facts* respecting the *relationship or contacts* between the parties." 960 F.2d at 1044. The district court properly found "silence-plus-more" based on the undisputed record of the parties' relationship and contacts. Appx5.[5]

---

[5] An "intent to mislead" is not required. *Aukerman*, 960 F.2d at 1043 & n.18.

Even if a duty to speak were required (and it is not), Fraunhofer *did* have such a duty given its prior relationship and continuing work with SXM. *Cf. High Point*, 817 F.3d at 1326-31 (finding misleading conduct where patentee "helped Defendants build [the allegedly-infringing] communications network" and had "continuing business relationships"); *SCA*, 767 F.3d at 1350 ("close relationship" supports misleading inference).

The cases Fraunhofer cites do not support a contrary conclusion. There was no post-infringement silence in *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1553-57, 1559 (Fed. Cir. 1983), and, unlike here, the patentee also did not design the allegedly-infringing product. While the *Stickle* parties had a close business relationship before infringement started, they had no meaningful business relationship afterwards. Similarly, in *B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419, 1425 (Fed. Cir. 1997), Braun and Abbott never had "relations" about the allegedly-infringing product and the decision identifies no dealings after Abbott began selling that product. And in *SCA*, 767 F.3d at 1350, the parties' interactions were "meager" because they "exchanged only six terse letters" over eight months and there was no evidence of a "close relationship."[6]

---

[6] The district court decision in *Sprint Communications Co. v. Time Warner Cable, Inc.*, 2017 WL 978107, at *3-6 (D. Kan. Mar. 14, 2017), is easily distinguished: the

31

In contrast to these cases, Fraunhofer and SXM, a known licensee, worked together to design and build the allegedly-infringing system and they continued to do business for five years after SXM allegedly became unlicensed—all while Fraunhofer remained silent as to any alleged infringement.

Fraunhofer's substantial reliance on *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1292, 1295 (Fed. Cir. 1992), is even further afield. There, the "onus was upon *CES* [the alleged infringer] to communicate with Hemstreet [the patentee]" because "as of the last communication" "CES promised a prompt response to Hemstreet" concerning CES's examination of Hemstreet's patents and a possible license arrangement, but CES "did not provide one." Here, there was no discussion of possible infringement before 2015 and thus SXM never promised Fraunhofer a response on that topic. In fact, when Fraunhofer finally raised possible infringement in late 2015, SXM responded to Fraunhofer's inquiry but it was Fraunhofer that remained silent after threatening to bring an adversary proceeding in bankruptcy court—this time for fifteen months before filing suit.

---

"silence" occurred before infringement and the parties' relationship was "severed" when the infringement allegedly began.

    **c.**    **Fraunhofer's Unsupported And Unreasonable "Alternative" Inferences Cannot Avoid The Only Inference From Fraunhofer's Silence And Conduct: That Fraunhofer Did Not Object To SXM's Continued Use Of The Allegedly-Infringing System**

Fraunhofer presents *for the first time on appeal* numerous "alternative" inferences from its silence and conduct. Br.28-31. Fraunhofer forfeited these arguments by not making them below, *see Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1322-23 (Fed. Cir. 2008), despite having ample opportunity. Appx5709-5710, Appx1540-1541, Appx1544-1545, Appx6528-6530.

Besides, Fraunhofer's "alternative" inferences are improbable and unreasonable. They are also unsupported by any evidence. The summary judgment standard does not require a court to accept such "improbable" or "unreasonable" inferences. *In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 510 (3d Cir. 2021); *Tindle v. Pulte Home Corp.*, 607 F.3d 494, 496 (7th Cir. 2010). *High Point* rejected similarly unfounded alternative inferences in an equitable estoppel analysis on summary judgment. 817 F.3d at 1329-31. SXM addresses each of Fraunhofer's "inferences" below.

    **1.**    Fraunhofer speculates that SXM could have concluded Fraunhofer did not raise infringement from 2010 to 2015 because "[g]iven SXM's limited profitability in the several years following the merger, it may not have been worth the expense" for Fraunhofer to raise infringement. Br.29. Aside from being

33

irrelevant—parties enforce patents all the time against entities with revenue but no profits—no evidence supports Fraunhofer's contention. And Fraunhofer's premise is in fact false, as Fraunhofer's own appendix citation shows. SXM reported $465 million in *profit* in 2010, which increased to over $1 billion in annual profit starting in 2013. Appx3359, Appx3573.

Moreover, Fraunhofer's reliance on *Aukerman* for this point is misplaced. Br.30-31. There, Chaides (the accused infringer) told Aukerman (the patentee) before the period of silence that Aukerman "would only recover $200-$300 a year" from an infringement suit. 960 F.2d at 1026-27, 1044. The Court held this statement "could lead one in Chaides' position to infer that Aukerman did not sue because the amount in issue was *de minimis*, not that Aukerman was abandoning its claims." *Id.* at 1044. Unlike *Aukerman*, there is no evidence SXM or Fraunhofer believed potential infringement damages were *de minimis*, let alone that SXM *communicated that belief to Fraunhofer* such that SXM would have inferred Fraunhofer did not raise infringement because "the amount in issue was *de minimis*."

**2.** Fraunhofer surmises that SXM could have concluded the silence resulted from Fraunhofer not being "focused" on identifying infringement. Br.29. But, again, there is no evidence that SXM knew about Fraunhofer's purported lack of "focus." *See Aukerman*, 960 F.2d at 1044 (patentee's "other litigation can not logically enter into whether Chaides reasonably drew an inference that it would not

34

be sued if such facts are not known to Chaides"). Nor could any alleged lack of "focus" be inferred simply because Fraunhofer is technically a "non-profit organization," especially since Fraunhofer generated over a billion dollars in revenue, including $100+ million annually from licenses. Appx3284-3287.

3.      Fraunhofer theorizes SXM could have concluded Fraunhofer did not raise infringement because Fraunhofer "may not have had the full set of facts" needed to evaluate "any possible claims against SXM." This is because, Fraunhofer claims, it purportedly was "unaware" until discovery that XM did not obtain WorldSpace's consent to transfer the Sublicense to SXM in the January 2011 merger. Br.29. This argument lacks merit.

