# United States Court of Appeals for the Federal Circuit

---

**FRAUNHOFER-GESELLSCHAFT ZUR FORDERUNG DER ANGEWANDTEN FORSCHUNG E.V.,**
*Plaintiff-Appellant*

**v.**

**SIRIUS XM RADIO INC.,**
*Defendant-Appellee*

---

2023-2267

---

Appeal from the United States District Court for the District of Delaware in No. 1:17-cv-00184-JFB-SRF, Senior Judge Joseph F. Bataillon.

---

Decided: June 9, 2025

---

DAVID C. MCPHIE, Irell & Manella LLP, Newport Beach, CA, argued for plaintiff-appellant. Also represented by REBECCA CARSON, BEN J. YORKS; GRANT WILLIS GABRIEL, Los Angeles, CA.

MARK BAGHDASSARIAN, Herbert Smith Freehills Kramer (US) LLP, New York, NY, argued for defendant-appellee. Also represented by ALAN ROY FRIEDMAN, SHANNON H. HEDVAT, TOBIAS B. JACOBY, JASON MOFF, GARY P. NAFTALIS.

---

Before LOURIE, DYK, and REYNA, *Circuit Judges*.

LOURIE, *Circuit Judge*.

This case returns after we previously vacated the district court's grant of Sirius XM Radio Inc.'s ("SXM") motion to dismiss for failure to state a claim. *See Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372 (Fed. Cir. 2019) ("*Fraunhofer I*"). Now on summary judgment, the district court again entered final judgment in favor of SXM, concluding that Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V.'s ("Fraunhofer") claims for infringement of now-expired U.S. Patents 6,314,289, 6,931,084, 6,993,084, and 7,061,997 ("the asserted patents") are barred by equitable estoppel. *Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V. v. Sirius XM Radio Inc.*, No. 17-cv-184, 2023 WL 4420414 (D. Del. July 10, 2023) ("*Decision*").

We reverse.

## BACKGROUND[1]

Fraunhofer is a non-profit research organization based in Munich, Germany, that has spent decades developing and patenting various inventions relating to multicarrier modulation ("MCM") technology. That technology is used for Digital Audio Radio Service ("DARS"), otherwise known as satellite radio.

On March 4, 1998, Fraunhofer entered into an agreement ("the Master Agreement") with WorldSpace International Network, Inc. ("WorldSpace"), granting WorldSpace

---

[1] Additional background can be found in *Fraunhofer I*. We recount the relevant facts here for convenience.

a "worldwide, exclusive, irrevocable license, with the right to sublicense," to various of Fraunhofer's patents directed to MCM technology, including those asserted here. J.A. 1629. Also in 1998, Fraunhofer began a collaboration with XM Satellite Radio ("XM") to bring satellite radio to the United States. Because that work would require use of the MCM technology protected by the asserted patents, Fraunhofer told XM that, in light of the Master Agreement, XM would need to seek a sublicense to those patents from WorldSpace. That condition was made express in a Firm Fixed Price Contract ("FFPC") between XM and Fraunhofer. J.A. 1707. XM obtained the requisite "irrevocable" sublicense, J.A. 1638–58, and, with the help of Fraunhofer, incorporated the patented MCM technology into its satellite radio system, the XM DARS System, which it launched in 2001.

Later, in 2008, XM, which had successfully developed the "high-band" XM DARS System, joined forces with Sirius Satellite Radio, Inc., which had developed its own "low-band" satellite radio system, to form SXM.[2] As part of that new venture, SXM was faced with the challenge of determining how to proceed with the distinct low- and high-band systems, which were technically incompatible due to physical differences in receivers. Given that both systems were already in commercial use, SXM continued to operate each system while it worked to gradually shift car manufacturers to just one of the two systems. Ultimately, SXM opted to encourage manufacturers to implement the high-band system in new vehicles.

Meanwhile in 2008, WorldSpace filed for bankruptcy. As part of the bankruptcy proceedings, XM and

---

[2] The terms "high-band" and "low-band" refer to the relative range of frequencies used in each system. That is, the "high-band" XM DARS System operates at a higher range of frequencies than the "low-band" system.