Fraunhofer does not dispute it had all facts necessary to raise infringement based on the argument that the MLA and Sublicense terminated in 2010—the position Fraunhofer initially advanced and continues to pursue. Fraunhofer's contention that it did not have facts to support its position that the Sublicense terminated in the 2011 merger misses the point. The relevant question is whether SXM could reasonably infer that Fraunhofer did "not intend to enforce its patent[s] against" SXM, *High Point*, 817 F.3d at 1330, not whether SXM could infer that Fraunhofer abandoned a *particular* infringement argument for why SXM's license terminated.

35

Even so, Fraunhofer fails to present evidence that SXM knew Fraunhofer did not have the "full set of facts" about the Sirius-XM merger. The merger was publicly disclosed. According to Fraunhofer, patent licenses are not transferred in a merger without "formal consent" from the licensor. Br.57. Thus, from Fraunhofer's perspective, the publicly disclosed merger extinguished XM's license *unless* there was consent. The SEC filings did not mention consent and Fraunhofer asserts it was aware of none. Moreover, nothing stopped Fraunhofer from asking WorldSpace or SXM if WorldSpace had consented.

    **4.**    Fraunhofer hypothesizes that SXM could have concluded Fraunhofer did not raise infringement because the parties had a "pattern" of taking a "long time" to "resolve payment issues." Br.29. But however long it took to resolve those issues, Fraunhofer's undisputed practice to *raise* "payment issues" only supports the conclusion that Fraunhofer's conduct was misleading. Despite seeking payment under existing contracts relating to the high-band system, Fraunhofer never raised or sought payment for SXM's allegedly-infringing use of the high-band system.

    **5.**    Finally, Fraunhofer speculates that SXM could have concluded Fraunhofer did not raise infringement because Fraunhofer's work on the system purportedly ended after 2010 and SXM's post-2010 interactions were "primarily" with a "different team at Fraunhofer." Br.28. Again, even if Fraunhofer were right about the nature of the parties' post-2010 interactions, that would not explain why

Fraunhofer did not raise infringement when the parties continued to do business and Fraunhofer knew SXM was using the high-band system.

> **d.     Fraunhofer Mischaracterizes The Order As Relying On Laches And Mischaracterizes The Order's Reference To The Settlement**

Fraunhofer attempts to rewrite the Order by mischaracterizing the district court's rhetorical question, "*Why the wait?*," and its references to the bankruptcy settlement. Br.47-51.

By asking, "*Why the wait?*," the district court highlighted the misleading nature of Fraunhofer's five-year delay before raising infringement with SXM in 2015. From SXM's perspective, Fraunhofer would not "wait" to raise infringement if it intended to enforce its patents. Appx3. The question was not, as Fraunhofer asserts, an erroneous reference to laches that "emphasiz[ed] the purported unreasonableness of Fraunhofer's delay *in bringing suit*" in 2017. Br.47. Fraunhofer ignores the Order's next sentence showing the district court centered on Fraunhofer's "five-year delay *in asserting*" its patent rights in 2015. Appx3.

Similarly, the Settlement provides additional context supporting the misleading nature of Fraunhofer's silence and conduct. It represented an effort to shore up the Sublicense in light of WorldSpace's bankruptcy. From SXM's perspective, Fraunhofer would be expected to speak up if, shortly after the publicly

filed and noticed settlement, SXM became unlicensed and Fraunhofer did not approve of SXM's continued use of the allegedly-infringing system.

### B. The District Court Did Not Abuse Its Discretion By Concluding SXM Relied On Fraunhofer's Misleading Silence and Conduct

"To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with" the allegedly-infringing conduct. *Aukerman*, 960 F.2d at 1043. That happened here.

Fraunhofer's misleading silence and conduct lulled SXM into continuing to use the high-band system, expanding its high-band business, migrating its low-band business to the high-band system, and stopping the development and marketing of its non-infringing low-band system. Appx4148, Appx1841, Appx4362, Appx4359. *See Radio Sys. Corp. v. Lalor*, 709 F.3d 1124, 1130-31 (Fed. Cir. 2013) (defendant "relied on this silence by significantly expanding its product line").[7]

---

[7] SXM further relied by failing to take actions limiting its exposure, such as seeking a license. *See Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112, 124 (D. Mass. 1993) (failure to take "actions to protect itself from a lawsuit … is evidence of [defendant's] reliance"), *aff'd*, 26 F.3d 140 (Fed. Cir. 1994). Here, SXM consistently sought to ensure it had licenses to intellectual property. Appx1638-Appx1658, Appx1664, Appx1666, Appx1707, Appx2350. *See ABB*, 52 F.3d at 1065 (affirming reliance where trial court concluded GMF would have negotiated a patent license given that it had obtained licenses to plaintiff's other patents).

The Order focuses on one of these forms of reliance: SXM's migration of its entire satellite radio business to the high-band system. The undisputed record confirms that, following the merger of Sirius and XM, SXM conducted an analysis to determine "which of the former pair's competing systems (referred to as the high-band and low-band systems) to continue and which to retire." Appx5-6. In 2010, SXM elected to migrate to the high-band and implemented that plan over the course of ten years. But SXM could have pursued the alternative low-band system. Appx6, Appx4148, Appx4362, Appx4358-4359.

Looking at this alternative and the facts as a whole, the district court correctly determined that, if Fraunhofer had raised infringement, SXM had options and "could and would have elected the low[-band system]." Appx6. *See High Point*, 817 F.3d at 1331 (reliance where Sprint had "options when building its network"); *see also ABB*, 53 F.3d at 1064 (affirming equitable estoppel where the trial court "looked at the conduct of the parties and decided GMF had a relationship with CM that lulled GMF into a sense of security that it would not be sued.").

To challenge this ruling, Fraunhofer advances many of the same arguments this Court has rejected in past cases, including *High Point*.

**1.    Fraunhofer Seeks To Apply An Erroneously High Burden Of Proof Contravening This Court's Precedents**

Fraunhofer erroneously argues that no evidence exists showing SXM "would have" migrated to the low-band system had Fraunhofer raised infringement. Br.33-36. But *High Point* rejected that very argument, holding that, "to show reliance on [a patentee's] silence and inaction, [the accused infringer] need not prove precisely what alternative paths it would have taken" but only that alternatives were "considered." 817 F.3d at 1332 (quoting *Aspex*, 605 F.3d at 1312); Brief for Plaintiff-Appellant at 44-45, *High Point SARL v. Sprint Nextel Corp.*, No. 15-1298, Doc. 30 (Apr. 30, 2015). In *High Point*, this Court found reliance where Sprint "considered using a different system," "considered purchasing" other equipment, and/or "could have" retrofitted infrastructure. 817 F.3d at 1331.