WorldSpace entered into a Settlement Agreement to resolve outstanding payments owed under the sublicense. J.A. 1711–13. The Settlement Agreement characterized itself as an amendment to the sublicense and provided that the agreement could not be assigned or transferred by sale or merger without written consent of the parties. J.A. 1712. Neither Fraunhofer nor SXM, XM's parent company at that time, were parties to the Settlement Agreement. However, the agreement was made public, with notice to Fraunhofer, during formal bankruptcy proceedings. J.A. 1715–23, 1725–26; *see also* J.A. 6207 (Fraunhofer's corporate representative testifying that Fraunhofer "had long assumed that there existed a sublicensing agreement" between XM and WorldSpace, and that "[i]t is a fact that [the] sublicensing agreement became public during the bankruptcy proceedings"). Thereafter, in 2011, XM formally merged into and with SXM, terminating the existence of XM. It remains disputed whether any of XM's rights to the asserted patents attached to its successors, whether via the "irrevocable" sublicense from WorldSpace or via the FFPC with Fraunhofer. *Compare* Fraunhofer Br. 10 (noting that XM's Settlement Agreement did not "grant any rights to SXM, which was XM's parent company at the time"), *with* SXM Br. 7 (suggesting the FFPC "granted XM and its successors a license" to the asserted patents). In any event, with or without a license, SXM continued to use the XM DARS System, incorporating the allegedly infringing technology.

Also at the bankruptcy court, in 2010, WorldSpace rejected the Master Agreement, which "was equivalent to a breach occurring 'immediately before the date of the filing of the [bankruptcy] petition.'" *Fraunhofer I*, 940 F.3d at 1375–76 (alteration in original) (quoting *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 374 (2019)). The breach gave Fraunhofer the right to terminate the Master Agreement. *Id.* It remains disputed whether

the agreement was actually terminated at that time. *Compare* Fraunhofer Br. 10, *with* SXM Br. 9.

Years later, in 2015, Fraunhofer notified SXM that it believed SXM was infringing the asserted patents. *See* J.A. 444, 1800–03. It explained its belief that "the [Master Agreement] between Fraunhofer and World[S]pace was terminated as part of the World[S]pace bankruptcy" in 2010, J.A. 1802, such that "substantial rights [in the asserted patents had] reverted to Fraunhofer," J.A. 1800. The next month, Fraunhofer sent a letter to WorldSpace claiming that the Master Agreement was "terminated" in the context of the bankruptcy proceedings, and to the extent that was not the case, it had been terminated for cause under German law and by its own terms. *Fraunhofer I*, 940 F.3d at 1376; J.A. 1812–13. Thus, in Fraunhofer's view, the Master Agreement "terminated [in 2010] pursuant to the [bankruptcy c]ourt-approved agreement, with all patent rights reverting to Fraunhofer." Fraunhofer Br. 10 (citing J.A. 1769–70).

On February 22, 2017, Fraunhofer filed its complaint in the U.S. District Court for the District of Delaware, alleging that various aspects of the XM DARS System infringed the asserted patents. J.A. 167–74; *see also* J.A. 434–45 (Amended Complaint). The district court dismissed the case in its entirety on the ground that SXM had a valid license to the asserted patents. *Fraunhofer I*, 940 F.3d at 1374. We vacated the judgment and remanded for further proceedings. *Id.* at 1383. The case thereafter proceeded and, following discovery, the parties collectively filed thirteen motions for summary judgment.

In one of its motions, SXM argued that Fraunhofer's claims for infringement were barred by equitable estoppel. J.A. 1468–70. Specifically, SXM argued that, given Fraunhofer's collaboration with SXM to build the allegedly infringing aspects of the accused XM DARS System from at least 1998 to 2010, its failure to raise SXM's potential

infringement of the accused patents by that system until 2015 precluded its claims. J.A. 1469. SXM argued that it had relied on and was prejudiced by Fraunhofer's silence, as evidenced by its decision to migrate car manufacturers to the accused high-band system. J.A. 1469–70. In SXM's view, it could have alternatively migrated those manufacturers to the non-infringing low-band system had it known that it would be threatened with litigation. *Id.* Thus, SXM contended that, to the extent it did not already have an express license, Fraunhofer had effectively granted it an implied license to the asserted patents. J.A. 1468 (citing *High Point SARL v. Spring Nextel Corp.*, 817 F.3d 1325, 1331 (Fed. Cir. 2016)).