So too here it is undisputed that SXM considered migrating to the non-infringing low-band system. SXM had an alternative path available that would have avoided or significantly reduced SXM's infringement exposure if Fraunhofer had not "lull[ed]" SXM "into a sense of security." *Aukerman*, 960 F.2d at 1043; *ABB*, 53 F.3d at 1064. Instead, based on that "sense of security," SXM migrated to and built its business on the allegedly-infringing high-band system.

Fraunhofer also incorrectly argues that SXM must present contemporaneous affirmative direct evidence of reliance. Fraunhofer thus contends that SXM must

show the migration was "prompted" by Fraunhofer's silence and that the Order improperly used SXM's decisions, while being misled, as a "proxy" for reliance. Br.34-35. But Fraunhofer ignores the circumstances Fraunhofer itself created. Because Fraunhofer never raised infringement and created a false sense that it was permissible for SXM to use the patents, Fraunhofer's silence deprived SXM of the opportunity to make informed decisions. Defendants in these situations may prove reliance by circumstantial evidence and need not show they affirmatively considered the patentee's silence when taking actions. *See High Point*, 817 F.3d at 1330-32 (not requiring evidence that defendant contemporaneously considered patentee's silence).

Fraunhofer cites *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548 (Fed. Cir. 1996), *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770 (Fed. Cir. 1995), and *Meyers v. Asics Corp.*, 974 F.2d 1304 (Fed. Cir. 1992), but in those cases, unlike here, the patentee actually raised infringement at an early stage. Fraunhofer here said nothing to SXM.[8]

---

[8] They are inapposite for additional reasons. The alleged reliance in *Hall* occurred *before* the "relevant delay period." 93 F.3d at 1556-58. Fraunhofer also mistakenly quotes party *argument* and not the Court's holding. Br.34-35, quoting *Hall*. And unlike here, there was no evidence of reliance in *Gasser* and *Meyers*. The defendant in *Gasser* ignored five threats of litigation. 60 F.3d at 772. Likewise, the *Meyers* defendants "gave little weight to Meyers' efforts to negotiate licenses." 974 F.2d at 1309. No such facts exist here.

## 2.    The Low-Band System Was A Viable Alternative

Fraunhofer does not dispute that the low-band system is non-infringing but argues it was not a "viable alternative to infringement" because SXM could not have immediately shut down the high-band system and "recall[ed] and swapp[ed]" out high-band receivers already on the road. Br.39-40. The district court correctly rejected this strawman argument. Appx6-7.

For starters, the existence of, and immediate transition to, a viable non-infringing alternative so that infringement stops immediately or altogether are not required as Fraunhofer suggests. Had Fraunhofer raised infringement, SXM could have, at the very least, significantly *reduced* its infringement exposure by migrating *new* cars and subscribers to the non-infringing low-band system over time, just as it migrated *new* cars and subscribers to the high-band system due to Fraunhofer's misleading silence and conduct. Appx5-7, Appx4359, Appx4362.

Fraunhofer's argument fails for another reason: There could be *no* infringement from high-band receivers installed and sold while SXM was licensed, but used after SXM became unlicensed, due to patent exhaustion. *See High Point SARL v. T-Mobile USA, Inc.*, 53 F. Supp. 3d 797 (D.N.J. 2014) (equipment sales by sublicensee authorized for patent exhaustion purposes), *aff'd*, 640 F. App'x 917 (Fed. Cir. 2016).

42

MLA Section 7.5 likewise confirms there could be no such infringement by providing: "No termination or expiration of this Agreement shall prevent the continued use … by customers of WorldSpace's Affiliates, licensees and sublicensees [including SXM] … of products or services sold prior to the date of termination or expiration." Appx1633. Thus, SXM's pre-existing high-band customers could continue to "use" their high-band radios to receive high-band satellite signals after the MLA and Sublicense terminated.

### 3.    Fraunhofer's Speculation That SXM Would Have Migrated To The High-Band System Even If Fraunhofer Raised Infringement Does Not Raise Material Issues Of Fact

Fraunhofer presents unsupported and unreasonable speculation that SXM would still have migrated its entire satellite radio business to the high-band system had Fraunhofer raised infringement. Br.36-38, Br.40. The Court should reject this speculation.

***First***, Fraunhofer argues that SXM did not rely on Fraunhofer's misleading silence and conduct because SXM decided to migrate to the high-band system based on its higher market penetration. Br.36-37. Market penetration was the deciding factor only because Fraunhofer never raised infringement. If Fraunhofer had done so, SXM would have faced an entirely different choice when making its migration

decision. There is no evidence SXM would have still chosen the high-band system and the accompanying infringement exposure.[9]

Moreover, Fraunhofer's contention would make it virtually impossible for equitable estoppel to apply when the patentee never raised infringement but continued to do business with the alleged infringer. *High Point* rejected Fraunhofer's position by recognizing reliance even though Sprint, hearing no infringement concerns, "*preferred*" the infringing option it chose to pursue. Brief for Defendants-Appellees at 41, *High Point SARL v. Sprint Nextel Corp.*, No. 15-1298, Doc. 38 (July 9, 2015) (emphasis in original); *High Point*, 817 F.3d at 1331-32.

**Second**, Fraunhofer argues SXM relied on its belief that it had rights under the Sublicense and not Fraunhofer's misleading silence and conduct. Br.37-38. But Fraunhofer's misleading silence and conduct reinforced SXM's belief that it was permitted to use the patents-in-suit. As SXM's Craig Wadin testified, without contradiction, SXM's belief in the Sublicense "matched up with everything else we did with Fraunhofer in terms of the [FFPC] we executed and *all* the subsequent [FFPC] amendments we executed with Fraunhofer," including the *2013* FFPC Amendment. Appx4368.

---

[9] In *Hemstreet*, 972 F.2d at 1292, 1294-95, CES expanded based on a "business decision" to "ignore" Hemstreet's "warning" of litigation. By contrast, here there was no "warning" to ignore.

44

This contrasts with *SCA*, *Hall*, *Gasser*, *Meyers*, and *Sprint*. In each case, the patentee raised infringement. In each, the defendant's belief that the patent was invalid or that its conduct was non-infringing was *independent* of the patentee's misleading silence or conduct.

Fraunhofer appears to suggest that only a knowing infringer may assert equitable estoppel. That argument would illogically deprive those who most need the protection of this defense—those with no clue that they even *might* be infringing. It would also be "contrary to principles of equity." *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386, 1398 n.27 (E.D. Wis. 1993), *aff'd*, 52 F.3d 1062 (Fed. Cir. 1995).