The district court agreed and granted SXM's motion on the basis of equitable estoppel, dismissing all other motions as moot and entering final judgment in favor of SXM. *See Decision*, at *4; J.A. 9. The district court explained that, assuming Fraunhofer's view of the facts, *i.e.*, "that SXM has been using Fraunhofer's patented technology without license since at least June 2010—and both [parties] knew it," then Fraunhofer's delay of more than five years in asserting the patents amounted to an inexcusable delay. *See Decision*, at *2. The district court further explained that SXM "relied on Fraunhofer's extended silence and conduct to its detriment," concluding that, "as the parties agree[d]," SXM's choice to migrate to the infringing high-band system "came down to business pragmatics." *Id.* at *3. That is, the court explained that "[i]f barred from the high-band, SXM could and would have elected the low[-band]." *Id.* Finally, the district court explained that it was undisputed that SXM was prejudiced by Fraunhofer's silence, as it spent years and "hundreds of millions of dollars" having equipment installed into vehicles to make those vehicles compatible with the accused XM DARS System. Based on that "undisputed record," the district court granted summary judgment to SXM. *Id.*

Fraunhofer timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

We review a district court's grant of summary judgment of equitable estoppel in two steps. *Ferring B.V. v. Allergan, Inc.*, 980 F.3d 841, 850 (Fed. Cir. 2020). First, applying the law of the regional circuit, we review whether there are any genuine disputes of material fact that would preclude summary judgment. *Id.* The Third Circuit reviews a grant of summary judgment *de novo*, viewing all facts and drawing all reasonable inferences in the nonmovant's favor. *Glaesener v. Port Auth. of New York & New Jersey*, 121 F.4th 465, 467 (3d. Cir. 2024) (citation omitted). Absent any such disputes, we then review the district court's application of equitable estoppel for abuse of discretion. *Ferring B.V.*, 980 F.3d at 851 (quoting *John Bean Techs. Corp. v. Morris & Assocs., Inc.*, 887 F.3d 1322, 1327 (Fed. Cir. 2018)).

### I

Equitable estoppel is a defense "addressed to the sound discretion of the trial court." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (en banc), *abrogated on other grounds by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328 (2017). The defense has three requirements:

> (1) the patentee engages in misleading conduct that leads the accused infringer to reasonably infer that the patentee does not intend to assert its patent against the accused infringer; (2) the accused infringer relies on that conduct; and (3) as a result of that reliance, the accused infringer would be materially prejudiced if the patentee is allowed to proceed with its infringement action.

*Ferring B.V.*, 980 F.3d at 853 (quoting *John Bean*, 887 F.3d at 1327). We address the parties' arguments as to each requirement in turn.

A. Misleading Conduct

"The first element of equitable estoppel requires [Fraunhofer] to have made a misleading communication, either affirmatively or by omission, to [SXM]." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 767 F.3d 1339, 1349 (Fed. Cir. 2014).[3] In general, "silence alone will not create an estoppel unless there was a clear duty to speak," or unless a patent owner's "continued silence" reinforces an accused infringer's inference that the patent owner has acquiesced to the infringer's conduct. *Aukerman*, 960 F.2d at 1043–44. Put otherwise, misleading conduct occurs where an accused infringer can reasonably infer from a patent owner's conduct or silence that the patent owner has known of the allegedly infringing activities for some time without having asserted its rights. *See High Point*, 817 F.3d at 1330. Here, the district court concluded that there was no genuine dispute of material fact that Fraunhofer's failure to raise the issue of potential infringement to SXM from 2010—the year Fraunhofer asserts that it reacquired all rights to the asserted patents—until 2015 amounted to misleading silence. We agree.