An alleged infringer can show reliance when the patentee "reinforced [the alleged infringer's] opinion [of non-infringement] through their inaction," *Radio Sys. Corp. v. Lalor*, 2012 WL 254026, at *9 (W.D. Wash. Jan. 26, 2012), *aff'd in relevant part*, 709 F.3d 1124 (Fed. Cir. 2013), or when it believed its conduct was non-infringing but "also relied upon the inaction of the patentee." *ABB*, 828 F. Supp. at 1398 n.27. This aligns with *Aukerman's* ruling that an alleged infringer need only show it "*substantially* relied" on the patentee's misleading silence or conduct. 960 F.2d at 1042-43.

***Third***, relying on *Sprint*, Fraunhofer speculates that the low-band system would not have "offset" the business reasons supporting transition to the high-band

system. Br.40. But in *Sprint*, Time Warner "anticipated over two billion dollars in savings" if it engaged in infringement that resulted in only $139,800,000 of damages. 2017 WL 978107, at *1, *6. Fraunhofer never presented such argument or evidence below.

*Fourth*, Fraunhofer contends SXM would still have chosen the high-band system had Fraunhofer raised infringement in 2010 because, during a late 2015 call lasting "15 or 20 seconds," Fraunhofer "confronted" SXM with its claim that SXM's Sublicense had terminated in 2010 in WorldSpace's bankruptcy but SXM "said nothing" about Fraunhofer's misleading silence and asserted SXM had "a valid sublicense pursuant to a [bankruptcy] settlement." Br.37, Appx4074. It is a non sequitur to treat that remark as evidence that SXM did not rely on Fraunhofer's misleading conduct and silence. The lower court rejected the same argument in *High Point*, explaining that "Sprint's post-2008 conduct is not indicative of how Sprint would have reacted had it been notified a decade before that its equipment was infringing." *High Point SARL v. Sprint Nextel Corp.*, 67 F. Supp. 3d 1294, 1315 (D. Kan. 2014).

Moreover, as the district court held here, "Fraunhofer's silence and course of conduct … misled SXM into reasonably believing it still had a valid and Bankruptcy Court approved sublicense to the asserted patents." Appx8. Thus, when Fraunhofer claimed in 2015 that the Sublicense had terminated *more than five years earlier* in

46

the bankruptcy, SXM was rightly incredulous, as the district court correctly held: "Fraunhofer faults SXM's apparently brazen, well, *reliance* on its sublicense when Fraunhofer finally raised the matter of infringement in late 2015. But this just confirms SXM's heartfelt (if indignant) belief that it had a valid sublicense." Appx7 (emphasis in original).

*Fifth*, Fraunhofer notes that SXM "took no action to avoid infringement even after receiving notice of Fraunhofer's claims." Br.38. That is irrelevant. The situation in 2015 was different from 2010. SXM had relied on Fraunhofer's misleading silence and conduct *for years* and reasonably could not reverse course after having moved carmakers and millions of subscribers to the high-band system. Appx4362, Appx4359, Appx4148, Appx6807-6808. *See High Point*, 67 F. Supp. 3d at 1315.

### 4. There Is No Material Dispute About When SXM Decided To Migrate To The High-Band System

Contrary to Fraunhofer's assertion, Br.40-41, there is no material dispute that SXM decided in 2010 to migrate to the high-band system. Appx4148, Appx4359. Nevertheless, the district court correctly deemed it immaterial whether the decision was made in 2008, 2010, or 2012. Even if the decision was made *before* SXM became unlicensed, SXM relied by *continuing* the process of migrating to the high-

band system. Appx7. Indeed, the ten-year migration did not gain momentum *until 2013*. Appx6807-6808.

### C. The District Court Did Not Abuse Its Discretion By Concluding SXM Was Prejudiced

The district court correctly held that prejudice was "undisputed." Appx8. Fraunhofer claims a passing reference to "prejudice" in half of one sentence in its reply on its own summary judgment motion, and a conclusory assertion in opposition to SXM's motion that SXM "fail[ed] to meet its burden" on prejudice, preserved Fraunhofer's no-prejudice arguments for appeal. Br.41, citing Appx6530, Appx5709. They did not. *See Stauffer v. Brooks Bros. Grp., Inc.*, 758 F.3d 1314, 1322 (Fed. Cir. 2014) (arguments raised below in reply brief are waived); *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1295-96 (Fed. Cir. 2009) ("skeletal or undeveloped" arguments deemed waived). That aside, once SXM put forward evidence of prejudice, the burden shifted to Fraunhofer to show there was a material issue of fact. Fraunhofer "failed to present evidence to rebut" the "prejudice showing made by [SXM]." *High Point*, 817 F.3d at 1332.

Furthermore, the district court did not abuse its discretion by finding SXM prejudiced by its reliance on Fraunhofer's misleading silence and conduct.

Prejudice is shown by "a *change of economic position* flowing from actions taken or not taken by the patentee." *Aspex*, 605 F.3d at 1312. As the district court

48

correctly determined, SXM was prejudiced by its migration to and expansion of the high-band system. Appx7 ("prejudice" due to "a decade's unrecoverable effort changing over automotive installations"), Appx8 ("SXM irretrievably installed … equipment into peoples' cars during the ten years it took to shift car manufacturers over to the new system"), Appx8 ("SXM substantially developed its business in reliance, in an expenditure of time, product development, manufacturing shifts, and installations that (aside from the money) SXM could not get back were this stale claim permitted.").

Fraunhofer ignores those facts because it cannot dispute them, as the record shows no genuine issue about the migration and expansion. Appx4148, Appx4362, Appx4358-4359, Appx445; *see also* Appx1855-2129 & Appx6906-6935, Appx6953, Appx6959-6965 ("chipset data" spreadsheet (Br.53)). Charts attached to Fraunhofer's own damages expert report summarized the changes in SXM's economic position:

- New high-band installations increased from 53.7% of total SXM installations in 2010 to 69% in 2015, while low-band installations fell from 44.7% to 31% in that period. Appx6807-6808.

- Between 2010 and 2015, total high-band installations increased by more than 34 million. Appx6807-6809.

49

- In the same period, active subscribers of the high-band system increased by 8.6 million. Appx6809.