---

[3] The portion of the panel decision in *SCA Hygiene* reversing summary judgment based on equitable estoppel was reinstated and adopted by the *en banc* court upon rehearing. 807 F.3d 1311, 1333 (Fed. Cir. 2015). The Supreme Court then granted certiorari and vacated the *en banc* court's decision on the issue of laches, but did not address its decision regarding equitable estoppel. 580 U.S. at 333 n.2, 346. Thus, the three-judge panel's treatment of equitable estoppel in *SCA Hygiene* remains good law.

There is no dispute that Fraunhofer was aware that, to successfully launch the accused XM DARS System, SXM needed access to the technology claimed in the asserted patents. Indeed, it required SXM to obtain a sublicense to those patents from WorldSpace before that system could be developed. *See* J.A. 1707. There is also no dispute that Fraunhofer itself assisted in SXM's development of the accused system. J.A. 441 (Fraunhofer's complaint alleging that "Fraunhofer built the infringing aspects of the XM DARS System at the request of [SXM] using the technologies covered by the [asserted patents]"). Thus, at all relevant times, Fraunhofer knew that aspects of the XM DARS System, which it helped build and which commercially launched in 2001, may infringe the asserted patents. Further still, Fraunhofer publicly touted its involvement in the development of that system for years to come. *See* J.A. 6104 (Fraunhofer's 2011 Annual Report noting that examples of its satellite-based communication systems "include the successful Sirius XM satellite radio system"); J.A. 4022 (designated confidential). But, despite that knowledge, Fraunhofer did not raise to SXM any issue of the XM DARS System's potential infringement of the asserted patents for more than five years after it argues any rights SXM had in the asserted patents had lapsed.

Accepting Fraunhofer's—the nonmoving party's—view of the facts, it was entirely reasonable for SXM to infer that Fraunhofer would not bring a claim that the XM DARS System infringed the accused patents. Not only did Fraunhofer know, since as early as 1998, that the accused system incorporated features that allegedly infringe the asserted patents, Fraunhofer itself *built* those allegedly infringing features. And if we accept Fraunhofer's view that all parties knew that any rights SXM had in the asserted patents were "derivative of" the rights granted from Fraunhofer to WorldSpace in the Master Agreement, such that "termination" of the Master Agreement in 2010 stripped SXM of any of its rights to the patents, *see* J.A. 441 (a disputed fact we

need not resolve here), then the more-than-five-year delay in raising the issue of SXM's potential infringement rises to the level of misleading conduct. *See High Point*, 817 F.3d at 1331 (concluding that patent owner's silence amounted to misleading conduct where the patent owner had actively engaged in building the accused system).

We are unpersuaded by Fraunhofer's argument that the "most plausible" explanation for its silence between 2010 and 2015 was that the parties' collaboration was substantially complete by 2010. *See* Fraunhofer Br. 26. Regardless whether that is true, it is beside the point. That the collaboration was substantially complete in 2010 does not explain why Fraunhofer, which at that time believed it was the only party with any rights to the asserted patents, did not question for five years SXM's continued use of the XM DARS System, a system that it not only helped build, but that it *knew* incorporated the allegedly infringing features and was in widespread commercial use.

We therefore agree with the district court's conclusion that Fraunhofer's more-than-five-year silence in asserting infringement, in light of its clear knowledge of that infringement, rose to the level misleading conduct.

B. Reliance

To satisfy the second requirement of equitable estoppel, SXM must show that it, in fact, substantially relied on the misleading conduct of Fraunhofer in connection with taking some action. *See Aukerman*, 960 F.2d at 1042–43. To show reliance, SXM must have had a relationship or communication with Fraunhofer that "lull[ed]" it into a "sense of security" in continuing its use of the accused XM DARS System. *Id.*

SXM argues that "Fraunhofer's misleading silence and conduct lulled SXM into continuing to use the [accused] high-band system, expanding its high-band business, migrating its low-band business to the high-band system, and

stopping development and marketing of its non-infringing low-band system." SXM Br. 38. It further suggests that its reliance on Fraunhofer's misleading conduct is evidenced by its "fail[ure] to take actions limiting its exposure, such as seeking a license." *Id.* at 38 n.7. Accordingly, in SXM's view, had it known that Fraunhofer would raise claims of infringement, it would have opted to migrate car manufacturers to the non-infringing low-band alternative or otherwise sought additional protections against patent infringement. In that way, SXM argues that the district court correctly determined that there is no genuine dispute that SXM relied on Fraunhofer's misleading conduct. *Id.* at 39 (citing *High Point*, 817 F.3d at 1331, and *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1064 (Fed. Cir. 1995)). But viewing the evidence in the light most favorable to Fraunhofer, we do not agree.