While migrating to the high-band system, SXM stopped improving the low-band system and marketing it to carmakers. Appx1841. The loss of low-band system development and marketing prejudiced SXM because, as the district court found, SXM "can't get its time back." Appx8.

All this undisputed evidence supports the district court's prejudice findings concerning, among other things, SXM's "expenditure of time, product development, manufacturing shifts, and installations." Appx8. *See Radio Sys.*, 709 F.3d at 1130 ("investment in new products" shows prejudice).

Fraunhofer suggests prejudice requires showing precise cost amounts, but no such requirement exists. Br.42-43. "[C]apital investments by [SXM] per se are not a prerequisite to a finding of economic prejudice." *ABB*, 52 F.3d at 1065. SXM's migration to and expansion to the high-band system is enough. *See Aspex*, 605 F.3d at 1312 ("Clariti's development of its AirMag® business, in reliance on Aspex's silence … represents a significant change in economic position and constitutes material prejudice sufficient to support equitable estoppel."); *ABB*, 52 F.3d at 1065 ("increasing sales [of allegedly-infringing product] without additional evidence of capital investments" establishes prejudice); *High Point*, 817 F.3d at 1332 (prejudice exists where alleged infringer relies by "significantly expanding its product line").

50

Even if figures were required, the record provides ample support. *See, e.g.*, Appx1797, Appx2350, Appx6016. *See* Appx8 ("hundreds of thousands of Euros paid to develop the high-band system before and after the supposed master-license termination"). *See also* Appx6807, Appx6965, Appx7367 (identifying millions in manufactured high-band chipsets and cost per module, which includes the chipset).

Finally, Fraunhofer argues SXM's investments in the high-band system were not the result of Fraunhofer's misleading conduct. Br.42. Not so. If SXM had migrated to the low-band system because Fraunhofer had raised infringement concerning the high-band system, SXM would have stopped investing in development of the high-band system, just as it did for the low-band when it decided to migrate to the high-band. Appx1841.

## D.    The FFPC Does Not Bar Equitable Estoppel

Fraunhofer argues that, "[e]ven if SXM had satisfied all three of the equitable estoppel elements," summary judgment would "still fail" because SXM "did not prove the *additional requirements* needed to establish an *implied license*." Br.44. But no such requirements exist, and the district court did not find an "implied license." Instead, it found "this patent-infringement complaint ***equitably estopped***," and that equitable estoppel "effectively grants" an implied license. Appx1, Appx5. This Court has consistently affirmed equitable estoppel on summary judgment without even referring to an "implied license." *See Radio Sys.*, 709 F.3d at 1130-31; *Aspex*,

51

605 F.3d at 1310-14; *Scholle*, 133 F.3d 1471-73; *ABB*, 52 F.3d at 1063-65. Thus, if SXM satisfied "all three of the equitable estoppel elements," ***there are no "additional requirements" needed for the Court to affirm.***

That should end the analysis. Nevertheless, the district court would not have erred had it found an implied license based on equitable estoppel. Fraunhofer's argument that the FFPC precludes such relief because it concerns the "same subject" fails. Br.44-45.

***First***, the district court correctly observed Fraunhofer was "talking out of both sides of its mouth" below by asserting both that the FFPC precludes equitable estoppel and also that there was no license between it and SXM, and thus no contract on the "same subject." Appx5. Fraunhofer still seeks to have it both ways. *Compare* Br.44 ("The Existence Of An Express *License* On The Same Subject Precludes Any Finding Of An Implied License Here") *with* Br.46 (the FFPC "did *not* provide XM with a license").

Furthermore, any argument that the Sublicense from WorldSpace precludes implying a license from Fraunhofer fails because Fraunhofer was not a party to the Sublicense. *See Peter v. United States*, 6 Cl. Ct. 768, 780 (1984) ("The rule that the existence of an express contract preempts an implied contract has full effect only when the parties to both contracts are the same").

***Second,*** as the district court observed, *High Point* upheld equitable estoppel despite prior licenses to the patents-in-suit. *See High Point*, 817 F.3d at 1327-32; Appx5. Fraunhofer tries to avoid *High Point* by claiming the lower court stated Sprint was "not seeking an implied license." Br.46. But *High Point* held that "[t]he ***effect*** of equitable estoppel is a license to use the invention." 817 F.3d at 1328. The Court thus held equitable estoppel effectively granted a license notwithstanding the prior express licenses. *See* Appx5 ("equitable estoppel *effectively* grants" an "implied license").[10]

***Third***, Fraunhofer misplaces reliance on *Endo*, 746 F.3d at 1377-79, concerning legal estoppel, and *Atlas Corp. v. United States*, 895 F.2d 745 (Fed. Cir. 1990), a non-patent case for breach of an implied-in-fact mutual contract with the government. This Court has ***never*** applied those cases to equitable estoppel. To do so would effectively overrule *High Point*.

Legal estoppel turns on the scope of an earlier express contract. *Endo*, 746 F.3d at 1377-79 (legal estoppel applies "where a patentee had licensed or assigned a

---

[10] In *High Point*, this Court necessarily rejected plaintiff's argument on appeal that prior contracts precluded equitable estoppel. *See* Brief for Plaintiff-Appellant at 39-40, *High Point SARL v. Sprint Nextel Corp.*, No. 15-1298, Doc. 30 (Fed. Cir. Apr. 30, 2015), and Reply Brief for Plaintiff-Appellant at 5-6, *High Point SARL v. Sprint Nextel Corp.*, No. 15-1298, Doc. 45 (Fed. Cir. Aug. 26, 2015), both citing *Endo Pharms. Inc. v. Actavis, Inc.*, 746 F.3d 1371 (Fed. Cir. 2014).

right, received consideration, and then sought to derogate from the right granted"). By contrast, equitable estoppel requires no findings on the existence or scope of a prior contract right. *See High Point*, 817 F.3d at 1330. Furthermore, *Endo* was partially based on a provision in the parties' contract disclaiming "other licenses not within the literal terms of the contract." 746 F.3d at 1373, 1378. The FFPC contains no such provision.

*Atlas* prohibits an "implied-in-fact" mutual contract that contradicts the terms of a prior express contract. 895 F.2d at 754-55 (where the parties' express contract set price, they could not have an "implied-in-fact" mutual contract addressing the "same subject," *i.e.*, the price); *see also* 17 C.J.S. Contracts § 16 (an express contract precludes an implied contract "of a different or contradictory nature"). "Implied-in-fact" contracts require a "meeting of minds," *Atlas*, 895 F.2d at 754, which is not required for equitable estoppel.