SXM is correct that, to show reliance on Fraunhofer's silence, SXM "need not prove precisely what alternative paths it would have taken, or that every marketing decision was based on reliance" on Fraunhofer's misleading conduct. *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1312 (Fed. Cir. 2010). But SXM must nevertheless establish that it at least *considered* Fraunhofer's silence or inaction and that such consideration influenced its decision to migrate to the accused high-band system. *See id.* (affirming grant of summary judgment where it was undisputed that the accused infringer "took into account" the patent owner's failure to pursue the asserted patent when the parties had discussed potential infringement of two other patents); *SCA Hygiene*, 767 F.3d at 1351 (noting that accused infringer's testimony that it "would not have made certain capital investments had it been involved in an earlier lawsuit over the [accused] products" did "not necessarily establish that [the accused infringer] expanded its business *after considering the implications* of [the patent owner]'s silence" (emphasis added)).

Here, as Fraunhofer points out, an SXM representative testified that the impetus for pursuing the accused XM DARS System over the non-infringing low-band alternative was not that SXM took Fraunhofer's silence as acquiescence of SXM's continued use of the patented technology, but that the XM DARS System had greater market penetration and was the easier business choice:

> Q. Okay. And can you summarize why the decision was made to migrate to the high band?
>
> A. I think it boils down to both systems were equivalent. No marked differentiation between the two when it came to service availability, consumer acceptance, whether it's audio quality, number of channels, any of those things. It really boiled down to: Which is the easiest population to migrate? And it was easier to move the 35 percent to the 65 percent than the reverse. It really boiled down to that.

J.A. 1851; *see also* J.A. 1852 (confirming on redirect that the decision to migrate to the high-band system, "had nothing to do with the technology"). As in *SCA Hygiene*, that testimony does not "necessarily establish" that SXM opted to migrate its systems to the accused XM DARS System in reliance on Fraunhofer's silence. 767 F.3d at 1351; *see also Hemstreet v. Comput. Entry Sys. Corp.*, 972 F.2d 1290, 1294–95 (Fed. Cir. 1992) (reversing summary judgment where "there [was] a total absence in the record of any showing by [the accused infringer] that its activities were *in reliance upon* supposed actions of [the patent owner], rather than a business judgment of its own"). Thus, the evidence introduced by SXM does not indisputably establish that it relied on Fraunhofer's silence in making its business decisions.

We are further unpersuaded by SXM's position that it would have taken steps to limit its liability, "such as seeking a license," had it been threatened with litigation. SXM

Br. 38 n.7. To support that argument, SXM merely cites the various agreements at issue in *this* litigation (*e.g.*, its sublicense agreement with WorldSpace, the FFPC with Fraunhofer). But none of those agreements reasonably establishes SXM's broader proposition that it "continuously sought to ensure it had licenses to intellectual property," such that, had it known it was exposed to litigation, it would have sought additional protection against the asserted patents. SXM Br. 38 n.7. That evidence, viewed in the light most favorable to Fraunhofer, does not establish SXM's theory of reliance here. There may have been sufficient circumstantial evidence to permit a factfinder to find reliance,[4] but the existing record does not compel such a finding as required for summary judgment.

Summary judgment was therefore improper, as SXM has not established through undisputed evidence that it relied on Fraunhofer's misleading conduct. Although the matter is not entirely clear, we decline to go so far as to affirmatively conclude at this stage, when all the facts may not be known to us, that there is insufficient evidence through which SXM could make that showing. *See Hemstreet*, 972 F.2d at 1295.

C. Prejudice

Despite having already concluded that summary judgment was inappropriate, we nevertheless address the third and final requirement of equitable estoppel—prejudice. To satisfy this element, SXM must establish that "[d]ue to its

---

[4] *See, e.g.*, *Moleculon Rsch. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("It is hornbook law that direct evidence of a fact is not necessary. 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" (quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960))).