If the Court were to apply Fraunhofer's overly broad interpretation of *Atlas*, Br.45, to implied licenses in the patent context, there could never be implied licenses based on legal estoppel, since there would always be a prior express contract on the "same subject." There also could never be equitable estoppel where there was a prior contract, as occurred here and in *High Point*. Such a rule contradicts equity and this Court's precedents.

54

***Fourth***, even if *Endo* and *Atlas* were relevant, they would not prevent an implied license here. Under any reasonable interpretation, the FFPC did not *preclude* SXM from obtaining licenses to the patents-in-suit. On the contrary, the FFPC contemplated that SXM would have licenses so Fraunhofer could do its work under the contract and SXM could "use the results." Appx1664, Appx1666, Appx1707, Appx6211-6213, Appx4368, Appx6009. Finding an implied license based on equitable estoppel would not "rewrite" the parties' "bargain," *Endo*, 746 F.3d at 1378, or contradict the FFPC's express terms. *Atlas*, 895 F.2d at 754. Instead, it would validate that bargain.

Fraunhofer's apparent reading of the FFPC—that the "bargain" was XM (and its "successors") could receive a sublicense *only* from WorldSpace, and could *never* receive a license from Fraunhofer, even by implication—fails for several reasons. It is not supported by the FFPC. It makes "little sense" in light of the FFPC's "purpose"—which allegedly was for Fraunhofer to incorporate the patents-in-suit into SXM's high-band system. *Thomas v. Dep't of Housing & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997). And Fraunhofer's current appellate argument does not comport with equity, given Fraunhofer's position that it did not directly grant a license at the time only due to WorldSpace's pre-existing exclusive license, which Fraunhofer claims terminated in 2010. Appx5703-5705, Appx1533-1537. It would be illogical to contend that Fraunhofer would not have directly granted SXM a

55

license to the patents-in-suit in the absence of WorldSpace's pre-existing exclusive license.

*Finally*, contrary to Fraunhofer's suggestion, *Stickle* did not hold that *mutual* intent is required for an implied license based on equitable estoppel. Br.47. Rather, *Stickle* held that an implied license based on equitable estoppel cannot arise from inferred consent alone because, in addition, "[o]ne must have been led to take action by the conduct of the other party." 716 F.2d at 1559. More recent precedent calls into question whether detrimental reliance is required for an implied license where, as here, the patentee received consideration in connection with the allegedly-infringing product. *See Wang*, 103 F.3d at 1581-82 (finding implied license based on equitable estoppel where Wang's conduct led Mitsubishi to "infer consent" and Wang obtained "consideration").

### E.    Fraunhofer's Cross-Motion On Equitable Estoppel Should Not Be Granted

If it does not affirm, there is no reason for this Court to direct the district court to grant Fraunhofer's cross-motion for summary judgment on equitable estoppel. Br.52.

*First,* the district court's denial of Fraunhofer's motion is "not ordinarily appealable." *Semcon Tech, LLC v. Micron Tech., Inc.*, 660 F. App'x 908, 915 (Fed. Cir. 2016). Respectfully, "it would be inappropriate for this [C]ourt" to grant

Fraunhofer's motion where the district court "merely dismissed it as moot in light of the court's ruling on [SXM's] motion." *Id.* at 916.

***Second,*** Fraunhofer's summary judgment motion argued only that SXM could not establish reliance. Appx1540-1541, Appx1544-1545. Fraunhofer forfeited its new argument that summary judgment should be granted in its favor because SXM purportedly cannot establish "any of the three elements." Br.52. Even so, the district court did not abuse its discretion by finding SXM established all three elements, including reliance.

***Third,*** Fraunhofer mischaracterizes the district court's evidentiary rulings and misunderstands that evidence can be considered in opposition to Fraunhofer's motion even if the district court declined to consider it when granting SXM's motion. Br.53.

The Order did *not* hold that a 2012 email from Fraunhofer to SXM—which stated that Fraunhofer was willing to offer the "MCM patents" to SXM, although the "simplest solution" was to "give up the patents" altogether because Fraunhofer did not want to pay certain fees, Appx6019-6020—"lack[ed] foundation and relevance." Br.53. Instead, the district court "accept[ed]" Fraunhofer's "disavowal" of the email since the record supported summary judgment in SXM's favor even without it. Appx4.

The email buttresses equitable estoppel because it shows Fraunhofer made statements to SXM about the patents-in-suit without mentioning infringement. Although Ernst Eberlein, the email's author, testified it was a "throwaway comment" "not [made] in my function at Fraunhofer," Appx6529, there is no evidence SXM knew that. *See Aukerman*, 960 F.2d at 1044. On the contrary, Mr. Eberlein was the head of Fraunhofer's Digital Communication Group at the time, Appx3964, he sent the email from his official Fraunhofer account, Appx6020, and SXM's response showed that SXM took the email seriously. Appx6019.

The district court also did not "dismiss" Craig Wadin's declaration but declined to consider it on *SXM's motion* because it was "late-arriving," as it was "appended to SXM's opposition to Fraunhofer's" motion. Appx6. On Fraunhofer's motion, the court could have considered Mr. Wadin's declaration. Mr. Wadin states that, if Fraunhofer had raised infringement in 2010 or 2011, and the parties could not achieve a mutual resolution, then "given the availability of a non-infringing alternative (the low-band system), SXM would not have migrated *new* sales and installations of satellite radios in vehicles to the allegedly infringing high-band system" and would not have "invested nearly as much as it did in the infrastructure supporting the high-band system." Appx6231-6232. Mr. Wadin also states that, by 2015, "the situation was different," as "SXM had already committed to moving new sales and installations of satellite radios to the high-band system over the course of

nearly five years and had already spent hundreds of millions of dollars investing in that system and the migration to it." *Id.* Contrary to Fraunhofer's assertions below, Mr. Wadin's declaration is consistent with his deposition, including his testimony that SXM would not have recalled already-installed receivers. Br.40.

In any event, if this Court does not affirm, all these issues should be explored on remand on the basis of the entire record.

### F.     The Court Should Not Remand The Case To Consider Fraunhofer's Alternative Sublicense Termination Dates

Fraunhofer contends the district court erred by not considering the effect Fraunhofer's alternative 2015 and 2011 Sublicense termination dates would have on equitable estoppel. Br.54-58. These new arguments fail for several reasons.