Case: 23-2267 Document: 49 Page: 14 Filed: 06/09/2025



reliance, [it] will be materially prejudiced if [Fraunhofer] is allowed to proceed with its claim." *Aukerman*, 960 F.2d at 1028, 1041. That is, SXM must establish that there is a nexus between the alleged prejudice and its reliance on Fraunhofer's misleading conduct. *See ABB*, 52 F.3d at 1065 ("[C]ases in which economic prejudice has been found lacking did not so hold because of a lack of capital investments, but, rather, because the alleged infringer failed to prove that their increased expenditures . . . were in any way related to actions taken by the patentee."). Accordingly, because SXM has not presented undisputed evidence of its reliance, SXM necessarily cannot establish that it would be prejudiced by that reliance at this stage. *See SCA Hygiene*, 767 F.3d at 1350 ("There is a difference between prejudice that *results from* a patentee's alleged misrepresentation and prejudice caused by *reliance upon* it.").

However, we agree with the district court that, if SXM can establish at trial that it relied on Fraunhofer's misleading conduct in reaching its decision to migrate to the accused high-band system, then there is no genuine dispute of material fact that SXM was prejudiced by that reliance. *See Decision*, at *4. The undisputed evidence is clear that SXM made a business decision to migrate to the accused high-band system while simultaneously deciding to "set aside further efforts on the low-band system." *See* J.A. 1841–42. That decision, made in the face of a viable non-infringing alternative, is sufficient to establish prejudicial reliance. *See Aspex*, 605 F.3d at 1312 ("Clariti's development of its AirMag® business, in reliance on Aspex's silence . . . represents a significant change in economic position and constitutes material prejudice sufficient to support equitable estoppel.").

Fraunhofer's attempt to generate disputes of material fact regarding whether the low-band system was a "viable" non-infringing alternative is unpersuasive. In support of its position, Fraunhofer cites testimony of SXM's corporate representative explaining that replacing low-band

receivers with high-band receivers was an "ugly" approach. *See* Fraunhofer Br. 40 (citing J.A. 4355). But the cited testimony only supports the notion that it would have been impracticable for SXM to replace existing low-band receivers in consumers' vehicles with the accused high-band system. As the evidence shows, and Fraunhofer concedes, instead of replacing any receivers in any vehicles, SXM made the decision to migrate to the high-band system in new vehicles, while maintaining operability of the low-band system in existing vehicles—a process that took nearly a decade to complete. *See* J.A. 4359; Fraunhofer Br. 9. None of that evidence suggests that, at the time SXM had to make its decision about how to handle the two incompatible systems, SXM could not have chosen to migrate to the non-infringing low-band system. Indeed, we see no evidence that contradicts the testimony of SXM's representative that that decision had all to do with business pragmatics and nothing to do with inadequacies in the low-band technology. J.A. 1851–52.

Accordingly, should SXM be able to establish at trial that it relied on Fraunhofer's misleading conduct in connection with its decision to migrate to the accused high-band system as opposed to the non-infringing low-band alternative, then it has adequately established that it was prejudiced by that silence. But unless SXM makes that threshold showing of reliance, its defense of equitable estoppel must fail.

## II

Before closing, we briefly address Fraunhofer's request that we should not only reverse the grant of summary judgment, but also find that summary judgment should affirmatively be granted for Fraunhofer on SXM's equitable estoppel defense. Fraunhofer Br. 18, 52–54; Fraunhofer Reply Br. 25–28. Fraunhofer, in essence, requests that we review, in the first instance, the merits of its cross-motion for summary judgment, *see* J.A. 1523–45, a motion that

was rendered moot by the district court's judgment, *see Decision*, at *4, and that would require us to shift the burdens and review the facts in a different light. We are an appellate court; we review only the judgments before us, and so we decline to consider Fraunhofer's request.

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. For the foregoing reasons, the district court's grant of summary judgment in favor of SXM dismissing all claims as equitably estopped is reversed. Upon remand, the district court is to consider, as appropriate, the parties' remaining motions for summary judgment.

**REVERSED**