### 1.     Fraunhofer Forfeited Its Remand Arguments

Fraunhofer forfeited its arguments by never arguing *anywhere* that, if the district court *found or assumed* that the Sublicense terminated in 2010 and that equitable estoppel resulted, then Fraunhofer would abandon the 2010 termination date. Nor did Fraunhofer argue that the court should assume the Sublicense terminated in 2015 or 2011 when analyzing equitable estoppel or that equitable estoppel does not apply if the Sublicense terminated in 2011.

Fraunhofer only asserted in a footnote in a reply brief that SXM could not establish the reliance element "if SXM is found to have had a license through 2015," Appx6528, but that would require finding the Sublicense did *not* terminate in 2010.

59

Not only did the court below not make such a ruling, it assumed—as did SXM in its motion—that the Sublicense *did* terminate in 2010. Appx2-3, Appx1469. That aside, Fraunhofer did not preserve its argument by what it said in a one-sentence footnote in a reply brief to which SXM had no opportunity to respond. *See Stauffer*, 758 F.3d at 1322; *Fresenius*, 582 F.3d at 1295-96.

There are no special circumstances excusing Fraunhofer's failure to raise these arguments, and Fraunhofer offers none. SXM's equitable estoppel motion explicitly assumed the Sublicense terminated in 2010. Appx1469. Fraunhofer therefore could have argued, but did not, that the court should assume alternative termination dates of 2011 and 2015 if a 2010 termination resulted in equitable estoppel. *See Golden*, 527 F.3d at 1323 ("There is no reason why [appellant] could not have raised the issue" as it "in no way depends upon or derives from the decision proffered below."). As in *Golden*, the Court should reject Fraunhofer's request to "remand the case to the district court to consider [appellant's] new argument." *Id.* at 1323-24.

In an apparent effort to avoid forfeiture, Fraunhofer *for the first time* mischaracterizes its alternative Sublicense termination dates as "independent" "theories of liability." Br.18-19, Br.54. They are not "theories of liability." *See Spence v. City of Philadelphia*, 147 F. App'x 289, 292 (3d Cir. 2005) ("theory of liability" is a "claim" such as a "disparate treatment claim"). Fraunhofer's

60

contentions are alternative arguments supporting its infringement claim, not separate claims. Nor are Fraunhofer's arguments "independent." If the Sublicense terminated in 2010, then there would be no reason to determine if it terminated later in time. *Cf. Rockies Exp. Pipeline LLC v. Salazar*, 730 F.3d 1330, 1341 (Fed. Cir. 2013) (party could not terminate already-terminated contract).

Indeed, Fraunhofer admits its 2015 and 2011 termination dates were "alternative" arguments to termination in 2010. Br.3, Br.61. This case is nothing like *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311 (Fed. Cir. 2001), where the district court improperly granted summary judgment on one claim—defendant's *invalidity* counterclaim—based on finding the defendant proved an entirely separate claim—defendant's counterclaim for *noninfringement*. *Id.* at 1321 ("noninfringement does not moot invalidity").

### 2. Equitable Estoppel Applies Even Assuming Fraunhofer's Alternative Arguments That The Sublicense Terminated In 2015 Or 2011

Even if Fraunhofer did not forfeit its remand arguments, equitable estoppel still bars Fraunhofer's complaint. Fraunhofer argues that the Order's equitable estoppel ruling "applies only" if SXM became unlicensed in 2010 and that its alternative arguments that the Sublicense terminated in 2015 or 2011 are not moot. Br.54-55. Fraunhofer is mistaken. The Order's ruling applies even accepting Fraunhofer's alternative Sublicense termination arguments.

61

### a. The Order's Equitable Estoppel Ruling Applies To Fraunhofer's Argument That It Terminated The Sublicense In 2015

Fraunhofer argues the Order "collapse[s]" if the Sublicense "did not terminate until 2015" because "Fraunhofer had no reason—and in fact, no legal right—to raise any issue of infringement between 2010 and 2015" and so its silence during that period "could not have been misleading." Br.55. Not so.

Fraunhofer claims it "unilaterally terminated" the MLA, and thus the Sublicense, in 2015 based on defaults that occurred *in 2010*—specifically, publicly disclosed breaches from WorldSpace's failure to pay $26,628.30 and the MLA's "rejection" in bankruptcy. Appx1510-1511. Under this argument, Fraunhofer could have terminated the Sublicense and asserted an infringement claim against SXM *at any time* after the defaults occurred in 2010. *See* Appx3 (under Fraunhofer's argument, Fraunhofer "retained" a "latent right to terminate" the MLA).

Fraunhofer misled SXM by not doing so and by continuing to work with SXM and support its satellite business. SXM relied on Fraunhofer's silence and conduct in all the ways discussed above, including building its business around the allegedly-infringing system. In short, there is no material difference between Fraunhofer's 2010 and 2015 termination arguments. Either way, Fraunhofer's failure to assert infringement from 2010 to 2015, despite having the right to do so, constituted misleading conduct on which SXM relied to its detriment.

The facts assumed under Fraunhofer's 2015 termination argument stand in stark contrast to *Ricoh Co. v. Nashua Corp.*, 1999 WL 88969 (Fed. Cir. Feb. 18, 1999), and other cases Fraunhofer cites, such as *Radio Sys.*, 709 F.3d at 1131, where the Court held that silence or conduct was not misleading because it occurred *before the patents had issued*. In those cases, plaintiffs had "no right" to object to defendants' activities and thus could not be "estopped for failing to speak up." *Ricoh*, 1999 WL 88969, at *4. Here, the patents-in-suit had already issued and, under Fraunhofer's own view, Fraunhofer had the "right" to terminate the Sublicense and assert infringement.

> **b.     The Order's Equitable Estoppel Ruling Applies To Fraunhofer's Argument That The Sublicense Did Not Pass To SXM In The 2011 Merger**

The Order explicitly "[a]ssume[d]" the premise of Fraunhofer's merger-related summary judgment motion—that the Sublicense did not pass to SXM when XM merged into it. Appx2.[11] Under this "alternative" argument, infringement began in January 2011, just four months after the Sublicense would have been terminated under Fraunhofer's primary argument. Shortening Fraunhofer's five years of misleading silence and conduct by four months is not material. SXM was still misled

---

[11] Fraunhofer argues the Order "misapprehended" Fraunhofer's argument, but the Order plainly assumed any assignment in the merger was not effective, extinguishing the Sublicense when XM merged into SXM in 2011. Appx2.

from 2011 to 2015 to continue and expand its high-band business. And SXM still was deprived of opportunities to consider its options, including transitioning to the non-infringing low-band system or seeking a license.

The four-month difference is also immaterial because, under both arguments, SXM became unlicensed at the beginning of the migration process. The Order holds that equitable estoppel applies regardless of whether SXM's migration decision was made in 2008, 2010, or 2012, because SXM "reli[ed] on Fraunhofer's apparent approval of its decision *over the next five years* of the ten-year effort to shift over equipment manufacturing." Appx7. Thus, even if SXM decided to migrate in 2010 and became unlicensed in 2011, SXM relied on the misleading silence and conduct by *continuing* the migration, which, again, did not gain momentum until 2013. Appx6807-6809.

### 3.    The Merits Of Fraunhofer's Merger "Theory Of Liability" Are Not Before This Court

Fraunhofer references in passing the purported merits of its merger "theory of liability" and contends it did not forfeit that position. Br.56-58. However, those merits are not before the Court. Equitable estoppel applies based on the *assumption* that Fraunhofer's merger "theory of liability" is *correct*, and Fraunhofer does not ask this Court to rule on that theory. Here, on appeal, SXM has not briefed the merits but only corrects certain inaccuracies in Fraunhofer's presentation.

For example, contrary to Fraunhofer's contention, Br.57, the Settlement did not amend the TLA to add a no-transfer provision, but instead made only non-transferable "*This Agreement*," which was defined to mean the Settlement itself. The Settlement's no-transfer provision made no reference to the TLA. Appx1711-1713, Appx5561-5562.

Fraunhofer also makes incorrect and incomplete assertions in support of its contention that it did not forfeit its unpled merger "theory of liability." Fraunhofer claims it first learned of WorldSpace's lack of consent in discovery *in 2020*. Br.57-58, citing Appx2979; Appx2983. But Fraunhofer did not raise its "theory of liability" until summary judgment *in 2023*—after discovery requesting disclosure of such arguments and after WorldSpace ceased to exist upon the 2022 final bankruptcy decree. Fraunhofer *never* supplemented its interrogatory responses to reveal its new "theory of liability." Appx5764-5773, Appx2930-2932, Appx5805-5806, Appx5809. *See In re MTBE Prods. Liab. Litig.*, 2014 WL 494522, at *3-4 (S.D.N.Y. Feb. 6, 2014) (failure to timely amend contention interrogatory under Fed. R. Civ. P. 26(e)(1) barred new "theory of liability"). Nor did Fraunhofer reveal its "theory of liability" in expert discovery. Even Fraunhofer's damages expert did not use 2011 as an alternative hypothetical negotiation date. Appx6580-6581.

Fraunhofer thus deprived SXM the opportunity to conduct discovery on WorldSpace's intent to make the TLA transferrable and/or obtain WorldSpace's consent for the purported transfer. *See MTBE*, 2014 WL 494522, at \*3-4 (plaintiff has burden to establish lack of prejudice; prejudice presumed when new "theory of liability" is disclosed after discovery); *Spence*, 147 F. App'x at 291-92 ("allowing Spence to add a new theory of liability at summary judgment would have impermissibly prejudiced the City").

Fraunhofer's assertion that it "had no reason to know [its merger argument] even existed," Br.58, contradicts its own "theory of liability" for the reasons discussed above at page 36. Fraunhofer had the ability to assert its "theory of liability" starting *in 2011*.

## II.  THE DISTRICT COURT'S NON-FINAL DISCOVERY ORDER IS NOT PROPERLY BEFORE THE COURT AND IN ANY CASE IS CORRECT

The discovery order challenged by Fraunhofer should not be addressed because it is unrelated to the final judgment on equitable estoppel. *See Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1350 (Fed. Cir. 2006) (not considering ruling where judgment was not based on it).

In any event, the district court did not abuse its discretion by finding that Fraunhofer failed to meet its burden to show a common legal interest between Fraunhofer and IPXI at the time of the communications at issue. Appx24-27,

Appx15-17. The district court likewise did *not* adopt a "bright-line rule that no common interest can apply to communications between a patentee and licensee before a licensing agreement has been executed." Br.60. Rather, the district court held there was no "clear error" in the magistrate judge's *factual* finding that, at the time the communications were exchanged 6-8 months before Fraunhofer and IPXI entered into the Master Agreement and License Option Agreement, the "prospect" of a common legal interest between those parties was "remote, contingent and uncertain." Appx22, Appx27, Appx16. *Compare TC Tech. LLC v. Sprint Corp.*, 2018 WL 6584122, at *3-4 (D. Del. Dec. 13, 2018) (holding lack of agreement is "*evidence* of the lack of a shared interest," but finding common interest for communications "shortly," *i.e.*, twelve days, before agreement was executed).[12]

Fraunhofer argued that a common legal interest was established by an NDA executed before the communications, but the courts below found the NDA showed the parties "viewed their relationship as commercial in nature" and did not create "legal obligations beyond nondisclosure." Appx16, Appx27. This contrasts with *In re Regents of University of California*, 101 F.3d 1386, 1388-90 (Fed. Cir. 1996),

---

[12] Further exposing Fraunhofer's false premise, the discovery order affirmed by the district court held there was a common interest for *other* communications exchanged *before* execution of the license agreement because Fraunhofer and IPXI were "in the final stages of completing the licensing deal." Appx18, citing *TC Tech*.

where Lilly shared a common legal interest with the patentholder because it was a "potential licensee" that had previously entered into a binding "option agreement" for license rights.

## CONCLUSION

SXM respectfully requests that the Court affirm summary judgment for SXM.

Respectfully submitted,

Dated:  January 18, 2024

*/s/ Gary P. Naftalis*
Gary P. Naftalis
Mark A. Baghdassarian
Alan R. Friedman
Tobias B. Jacoby
Jason M. Moff
Shannon H. Hedvat
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: (212) 715-9100
Fax: (212) 715-8000
gnaftalis@kramerlevin.com
mbaghdassarian@kramerlevin.com
afriedman@kramerlevin.com
tjacoby@kramerlevin.com
jmoff@kramerlevin.com
shedvat@kramerlevin.com

*Attorneys for Defendant-Appellee*
*Sirius XM Radio Inc.*

68

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 23-2267

**Short Case Caption:** Fraunhofer v. Sirius XM

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>13,992</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 01/18/2024

Signature: /s/ Gary P. Naftalis

Name: Gary P. Naftalis